Robert W. Norman, Jr. (SBN 232470)
Timothy A. Schneider (SBN 300816)
HOUSER LLP
9970 Research Drive
Irvine, California 92618
Telephone: (949) 679-1111
Facsimile: (949) 679-1112
E-Mail: tschneider@houser-law.com

Attorneys for Defendants, PHH MORTGAGE CORPORATION, NOW KNOWN AS ONITY MORTGAGE CORPORATION and HSBC BANK USA, NATIONAL ASSOCIATION, AS TRUSTEE FOR DEUTSCHE ALT-A SECURITIES MORTGAGE LOAN TRUST, SERIES 2006-AR2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| CORY MAYER,<br><br>　　　　Plaintiff,<br><br>　　　vs.<br><br>DEUTSCHE ALT A SECURITIES MORTGAGE LOAN TRUST SERIES 2006-A; PHH MORTGAGE CORPORATION; WESTERN PROGRESSIVE, LLC; DOES 1-20; and all persons unknown claiming any interest in the property, inclusive, and DOES 1 through 50, inclusive,<br><br>　　　　Defendants. | CASE NO.:  5:25-cv-00182-NW<br><br>**DECLARATION OF TIMOTHY A. SCHNEIDER IN SUPPORT OF DEFENDANTS PHH MORTGAGE CORPORATION, NOW KNOWN AS ONITY MORTGAGE CORPORATION AND HSBC BANK USA, NATIONAL ASSOCIATION, AS TRUSTEE FOR DEUTSCHE ALT-A SECURITIES MORTGAGE LOAN TRUST, SERIES 2006-AR2 NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT TO PLAINTIFF CORY MAYER'S FIRST AMENDED COMPLAINT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF THE ISSUES**<br><br>Date:　　　　July 15, 2026<br>Time:　　　　9:00 a.m.<br>Judge:　　　Noel Wise<br>Courtroom:　3, 5th Floor<br>Place:　　　280 South 1st Street<br>　　　　　　San Jose, California 95113 |

1
DECLARATION OF TIMOTHY A. SCHNEIDER

## DECLARATION OF TIMOTHY A. SCHNEIDER

I, Timothy A. Schneider, hereby declare as follows:

1. I am an attorney licensed to practice law in the State of California, the U.S. District Court for the Northern District of California, and other courts, and am employed by the law firm of Houser LLP, counsel of record for defendants PHH Mortgage Corporation, now known as Onity Mortgage Corporation ("PHH"), and HSBC Bank USA, National Association, as trustee for Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR2 ("HSBC, as Trustee," and together with PHH, the "Defendants") herein. I have personal knowledge of the facts set forth herein and if called as a witness could and would competently testify as to those facts.

2. I make this declaration based upon my personal knowledge and my review of the documents exchanged and/or produced in this case.

3. On or about April 1, 2025, Plaintiff Cory Mayer ("Plaintiff") served "initial disclosures pursuant to Rule 26." Attached as **Exhibit 10** is a true and accurate copy of Plaintiff's Initial Disclosures.

4. Plaintiff has not served any amended or supplemental initial disclosure pursuant to Federal Rule of Civil Procedure, Rule 26.

5. On or about August 1, 2025, Plaintiff served verified "Responses to Defendant PHH Mortgage Corporation's Interrogatories to Plaintiff Cory Mayer, Set One." Attached as **Exhibit 11** is a true and accurate copy of Plaintiff's Responses to Defendant PHH Mortgage Corporation's Interrogatories to Plaintiff Cory Mayer, Set One.

6. The deposition of Plaintiff Cory Mayer in this matter was conducted on February 11, 2026. I conducted the deposition and have reviewed the testimony Plaintiff provided during his deposition given in this case. The time period under Federal Rule of Civil Procedure, Rule 30(e) has passed and Plaintiff Cory Mayer has not made any changes or edits to the transcript. Attached as **Exhibit 12** is a true and accurate copy of the title page, relevant pages of the transcript, and relevant exhibits from the deposition.

7.     The deposition of non-party Hillary Hamilton in this matter was conducted on February 12, 2026. I conducted the deposition and have reviewed the testimony non-party Hillary Hamilton provided during her deposition given in this case. The time period under Federal Rule of Civil Procedure, Rule 30(e) has passed and non-party Hillary Hamilton has not made any changes or edits to the transcript. Attached as **Exhibit 13** is a true and accurate copy of the title page, relevant pages of the transcript, and relevant exhibits from the deposition.

8.     The deposition of non-party Christopher Mayer in this matter was conducted on February 12, 2026. I conducted the deposition and have reviewed the testimony non-party Christopher Mayer provided during his deposition given in this case. The time period under Federal Rule of Civil Procedure, Rule 30(e) has passed and non-party Christopher Mayer has not made any changes or edits to the transcript. Attached as **Exhibit 14** is a true and accurate copy of the title page, relevant pages of the transcript, and relevant exhibits from the deposition.

9.     The deposition of non-party Helen Mayer in this matter was conducted on February 12, 2026. I conducted the deposition and have reviewed the testimony non-party Helen Mayer provided during her deposition given in this case. The time period under Federal Rule of Civil Procedure, Rule 30(e) has passed and non-party Helen Mayer has not made any changes or edits to the transcript. Attached as **Exhibit 15** is a true and accurate copy of the title page, relevant pages of the transcript, and relevant exhibits from the deposition.

10.     On January 9, 2026, Defendants' counsel Hinshaw & Culbertson LLP served a SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION on Argus Home Loans Incorporated that requested documents related to Plaintiff's efforts to refinance. The subpoena to Argus Home Loans Incorporated demanded production on or before January 30, 2026. Defendants provided one extension to Argus Home Loans Incorporated until February 4, 2026 to provide responses and documents to the subpoena. Argus Home Loans Incorporated did not provide responses or documents to the subpoena. Defendants filed a Joint Statement on February 20, 2026 where Plaintiff's counsel acknowledged he represented Argus Home Loans and that the documents will be ready for production "in the next week or so" (ECF 139). The Magistrate Judge issued an Order on Discovery Disputes,

including ECF 139, on March 11, 2026 (ECF 149). The Magistrate Judge issued a Corrected Order on Discovery Disputes, including ECF 139, on March 11, 2026 (ECF 150). The Magistrate Judge ordered: "If the documents have not yet been produced, they are to be produced within three (3) business days of the date of this Order." Defendants have not received any documents or responses from Argus Home Loans. Attached as **Exhibit 16** is a true and accurate copy of March 11, 2026 Corrected Order on Discovery Disputes.

11. On February 17, 2026, Defendants' counsel Hinshaw & Culbertson LLP filed a Joint Statement concerning Plaintiff's discovery responses (ECF 134). The Magistrate Judge issued a Discovery Order re Dkt. 134 on March 3, 2026 (ECF 148, 148-1). The Magistrate Judge ordered that Plaintiff's supplemental production of documents and verified supplemental interrogatory responses, where ordered, are to be served no later than March 10, 2026. The Magistrate Judge ordered, in part: "Accordingly, Plaintiff's complete application for refinancing, including from 2020 to present, including ALL supporting documents submitted therewith, including tax returns, are relevant and proportional to the needs of the case. Similarly, all documents submitted in support of any credit application from 2020 to present, including tax returns, are relevant and proportional to the needs of the case. All such documents in Plaintiff's custody and control must be produced." Defendants have not received any documents of Plaintiff's complete application for refinancing, credit application, or supporting documents as required by the Magistrate Judge's March 3, 2026 order (ECF 148, 148-1). Attached as **Exhibit 17** is a true and accurate copy of March 11, 2026 Discovery Order.

12. On December 16, 2025, the Magistrate Judge held a Discovery Hearing via Zoom (ECF 86). During that hearing, the Magistrate Judge advised Plaintiff's counsel nine times during a December 16, 2025 hearing that the discovery he was seeking was not proportional to the needs of the case. Attached as **Exhibit 18** is a true and accurate copy of the title page, and relevant pages of the transcript from the December 16, 2025 Discovery Hearing.

13. On February 19, 2026, the Magistrate Judge held a Discovery Hearing via Zoom (ECF 135). During that hearing, the Magistrate Judge stated: Excuse me, Mr. Christensen. This case is not that complicated. It's a breach of contract case, and there's a -- there is -- by Plaintiff's own allegations, there's a significant paper trail which Plaintiff has." Attached as **Exhibit 19** is a true and accurate

copy of the title page, and relevant pages of the transcript from the February 19, 2026 Discovery Hearing.

14.    Plaintiff submitted twenty-five discovery statements to the Court (ECF 35, 45, 47, 62-65, 68-70, 73, 76, 84, 90-92, 97, 116, 126-130, 142, 144) and five motions for relief from discovery orders – all of which were denied (Motions, ECF 106-108, 151, 153; Orders, ECF 111, 152, 155. The Court denied a number of the joint statements for Plaintiff's failure to comply with the Court's rules, others were unnecessary or moot because Defendants agreed to provide amended responses or documents prior to the filing of the joint statement, and another handful on other grounds such as proportionality (ECF 46, 55, 77, 81-82, 87, 93, 95, 98, 117, 150).

15.    Plaintiff and Defendants attended an in-person mediation with Judge Evelio Grillo on March 9, 2026 in Oakland, California. The parties did not reach a resolution at the mediation. The parties continued settlement discussions with the assistance of Judge Evelio Grillo following the mediation. The parties have not reached a resolution.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 22nd day of May, 2026, at Upland, California.

_____
Timothy A. Schneider

5
DECLARATION OF TIMOTHY A. SCHNEIDER

# EXHIBIT 10

Andrew J. Christensen (SBN: 260748)
Law Offices of Andrew J. Christensen, P.C.
2063 Mountain Blvd. Suite 2
Oakland, CA 94611
Tel: (510) 761-7183
Fax: (510) 680-3430
Andrew@CaliforniaHomeLawyer.com

Pamela D. Simmons #160523
Law Office of Simmons & Purdy
2425 Porter Street, Suite 10
Soquel, CA 95073
Tel: (831) 464-6884
Fax: (831) 464-6885
E-mail: pamela@pamelaw.com

Attorneys for Plaintiff
Cory Mayer

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| Cory Mayer,<br>             Plaintiff,<br>       v.<br>DEUTSCHE ALT A SECURITIES<br>MORTGAGE LOAN TRUST SERIES<br>2006-A.;<br>PHH MORTGAGE CORPORATION;<br>WESTERN PROGRESSIVE, LLC;<br>DOES 1-20; and all persons unknown<br>claiming any interest in the property,<br>inclusive and DOES 1 through 50,<br>inclusive,<br>             Defendants. | CASE NO.:  5:25-cv-00182-NW<br>Unlimited Jurisdiction<br><br>**Plaintiffs' Initial Disclosures**<br><br>Honorable Judge Noël Wise<br>Action Filed: August 9, 2024<br>Trial Date: None |

Plaintiff makes these initial disclosures pursuant to Rule 26. Plaintiff does not waive any privilege and reserves the right to supplement these disclosures.

## 1. **DOCUMENTS**

Plaintiff's documents to support his claims include correspondence with Defendants, including emails between counsel for Plaintiff and Defendant, letters, statements, notices and the settlement agreement.  Plaintiff has financial records proving his payments and credit reports. All of these records are with Plaintiff's counsel.

Mortgage refinancing documents support Plaintiff's claim for damages and are in the

-1-

EXHIBIT 10
PAGE 1 OF 4

possession of Phillip Lewis at Argus Mortgage.

## 2. WITNESSES

The following witnesses may have information relevant to the claims and defenses in this case:

Cory Mayer, plaintiff, about most of the facts of the case and damages.

Hillary Hamilton, Plaintiff's wife, has information regarding his emotional distress damages.

Chris Mayer: Plaintiff's father has information regarding his emotional distress damages.

Helen Mayer: Plaintiff's mother has information regarding his emotional distress damages.

Kimberly Mayer: Plaintiff's sister has information regarding his emotional distress damages

Pamela Simmons, Bill Purdy, Brian Paino: these attorneys for Plaintiff and Defendant have information about the communications between them before and after the 2020 settlement, including about payments being rejected and the loan not being reinstated.

Phillip Lewis at Argus Mortgage has information about Plaintiff's attempts to refinance showing that the failure of refinancing was caused by Defendants' wrongdoing.

## 3. DAMAGES

Plaintiffs damages are as follows:

Damages from the inability to refinance his home:  Not less than $500,000, as will be the subject of expert witness testimony at trial, which is the difference between what he will pay over the life of the loan at the higher rates he is stuck with currently compared to the low rates he could have qualified for in refinancing after the 2020 settlement but for the wrongdoing of Defendants rejecting his payments and not reporting him current on his payments.  This is usually calculated by the net present value of the stream of payments under his current loan over the life of the loan, and the net present value of the stream of payments he could have made at the lower rates he could have obtained.  At this time Plaintiff does not have all the information for calculating this claim but will supplement when he has obtained it.

Interest on the loan from 2020 to present:  no interest accrues on the loan from the time they failed to accept installment payments. The amount will be calculated by an expert witness at trial based on the loan documents and payment histories. This amount is accruing and ongoing. This may

-2-

EXHIBIT 10

PAGE 2 OF 4

be calculated with a reinstatement quote or payoff quote and using amortization schedules to add up the interest that has accrued.

Loss of Credit Expectancy: Not less than $50,000 for the harm to his credit score and the inability to get credit. This will be the subject of expert witness testimony and is based on industry standard practices for calculating these types of damages.

Loan fees and charges before 2020 settlement: Defendants were obligated to waive certain fees and costs in the 2020 settlement agreement, but they failed to do so. These amounts will be calculated from the loan transaction histories and related records once they are obtained in discovery.

Late fees and foreclosure related charges and any other fees and costs associated with being in default from 2020 to present that accrued and were charged to the loan that would not have been incurred had Defendant's properly applied the funds to the loan and accepted Plaintiff's payments. These will be calculated by Defendants' records once they are obtained in discovery.

Emotional Distress Damages:  not less than $300,000 on account of the stress caused by the wrongdoing and the threat and fear of losing the house to foreclosure. This led Plaintiff to believe he was having heart attacks several times, and the stress caused severe anxiety causing serious harm in his family and personal life, including leading to him separating from his wife.

Punitive Damages: as determined by the jury but should be a multiple of the actual damages and attorney's fees in this case, for a total of no less than $6 million.

Attorney's fees and costs will be recovered under statute and contract and are damages for slander of title. The amount will be proven at trial or by post-trial motion based on the fees and costs incurred.

DATED:  April 1, 2025

/s/ Andrew J. Christensen

_____
Andrew J. Christensen
Attorney for Plaintiff
Cory Mayer

-3-

EXHIBIT 10
PAGE 3 OF 4

Cory Mayer v. DEUTSCHE et. al.
CASE NO.: 5:25-cv-00182-BLF

**PROOF OF SERVICE**

I, Andrew J. Christensen, declare that I am a citizen of the United States, over 18 years of age, employed in Alameda County, and not a party to the within action. My business address is 2063 Mountain Blvd. Suite 2, Oakland, CA 94611.

On April 1, 2025, I served the following document(s) on the parties listed below by email.

**Plaintiffs' initial disclosures.**

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on the following date at Oakland, California.

Dated:  April 1, 2025           Andrew J. Christensen
                                Andrew J. Christensen

| **By Email:** | |
| --- | --- |
| Brian A. Paino (SBN 251243) bpaino@hinshawlaw.com Helen Mosothoane (SBN 254511) hmosothoane@hinshawlaw.com HINSHAW & CULBERTSON LLP 350 South Grand Ave., Suite 3600 Los Angeles, CA 90071-3476 Telephone: 213-680-2800 Facsimile: 213-614-7399 | Attorneys for Defendants PHH MORTGAGE CORPORATION and HSBC BANK USA, NATIONAL ASSOCIATION, AS TRUSTEE FOR DEUTSCHE ALT-A SECURITIES MORTGAGE LOAN TRUST, SERIES 2006-AR2 |

Plaintiffs' Notice and Motion1 5:25-CV-00182-BLF

EXHIBIT 10
PAGE 4 OF 4

# EXHIBIT 11

Andrew J. Christensen (SBN: 260748)
Law Offices of Andrew J. Christensen, P.C.
2063 Mountain Blvd. Suite 2
Oakland, CA 94611
Tel: (510) 761-7183
Fax: (510) 680-3430
Andrew@CaliforniaHomeLawyer.com

Pamela D. Simmons #160523
Law Office of Simmons & Purdy
2425 Porter Street, Suite 10
Soquel, CA 95073
Tel: (831) 464-6884
Fax: (831) 464-6885
E-mail: pamela@pamelaw.com

Attorneys for Plaintiff
Cory Mayer

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| Cory Mayer,<br><br>                Plaintiff,<br><br>      v.<br><br>DEUTSCHE ALT A SECURITIES MORTGAGE LOAN TRUST SERIES 2006-A.;<br>PHH MORTGAGE CORPORATION;<br>WESTERN PROGRESSIVE, LLC; DOES 1-20; and all persons unknown claiming any interest in the property, inclusive and DOES 1 through 50, inclusive,<br><br>                Defendants.. | CASE NO.: 5:25-cv-00182-NW<br>Unlimited Jurisdiction<br><br><br>**RESPONSES TO DEFENDANT PHH MORTGAGE CORPORATION'S INTERROGATORIES TO PLAINTIFF CORY MAYER, SET ONE** |

PROPOUNDING PARTY:    PHH MORTGAGE CORPORATION

RESPONDING PARTY:    CORY MAYER

SET NO.:    One

Cory Mayer ("Responding Party") hereby submits the following responses to Interrogatories, Set One propounded by PHH MORTGAGE CORPORATION ("Propounding Party").

-1-

EXHIBIT 11
PAGE 1 OF 27

**RESPONSES TO REQUESTS FOR INTERROGATORIES**

**INTERROGATORY NO. 1: IDENTIFY ALL** addresses where **YOU** have resided since March 1, 2006, including the dates YOU resided at each of those addresses.

**RESPONSE TO INTERROGATORY NO. 1:** 8650 Hihn Road, Ben Lomond, CA.


**INTERROGATORY NO. 2: IDENTIFY ALL PERSONS** having knowledge of any of the facts, occurrences, and matters set forth in **YOUR COMPLAINT** and include the substance of the knowledge possessed by each such **PERSON**.

**RESPONSE TO INTERROGATORY NO. 2:**

Cory Mayer, plaintiff, about most of the facts of the case and damages.

Hillary Hamilton, Plaintiff's wife, has information regarding his emotional distress damages.

Chris Mayer: Plaintiff's father has information regarding his emotional distress damages.

Helen Mayer: Plaintiff's mother has information regarding his emotional distress damages.

Kimberly Mayer: Plaintiff's sister has information regarding his emotional distress damages.

Pamela Simmons, Bill Purdy, Brian Paino, Brian Liddicoat: these attorneys for Plaintiff and Defendant have information about the communications between them before and after the 2020 settlement, including about payments being rejected and the loan not being reinstated.

Phillip Lewis at Argus Mortgage has information about Plaintiff's attempts to refinance showing that the failure of refinancing was caused by Defendants' wrongdoing.

Ken Pittman at Argus Home Loans has information about refinancing.

Michelle Pappas at First American Title regarding opening of escrow for the refinancing.

-2-

EXHIBIT 11
PAGE 2 OF 27

**INTERROGATORY NO. 3: IDENTIFY** each provision of the **LOAN DOCUMENTS YOU** contend **DEFENDANTS** breached.

**RESPONSE TO INTERROGATORY NO. 3:**  Defendants breached the following sections of the Adjustable Rate Note: section 3(A) regarding the amount and receipt and application of payments; 3(C) regarding payment changes; 4(F) regarding notice, section 7 regarding failure to pay as required and loan charges;  section 8 regarding notices; in the Interest-Only Addendum to Adjustable Rate Promissory Note section 3(A) regarding payments.

Defendants violated the following provisions of the deed of trust: uniform covenant 1 regarding accepting and rejecting payments; uniform covenant 2 regarding application of payments; uniform covenant 3 regarding funds for escrow items; covenant 9 regarding protection of lender's interests; covenant 14 regarding loan charges; covenant 15 regarding notice.

**INTERROGATORY NO. 4:** Describe with specificity the steps **YOU** have taken to refinance the **LOAN** since January 1, 2020.

**RESPONSE TO INTERROGATORY NO. 4:** Responding Party had discussions with a loan broker at the beginning of 2020 while negotiating the settlement to determine what was needed to complete refinancing after the settlment. Based on these discussions, Responding Party required the terms in the settlment agreement requiring the credit reporting in a manner that would allow him to qualify for refinancing the loan after the settlment so he could get away from PHH who had been so terrible to him in rejecting payments.   Responding Party worked to get refinancing in 2020 and 2021 and 2024 with Philip Lewis of Financial Strategies located at 621 Capitola Ave Capitola Ca 95010 w. 831.476.6331, and a company called Argus Home Loans.  Responding Party submitted financial information several times in the process

EXHIBIT 11
PAGE 3 OF 27

of applying for the loan, including, but not limited to n September 2020, October 2020, November 2020, March 2021, June 2021, October 2021, November 2021. Responding Party submitted approximately four loan applications over several years in an attempt to refinance. Responding Party communicated with the brokers through emails and phone calls. Responding Party has produced emails with Mr. Lewis during this process. An appraisal and credit reports were obtained. Responding Party applied through lender A&D Mortgage LLC. Loan application documents were exchanged on a platform called docmagic. They opened escrow with First American Title, with Michelle Pappas. Ms. Pappas pulled a title report. Responding Party would have been approved for the lowest rates at the time in mid 2020 in the range of 1.9%, but Philip Lewis informed Responding Party that because the credit report in September 2020 showed a payment was 60 days late that it disqualified him from obtaining refinancing based on the lender's guidelines and that submitting Responding Party's application to the lenders would result in a rejection. That was the reason that the refinance failed. In November 2021 his broker Philip Lewis suggested that Responding Party seek private equity loans because of the inability to qualify for conventional financing because of PHH's failure to accept payments or report on time payments to the credit. That alternative credit would be far more expensive.

**INTERROGATORY NO. 5: IDENTIFY** each **COMMUNICATION** made by **DEFENDANTS** since May 1, 2020, upon which **YOU** relied to **YOUR** detriment.

**RESPONSE TO INTERROGATORY NO. 5:** Responding Party objects that this request is burdensome and not proportional to the needs of the case. Responding Party relied on the many statements by phone and email of Defendants' counsel Brian Paino from January 2020 to the time of the filing of the complaint regarding the parties' efforts to resolve the matter. Plaintiff is producing these emails in discovery and the burden of identifying each email from Paino to Responding Party's counsel Pamela

-4-

EXHIBIT 11
PAGE 4 OF 27

Simmons is the same for both parties and therefore Plaintiff refers Defendants to these emails produced.

A few examples of these are that on November 30, 2020, Mr. Paino responded to Ms. Simmons that he knew the reinstatement had not occurred, but he was working on it. Mr. Paino stated that "based on my review of the account history, I believe that the issues stem from the way the reinstatement payment was applied…" Mr. Paino further wrote "…in looks like the escrow advance balance was not zeroed out upon the application of the reinstatement funds which caused a new escrow analysis to be conducted in order to collect the remaining escrow deficiency. To address this, I have asked PHH to reverse the reinstatement payment and reapply it retroactively to the amounts that were due as of the "good-through-date." He then stated that "[a]t this point I'm a little hesitant to send in the check you provided as it may compound the account issues."

Mayer's counsel Ms. Simmons has regularly contacted Mr. Paino, who has been unable to rectify the issues. For the next several years, counsel for Plaintiff and counsel for Defendants regularly were in contact about trying to fix the problem, with Mayer's counsel offering to pay and tendering payments, and Mr. Paino assuring Mayer's attorney that PHH was making headway on implementing the Settlement Agreement.

The following are a few examples of dozens of communications over several years: On May 13, 2021, Simmons sent a follow up email stating Mayer was ready to refinance to pay off the entire loan if PHH would simply accept the payments she was tendering and honor the settlement agreement. Simmons asked about PHH's progress. On that same day Paino emailed Simmons "I believe we're close. The account is now showing as due for February 1, 2020, and I just received an update that further adjustments are being made that should bring the account due for the June 1, 2020 payment. Did you hear anything from your client on the tax payments?"

On June 25, 2021, Paino emailed Simmons "I received a payoff quote and reinstatement quote from PHH, but noticed discrepancies between the two quotes

EXHIBIT 11
PAGE 5 OF 27

related to escrow balances, so I asked the client for an explanation of the discrepancies." Paino emailed Simmons on July 30, 2021, that he had a call with his client about the proposals for paying a discounted amount to satisfy the loan and discusses options for working out a deal. On October 31, 2021, Paino emailed Simmons that "I am still waiting for an update from my client and don't have much to report" and goes on to suggest alternate arrangements to enable refinancing to pay off the entire loan. There are many dozens of similar emails between the parties over the next several years between the 2020 settlement and the 2024 motion to enforce the settlement agreement. Mayer relied upon the representations of PHH's counsel that they were working to correct the issues and reinstate the loan. This includes the declarations and information contained in Defendants' oppositions to the first motion to enforce the settlement agreement.

Shortly after Responding Party filed the first motion to enforce the settlment agreement Defendants filed an opposition and a declaration claiming that the $158,125.89 reinstatement amount had been properly applied to the loan, that the unpaid principal amount was correct and that loan was due for the June 2020 payment, and that the credit reporting had been done timely in June 2010. On January 6, 2022, Mayer withdrew his motion to enforce in reliance on these representations by Defendants and further representations by counsel on the phone and by email that they were working out the numbers to fix the escrow issue so Mayer could send the payments.

In January 2022 shortly after the First Motion to Enforce, PHH's counsel Mr. Paino again was in email contact with Mayer's counsel about efforts to work out the issues so that PHH would start accepting payments and stop wrongfully paying property taxes in advance and requested that PHH send all monthly mortgage statements from January 2020 to present to figure out what needed to be changed to get the loan sorted out on reinstating the escrow and fee issues.

During 2020 to 2024 PHH sent monthly billing statements that included loan

-6-

EXHIBIT 11
PAGE 6 OF 27

transaction histories indicating that PHH made several attempts to reverse the application of the $158,125.89 reinstatement amount and reapply the payments to the loan. PHH has reversed the entire reinstatement amount off the loan and attempted to reapply the funds to the loan no less than four times since 2020.  Each time the funds were applied in different ways in different amounts, none of which were correct. However, Mayer waited for PHH to work out the problem based on PHH's representations, and paid his mortgage payments to his attorney's trust account and his attorney diligently kept in contact with PHH's attorney to find out the status of the efforts to apply the payments correctly and constantly tendering payments, stating Mayer is ready, willing, and able to pay the full amount of principal and interest installments due after the settlement and to pay all property taxes that PHH wrongfully paid in advance of the due dates.  Mayer relied on the actions and billing statements and information from PHH's counsel Brian Paino from 2020 through 2024 in deciding not to bring suit during that time because Mayer believed Paino's and PHH's representations that PHH was working it out and would get it fixed.

**INTERROGATORY NO. 6:** Describe with specificity how the conduct of **DEFENDANTS** caused **YOU** to suffer a "loss of credit expectancy," as alleged in Paragraph 57 of the **COMPLAINT**.

**RESPONSE TO INTERROGATORY NO. 6:** As a proximate result of Defendants' failing to properly report to his credit pursuant to the settlement agreement, and the failure to send billing statements, and the failure to send Plaintiff the UDF forms as required by the settlement agreement, Plaintiff was unable to refinance.  Plaintiff was waiting to receive the UDF forms so he could then pull his credit and close on refinancing when his credit was good because he knew he would not be able to qualify if his credit showed his loan was not paid timely.  Plaintiff waited months for the UDF forms or notice that Defendant had reported to his credit. During that time he did not receive billing statements. Plaintiff finally applied for financing later in 2020 only to

-7-

EXHIBIT 11
PAGE 7 OF 27

find PHH reported him as late on payments, which denied him the ability to refinance at low rates around 1.9% at the time and will be forced to pay the higher 5.125% interest rate for the life of the loan. This damage to his credit by showing him late on payments that he was ready willing, and able to make but was prevented from making by Defendants' conduct reduced his credit score. Responding Party was unable to get credit for his business or to fix up his home or to buy a new car because his credit was bad because of PHH's wrongful conduct. Responding Party knew from the denial of the mortgage refinance that he would also not qualify for these types of credit.

**INTERROGATORY NO. 7: IDENTIFY ALL** excessive and wrongful charges **YOU** contend were assessed to the **LOAN**, including the date **YOU** contend any such charges were assessed to the **LOAN**.

**RESPONSE TO INTERROGATORY NO. 7:** Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure. Responding Party objects that Defendants are wrongfully withholding the evidence necessary to establish these claims and Responding Party is in the process of compelling production of that evidence. Defendants are wrongfully refusing to produce documents showing fees and charges in response to Plaintiff's RFP 1 to HSBC and RFP 1, and 2 to PHH, among other records. Defendants are withholding loan histories, lists of fees and charges, and code breakers that would enable Plaintiff to identify charges and whether the funds applied to the loan were applied to charges. The partial loan histories appear to show funds applied to unexplained items that may be such fees but Plaintiff cannot determine this yet until Defendants comply with discovery. Plaintiff will supplement this response once Defendants comply with discovery and after depositions on this topic.

EXHIBIT 11
PAGE 8 OF 27

**INTERROGATORY NO. 8: IDENTIFY ALL** excessive and wrongful charges on the **LOAN** that **YOU** contend **YOU** have paid since April 1, 2020.

**RESPONSE TO INTERROGATORY NO. 8:** Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure. Responding Party objects that Defendants are wrongfully withholding the evidence necessary to establish these claims and Responding Party is in the process of compelling production of that evidence.  Defendants are wrongfully refusing to produce documents showing fees and charges in response to Plaintiff's RFP 1 to HSBC and RFP 1, and 2  to PHH, among other records. Defendants are withholding loan histories, lists of fees and charges, and code breakers that would enable Plaintiff to identify charges and whether the funds applied to the loan were applied to charges. The partial loan histories appear to show funds applied to unexplained items that may be such fees but Plaintiff cannot determine this yet until Defendants comply with discovery.   Plaintiff will supplement this response once Defendants comply with discovery and after depositions on this topic.

**INTERROGATORY NO. 9:** Describe with specificity the basis for **YOUR** allegation in the **COMPLAINT** that **DEFENDANTS** violated the California Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq*.

**RESPONSE TO INTERROGATORY NO. 9:** Defendants were engaged in the collection and attempted collection of consumer debts and are legally bound to follow the prescriptions of the Rosenthal Fair Debt Collection Practices Act ("RFDCPA"), California Civil Code § 1788, et seq. Defendants PHH and HSBC are "debt collectors" within the meaning of California Civil Code §1788.2 because they engage in debt collection in the regular course of their business as mortgage lender and loan servicer. PHH as the loan servicer collects the debt of the Plaintiff's mortgage loan on behalf of

EXHIBIT 11
PAGE 9 OF 27

HSBC, and HSBC is a debt collector because it collects the debt owed to it through its authorized agent PHH. Plaintiff is a "debtor" within the meaning of § 1788.2(h) as a natural person for whom Defendant debt collectors PHH and HSBC seek to collect payment of Plaintiff's home mortgage loan which is a consumer debt because it was for personal and family use.

Defendants violated the Rosenthal act by sending inaccurate and misleading billing statements from July 2020 to present which was a deceptive means to prevent Plaintiff from paying the loan or paying in the correct amount. For example, the statement dated July 16, 2020, erroneously stated that $17,558.93 was the amount due which was incorrect and on information and belief Plaintiff believes it should not have been more than $6,865.92 which is the amount of $3,432.96 for June and July 2020. The July 16, 2020 statement improperly demanded $1,316.52 for an escrow impound, which was improper because no impound was allowed or agreed to and even if it were allowed, it is vastly higher than the legally allowable amount under RESPA which would be around $666 per month based on the property taxes of approximately $8,000 per year. The statement included improper "Assessed Expenses" of $3,138.88 but no such expenses are allowable as the reinstatement amount in the settlement agreement took care of any fees and there were no grounds to charge any fees after the settlement.  The July 2020 statement incorrectly stated that there was a negative escrow balance of -$34,203.78 which was incorrect because the reinstatement amount paid by Plaintiff pursuant to the settlement agreement cured all amounts. These are just some errors. Every billing statement from July 2020 to present is erroneous for these same reasons and more.

These acts are a violation of §1788.17, through its incorporation of 15 U.S.C. §1692e of the FDCPA. Each monthly billing statement sent from July 2020 to present is wrong, and incorrectly states that there is an escrow impound account, and the amount for the impound is far too high, and the amount of the escrow advance balance is well over $30,000 too high because it should have been reduced to $0 by the

-10-

EXHIBIT 11
PAGE 10 OF 27

Reinstatement Amount. The billing statement dated 3/16/2021 erroneously shows a suspense balance of $168,468.78 and a total amount due of $302,352.40, and an escrow balance of -$47,938.64, when in fact the escrow balance should be $0, the suspense should be $0, and the amount owed should be $34,329.60 which is only the principal and interest payments for 10 months from June 2020 to the time of the statement. The billing statement dated July 17, 2023, erroneously says the monthly payment is $4,222.96 which is too high and includes an improper escrow impound. The escrow balance is -$27,613 which is also wrong and should be $0, and the amount past due says $180,354.56, which is also vastly overstated and should be no more than $127,019.52, which are the principal and interest payments from June 2020 to the time of the statement. There are many more billing statements up to the present and all are similarly inaccurate.

Defendants did not specify in the Settlement Agreement the amount of the future monthly payment starting March 1, 2020, or whether it would include an escrow impound, and failed to send billing statements to Plaintiff for five months after the settlement, but then argue that Plaintiff was in default on his loan for not making payments, then rejecting his payment of $24,133.41 claiming it was the wrong amount after intentionally failing to communicate to him the correct amount. This conduct is a deceptive means used to collect a debt in violation of the Rosenthal Act. Defendants never remedied any of the violations.

**INTERROGATORY NO. 10:** Describe with specificity the basis for **YOUR** allegation in the **COMPLAINT** that **DEFENDANTS** violated the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq*.

**RESPONSE TO INTERROGATORY NO. 10:** Defendants are liable for violations of the Real Estate Settlement Procedures Act "RESPA" under 12 U.S.C. §2614 for violating 12 U.S.C. §2605. Mayer may enforce his rights under RESPA by private right

-11-

EXHIBIT 11
PAGE 11 OF 27

of action under §2605(f).  CFPB Regulation X, 12 CFR §1024.17 implements these RESPA statutes.  Failure to comply with Regulation X is a violation of RESPA 12 U.S.C. §2605(k)(1)(E).  PHH is a servicer within the meaning of RESPA and Regulation X because it services the Loan for HSBC and the Loan is a home mortgage loan on a single family residence.

Defendants violated 12 CFR §1024.17(c) by overcharging Mayer from July 2020 through February 2022 monthly escrow impound amounts far higher than the 1/12th amount allowed, and more than the 1/6th amount of allowed cushion.  Mayer's property taxes ranged from about $8,914.90 to $9,479.98 those years, which would permit only a maximum of $790 per month in escrow impound, but PHH sent billing statements attempting to collect escrow impound amounts in the range of $1,200 and 1,316.52. PHH violated 12 CFR §1024.17(i) by sending inaccurate and incorrect escrow accounting information, including the analysis dated February 16, 2024, which incorrectly shows an escrow surplus of $7,386.84.

PHH's violations in charging far too much for escrow impound caused Mayer damages because it is one of the reasons that PHH rejected Mayers payments. PHH claims Mayer's payments were insufficient to cover the amount of his monthly obligation because he did not pay enough to cover the escrow impound which was significantly overstated.  Mayer is entitled to damages caused by the rejection of his payments for the last five years.

**INTERROGATORY NO. 11:** Describe with specificity the basis for **YOUR** allegation in the **COMPLAINT** that **DEFENDANTS** engaged in unlawful, unfair, and/or fraudulent business practices.

**RESPONSE TO INTERROGATORY NO. 11:** Defendants violated §17200 with the unfair practices described in this complaint by frustrating and preventing Plaintiff from paying his mortgage. The near total failure to comply with the settlement

EXHIBIT 11
PAGE 12 OF 27

agreement and the failure to send statements, and then sending inaccurate statements intermittently and rejecting payments multiple times and intentionally paying property taxes early when they know Plaintiff was current paying them and setting up an unauthorized and surprise escrow impound are intentional and unfair business practices designed to keep Plaintiff in default on the loan for the purpose of incurring additional servicing fees and costs because the servicer PHH makes more money servicing loans in default.

Defendants violated §17200 by claiming Mayer is in default for not making payments on time while they were not sending him statements and then claiming he had not paid enough when they were sending him plainly improper statements for amounts that should have been covered by the $158,125.89 reinstatement for taxes, and imposing a surprise escrow impound account without notice.

Defendants have unfairly frustrated Plaintiff's ability to pay his loan continually from June 2020 to present.

Defendants' failure to send billing statements violated federal law including the Truth in Lending Act (TILA), and corresponding Regulation Z.  The inaccurate billing statemetns also violate TILA.  The inaccurate billing statements from 2020 to present violate the FDCPA and the Rosenthal Act. It is an unfair practice to violate mortgage lending law requirement to send billing statements, then claim Mayer is not paying, or is paying the wrong amount.

The totality of PHH's conduct was inherently unfair to Plaintiff as it was against public policy, immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiff, specifically, and consumers, in general.

The conduct of PHH as described throughout this Complaint was unfair in that the negative impact on Plaintiff (as described above) far outweighs any benefit to PHH. Defendants have acted in a manner that is both wrongful and likely to mislead members of the general public in their actions.

Plaintiff suffered injury in fact and direct financial loss caused by Defendants'

EXHIBIT 11

PAGE 13 OF 27

actions because he was unable to become current and lost the ability to refinance at lower rates.

**INTERROGATORY NO. 12: IDENTIFY** each act on the part of **DEFENDANTS YOU** contend slandered **YOUR** title to the **PROPERTY**.

**RESPONSE TO INTERROGATORY NO.12:** Defendants slandered Plaintiff's title to the property by recording a Notice of Default on August 24, 2023, and Notice of Trustee's Sale on December 4, 2023, because Plaintiff was not in default on his obligations under the loan. The Notice of Default stated that the amount of the default is $178,903.80 as of 9/11/2023. This statement is false because he had tried to pay but PHH rejected his payments. It is false because the amount is overstated even if Mayer's obligation to pay is not excused by the rejection of tendered payments. The Notice of Default says that Mayer breached his obligations by not making payments of principal, interests plus impounds which became due on 06/01/2020 and all subsequent installments. This is false because he paid but they wrongfully rejected his payment. The Notice of Trustee Sale falsely stated "YOU ARE IN DEFAULT UNDER A DEED OF TRUST[.]" Plaintiff's obligations to pay had been fulfilled by his tendering of the payments on November 16, 2020, for $24,133.41, and he is entitled to the benefits of full performance under California Civil Codes §§1504, 1511, 1512, 1485. Defendants slandered Mayer's title by recording the Notice of Default and Notice of Trustee Sale and attempting to foreclose while being the ones that were and are preventing his payment of the loan.

Defendants had no privilege or justification for recording these documents stating that there was a default and stating the incorrect amounts due.

Defendants' actions were done with malice with the intent to harm Mayer by preventing him from becoming current on his loan, and preventing refinancing. Defendants lacked reasonable grounds for belief in the truth of the Notice of Default

-14-

EXHIBIT 11
PAGE 14 OF 27

and Notice of Trustee Sale that Mayer had defaulted on his obligations because they knew he had attempted to pay the correct amount timely and to pay his taxes but they had wrongfully rejected his tendered payments and paid his property taxes early which was wrongful. Defendants acted in reckless disregard for Mayer's rights.

Plaintiff suffered financial harm because it prevented his refinancing. Plaintiff also suffered damages in the form of attorney's fees for correcting the issue and obtaining an injunction to stop the foreclosure and this action. The Notice of Default and Notice of Trustee Sale impaired the marketability of the property and decreased its value.

Defendants' conduct was a substantial factor in causing this harm.

**INTERROGATORY NO. 13:** For each item or category of damages **YOU** claim to have suffered due to the action or inaction of **DEFENDANTS**, **IDENTIFY** and describe the nature and amount of the damages sought, how the damages were calculated, and the facts supporting **YOUR** claim that the damages resulted from some action or inaction on the part of **DEFENDANTS**.

**RESPONSE TO INTERROGATORY NO. 13:** .

Responding Party objects that the request because it seeks premature disclosure information to be furnished by experts. Responding Party will not produce such information until the time for disclosure of expert testimony. Discovery is still ongoing, and many of the documents necessary to prove the amount of these charges and fees are in possession of Propounding Party. Once the documents are obtained in discovery, they will be analyzed by experts, and expert testimony will show the amount of these damages at trial.    The exact amount of damages is still unknown to Plaintiff and it is expected that the amount of the damages shall be determined at the time of trial.

Responding Party cannot comply with this request as to punitive damages because "[l]ost punitive damages, however, are not amenable to an objective

-15-

EXHIBIT 11
PAGE 15 OF 27

determination. "`Unlike the measure of actual damages suffered, which presents a question of historical or predictive fact, [citation], the level of punitive damages is not really a "fact" "tried" by the jury.'" (*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 437, 121 S.Ct. 1678, 149 L.Ed.2d 674, quoting *Gasperini v. Center for Humanities, Inc.* (1996) 518 U.S. 415, 459, 116 S.Ct. 2211, 135 L.Ed.2d 659 (dis. opn. of Scalia, J.).) Instead, a jury's "imposition of punitive damages is an expression of its moral condemnation." (*Cooper Industries*, at p. 432, 121 S.Ct. 1678.) Indeed, a plaintiff is not "`entitled, as of right'" to an award of punitive damages (*Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791, 801, 197 P.2d 713 (*Brewer* )), even if the jury finds the defendant "guilty of oppression, fraud, or malice" (Civ.Code, § 3294, subd. (a)). Thus, to award lost punitive damages, the trier of fact must determine what moral judgment would have been made by a reasonable jury. Because moral judgments are inherently subjective, a jury cannot objectively determine whether punitive damages should have been awarded or the proper amount of those damages with any legal certainty. (See Rest.3d Law Governing Lawyers, § 53, com. h, p. 393 [an award of lost punitive damages "calls for a speculative reconstruction of a hypothetical jury's reaction"].)  *Ferguson v. Lieff Cabraser* (2003) 135 Cal.Rptr. 2d 46, 54.

Responding Party cannot comply with this request as to emotional distress damages because "In terms of emotional distress damages, courts have repeatedly ruled that a Plaintiff is not required to put a specific dollar amount on emotional distress. Plaintiffs need not provide a calculation for compensatory damages pertaining to emotional distress, as such calculations are necessarily vague and hard to ascertain. See *Williams v. Trader Publishing Co.*, 218 F.3d 481, 486 n. 3 (5th Cir.2000); see also *Creswell v. HCAL Corp.*, No. 04cv388 BTM (RBB), 2007 WL 628036 at 2 (S.D.Cal. Feb. 12, 2007). Indeed, CACI 3905a states that there is "no fixed number" for awarding emotional distress damages."

Damages from the inability to refinance Plaintiff's home are estimated to be not

EXHIBIT 11
PAGE 16 OF 27

less than $500,000, as will be the subject of expert witness testimony at trial, which is the difference between what he will pay over the life of the loan at the higher rates he is stuck with currently compared to the low rates he could have qualified for in refinancing after the 2020 settlement but for the wrongdoing of Defendants rejecting his payments and not reporting him current on his payments. Plaintiff would have qualified to refinance in mid-2020 for the best rates for Fanny Mae loans around 1.9% but is now going to be required to pay 5.125% for the life of this loan. but for Defendants' wrongful conduct in not reporting timely, nor correctly, and not informing Plaintiff that they had done so, and not sending statements and not accepting payments. These damages are usually calculated by the present value of the stream of payments under his current loan over the life of the loan at the 5.125%, and the net present value of the stream of payments he could have made at the lower rates he could have obtained of around 1.9%.  At this time Plaintiff does not have all the information for calculating this claim but will supplement when he has obtained it.

Interest on the loan from 2020 to present:  no interest accrues on the loan from the time they failed to accept installment payments. The amount will be calculated by an expert witness at trial based on the loan documents and payment histories. This amount is accruing and ongoing. This may be calculated with a reinstatement quote or payoff quote and using amortization schedules to add up the interest that has accrued.

Loss of Credit Expectancy: Not less than $50,000 for the harm to his credit score and the inability to get credit. This will be the subject of expert witness testimony and is based on industry standard practices for calculating these types of damages.

Loan fees and charges before 2020 settlement: Defendants were obligated to waive certain fees and costs in the 2020 settlement agreement, but they failed to do so. These amounts will be calculated from the loan transaction histories and related records once they are obtained in discovery.

Late fees and foreclosure related charges and any other fees and costs associated

-17-

EXHIBIT 11
PAGE 17 OF 27

with being in default from 2020 to present that accrued and were charged to the loan that would not have been incurred had Defendant's properly applied the funds to the loan and accepted Plaintiff's payments. These will be calculated by Defendants' records once they are obtained in discovery.

The damages include $33,120.95 for failing to apply that credit to the loan.

All late fees, inspection fees, and all other types of fees and costs incurred after the settlement around April 2020 that would not have been incurred but for Defendants' breaches.    The amounts will be determined after discovery based on Defendants' records and expert testimony.    Defendants' are currently wrongfully withholding the information necessary to determine these amounts.

The Notice of Default and Notice of Trustee Sale impaired the marketability of the property and decreased its value. This will be the subject of expert witness testimony based on comparable sales and related methodologies.

Mayer seeks statutory damages of $2,000 under 12 U.S.C. §2605(f)(1)(B) because of PHH's pattern or practice of noncompliance with the requirements of this section. Mayer requests attorneys' fees and costs.

Plaintiff is entitled to attorney's fees and costs.

**INTERROGATORY NO. 14:** For each person or entity with which **YOU** have applied for credit or that has otherwise viewed **YOUR** credit report between April 1, 2020, and the **PRESENT DATE**, **IDENTIFY** and describe the date **YOU** applied for credit or other transaction, the type of transaction involved, and the terms **YOU** were offered and/or received.

**RESPONSE TO INTERROGATORY NO. 14:** Responding Party had discussions with a loan broker at the beginning of 2020 while negotiating the settlement to determine what was needed to complete refinancing after the settlment. Based on these discussions, Responding Party required the terms in the settlment agreement requiring the credit reporting in a manner that would allow him to qualify for

EXHIBIT 11
PAGE 18 OF 27

refinancing the loan after the settlment so he could get away from PHH who had been so terrible to him in rejecting payments.   Responding Party worked to get refinancing in 2020 and 2021 and 2024 with Philip Lewis of Financial Strategies located at 621 Capitola Ave Capitola Ca 95010 w. 831.476.6331, and a company called Argus Home Loans.  Responding Party submitted financial information several times in the process of applying for the loan, including, but not limited to n September 2020, October 2020, November 2020,  March 2021,  June 2021, October 2021, November 2021.  Responding Party submitted approximately four loan applications over several years in an attempt to refinance.  Responding Party communicated with the brokers through emails and phone calls. Responding Party has produced emails with Mr. Lewis during this process. An appraisal and credit reports were obtained.  Responding Party applied through lender A&D Mortgage LLC.   Loan application documents were exchanged on a platform called docmagic.   They opened escrow with First American Title, with Michelle Pappas.   Ms. Pappas pulled a title report.   Responding Party would have been approved for the lowest rates at the time in mid 2020 in the range of 1.9%, but Philip Lewis informed Responding Party that because the credit report in September 2020 showed a payment was 60 days late that it disqualified him from obtaining refinancing based on the lender's guidelines and that submitting Responding Party's application to the lenders would result in a rejection. That was the reason that the refinance failed.

**INTERROGATORY NO. 15:** If **YOU** contend any application for credit or other transaction identified in response to the previous Interrogatory was affected in any way by any action and/or inaction on the part of **DEFENDANTS**, **IDENTIFY** and describe what effect such action and/or inaction allegedly had and any damage **YOU** claim to have suffered.

**RESPONSE TO INTERROGATORY NO. 15:** Defendants' failure to properly report the UDFs and the failure to send the forms to Mayer proving they had fixed his credit

EXHIBIT 11
PAGE 19 OF 27

caused Mayer to lose the ability to refinance at lower rates. Mayer had an agent standing by to submit an application to refinance at lower rates but he did not receive the UDF forms which were to serve as notice that the credit reporting had been fixed. Mayer had been informed that he would not qualify for refinancing without the credit report being fixed. Plaintiff suffered damages measured by the difference between the amount Plaintiff would have paid over the life of the Loan from 2020 under a refinance at a lower interest rate compared to what he has to pay at his current higher interest rate.

**INTERROGATORY NO. 16: IDENTIFY** each internet-based social networking site that **YOU** have used during the past five years (*e.g.,* Facebook, Instagram, MySpace, Snapchat, Twitter, Vine, TikTok, *etc*.). For each such site identified, please include the name and address of the service provider, the name and address of the account holder, **YOUR** user name or avatar, the URL where the account was/is available, and the dates during which **YOU** used the account.

**RESPONSE TO INTERROGATORY NO. 16:** Responding Party objects that this request is outside the scope of discover because it is not relevant to the claims or defenses of the parties and is not reasonably calculated to lead to the discovery of admissible evidence, it is not proportional to the needs of the case and is only harassing and serves no legitimate purpose. This information is private.

**INTERROGATORY NO. 17: IDENTIFY ALL PERSONS** who provided **YOU** with health care or medical services to treat any physical, mental, and/or emotional injuries that **YOU** attribute to the alleged acts and/or omissions of **DEFENDANTS**.

**RESPONSE TO INTERROGATORY NO. 17:** Plaintiff did not receive health care related to this matter at this time.

**INTERROGATORY NO. 18:** Describe any and **ALL** humiliation, embarrassment and/or mental or emotional distress or any similar type of injury **YOU** claim to have

EXHIBIT 11
PAGE 20 OF 27

suffered as a result of the alleged conduct of **DEFENDANTS**, including all manifestation of such mental states and any medical treatment **YOUR** received as a result thereof.

**RESPONSE TO INTERROGATORY NO. 18:**   Responding Party lost sleep on account the stress on a regular basis for the last five years, several nights a week to several nights per month. This affected his physical and mental health and it adversely affected his ability to work and focus on his work. The adverse effects on Responding Party caused by the stress imposed by Defendants' misconduct was a major factor contributing to the deterioration of his marriage leading to separation and the wife moving out of the house. The fear of losing the house and the helplessness of not being able to force the lender to take his payments caused such severe emotional distress that it prevented Plaintiff from reconciling with his wife for the last five years. The stress harmed his family relationships because it caused him to be preoccupied and irritable and caused disagreements with his family and caused a short temper and strife.   It caused stress with his friends because it preoccupied his mind and he talked about it constantly to his friends. Responding Party began drinking excessive alcohol to cope with the stress.

**INTERROGATORY NO. 19:** If **YOU** are claiming any out-of-pocket financial losses in this case, **IDENTIFY** the total amount of out-of-pocket loss, the date(s) **YOU** lost each such amount, and the reason **YOU** contend **YOU** lost each amount.

**RESPONSE TO INTERROGATORY NO. 19:** Responding Party objects that the request is vague and ambiguous as to the meaning of "out-of-pocket loss" because it is unclear what types of damages may be referred to here. Responding Party has set forth the information for his claim for damages in response to other interrogatories. Responding Party objects that this request is duplicative.   Responding Party objects that the request because it seeks premature disclosure information to be furnished by experts. Responding Party will not produce such information until the time for disclosure of expert testimony. Discovery is still ongoing, and many of the documents

-21-

EXHIBIT 11
PAGE 21 OF 27

necessary to prove the amount of these charges and fees are in possession of Propounding Party. Once the documents are obtained in discovery, they will be analyzed by experts, and expert testimony will show the amount of these damages at trial.    The exact amount of damages is still unknown to Plaintiff and it is expected that the amount of the damages shall be determined at the time of trial.

Damages from the inability to refinance Plaintiff's home are estimated to be not less than $500,000, as will be the subject of expert witness testimony at trial, which is the difference between what he will pay over the life of the loan at the higher rates he is stuck with currently compared to the low rates he could have qualified for in refinancing after the 2020 settlement but for the wrongdoing of Defendants rejecting his payments and not reporting him current on his payments. Plaintiff would have qualified to refinance in mid-2020 for the best rates for Fanny Mae loans around 1.9% but is now going to be required to pay 5.125% for the life of this loan. but for Defendants' wrongful conduct in not reporting timely, nor correctly, and not informing Plaintiff that they had done so, and not sending statements and not accepting payments. These damages are usually calculated by the present value of the stream of payments under his current loan over the life of the loan at the 5.125%, and the net present value of the stream of payments he could have made at the lower rates he could have obtained of around 1.9%.  At this time Plaintiff does not have all the information for calculating this claim but will supplement when he has obtained it.

Interest on the loan from 2020 to present:  no interest accrues on the loan from the time they failed to accept installment payments. The amount will be calculated by an expert witness at trial based on the loan documents and payment histories. This amount is accruing and ongoing. This may be calculated with a reinstatement quote or payoff quote and using amortization schedules to add up the interest that has accrued.

Loss of Credit Expectancy: Not less than $50,000 for the harm to his credit score and the inability to get credit. This will be the subject of expert witness testimony and

-22-

EXHIBIT 11
PAGE 22 OF 27

is based on industry standard practices for calculating these types of damages.

Loan fees and charges before 2020 settlement: Defendants were obligated to waive certain fees and costs in the 2020 settlement agreement, but they failed to do so. These amounts will be calculated from the loan transaction histories and related records once they are obtained in discovery.

Late fees and foreclosure related charges and any other fees and costs associated with being in default from 2020 to present that accrued and were charged to the loan that would not have been incurred had Defendant's properly applied the funds to the loan and accepted Plaintiff's payments. These will be calculated by Defendants' records once they are obtained in discovery.

The damages include $33,120.95 for failing to apply that credit to the loan.

All late fees, inspection fees, and all other types of fees and costs incurred after the settlement around April 2020 that would not have been incurred but for Defendants' breaches.    The amounts will be determined after discovery based on Defendants' records and expert testimony.    Defendants' are currently wrongfully withholding the information necessary to determine these amounts.

The Notice of Default and Notice of Trustee Sale impaired the marketability of the property and decreased its value. This will be the subject of expert witness testimony based on comparable sales and related methodologies.

Mayer seeks statutory damages of $2,000 under 12 U.S.C. §2605(f)(1)(B) because of PHH's pattern or practice of noncompliance with the requirements of this section. Mayer requests attorneys' fees and costs.

Plaintiff is entitled to attorney's fees and costs.

**INTERROGATORY NO. 20: IDENTIFY YOUR** monthly net total income for each month between May 1, 2020, and the **PRESENT DATE**.

**RESPONSE TO INTERROGATORY NO.20:** Responding Party objects to the extent

-23-

EXHIBIT 11
PAGE 23 OF 27

it expressly or impliedly seeks information which is confidential or proprietary in nature and to the extent it seeks sensitive financial information pertaining to the Plaintiff, as the disclosure of such information would violate Plaintiff' right to privacy, including the right to privacy in personal financial records. Responding Party objects to producing any tax returns, tax documents or other tax documents protected by the taxpayer privilege, as protected under California law. The Plaintiff objects to disclosing this information on the basis that such a request violates the privacy privilege protected by Article I, Section I of the California Constitution. Responding Party does not waive the tax return privilege. This request is burdensome and oppressive and not proportional to the needs of the case because it would take dozens of hours going through five years of business records to calculate all of this information which is unnecessary because Plaintiff is producing certain financial records and statements demonstrating his ability to afford the loan payment every month, including documents showing where he sent his mortgage payments to his attorney's trust account because PHH refused to accept them. This is sufficient to the needs of the case for the claims and defenses of the parties.

DATED:  August 1, 2025

/s/ Andrew J. Christensen

Andrew J. Christensen
Attorney for Plaintiff
Cory Mayer

-24-

EXHIBIT 11
PAGE 24 OF 27

**<u>VERIFICATION</u>**

I, Cory Mayer, am the Responding Party. I have read the foregoing Responses to Defendant PHH Mortgage Corporation's Interrogatories, Set One and I know their contents.

The matters stated in the aforementioned responses are true of my own knowledge, except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 1, 2025 at Ben Lomond California.

By:_____

Name: Cory Mayer

-25-

EXHIBIT 11
PAGE 25 OF 27

## VERIFICATION

I, Cory Mayer, am the Responding Party. I have read the foregoing Responses to Defendant PHH Mortgage Corporation's Interrogatories, Set One and I know their contents.

The matters stated in the aforementioned responses are true of my own knowledge, except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 1, 2025 at Ben Lomond California.

By: _____

Name: Cory Mayer

-25-

EXHIBIT 11
PAGE 26 OF 27

## PROOF OF SERVICE

I, Karen Sanchez, declare that I am a citizen of the United States, over 18 years of age, employed in Alameda County, and not a party to the within action. My business address is 2063 Mountain Blvd. Suite 2, Oakland, CA 94611.

On August 1, 2025, I served the following document(s) on the parties listed below by email

**RESPONSES TO DEFENDANT PHH MORTGAGE CORPORATION'S INTERROGATORIES TO PLAINTIFF CORY MAYER, SET ONE**

**RESPONSES TO DEFENDANT PHH MORTGAGE CORPORATION'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE**

**RESPONSES TO DEFENDANT PHH MORTGAGE CORPORATION'S REQUESTS FOR ADMISSION TO PLAINTIFF CORY MAYER, SET ONE**

**DOCUMENT PRODUCTION**

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on the following date at Oakland, California.

Dated:  _August 1, 2025_              _/s/ Karen Sanchez_____
                                              Karen Sanchez

| By Email: | |
|---|---|
| Brian A. Paino (SBN 251243) bpaino@hinshawlaw.com Helen Mosothoane (SBN 254511) hmosothoane@hinshawlaw.com Zeeshan Iqbal (SBN 337990) ziqbal@hinshawlaw.com HINSHAW & CULBERTSON LLP 350 South Grand Ave., Suite 3600 Los Angeles, CA 90071-3476 | Attorneys for Defendants PHH MORTGAGE CORPORATION and HSBC BANK USA, NATIONAL ASSOCIATION, AS TRUSTEE FOR DEUTSCHE ALT-A SECURITIES MORTGAGE LOAN TRUST, SERIES 2006-AR2 |

-1-

EXHIBIT 11
PAGE 27 OF 27

# EXHIBIT 12

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---o0o---

CORY MAYER,

        Plaintiff,

vs.                              No. 5:25-cv-00812-NW

DEUTSCHE ALT A SECURITIES

MORTGAGE LOAN TRUST SERIES

2006-A; PHH MORTGAGE

CORPORATION; WESTERN

PROGRESSIVE, LLC; DOES

1-20; and all persons

unknown claiming any interest

in the property, inclusive,

and DOES 1 through 50,

inclusive,

        Defendants.
_____/

ZOOM VIDEOCONFERENCE DEPOSITION OF CORY MAYER

February 11, 2026

Reported by Valerie Padilla, CSR No. 3081

Job No. NY 7883366

Pages 1 - 255

EXHIBIT 12
PAGE 1 OF 87

Page 4

ZOOM VIDEOCONFERENCE DEPOSITION OF CORY MAYER

BE IT REMEMBERED, that pursuant to Notice, and on the 11th day of February 2026, commencing at the hour of 9:17 a.m., virtually appeared CORY MAYER, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

---o0o---

APPEARANCES:

(All parties appearing remotely)

For the Plaintiff:

     ANDREW JOE CHRISTENSEN, ESQ.
     2063 Mountain Boulevard, Suite 2
     Oakland, CA 94611
     (510) 761-7182
     andrew@californiahomelawyer.com


     PAMELA D. SIMMONS, ESQ.
     Law Office of Simmons & Purdy
     2425 Porter Street, Suite 10
     Soquel, CA 95073
     (831) 464-6884
     pamela@pamelaw.com

EXHIBIT 12
PAGE 2 OF 87

Page 5

For the Defendants:

    TIMOTHY A. SCHNEIDER, ESQ.

    Houser LLP

    9970 Research Drive

    Irvine, CA 92618

    (949) 679-1111

    tschneider@houser-law.com


    HELEN MOSOTHOANE, ESQ.

    Hinshaw & Culbertson LLP

    350 South Grand Avenue, Suite 3600

    Los Angeles, CA 90071

    (213) 680-2800

    hmosothoane@hinshawlaw.com

EXHIBIT 12
PAGE 3 OF 87

married in?

A.   Yes.  Santa Cruz County.

Q.   Are you and Ms. Hamilton still together?

A.   No, we are currently separated.

Q.   And when you say "separated," you don't mean divorced; is that correct?

A.   We have not finalized the divorce.  We live in two separate locations.

Q.   When you say you have not finalized the divorce, is there a divorce action pending?

A.   Oh, I don't -- she -- she spoke about pursuing documents, but I don't think anything has been materialized.

Q.   Okay.  So there's no formal court action to legalize the divorce; is that correct?

A.   Not -- not yet.

Q.   But you and Ms. Hamilton have had discussions about completing paperwork to effectuate the divorce; is that correct?

A.   Yeah, we've talked about it, but we're also talking about counseling and trying to work things out and stay together.

Q.   Okay.  Have you started any of that counseling?

A.   Not yet.

EXHIBIT 12
PAGE 4 OF 87

Q.    When did you first discuss the idea of counseling?

A.    Oh, 2017, '18, sometime around then. Then, once again, every year. We just spoke about counseling a month ago.

Q.    Okay. So, have you guys had discussions dating back to 2017 about getting divorced?

A.    Not really. That's -- no. A divorce is more in the past couple years since 2020. It got really serious in 2020.

Q.    Do you recall what month in 2020 those discussions escalated?

A.    Oh, must have been the early part of the year.

Q.    So, like right around the time that the COVID shutdowns were, you know, and staying home orders were put into effect?

A.    You know, I can't remember the exact month, but it might have been in the summer of that year. So, shortly after COVID, I'm not sure.

Q.    So, at some point during the stay-at-home orders in 2020, those discussions of divorce kind of escalated?

A.    Yeah. She left shortly before there was any stay-at-home orders. I think she's just

EXHIBIT 12
PAGE 5 OF 87

frustrated with this lawsuit and everything going on with my house, not trusting --

Q.    When did you --

Sorry, what was that last part?

A.    She's not trusting what I'm saying. Nothing's happening with the bank, nothing's happening with anything with PHH's side of things and she's losing trust and losing faith and patience.

Q.    And that losing of faith started before 2020?

A.    I don't know.  You'd have to talk to her about that.  I believe it's more about 2020, that -- that was when it started.

Q.    Do you recall when she first moved out?

A.    I just told you that, sometime in the beginning of 2020 that she was staying with her mother for a few months, going back and forth, and then she made it official shortly after.

Q.    Prior to her moving out, did you guys have discussions about separation?

A.    No.  I was shocked.

Q.    So, in early 2020 she started staying with her mother and that was kind of the first time she brought up separating?

EXHIBIT 12
PAGE 6 OF 87

Q. Is it one, it was like technically listed as a three-bedroom and then it has an office that can kind of be a bedroom?

A. Yeah, correct. They had a permitted studio conversion, art studio, whatever you want to call it.

Q. Okay. Does that studio have its own separate entrance?

A. Yes.

Q. Okay. So, fast forwarding back to kind of the 2016/2017 timeframe, that's when there was a foreclosure of your home; is that correct?

A. Yes.

Q. And then you had a lawsuit in 2017 related to that foreclosure, correct?

A. Yes.

Q. So, when you first started having, you know, the issues you referenced in your marriage, is it your belief that it was related to that foreclosure?

A. Yeah.

Q. Okay. And then that lawsuit kind of, you know, went on its course and eventually you resolved that lawsuit, correct?

A. Yeah, and our relationship was a little

EXHIBIT 12
PAGE 7 OF 87

Page 43

never won.  I never did.  I never did that well in contests, so -- I had to go to school.  Went to community college and went to work.  I guess surfing's a job, too, but a different type of job.

Q.  Well, a bit more enjoyable of a job.

A.  Yeah, sports, those guys travel a lot. It's not a type of job or a sport that you're local.  They're always on the road, so it's a little -- it wasn't really for me, I'm more of a home body.

Q.  Okay.  So, I find myself being more of a home body myself.  Is it an ideal life, more at home, you know, kind of relaxing and watching what you want to watch or is it going out partying with friends?  What's kind of like the ideal night for you?

A.  At home, yeah.

Q.  Does anyone currently live with you?

A.  Yes, I have a roommate.

Q.  And what is the roommate's name?

A.  Chris Rogers.

Q.  And does he rent a room from you?

A.  Yes.

Q.  Do you have a written agreement with him?

A.  Yes.

EXHIBIT 12
PAGE 8 OF 87

Page 44

Q.    Do you recall when you entered into that agreement?

A.    I believe it was 2020, the summer of 2020.  I'd have to look at documents for the exact date.  I believe it's August, the month of August in 2020.

Q.    So, he's been there about five-and-a-half years, then?

A.    Yes.  He's a great tenant.

Q.    And what does he pay you monthly?

A.    It's -- I've had to adjust it several times since 2020.  He's currently paying 1450.

(Witness coughs.)  Excuse me.

Q.    Does he ever miss a rental payment?

A.    Nope.  He's never even been late.  He hasn't been late once, not one time in five years.

Q.    Do you recall what the initial rent was in 2020?

A.    I believe it was either 1150 or 1250 because I have his PG&E, water, and garage all included.  I can't remember if it was 1150 or 1250.

Q.    And then for the rental increases, were those in writing?

A.    Yeah, it was $100 a year.  Yes.  I do a month-by-month lease agreement with him, and on

EXHIBIT 12
PAGE 9 OF 87

that agreement, I have the increases written down.

Q.   Does he rent like a single bedroom from you --

A.   Yeah.

Q.   -- at the property?

A.   Yeah, just a bedroom.

Q.   Is that the studio?

A.   Yeah, he has the one bedroom with his own entrance.

Q.   And then do you share like common spaces, like the kitchen and living --

A.   No.

Q.   -- space?

A.   No.

Q.   Does the studio have its own kitchenette?

A.   Yeah, and bathroom.  And he doesn't use the laundry.

Q.   Do you have like a personal relationship with Mr. Rogers or is it really just he's your tenant and you don't really speak to him too often?

A.   I don't speak with him much, no.

Q.   Okay.  Does he get mail to the same mailbox at the property?

A.   Yes.

Q.   Okay.  If he doesn't, I guess the studio

EXHIBIT 12
PAGE 10 OF 87

Q.    -- in the previous twenty years?

A.    No.

Q.    And is that just a sole proprietorship?

A.    Yes.

Q.    You've never incorporated or filed any Articles with the Secretary of State, correct?

A.    Not yet.

Q.    Okay.  Have you done work for any other company or any other sole proprietor in the past twenty years other than yourself?

A.    Yeah, I get -- I worked with a couple different contractors.

Q.    Did you work as a subcontractor for them?

A.    Yeah, they, what is it, 1099 me.

Q.    Okay.

A.    And a couple times they put me on payroll.

Q.    When was the last time that you were on payroll for one of these contractors?

A.    I was on payroll last year, October to December, for the contractor named Shawn McVey, Venture Point Building.

Q.    Was that for a specific project?

A.    Yes.

Q.    Okay.  How were you paid for that?

EXHIBIT 12
PAGE 11 OF 87

Page 60

A.    It was all direct deposit.

Q.    When you say "direct deposit" --

A.    Hourly.

Q.    Hourly?

A.    Yeah, hourly.

Q.    Okay.  Do you recall your hourly rate?

A.    $60 an hour.

Q.    And do you recall the total amount you were paid for that project?

A.    No.

Q.    Were you working on that project full time during that time period?

A.    Yes.

Q.    Were you working on any other projects during that time period?

A.    No.

Q.    Okay.  And that was, I believe you said, October through December of 2025?

A.    Correct.

Q.    Since 2020, what other times have you been on payroll for one of these contractors?

A.    2020.  I was on payroll for a contractor named Paolo Flansburg up until, I believe, 2023, February.

Q.    When did that start?

EXHIBIT 12
PAGE 12 OF 87

Page 61

A.    I'd have to look at my files, but it's -- it would have been, say, 2015.

Q.    During that time period, were you working for Paolo Flansburg full time?

A.    Yeah, full time.  There was times throughout the year that it would be work part time and I would fill in with Santa Cruz Home Refurbishers, my company.

Q.    Was that for more of an intermittent basis or was there more like a from 2020 to 2021 kind of gap that you had to fill in?

A.    No, it was just, say, a week or two weeks I worked for him full time regularly.

Q.    Okay.  And how much were you making per hour in 2022?

A.    I believe it was $45 an hour or 50.

Q.    And what about 2021?

A.    '21?  Maybe 40.

Q.    And what about 2020?

A.    That would have been the same amount.  It might have been 45, I can't remember.

Q.    Okay.  And were you working 40 hour work weeks or were you working kind of as many hours as --

A.    Yeah.  Forty hour work weeks.  And I had

EXHIBIT 12
PAGE 13 OF 87

my own business, so I sometimes will work weekends and after -- after work.  I will even work a couple hours after work, yeah.

Q.    Were you a W-2 employee for Paolo Flansburg?

A.    I believe so.  Is that on payroll?  Yeah.  Yeah.

Q.    It's an employee versus an independent contractor or it could be a 1099.

A.    Yeah, there's a couple people that I've worked 1099 with throughout the years.

Q.    Okay.  So, since 2020 you've had income from your own proprietorship, the Santa Cruz Home Refurbishers, you were employed for a period of time by Paolo Flansburg, and you were employed for a period of time by Venture Point Building; is that correct?

A.    Yeah.  And there's also another couple other contractors.

Q.    Who else?

A.    Jeremy Davis.  He was a 1099 last year, in the year 2025.

Q.    For how long did you work for him?

A.    It was about six months out of 2025.  Leading up to that October, yeah.

EXHIBIT 12
PAGE 14 OF 87

Q. And then are there any other contractors that you worked for?

A. There was -- you know, there was one, but it was only one job and I can't even remember his name. It was only for two weeks. Can't remember his name.

Q. Do you recall what year?

A. I think it was the year before that, 2024.

Q. Okay. When you were working for Jeremy Davis, were you being paid hourly?

A. Yup. Same.

Q. Do you recall what your hourly --

A. Yeah, it was 60. He may have started me at 55, and after three weeks to a month moved me to 60.

Q. Do you have a written contract with Jerry Davis?

A. No. No. I just filled out the tax information, yeah, and gave him all my personal information when I started working for him.

Q. And was that forty hours a week?

A. Yes.

Q. Do you recall if you ever were paid overtime?

EXHIBIT 12
PAGE 15 OF 87

A.    It's possible, an hour here or there.

Q.    But typically it was a forty-hour work week for Jeremy Davis?

A.    Yeah, but it's highly likely that I did an hour or two overtime.

Q.    For all of your income from these various sources since 2020, would all of the income have been deposited into your Bank of America checking account?

A.    Yes.

Q.    Okay.

A.    I also have a business account with Bank of America.

Q.    Okay.

A.    Sometimes my -- on my jobs with Santa Cruz Home Refurbishers, people write the check out to Santa Cruz Home Refurbishers.

Q.    For Venture Point Building, Paolo Flansburg, and Jeremy Davis, were all those direct deposit?

A.    No.  Just the Venture Point.  Only one.

Q.    So, for Jeremy Davis, were you handed a physical check?

A.    Yeah,, he has an accountant and the accountant delivered the checks to all the

EXHIBIT 12
PAGE 16 OF 87

A.    One time.

Q.    And when was that?

A.    It was in 2022, I believe.

Q.    And what was that for?

A.    It was a short trip seeing my friend's house in Indonesia.

Q.    Wow, out of the country?

A.    Yeah.  He had just built -- well, he had been working on this house for ten years and he's my best friend and I got to meet the family and it was a wonderful trip.

Q.    How long was that trip?

A.    About two weeks.  Then you used up another couple days there and back in travel time, so it's close to three weeks that I took off work.

Q.    Do you recall what month that was?

A.    Oh, man.  August.

Q.    Do you recall the total cost of the trip?

A.    Well, the plane ticket was from miles from my credit card so I didn't have to pay the plane ticket.  It was about $1000 if I was able to stay at my friend's house, but it was free -- free hotel, free lodging.  Oh, we could say 2000, just to be safe.

Q.    Okay.  So, you were able to use miles

EXHIBIT 12
PAGE 17 OF 87

from a credit card for a plane ticket?

A.    Yes.

Q.    So, there was no out-of-pocket cost at least for the plane ticket, correct?

A.    Yeah, but I had some travel costs once I was in Indonesia that I used a credit card for just 'cause it's easier, so that might have been 500, plus a thousand while I was on my vacation for spending cash.

Q.    Right.

A.    Rough estimate.

Q.    Sure.

Free lodging through your friend, correct?

A.    Yeah.  And they all cook, so I didn't have to spend much on food, either.

Q.    Okay.  So, it was just --

A.    Food and lodging, so I didn't have to spend much money on that trip.  It was mainly just to visit family.  It was almost a business trip.

Q.    So, the money you did spend, then, was maybe for some additional food, maybe for a couple of souvenirs?

A.    Taxis, yeah.

Q.    That's incredible.

EXHIBIT 12
PAGE 18 OF 87

Are you able to see this document?

A.    Yes.

Q.    Okay.  I'll scroll through.

And just for clarity, the document is Bates stamped as Mayer1119 through Mayer1124.

On page 4 of this document, is that your signature?

A.    Appears to be.

Q.    And if we go back to the top, this is dated March 1st, 2006, and do you want to read the first line under Section 1?

A.    Yes.

Q.    Can you go ahead and read that?

A.    "In return for a loan that I have received, I promise to pay U.S. $456,000.  This amount is called principal plus interest to the order of lender.  Lender is Pinnacle Financial Corporation, dba Tri-Star Lending Group.  I will make all payments under this note in the form of cash, check, or money order."

Q.    Is this the note that you took out when you purchased the property?

A.    I believe so.

Q.    Okay.  And this is the loan that is the subject of this current civil action; is that

EXHIBIT 12
PAGE 19 OF 87

correct?

A.   I believe so.

Q.   Okay.

MR. SCHNEIDER:  I'll attach as Exhibit 2, this is the Deed of Trust.  It's Bates stamped Mayer1125 through 1142.

(Defendants' Exhibit No. 2 was marked for identification.)

BY MR. SCHNEIDER:

Q.   Are you able to view this document?

A.   I can see that.

Q.   If we go to page 10 of this document, is that your signature on the signature line for borrower?

A.   Yes.  Yes.

Q.   Do you recall signing a document called Deed of Trust when you took out the loan for this property?

A.   Yes.

Q.   Okay.  Do you understand if there is a difference between a note and Deed of Trust?

A.   Not exactly, yeah.

Q.   Okay.

MR. SCHNEIDER:  I'm going to attach as Exhibit 3 a modification agreement.  It's Bates

EXHIBIT 12
PAGE 20 OF 87

Page 86

stamped Mayer1520 through 1525.

(Defendants' Exhibit No. 3 was marked for identification.)

BY MR. SCHNEIDER:

Q.    Do you recall entering into a modification agreement for this mortgage loan?

A.    Yes.

Q.    Okay.  And do you recall when that was?

A.    Yes.  2000 -- the first payment was January 1st, 2010.

Q.    Okay.  And if we go to page 4 of this document, is that your signature on the signature line?

A.    Yeah, but I don't ever put a middle initial like that.  I've never done that in my whole life.

Q.    Do you have any reason to believe that that would not be your signature on that signature line?

A.    Yeah, I don't do it like that.  It looks like there's two Mayers.

Q.    Now --

A.    It would have been scribbled out.

Q.    If we look at this document, it says "Interest Only Step Rate Loan Modification

EXHIBIT 12
PAGE 21 OF 87

something like that.

Q.    Okay.    Previously we discussed that you had a prior action that you initiated in 2017 related to the loan at issue in this case, correct?

A.    Sorry?

Q.    I said, we previously discussed that you had a prior action that you initiated in 2017 related to the foreclosure of the loan that's at issue in this case, correct?

A.    For the second?

Q.    For the first position loan.

A.    Yeah.

Q.    And in that 2017 case, you resolved that through a settlement agreement, correct?

A.    Yes.

Q.    Okay.    Do you recall the terms of that settlement?

A.    There was a payment made to me and then they were going to reinstate the loan.  We were waiting for the reinstatement amount and they failed to get back to me and we kept going back and forth trying to get what the reinstatement amount was.  The longer it went on, the worse it got.

Q.    Do you recall any other terms of the settlement agreement?

EXHIBIT 12
PAGE 22 OF 87

A.    Just to pay my mortgage on time for the remainder of the loan.

Q.    Do you recall reviewing that settlement agreement in 2020?

A.    Yes.

MR. CHRISTENSEN:  Mr. Schneider, the document that's on the screen is still up.

MR. SCHNEIDER:  I understand.  I haven't attached it yet.

MR. CHRISTENSEN:  Okay.

MR. SCHNEIDER:  What I'm attaching as Exhibit 4 is the settlement agreement.  This is Bates stamped Mayer1725 through 1733.

(Defendants' Exhibit No. 4 was marked for identification.)

BY MR. SCHNEIDER:

Q.    Are you able to see this document?

A.    Yes.

Q.    And if we go to page 8 of that document, is that your signature on the signature line for Cory Mayer?

A.    Yes.

Q.    Okay.  Okay.  So, Section 1 of the settlement agreement, it's titled "Borrower's Obligation to Reinstate."  It states, "Borrower

EXHIBIT 12
PAGE 23 OF 87

acknowledges, understands, and agrees that the total amount required to reinstate the loan as of February 19th, 2020 is $158,125.89."

It provides a breakdown of the amounts included in that, and then it states, "Within thirty days of the effective date, borrower shall tender the reinstatement amount to PHH."

Do you recall this term of the settlement?

A.    Yes.

Q.    Okay.  Do you recall receiving a document called "Reinstatement Quote" as part of your review for this settlement agreement?

A.    Yes.

MR. SCHNEIDER:  Attaching as Exhibit 5, this is a Mortgage Reinstatement Quote.  It is Bates stamped Mayer1596 through 1598.

(Defendants' Exhibit No. 5 was marked for identification.)

BY MR. SCHNEIDER:

Q.    Are you able to view this document?

A.    Yes.

Q.    Okay.  Is this the reinstatement quote that you reviewed as part of your review of the settlement agreement in 2020?

EXHIBIT 12
PAGE 24 OF 87

A.    It appears to be.

Q.    And if we look at the box here on the bottom of the first page, it has descriptions and amounts for certain items and it goes principal for $14,670.91, interest for $128,178.13, county tax for $43,537.56, and a line item called lien that is bracketed for $33,120.95.

Do you have any -- what is your understanding of what was meant by this description called "lien"?

A.    I'm -- I'm not sure if this is even the right document.

Q.    If we go back to Exhibit 4, the settlement agreement, the item that was called lien on the reinstate quote appears here as -- it says "credit" and it's bracketed for the same amount, $33,120.95.

Do you see that?

A.    Yeah.  I don't know what that's -- that's for.

Q.    What is your understanding of what that term "credit" meant?

A.    That I -- that I'm getting credited that amount and I don't know why.

Q.    When you say you're getting credited that

EXHIBIT 12
PAGE 25 OF 87

Page 96

that amount was the total amount paid by PHH for the taxes for the property?

A.   I'm not sure.  I mean, that's what they say, but I don't think it's accurate.

Q.   Why don't you think it's accurate?

A.   I was paying my property taxes.  Seems way too high.

Q.   Did you believe that it seemed way too high when you entered into this settlement agreement?

A.   Yes.

Q.   Did you contest that amount prior to entering into the settlement agreement?

A.   I don't think so.

Q.   Okay.  Do you recall submitting these reinstatement funds to PHH pursuant to paragraph one?

A.   Can you say that again?

Q.   Do you recall if you submitted your reinstatement funds to PHH pursuant to paragraph one?

A.   Yeah.

Q.   Did you make that payment yourself?

A.   Yeah.  That was my attorney.

Q.   So, that payment was made by your

EXHIBIT 12
PAGE 26 OF 87

attorney on your behalf; is that correct?

A.    Yes.

Q.    How do you know that your attorney made that payment?

A.    Because I allowed her to and told her to.

Q.    Did you receive confirmation that the payment had been made?

A.    Correct.

Q.    Okay.  And did that confirmation come from PHH?

A.    We are waiting for them.  They had thirty days to adjust my credit, I believe, and apply the payment.  Then they had another thirty days to get back to me about it and they never did it.  They never did anything.  To this day I'm still waiting. Obviously, that's what led to this.  Still waiting for the amount to go through.  They don't know what the amount is.

Q.    Do you believe PHH has applied the funds submitted by you pursuant to paragraph one to reinstate the loan pursuant to the terms of this agreement?

A.    No, I don't believe they have.  I believe they ripped up the check.

Q.    What do you mean by you believe they

EXHIBIT 12
PAGE 27 OF 87

Q.    Okay.   So, now, following the reinstatement funds being submitted in 2020, have you attempted to make any payments directly to PHH?

A.    No.

Q.    Okay.

MR. CHRISTENSEN:   I'm going to object as vague and ambiguous in reference to PHH.

BY MR. SCHNEIDER:

Q.    Following the reinstatement pursuant to the settlement in 2020, have you made any of your mortgage payments?

A.    No.

Q.    Okay.

MR. CHRISTENSEN:   Sorry, I'm going to object.   It's vague and ambiguous when you make your payments, make your mortgage payments.   To who and where.

THE WITNESS:   The amount, address.   Send it to Santa Claus.

BY MR. SCHNEIDER:

Q.    Have you sent any money to PHH since 2020?

A.    No.

MR. CHRISTENSEN:   Objection, vague and ambiguous as to what you mean "sent to PHH."

EXHIBIT 12
PAGE 28 OF 87

You know his lawyers have been sending money in different than him sending it to the lender directly, so...

MR. SCHNEIDER:  It's really not vague and ambiguous.  Did he personally send money to PHH, the answer is no.

Now let me ask my next question.

BY MR. SCHNEIDER:

Q.    Have you sent any money for your mortgage loan since 2020 to your attorneys?

A.    Yes.

Q.    Okay.  Have you been making monthly payments for your mortgage loan to your attorneys?

A.    Correct.  Yes, every month.

Q.    Have you ever failed to pay a monthly payment related to your mortgage loan to your attorneys since 2020?

A.    If -- if I do, then I pay a double month the following month.  It was once or twice throughout the year.

Q.    Okay.  What is your understanding of what the monthly payment amount is for the loan since 2020?

A.    It's around 3450, maybe shortly under. 3437, something like that.

EXHIBIT 12
PAGE 29 OF 87

Q.    And what amount do you send to your attorneys each month for your mortgage payment?

A.    Roughly 3400.  Sometimes a little more.

Q.    Is it your position that you have sent payments to your attorney for -- that are sufficient for every single month since 2020 for the amount you believe is required to pay the mortgage being approximately $3400?

A.    Yes.

Q.    Okay.  How did you send these payments to your attorney?

A.    Through -- well, I write a check and I drop it off at her office.

Q.    Okay.  So, every single one of these payments was -- scratch that.

Was every single one of the payments that you have made to your attorneys for the mortgage since 2020 made via personal check?

A.    Yes.

Q.    Okay.  And were those payments made from your personal checking account with Bank of America?

A.    Yes.

Q.    Do you know if your attorneys have ever attempted to send PHH additional funds related to

EXHIBIT 12
PAGE 30 OF 87

Page 110

A.    I believe they shredded the checks up because they didn't know how to apply them properly.

Q.    Okay.  So, is it your understanding that your attorneys remain in possession of all of that money?

A.    Yeah.

Q.    Okay.

A.    We're still waiting to hear back from PHH.  They need to apply it properly.

Q.    Since 2020 have you made any phone calls to PHH?

A.    No.

Q.    Since 2020 have you received any phone calls from PHH?

A.    Nope.

Q.    Since 2020 have you attempted to email PHH?

A.    Nope.

Q.    Since 2020 have you received any emails from PHH?

A.    No.

Q.    Since 2020 have you had any form of communication yourself with PHH?

A.    No.

EXHIBIT 12
PAGE 31 OF 87

Q.   And then we established you did not contact PHH at any point to update your mailing address, correct?

A.   It was always the same, yeah.

Q.   Did your attorney, Mr. Liddicoat, tell you that you needed to contact PHH to update your mailing address?

A.   No, he did not.

MR. CHRISTENSEN:  When do you think is going to be a good time for a break?

MR. SCHNEIDER:  I mean, my thoughts are the next break should probably just be lunch.

MR. CHRISTENSEN:  Sure.

MR. SCHNEIDER:  So, maybe 12:30.

MR. CHRISTENSEN:  Okay.

BY MR. SCHNEIDER:

Q.   Did Mr. Liddicoat forward all of the mail he received that was addressed to you?

A.   I don't know.  I believe so.

Q.   So, it's your understanding that if Mr. Liddicoat received a piece of mail addressed to you, that he then forwarded it to you?

A.   Yes.

Q.   Okay.  Now, eventually the mailing address was changed back to your home, correct?

EXHIBIT 12

PAGE 32 OF 87

Page 147

"buying down the interest rate"?

A.    No.

Q.    Okay.  Did Mr. Lewis ever discuss this concept with you?

A.    No.

Q.    Okay.  When is the first time you recall submitting -- scratch that.

When is the first time Mr. Lewis confirmed that you had submitted all the required documents to be evaluated for a refinance?

A.    I can't remember.  I don't know.  It was sometime in 2020.  I think it was May 2020.

Q.    What happened after you submitted all those documents in May 2020?

A.    Nothing.  They tried to foreclose and take my house.

Q.    After you submitted documents to Mr. Lewis in May 2020, did he confirm that you had submitted everything required to be evaluated for a refinance?

A.    Yes.  Yes.  Yes.  Yes.

MR. CHRISTENSEN:    Let him finish the question.

BY MR. SCHNEIDER:

Q.    Did Mr. Lewis tell you that he submitted

EXHIBIT 12
PAGE 33 OF 87

Page 148

your documents to a lender or underwriter to be evaluated at that time?

A.    I don't think so.  I did a DocuSign and I think, at that point, we needed a payoff amount to P -- from PHH and they failed to respond to our request, which is why we're here now.  It's all because of the refinance.

Q.    So, in May of 2020, did Mr. Lewis tell you that you were approved for a refinance?

A.    I never got approved because we needed PHH to respond to our request for the payoff amount.

Q.    In May of 2020 --

MR. CHRISTENSEN:  I'm sorry, I'm sorry, I need to object.

Objection, vague and ambiguous as to what it means to be approved.

THE WITNESS:  And I did -- I did complete the DocuSign, which was the final process needed on Phil Lewis's end.

BY MR. SCHNEIDER:

Q.    So, in May of 2020, did Mr. Lewis tell you that you had been approved for a loan to refinance the property?

A.    I never -- I never -- never was

EXHIBIT 12
PAGE 34 OF 87

officially approved.

Q.    In May of 2020, did Mr. Lewis tell you that you had been declined a loan?

A.    No.

MR. CHRISTENSEN:  Again, objection, vague and ambiguous between approve and decline.

THE WITNESS:  He told me that I completed the DocuSign and that's the last I heard from him.

BY MR. SCHNEIDER:

Q.    In May of 2020, did Mr. Lewis tell you that you had received a conditional approval for a refinance loan?

MR. CHRISTENSEN:  Again, objection. Vague and ambiguous, calls for a legal conclusion.

MR. SCHNEIDER:  I'm not asking him to comment on what it means to be approved for a loan. I'm simply asking him what Mr. Lewis told him, so we can --

THE WITNESS:  Never -- he never told me.

BY MR. SCHNEIDER:

Q.    Okay.

A.    Does that answer your question?

Q.    Yes.

A.    Okay.

Q.    After May 2020, when is the next time you

EXHIBIT 12
PAGE 35 OF 87

recall submitting documents to Mr. Lewis for a refinance?

A. I'm not sure. I remember doing it three times. Maybe October or November.

Q. So, the next time would have been October or November of 2020; is that correct?

A. Yeah, I believe so.

Q. Okay. So, for this attempt in October or November of 2020, did Mr. Lewis communicate to you that you had submitted all required documents to be reevaluated for a refinance?

A. Yes.

MR. CHRISTENSEN: I'm sorry, I couldn't tell what you said, Mr. Schneider, if you said if Cory Mayer had submitted all the papers or if Phil Lewis had submitted the papers to someone else. I didn't understand.

Objection, vague. Sorry.

MR. SCHNEIDER: The question was if Phil Lewis communicated to Cory whether Cory had provided all required documents to be submitted for a refinance.

THE WITNESS: Yup.

BY MR. SCHNEIDER:

Q. In October -- when you were making this

EXHIBIT 12
PAGE 36 OF 87

attempt in October or November of 2020, did Mr. Lewis ever tell you that you had been approved for a refinance?

A.    Never.

MR. CHRISTENSEN:    Again, objection as to what it means to be approved.  Vague.

BY MR. SCHNEIDER:

Q.    In October or November of 2020, did Mr. Lewis ever tell you that you had received a conditional approval for a refinance?

MR. CHRISTENSEN:    Same objection.

BY MR. SCHNEIDER:

Q.    You can answer.

MR. CHRISTENSEN:    You can answer.

THE WITNESS:    Oh, no, I've never been -- you know, if I was approved, like I say, Mr. Schneider, we wouldn't be here today, sir.

I'm sorry, I don't mean to be rude.

BY MR. SCHNEIDER:

Q.    That's okay.  I know some of this may be tedious, but we need to be very clear and go over a timeline.  Even if it may seem annoying to provide responses, it's just something we have to do.

A.    I understand.

Q.    So, in October or November of 2020, did

EXHIBIT 12
PAGE 37 OF 87

Mr. Lewis tell you that you had been declined a refinance?

A.    Never, no.

Q.    In October or November of 2020, did Mr. Lewis tell you that he had submitted your documents to a lender for evaluation?

A.    I don't think -- I don't think so.

Q.    Okay.  So, after October or November of 2020, when was the next time you recall working with Mr. Lewis on a refinance?

A.    I'm not sure.  Maybe we did it again in 2021, I'm not sure.

Q.    Do you recall working with him around March 2021?

A.    Yeah.

Q.    Okay.  In March of 2021, did Mr. Lewis ever tell you that you had provided him with all of the documents needed to be evaluated for a refinance?

A.    Yeah.  Yup.  He'd send me a list and I fulfilled the list.

Q.    And in March of 2021, do you recall if Mr. Lewis ever told you that he had submitted your documents to a lender to be reviewed for a refinance?

EXHIBIT 12
PAGE 38 OF 87

A.    I'm not sure.

Q.    In March of 2021, did Mr. Lewis ever tell you that you had been approved for a refinance?

A.    Nope.

MR. CHRISTENSEN:    Same objection as to approved.

BY MR. SCHNEIDER:

Q.    In March of 2021, did Mr. Lewis ever tell you that you were conditionally approved for a refinance?

MR. CHRISTENSEN:    Again, same objection as to form.   Vague.

THE WITNESS:    No.    Never was told that I was approved or conditionally approved.

BY MR. SCHNEIDER:

Q.    In March of 2021, did Mr. Lewis ever tell you that you had been declined a refinance?

A.    Nope, I don't think so.

Q.    In March of 2021, do you know if your attorney, Pam Simmons, told Mr. Lewis to not submit your documents for review of a refinance?

A.    No, I don't think so.  I would have never advised her to do that.

MR. SCHNEIDER:    I'm going to attach as Exhibit 10 an email from Pam Simmons to Phil Lewis.

EXHIBIT 12
PAGE 39 OF 87

This is Mayer -- it's Bates stamped both 297 and 2968.

(Defendants' Exhibit No. 10 was marked for identification.)

BY MR. SCHNEIDER:

Q.    Are you able to view this document?

A.    Yes.

Q.    Okay.  So, if we start at the bottom, you know, there's an email from Ms. Simmons to Phil Lewis asking if he's close to being ready so she can put pressure on the lender.

Mr. Lewis responds saying, "Yep, should have him submitted early this week."

Sounds like they're talking about, you know, resubmitting your documents for a refinance.

And the top email in this chain is an email from Pam Simmons to Phil Lewis dated March 28th, 2021, and it says "Don't submit," with four exclamation points.  "We won't be able to close unless I get the lender's approval."

Do you see that?

A.    Yes.

Q.    So, it appears Ms. Simmons specifically instructed Mr. Lewis to not submit your package in March of 2021.

EXHIBIT 12
PAGE 40 OF 87

Page 155

Does that come as a surprise to you?

A.    I don't know the exact details about this.

Q.    But I believe you just testified that you would have never instructed Ms. Simmons to instruct Mr. Lewis to not submit your package for a refinance, correct?

MR. CHRISTENSEN:    Objection, misstates prior testimony.

THE WITNESS:    I'd pretty sure we weren't given a payoff amount and so that's why we weren't able to submit.  I could be wrong.

BY MR. SCHNEIDER:

Q.    After March 2021, when is the next time you recall working with Mr. Lewis on a refinance?

A.    I'm not sure if there was another one after that.  I think we had to file like a TRO or something to stop the foreclosure.

Q.    Do you recall working with Mr. Lewis in June of 2021?

A.    Oh, maybe there was.  That might have been the fourth time right there.  Final attempt.

Q.    Do you recall if in June of 2021 Mr. Lewis told you that you had submitted all required documents to be evaluated for a refinance?

EXHIBIT 12
PAGE 41 OF 87

A.    Yup.

Q.    Do you recall how Mr. Lewis would have communicated this to you?

A.    Yeah, he'd call me or send me an email with a list of the required documents and I would get busy producing those documents and drop them off in person at his office.

Q.    And then when he believed that he had everything he needed, would he send you an email saying, you know, thanks, we received it all?

A.    Correct.

Q.    Have you looked for all those emails in your email?

A.    Yes.

Q.    And have you produced all those to your attorney?

A.    Yes.

Q.    So, any communications that you have with Mr. Lewis via email have been produced to your attorney; is that correct?

A.    Yeah.  A lot of the communication with with Phil was through cell phone.

Q.    Does that include text messages?

A.    We don't text message.  It's mainly just communication through phone.  Not much email,

EXHIBIT 12
PAGE 42 OF 87

Page 157

either.

Q.   Okay.   So, then, in June of 2021, do you recall if Mr. Lewis ever told you that you had been approved for a refinance?

MR. CHRISTENSEN:   Same objection as to form and meaning.

You can answer.

THE WITNESS:   Not that I know of.  I don't think so.  I never was approved.  That's why I'm still here.

BY MR. SCHNEIDER:

Q.   In June of 2021, did Mr. Lewis ever tell you that you had been conditionally approved for a refinance?

A.   No.   That's why I'm still here.

Q.   And in June of 2021, did Mr. Lewis ever tell you that you had been declined a refinance?

A.   No.

Q.   And do you recall if you continued working with Mr. Lewis on a refinance in October of 2021?

A.   I'm sure I did.

Q.   Okay.

A.   Continued to keep going till the end of the year, sir.  Just trying to get PHH to supply us

Friday with everything else.

THE WITNESS:  I don't know.  I don't want to tell you the wrong thing.

BY MR. SCHNEIDER:

Q.   I'm just here for your understanding.

A.   I told you, I don't -- I don't know.

Q.   That's fine.

After 2021, when is the next time you recall working with Mr. Lewis on a refinance?

A.   It might have been the following year.

Q.   Do you recall making any efforts to refinance in 2022?

A.   Yeah, probably.  That might have been the fourth, final time.

Q.   Do you recall if you have any emails with Mr. Lewis to that effect?

A.   I'd have to check.

Q.   Do you recall making any efforts with Mr. Lewis in 2023 to refinance?

A.   Probably, yeah.

Q.   Do you recall if you have any emails to that effect?

A.   I'd have to look.

Q.   Do you know what months you would have been working with Mr. Lewis in 2024?

EXHIBIT 12

PAGE 44 OF 87

A.    I'd have to look to be exact, exact months, get back to you on that.

MR. SCHNEIDER:  To the extent those documents exist, we would move to compel a second deposition to discuss those documents because there is nothing in the production of communications between Mr. Mayer and Phil Lewis in 2023 and 2024 -- strike that -- 2022 and 2023.

MR. CHRISTENSEN:  Get this transcript and show that comment to the judge for everyone here and he'll direct for a deposition.  Thanks.

Go ahead.

BY MR. SCHNEIDER:

Q.    Do you recall making any efforts with Mr. Lewis in 2024 to refinance?

A.    I think we did.

Q.    Do you know if Mr. Lewis pulled a credit report in 2024 for this refinance effort?

A.    I don't know the exact date.  Whenever he needed.

MR. SCHNEIDER:  I'm attaching as Exhibit 14, it's a credit report dated January 10th, 2024, Bates stamped Mayer43 through 52.  This is a credit report from Advantage Credit Credit Reporting Services, and at the top, it says Argus Home Loans.

EXHIBIT 12
PAGE 45 OF 87

that time period that would have accounted for this improvement in your credit score?

A.    Nope.

Q.    And then in January 2024, did Mr. Lewis ever communicate to you that you had submitted all the documents required to be evaluated for a refinance?

A.    I don't know if the exact month is correct, but he -- yeah, whenever we were done with the package, I fulfilled all the documents that he requested, then he would tell me that -- that he had everything he needed.

Q.    Do you recall if that was February 2024?

A.    You know, sir, I don't know the exact month.  I've done it so many times, all the months, I mix them up.

Q.    Sure.

So, for this early 2024 effort, do you recall if Mr. Lewis ever told you that you had been approved for a refinance?

A.    He never told me that I was approved. Just like I told you before, if I was approved, I wouldn't be here sitting talking to you today.

Q.    Did Mr. Lewis ever tell you that you'd been conditionally approved for a refinance in

EXHIBIT 12
PAGE 46 OF 87

2024?

A.    No, sir.

MR. CHRISTENSEN:   Same objection as to form, vague and ambiguous.

Go ahead.

THE WITNESS:   If I had been approved, I wouldn't be here today.   This is costing me a lot of time and money and stress on my life.

BY MR. SCHNEIDER:

Q.    Did Mr. Lewis ever tell you in 2024 that you had been denied a refinance?

A.    Nope.

Q.    Did anyone ever tell you that you were denied a refinance based on the credit reporting for your first position loan?

A.    Denied, did you say?

Q.    Correct.

A.    Can you repeat that question?

Q.    Did anyone ever tell you that you were denied for a refinance due to the credit reporting for your first position loan?

MR. CHRISTENSEN:   Objection, vague and ambiguous as to "denied."

Go ahead, you can answer.

THE WITNESS:   I don't think I was denied.

EXHIBIT 12
PAGE 47 OF 87

I don't -- yeah, I don't know.

BY MR. SCHNEIDER:

Q.   Did anyone ever tell you that you had received a conditional approval for a refinance since 2020?

A.   I don't know.  I don't think so.  I think we need to pay off the amount from PHH in order to get any conditional approvals or anything like that.  I could be wrong, sir.  I'm not an attorney or a loan person.

MR. SCHNEIDER:  How's everyone doing right now?  Do we need to take a break?

THE WITNESS:  I'm okay.

MR. CHRISTENSEN:  Yeah, five minutes is fine.

THE WITNESS:  I'm out of water is all.

MR. SCHNEIDER:  Okay, five minutes.

Off the record.

(Recess taken.)

BY MR. SCHNEIDER:

Q.   When you first took out this loan in 2006, did you agree to have an escrow account?

A.   No.

Q.   Okay.  Are you aware at any time that an escrow account was created for your loan?

EXHIBIT 12
PAGE 48 OF 87

A.    No.

Q.    Okay.  Did your attorney, Mr. Liddicoat, ever tell you that he received an annual escrow statement for your loan?

MR. CHRISTENSEN:  Objection, attorney-client privilege, instruction not to answer.

MR. SCHNEIDER:  Motion to compel.

THE WITNESS:  No, sir.

MR. CHRISTENSEN:  Don't answer.

THE WITNESS:  Oh, okay.

MR. CHRISTENSEN:  You can show him the document and see if he remembers it and ask about communications.

MR. SCHNEIDER:  Yeah, we'll see.

MR. CHRISTENSEN:  Yes, we will.  Let's submit it on Friday.

MR. SCHNEIDER:  I'm attaching as Exhibit 15, it's an annual escrow statement dated February 11th, 2020 and it is produced as Bates stamped Mayer1592 through 1594.

(Defendants' Exhibit No. 15 was marked for identification.)

BY MR. SCHNEIDER:

Q.    Have you seen this document before?

EXHIBIT 12
PAGE 49 OF 87

A.    I'm not sure.

Q.    This document is dated February 2020, February 11th, 2020, which is before the date that you signed the settlement agreement.

Do you know if Mr. Liddicoat forwarded you this document?

A.    Probably.

Q.    If Mr. Liddicoat did forward you that document, how would he have done so?

A.    I'm not sure.  Maybe mail it to me.

Q.    Would he have emailed it to you?

A.    I'm not sure.  Probably more like mail.

Q.    Have you searched your email for all of your emails with Mr. Liddicoat?

A.    Yeah.

Q.    Have you produced those to your attorney?

A.    Yes.

MR. SCHNEIDER:  So, does anyone know if there's an email from Mr. Liddicoat in February 2020 with this as an attachment?

Care to comment, Mr. Christensen?

MR. CHRISTENSEN:  I don't know.  You couldn't have it, if there was.

MR. SCHNEIDER:  Because?  Why can't we have it?

EXHIBIT 12
PAGE 50 OF 87

MR. CHRISTENSEN:  I'll give you a good guess.

MR. SCHNEIDER:  I just would like you to state it.

MR. CHRISTENSEN:  Attorney-client privilege.

MR. SCHNEIDER:  Okay.  So, where's your privilege log?

MR. CHRISTENSEN:  It's not responsive to any request that you served and it's not in the discovery and we're not here to talk about that.

MR. SCHNEIDER:  Okay.

MR. CHRISTENSEN:  We can talk about privilege and scope of privilege on Friday.

MR. SCHNEIDER:  I very much disagree that that's not within the scope of discovery, I very much disagree that it's not included in our request for production, and I think you laughing at the fact that a privilege log is required is something the court will find interesting when, you know, my client's produced a 95-page privilege log.

MR. CHRISTENSEN:  It's not the same thing.

MR. SCHNEIDER:  And it's certainly required.  Anything that you're claiming

EXHIBIT 12
PAGE 51 OF 87

attorney-client privilege needs to be produced in a privilege log.

So, if there's an email that exists between Mr. Liddicoat and Mr. Mayer in February of 2020, that should be included in your privilege log if you're claiming attorney-client privilege over that communication, which is directly relevant to this case because whether Mr. Mayer knew of this escrow statement in February of 2020 is very relevant to the claims in this case and our defense.

MR. CHRISTENSEN:  Sure.  You can ask that and you can explore that and you can talk about it without getting into the privilege or violating the privilege, nobody's got any problem with that.  You can ask him about this, you can ask if he knows about it, you just can't ask about communications, that's all.

MR. SCHNEIDER:  I did ask him about it and he's not sure.  He can't say for certain if there's an email or not.  We would know for certain if there was an email if you provided a privilege log.

MR. CHRISTENSEN:  Well, I don't know what to tell you.  Go ahead, but --

EXHIBIT 12
PAGE 52 OF 87

Page 179

MR. SCHNEIDER:  I'm sorry, are you affirmatively -- are you affirmatively saying that you will not provide a privilege log?

MR. CHRISTENSEN:  No, that's not what I'm saying.  I'm saying that the communications between him and his lawyer about documents going back and forth at the time of settlement during litigation about legal advice are privileged and you can't have that.

You can find out what he knows about it. The document's not privileged but you have it.  The emails and communications are privileged, that's all.

MR. SCHNEIDER:  Okay.  If they're privileged, then you have to provide a privilege log.  So, are you going to --

MR. CHRISTENSEN:  Making a privilege log of every single email between him and his attorney is not relevant, not within the scope of discovery. You don't need it.  You're trying to make me do it just to do busy work.

MR. SCHNEIDER:  That's not busy work.  We have done a 90-page privilege log in this case, Mr. Christensen, so you have demanded that --

MR. CHRISTENSEN:  It's discovery fraud

EXHIBIT 12
PAGE 53 OF 87

and you know it.

MR. SCHNEIDER:  Mr. Christensen, let me speak and then you can speak so the court reporter can take what we are discussing down.

The question is, are you going to provide a privilege log for what you are claiming are attorney-client privileged communications?

MR. CHRISTENSEN:  No, because none of them are responsive or within the scope of discovery.  It's not -- that's not -- no, we're not.

MR. SCHNEIDER:  That's fine.  Okay, that's your answer.

MR. CHRISTENSEN:  We're not required to.

MR. SCHNEIDER:  We will reserve our right to move to compel on that.

MR. CHRISTENSEN:  Go right ahead.  I would love nothing more.

MR. SCHNEIDER:  Gladly.

MR. CHRISTENSEN:  Just to be clear, why do you think it's not privileged, an email between the attorney and my client?

MR. SCHNEIDER:  We're talking about your client's knowledge about the facts.  We can argue all we want about privilege and attorney-client

EXHIBIT 12
PAGE 54 OF 87

privilege and you can claim attorney-client privilege and we can fight about that.  That doesn't change the fact that if you are claiming attorney-client privilege, that you have to provide a privilege log.  At a minimum, we can know if the communication exists.  And you can't fight me on that.  Whether the communication exists, I'm entitled to it in discovery.

MR. CHRISTENSEN:  Nope, that's not true, either.

MR. SCHNEIDER:  That's the purpose of a privilege log, to show that a communication exists for a privileged matter.

MR. CHRISTENSEN:  Yeah, you think you can get --

MR. SCHNEIDER:  Do I think I can get a privilege log?  Yes, I think I can get a privilege log.

MR. CHRISTENSEN:  Every email in five years?  That's ridiculous.

MR. SCHNEIDER:  It's not ridiculous.

MR. CHRISTENSEN:  If the judge orders it, then we'll do it.

MR. SCHNEIDER:  That is literally what you have asked of us.  It is the same thing you

EXHIBIT 12
PAGE 55 OF 87

have asked of us.

MR. CHRISTENSEN:  Nope, that's not true, either.

MR. SCHNEIDER:  It 100 percent is.

Agree to disagree, but I have my answer, that you're not going to provide a privilege log consistent with your discovery obligations and we will bring that before the court.

MR. CHRISTENSEN:  No, that's not an accurate representation of what's happening.  So, you want to try to make me do busy work to run up the fees, fine, see if you can get the judge to --

MR. SCHNEIDER:  No, what I want is to know whether a communication exists.  Whether a communication exists about the delivery of this escrow statement to Mr. Mayer is directly relevant to the claims.

MR. CHRISTENSEN:  No, it's not.

MR. SCHNEIDER:  Okay.  Part of your client's claims is that an escrow account was improperly created.  Whether he had knowledge of the creation of that escrow account prior to the date of settlement, it's directly relevant to our defense.

MR. CHRISTENSEN:  That's not -- none of

EXHIBIT 12
PAGE 56 OF 87

that's accurate.

MR. SCHNEIDER:  Okay.

MR. CHRISTENSEN:  Okay.  No escrow account has ever been validly created.  They never complied when they needed to, that's what's going on, and the fact that you mailed it to the wrong place, to his lawyer --

Well, whatever.  You guys do whatever you want.  I know this is --

Nobody disputes that this letter was received by his lawyer.  Nobody disputes that.  And nobody disputes there's communications about it with PHH, and even the knowledge of his lawyers imputed to him by law, we've talked about this many times, so whatever.  You're not going to dig into privileged communications over this.  You don't need it.  You can't have it.

MR. SCHNEIDER:  I can have a privilege log.

MR. CHRISTENSEN:  You can ask him all you want about it.  You can ask him about this document, what he knows about it or remembers about it.

MR. SCHNEIDER:  I've already done that.

Moving on.

EXHIBIT 12
PAGE 57 OF 87

BY MR. SCHNEIDER:

Q.    Are you aware that your attorneys filed multiple motions for relief to -- sorry -- multiple motions to enforce the settlement in the previous civil action?

A.    Yes.

Q.    Okay.  Do you know whether your attorneys withdrew any of the motions to enforce the settlement in the previous civil action?

A.    Yeah.

Q.    Do you know why?

A.    Not the details.

Q.    Okay.  Do you recall executing what we call declarations in support of these motions to enforce the settlement?

A.    Yeah.

Q.    Okay.

MR. SCHNEIDER:  Attaching as Exhibit 16 is a declaration that was filed January 10th in the previous civil action.

(Defendants' Exhibit No. 16 was marked for identification.)

BY MR. SCHNEIDER:

Q.    If we go to page 3 of this document, is that your signature on the line that says "Cory

EXHIBIT 12
PAGE 58 OF 87

Page 188

Q.    Following the settlement in 2020, I think earlier we had established that you have not had any telephone or email contact with PHH, correct?

A.    Correct.

Q.    Have you had any communications in any manner, whether it be telephone, email, or otherwise, with HSBC as trustee?

A.    No.

Q.    And have you had any direct communication via email or telephone with any of PHH's attorneys since 2020?

A.    Nope.

Q.    Okay.  Did you delegate the management of ensuring the 2020 settlement was complied with to your attorneys?

MR. CHRISTENSEN:  Objection, vague and ambiguous.  Objection to form.

You can answer, if you know.

THE WITNESS:  I -- I don't know.

BY MR. SCHNEIDER:

Q.    Was it your understanding that your attorneys were handling your dispute concerning the 2020 settlement agreement with PHH?

A.    Yeah, of course.

Q.    Okay.  How often would you receive

EXHIBIT 12
PAGE 59 OF 87

updates from your attorneys after the settlement in 2020 about their efforts to resolve the dispute with PHH?

A. With Pamela Simmons, regularly.

Q. When you say "regularly," would that be --

A. Couple times a week. Couple times a week she kept me thoroughly informed what was going on and her waiting for PHH to comply with the payment -- payoff amount and all that.

Q. How would she provide you with these updates?

A. Telephone. And she also would provide me email, also.

Q. Have you searched for all those emails?

A. I'm not very good at looking at my email every day, so a lot of times she would call and we'd communicate over the phone. But there are emails.

Q. Have you searched for all of your emails with --

A. Yes.

Q. -- Pam Simmons?

A. Yes.

Q. And have you provided all those emails to

EXHIBIT 12
PAGE 60 OF 87

Page 207

Q.    Okay.   And then eventually Mr. Lewis obtains a credit report in September of 2020, finds out that there's a sixty day late payment being reported and that it disqualified you from obtaining refinancing.

Did Mr. Lewis ever tell you that there was a sixty day late payment that would disqualify you from refinancing?

A.    Yes.

Q.    Okay.   When did he tell you that?

A.    I'm not sure.   Maybe that same time. Must have been May 2020, November, went into the following year, I'm not sure.   Probably the first time.

Q.    Well, this would have to have been after September 2020, based on your verified response.   I mean, it says based on the credit report in September 2020 --

A.    I'm sorry.

Q.    -- then it was sixty days late.

A.    Then let's say it would have been the November attempt, 2020.

Q.    And that's when he would have told you that this sixty day late reporting would have disqualified you?

EXHIBIT 12
PAGE 61 OF 87

A.    Yes.

Q.    And, so, based on that, did Mr. Lewis say we're not going to submit you for refinancing because we know that you won't get approved because of this sixty day late payment?

A.    Yeah.

Q.    Okay.  Did he tell you which company was reporting it as sixty days late?

A.    I don't know.

MR. CHRISTENSEN:  I'm sorry, objection, vague and ambiguous.  What do you mean, which company or what time period?

Go ahead, you can answer, if you know.

THE WITNESS:  I don't know what company.

BY MR. SCHNEIDER:

Q.    So, you know, your response, your verified responses state that it's based on a credit report in September 2020.

So, let's go ahead and go back to the credit report we looked at from September 2020, and this is Exhibit 7.

And, so, if we kind of scroll down, here we are at page 4 of this exhibit, PHH Mortgage Services, and there's an entry saying sixty days late for August 2020.

EXHIBIT 12
PAGE 62 OF 87

Page 215

Q.    Since 2020 have you applied for a credit card to complete home improvements that you were denied for?

A.    I don't believe I was denied.

Q.    Did you ever apply for a credit card in order to complete home improvements?

A.    Yes.

Q.    When?

A.    Oh, last year.  2025.  I can't remember, Synchrony Bank or something.  I got a six -- six months zero percent interest and I got new floors for my house.  I paid it off within six months.  It was, I think, $4000.

Q.    And you said you did that in 2025?

A.    Correct.  January or February.

Q.    Did you make any attempts to obtain that credit before 2025?

A.    No.  I -- no.  Maybe regular credit cards and stuff to take advantage of this low interest rate.

Q.    Is there a reason that you waited until 2025 to do this or that's just when you decided to redo the floors?

A.    Yeah, that's -- it was time, yeah.  The carpet -- the carpet needed to go.  I think it was

EXHIBIT 12
PAGE 63 OF 87

Page 216

original carpet from 1961 and somehow I had asthma and I just bared it the whole time I lived there and then I slowly -- slow process.  It took over a year for me to get prepared for putting new floors in, and then when I finally got the floor, I executed that rather quickly.

Q.   Did something happen to the flooring that kind of expedited, you know, you taking care of it, like, you know, there was a fire that burned the floor or, you know --

A.   No, nothing like that.

Q.   -- multiple damage that kind of prompted you to do it?

A.   I was unable -- I was unable to get any -- any credit -- anything because my credit was wrongly affected from all of this.  That's what prolonged everything and that's why I had to wait all the way till 2025.

Q.   Did you make any attempts before 2025 to obtain this credit to redo your floors?

A.   I couldn't.  I couldn't even make an attempt because I knew that nothing had been rectified, so there was no reason to make it, it would be a waste of time, sir.

Q.   And then you also say that you were

EXHIBIT 12
PAGE 64 OF 87

unable to buy a new car.

Did you make any -- have you made any attempts since 2020 to purchase a new vehicle?

A.   Not a new car but I replaced a work truck.  It's actually an old car, but I had to replace my work truck.

Q.   When did you do that?

A.   2024.

Q.   Do you recall what month?

A.   November or December.

Q.   And did you obtain a loan to purchase that truck?

A.   No, I did not.

Q.   How did you fund the purchase of that truck?

A.   Cash.  I paid for it.

Q.   And how much was it?

A.   $16,000.

Q.   Is that typical for you with your work trucks, to pay cash as opposed to financing it?

A.   Yeah.  I've never had a loan on a car before.  But I don't buy cars regularly.  First time I bought a car in twenty years.

Q.   So, when you say, you know, in this verified response that you're unable to buy a new

EXHIBIT 12
PAGE 65 OF 87

car, what are you referring to?

A.    You know, it might have been my wife's car, now that I'm thinking about it.  I had to buy -- I bought -- I didn't have to do it, but I bought my wife a new car and I had a really bad interest rate during all that and so I had to pay it off as soon as possible, so that may be what you're talking about.  I think that was -- I don't know when that was.  2020, something like that.

Q.    Do you know who the lender was?

A.    Oh, man.  No, I don't.  We must have just went with the lender at the car dealership.  We were out in Tracy.

And now that I think about it, it was in 2018, I believe.  '17 or '18, sometime in there.

Q.    Do you recall what car it was?

A.    It was a Subaru Forester for Hillary, Hillary Hamilton.  But I'm on the car, too.  It's both of ours.

Q.    And you said that you paid -- paid off that loan?

A.    I paid it off as soon as possible because the interest was so high.  It was terrible.

Q.    Do you recall approximately how long it took you to pay it off?

EXHIBIT 12
PAGE 66 OF 87

Page 225

obtain credit.  You know, one of those we just discussed about, you know, you getting credit in 2025 to complete the flooring in your home.  You know, we've talked a lot about those types of efforts.

Is there anything else you can think of that we have not discussed today related to your inability to get credit since 2020?

A.   No, I don't think so.

Q.   The next couple of categories relate to loan fees and foreclosure-related charges.  I'm not going to ask you about that, unless you believe you have an understanding of exactly what those amounts are.

A.   No, sir.

Q.   Okay.  The next category is emotional distress damages, and it says not less than $300,000.

MR. SCHNEIDER:  So, as an initial matter, perhaps this is more posed to you, Mr. Christensen, is your client claiming garden variety emotional distress damages or are we going to be getting into more specific events?

MR. CHRISTENSEN:  I'm not the one being deposed.

EXHIBIT 12
PAGE 67 OF 87

Page 226

MR. SCHNEIDER:  I just want to know where I need to go down and how many objections are going to follow with these questions.

MR. CHRISTENSEN:  Do you want to count my gray hair?

MR. SCHNEIDER:  I got gray hairs already, so if that's what we're counting, then --

THE WITNESS:  I think I got you beat, buddy, and I --

MR. CHRISTENSEN:  Can we negotiate how much money for gray hair?

THE WITNESS:  I think it's a hundred thousand per hair.

MR. CHRISTENSEN:  No.

BY MR. SCHNEIDER:

Q.   So, on a more serious note, it says here the stress led you to believe that you were having heart attacks several times.

A.   Yeah.

Q.   When was the first time that that happened?

A.   There's a few -- few times.  One time my hearing went out on me and then my visual went out and my wife started feeding me food and it got me back to life without going to the hospital, and

EXHIBIT 12
PAGE 68 OF 87

Page 227

then it happened again a second time.  I don't know if it was a heart attack.

Q.    When was the second time?

A.    Oh, I don't know, maybe a year after that.

Q.    Are you able to narrow it down to a year?

A.    Oh, yeah.  Maybe within a year after that.  My brain does -- chooses to not remember that stuff.  It was all after 2020.

Q.    Were you transported to a hospital at the time you were having this heart attack?

A.    No, I thought -- I thought I was --

MR. CHRISTENSEN:  You've got to wait till he's done asking.  Go ahead.

THE WITNESS:  Go ahead and finish, sir.

MR. CHRISTENSEN:  Go ahead and finish.

BY MR. SCHNEIDER:

Q.    Were you transported to a hospital at any point when you believed you were having these heart attacks?

A.    No.  Very close.

Q.    Did you ever visit a doctor related to your belief that you were having these heart attacks?

A.    I went to Kaiser and got a physical

EXHIBIT 12

PAGE 69 OF 87

after.

Q.   Do you recall when that was?

A.   Oh, it was during 2020.  I did it a couple different times.

Q.   And is Kaiser your insurer?

A.   Yup.

Q.   Has Kaiser been your insurer since 2020?

A.   Yeah.

Q.   Do you recall what facility you visited?

A.   Scotts Valley.

Q.   Do you recall the name of the doctor?

A.   Dr. Guardia.  Guardia.  She's my physician.

Q.   And what was the result of that physical?

A.   I was okay.

Q.   There was no diagnosis for anything?

A.   No.  As far as I know, my heart's okay. I didn't go through the MRI and do future or further testing.

Q.   Were you prescribed any medication following that physical?

A.   Nope.

Another account, I went to the emergency room.

Q.   When was that?

EXHIBIT 12
PAGE 70 OF 87

A.    Might have been 2021 in Easter.  April. It was on Easter.  I spent the entire Easter in the emergency room.

Q.    And why did you go to the emergency room?

A.    I had to get stitches in my knuckle on my ring finger.  A knife went into my finger, right into the knuckle.

Q.    Are you claiming that that is related to PHH's conduct here?  Are you claiming that as a damage?

A.    I'm not sure.  You know, trying to, you know, working at home and -- it happened at home. It was just another emergency during all of this and it's all stress related.

So, yeah, actually, it's definitely caused by this.

Q.    Do you recall what emergency room that was?

A.    I don't know the exact.  You know, it was Dominican in Santa Cruz County.  They have one emergency room right in front.  I drove myself. Dominican in Santa Cruz County.  I drove myself there.  I didn't want to go.  The bleeding wouldn't stop.

Q.    And you said that was caused by a knife?

EXHIBIT 12
PAGE 71 OF 87

A.    Correct.    Utility knife.

Q.    Can you explain what happened?

A.    I slipped cutting a conduit pipe for some landscape lighting on some stairs in the backyard.

Q.    And you're claiming that that happened as a result of PHH's conduct?

A.    Well, not exactly.    Just another -- another hospital incident.

Q.    Have you had any other incidents with the hospital since 2020?

MR. CHRISTENSEN:    Objection, overbroad.

THE WITNESS:    And COVID.

MR. CHRISTENSEN:    It's overbroad.    You can ask him about stress related to this case, not his entire medical history.    It has nothing to do with this.

MR. SCHNEIDER:    Well, I mean, he just said that he cut himself on Easter and that was related to PHH's conduct, so it kind of seems like he's attributing every injury since 2020 to PHH's conduct.

MR. CHRISTENSEN:    No, that's not what he said.    You have to ask better questions, more clear.    We're not talking about his whole medical history.    You need to make it clear you're talking

EXHIBIT 12
PAGE 72 OF 87

about medical history in general or related to this.

BY MR. SCHNEIDER:

Q.   Were there any other incidences where you believed that you were having a heart attack due to the stress caused by PHH?

A.   No.

Q.   And it also says here that the stress caused severe anxiety.  How did that manifest itself?

A.   It makes me stressed, you know, stressed and depressed.  Anxiety leads to depression.

Q.   Did you ever seek medical treatment for this anxiety?

A.   No.

Q.   Have you ever sought any non-medical options to treat this anxiety?

A.   Oh, like Chinese medicine?  I do yoga and it actually helps.

Q.   As far as physicians and other physical remedies.

A.   No.

Q.   So, the only physician that you have seen related to your stress or anxiety caused by PHH was Dr. Guardio when you had the physical since 2020;

EXHIBIT 12
PAGE 73 OF 87

is that correct?

MR. CHRISTENSEN:  Objection, misstates prior testimony.

BY MR. SCHNEIDER:

Q.    Other than your physical with Dr. Guardio, since 2020 have you seen any other physicians related to the stress and anxiety caused by PHH?

A.    No.  Not that I know of.

Q.    Do you believe that your stress or anxiety has manifested itself in any physical ways?  You know, for instance, you said you believed you were having a heart attack.  Are there any other physical symptoms that you attribute to the stress or anxiety caused by PHH?

A.    No.

Q.    Do you have any loss of appetite, sleeplessness?

A.    Yeah, it's continuous, man.  This has been going on for ten years.

Q.    What time do you typically go to bed at night?

A.    Oh, 10:00 or 11:00.

Q.    And when do you take -- when do you wake up for work?

EXHIBIT 12
PAGE 74 OF 87

A.    6:00.  Didn't get much sleep last night from the stress from this.

Q.    Are there specific time periods where you just were unable to sleep at night due to the stress or anxiety caused by PHH?

A.    Of course.

Q.    When?

A.    Every day.

Q.    You struggle to sleep every single day --

A.    Yeah.

Q.    -- due to the stress or anxiety caused by PHH?

A.    Yeah, it's really bad, and it's really hard for me to keep my relationships.  And even with my family, I'm negative all the time.  With my wife.  They don't want to talk to somebody that's negative all the time, so it's been impossible.  I don't have any friends, and the close friends that I do have, it's been a real struggle to keep them in my life 'cause I'm just not a happy person to communicate with or be around.

Q.    I mean, it seems like your friends still want you in their life if you're invited to this bachelor party, right?

A.    He really was trying to help and it broke

EXHIBIT 12
PAGE 75 OF 87

Page 234

his heart when, you know, when he knew -- he knew that I couldn't do that.  That why he paid -- offered to pay for me.  I had to tell him about this deposition and couldn't give up this -- give up my house all over a party boat.

Q.    When was the trip for the bachelor party?

A.    I think they went on Tuesday.

Q.    When did you become aware of the bachelor party?

A.    In November.  We all -- they were setting it all up before Christmas.

Q.    And when did you tell them that you couldn't go?

A.    Right away.  November.

Q.    What was the reason that you weren't able to attend?

A.    Fear of being homeless.  Same reason everything has been on hold.  And I'm technically homeless.  Or, in your guys's eyes, I'm homeless.

Q.    How are you homeless?

A.    The foreclosure of my house, wrongful foreclosure.

Q.    I mean, your house is not foreclosed. So, how are you homeless?

A.    Yeah, but it was.  It says right here,

EXHIBIT 12
PAGE 76 OF 87

emotional distress damages.

Q.   Right.   But the foreclosure was in 2016 and was -- part of the 2017 lawsuit has been rescinded and all that has long since been taken care of and there hasn't been a foreclosure of your home --

A.   It has not been taken care of.

Q.   -- so how are you homeless?

A.   Has not been taken care.   Nothing has been taken care of.   Nothing has been applied to my loan.   I do not have the proper interest rate. Therefore, I can't afford it.   I'm foreclosing now.

Q.   Well, no one's foreclosing now because you have a TRO and injunction preventing the foreclosure sale, correct?

A.   Yeah, but if I didn't go to this deposition and I'm did a no-show because I'm on a cruise ship, I'd lose my house and be homeless.

Q.   But in November of 2020 you did not know that your deposition was going to conflict with this bachelor party, so when you declined the invite, you, in fact, had no idea that you may not be available.

A.   That's not true.

MR. CHRISTENSEN:   Counsel, could we take

EXHIBIT 12
PAGE 77 OF 87

Simmons for the attorney's fees that she has incurred since 2020?

A.    Yes.

Q.    Okay.  But you don't know what that amount is, correct?

A.    Yes, sir.

Q.    Okay.  So, on July 5th, 2023 you were arrested for a DUI, correct?

A.    July 5th, 2023.  Yeah.  It wasn't technically a DUI, but...

Q.    What do you believe it was?

A.    It was sleep -- sleeping, sleep driving. Fell asleep at the wheel.

Q.    Do you know what the charge was?

A.    Well, they gave me, it was a no contest. I have no recollection of the event.  I was sleeping.

Q.    Do you recall if you were parked on the side of the road and sleeping or were you driving?

A.    No.  Yeah, I was in a parking lot sleeping.

Q.    What parking lot were you in?

A.    Dave's Market, the end of that.  It was actually Beckman's Bakery.

Q.    Why were you sleeping in your car?

EXHIBIT 12
PAGE 78 OF 87

A.    'Cause I didn't want to drive.

Q.    Why didn't you want to drive?

A.    Too tired, so I went to sleep.

Q.    The only reason you didn't want to drive is because you were too tired?

A.    Correct.  Exhausted.

Q.    It wasn't because you had been drinking that night?

A.    No.

Q.    Were you drinking that night at all?

A.    I -- earlier in the night, so I didn't want to take the chance, but it wasn't why I chose to not drive, it was 'cause I was too tired to drive.

Q.    Do you recall what your blood alcohol content was?

A.    No.  It was -- no.

Q.    The court records indicate your blood alcohol content was .15.

Does that sound correct?

A.    Yeah, but that was the next day, so it's not accurate to when the time of the crash was.

Q.    I'm sorry, you said "time of the crash"?

A.    Yup.  I got in an accident.

Q.    On July 5th, 2023 you got in an accident?

EXHIBIT 12
PAGE 79 OF 87

A.   Yes.

Q.   So, you slept in the parking lot, woke up, and then got in an accident?

A.   I never woke up.  Didn't wake up till the next day.  I was in the hospital.  I have no recollection of driving.

Q.   Did you serve jail time?

A.   No.  They did a house arrest.

Q.   Were you appointed to any programs as part of the conditions of your release?

A.   What type of program?

Q.   Like a DUI program.

A.   Yeah.  I completed that.

Q.   What did that consist of?

A.   It was an eighteen month Zoom meetings, and before that, I had to go to AA.

Q.   Do you still attend AA meetings?

A.   No.  I really don't drink.  I never was a big drinker.

Q.   So, where were you drinking that night when you decided to sleep in the parking lot?

A.   It was earlier that day and it was at a barbecue, a buddy's house right across the street from where I was parked.

Q.   Was this a 4th of July barbecue?

EXHIBIT 12
PAGE 80 OF 87

Page 243

A.     Yeah, I couldn't park at his house because of the parking -- parking permit signs. Didn't want to get my car towed.

Q.     This wasn't the first DUI you've had, correct?

A.     No.  It technically wasn't a DUI, it was a no contest.

Q.     Do you recall when the first one was?

A.     That was 2017.

Q.     And what happened during that one?

A.     It was an accident.

Q.     Were there any injuries as a result of that accident?

A.     Yeah.  My wife was injured.

Q.     What injuries did she sustain?

A.     Broken ankle.

Q.     And did you serve any jail time for that?

A.     Maybe one night and I probably had to do an ankle monitor.

Q.     Did you have to complete any DUI programs or attend any AA meetings that time?

A.     Yes.  It was a three month first offender program and I had to do a couple AA meetings.

Q.     And where were you driving from when that happened?

EXHIBIT 12
PAGE 81 OF 87

Page 246

A.   2023?  Oh, say about ten grand, maybe fifteen, fifteen grand.

Q.   Did you pay for that all in cash or did you obtain a bond or anything like that?

A.   Cash.  All cash.  Check.

Q.   That's inclusive of attorney's fees and everything that kind of goes in with that?

A.   Yes.  Yes.

Q.   Okay.  As a result of your 2023 incident, was your license suspended?

A.   Restricted.

Q.   Restricted.  What does that mean?

A.   Yeah.  I can drive to and from work.

Q.   Okay.  So, it didn't -- clearly didn't affect your ability to get to work?

A.   Not at all.

Q.   Did it impact your ability to do work?

A.   Not at all.

Q.   Did it impact, you know, what you were doing as a handyman?

A.   Not at all.  I was very fortunate to stay busy after the accident.

Q.   Did it have any effect on any of your relationships with friends or family?

A.   Zero.  I actually made friends from it.

EXHIBIT 12
PAGE 82 OF 87

MR. SCHNEIDER: We'll reserve our right to compel further testimony, but I'll pass the witness to you for cross, if you have it.

MR. CHRISTENSEN: Yeah. Let's take five minutes, let me gather my notes.

Off the record for five minutes?

MR. SCHNEIDER: Okay.

MR. CHRISTENSEN: I only have a couple questions, I think.

(Recess taken.)

EXAMINATION BY MR. CHRISTENSEN:

Q. Mr. Mayer, I want to go back over a couple things about the medical things he'd asked you about.

A. Okay.

Q. So, you went to Dr. Guardio about your general health checkup that year, right? That was not related to when you thought you had a heart attack; is that right?

A. Correct.

Q. Okay. So, just to be clear, you're not seeking damages in this case for having to go see Dr. Guardio for that annual checkup that you talked about?

A. No, not seeking that.

EXHIBIT 12
PAGE 83 OF 87

Page 248

Q.    Okay.    The same for the knife wounds that you got working on your house, you're not seeking damages in this case from that knife wound, correct?

A.    No.

Q.    Okay.  Is it your understanding that from 2020 to now that you qualified to refinance your house except for the credit reporting problem caused by PHH and PHH's failure to give you a payoff amount; is that right?

A.    Yeah.

MR. SCHNEIDER:  Objection.

BY MR. CHRISTENSEN:

Q.    Okay.  So, do you remember Phil Lewis telling you that you qualified based on your financials to refinance?

A.    Yes.

Q.    Do you remember that?

A.    Yes.

Q.    Okay.

MR. SCHNEIDER:  Objection as to timeframe, vague and ambiguous.

BY MR. CHRISTENSEN:

Q.    From 2020 to 2025, current, 2026, do you remember Phil Lewis telling you several times that

EXHIBIT 12
PAGE 84 OF 87

A.   No.

Q.   Okay.  So, even though you've tried to pay your property taxes, PHH won't take your money; is that right?

A.   Yeah.

Q.   Okay.  So, even though you've been ready, willing, and able to pay your property taxes for ten years, PHH won't take your money to pay it, to pay those taxes; is that right?

A.   Yes.

Q.   Okay.  Do you think you should have to pay your property taxes back when PHH is not allowing you to pay it?

A.   At this point, no.

Q.   Okay.  That's all I have for now.

MR. SCHNEIDER:  I just have basically two quick followups to that.

EXAMINATION BY MR. SCHNEIDER:

Q.   I believe earlier you testified that you had this second scare where you believed that you were possibly having a heart attack related to the stress and anxiety caused by PHH, correct?

A.   Correct.

Q.   And it was after that second scare that you then went and had a physical with Dr. Guardio,

EXHIBIT 12
PAGE 85 OF 87

Page 251

correct?

A.    Yeah.    It wasn't related to the scare.    I have -- I have to go every year for my asthma in order to get an inhaler, this device here.    I don't know if you can see it, but I have to every year do a physical with her.

Q.    Okay.    And then one final question.

Just as a point of clarity on the damage you are claiming, are you claiming that PHH prevented you and your wife from having children?

A.    No.

Q.    Okay.

MR. SCHNEIDER:    Anything further, Mr. Christensen?

MR. CHRISTENSEN:    No, not for now.

MR. SCHNEIDER:    Alright.    We are off the record.

(Time noted:    5:18 p.m.)

EXHIBIT 12
PAGE 86 OF 87

Page 252

REPORTER'S CERTIFICATE

I, VALERIE PADILLA, a Shorthand Reporter, State of California, do hereby certify:

That CORY MAYER, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 24th day of February 2026.

_____

VALERIE PADILLA, CSR NO. 3081
State of California

EXHIBIT 12
PAGE 87 OF 87

# EXHIBIT 13

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---o0o---

CORY MAYER,

    Plaintiff,

vs.                                    No. 5:25-cv-00812-NW

DEUTSCHE ALT A SECURITIES

MORTGAGE LOAN TRUST SERIES

2006-A; PHH MORTGAGE

CORPORATION; WESTERN

PROGRESSIVE, LLC; DOES

1-20; and all persons

unknown claiming any interest

in the property, inclusive,

and DOES 1 through 50,

inclusive,

    Defendants.

_____/

ZOOM VIDEOCONFERENCE DEPOSITION OF HILLARY HAMILTON

February 12, 2026

Reported by Valerie Padilla, CSR No. 3081

Job No. NY 7883388

Pages 1 - 77

EXHIBIT 13
PAGE 1 OF 11

Page 3

ZOOM VIDEOCONFERENCE DEPOSITION OF HILLARY HAMILTON

        BE IT REMEMBERED, that pursuant to Notice, and on the 12th day of February 2026, commencing at the hour of 8:58 a.m., virtually appeared HILLARY HAMILTON, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

                    ---o0o---

APPEARANCES:

(All parties appearing remotely)

For the Plaintiff:

        ANDREW JOE CHRISTENSEN, ESQ.
        2063 Mountain Boulevard, Suite 2
        Oakland, CA 94611
        (510) 761-7182
        andrew@californiahomelawyer.com

For the Defendants:

        TIMOTHY A. SCHNEIDER, ESQ.
        Houser LLP
        9970 Research Drive
        Irvine, CA 92618
        (949) 679-1111
        tschneider@houser-law.com

EXHIBIT 13
PAGE 2 OF 11

Page 16

at the place in Rio Del Mar, correct?

A.   Uh-huh.

Q.   Okay.  Before the place in Rio Del Mar, where did you live?

A.   I was living with my mother in Aptos.

Q.   Do you recall when you started living with your mother?

A.   At the end of February of 2019.  I remember that clearly because it was right before I started my job.

Q.   And then prior to living with your mother, where did you live?

A.   I briefly lived with my former boss, who has passed away since.  From when I moved out from Cory's place, it was November through -- 2018 through February of 2019.

Q.   So, then, prior to living with your former boss, where did you live?

A.   With Cory.

Q.   Okay.  And do you know the address?

A.   8650 Hihn Road, Ben Lomond.

Q.   Okay.  So, you were living with Cory at 8658 Hihn Road until November 2018 and that's when you moved out and started living with your former boss, correct?

EXHIBIT 13
PAGE 3 OF 11

Page 17

A.    Correct.

Q.    Okay.  Why did you start living with your former boss instead of, you know, living with your mother or somewhere else?

A.    Well, basically she had a guest house and offered for me to live there because of my distress and need for somewhere to go.

Q.    What is her name?

A.    Margaret Payne.

Q.    I'm sorry, I didn't catch the last name.

A.    Payne, P-a-y-n-e.

Q.    Thank you.

A.    Uh-huh.

Q.    So, why did you decide to move out of Cory's home in November 2018?

A.    Well, because it was -- it had taken a toll on me, the stress that he was going through and how it, you know, it caused a lot of fights, and -- and over time, yeah, it just took a toll on me and I did not want to be in that environment anymore.

Q.    I believe you testified earlier that most of the stress was a result of what was going on with the home at the time; is that correct?

A.    Yes.

EXHIBIT 13
PAGE 4 OF 11

Q.    Were there any other stressors in your marriage at that time, finances, infidelity, gambling, drinking, you know, any other problems that came up in the marriage, other than what was going on with the home?

A.    Well, I personally did have a drinking problem, but that was a lot due to the stress, so...  Yeah.

Q.    Did Cory have a problem with you drinking?

A.    Yeah.

Q.    Did you guys have fights specifically about the drinking problem?

A.    Not -- not like serious explosive fights, but, yeah, he was concerned.

Q.    When you moved out in November of 2018, were you kind of separating from Cory?

A.    Well, yeah.  I mean, I needed to get out of an environment that I think was not good for my mental health.

Q.    Before all the stuff kind of started happening with the home at the time, did you have a drinking problem before then?

A.    No.

Q.    Okay.  So, other than what was going on

EXHIBIT 13
PAGE 5 OF 11

happening with the home, did those kind of change, as well?  Did the fights get kind of bigger and morph into something you hadn't experienced in the past?

A.    Yes.

Q.    Okay.  Just to be clear, we are still kind of talking about this 2016 timeframe, correct?

A.    The end of 2016.

Q.    Okay.

A.    Yeah, when it started to develop into more stress.

Q.    Okay.  And then in 2017, Cory filed a lawsuit against the bank for the foreclosure.

Are you aware of that?

A.    Yeah.

Q.    Okay.  And then in 2017, were you and Cory in a car accident?

A.    Yes.

Q.    Can you explain to me what happened that night?

A.    We were out at a friend's wedding and both had too much to drink.  I think he took a break and thought he was okay but we ended up in a car accident.  I don't remember any of it until I woke up during the accident and -- yeah.

EXHIBIT 13
PAGE 6 OF 11

Page 23

Q.   And were you injured during that accident?

A.   I was.

Q.   And what were your injuries?

A.   Well, I broke both legs and fractured my neck and broke some ribs and had a punctured lung.

Q.   Oh, wow, that sounds very scary.

A.   Yes.

Q.   Were you hospitalized for these injuries?

A.   Yes.

Q.   How long were you in the hospital for?

A.   Five or six days.

Q.   Have you made a full recovery from those injuries?

A.   Yeah, I have.

Q.   How long did that recovery take?

A.   Well, I think I was -- it's a little hard to remember, but I believe I was walking by April the following year.  Yeah, I did physical therapy.

Q.   And that accident was in October of 2017, correct?

A.   Yeah.

Q.   Okay.  So, it was almost six months before you were able to kind of start walking and get back into more of a normal daily life?

EXHIBIT 13
PAGE 7 OF 11

A.   Right.

Q.   Have you spoken to any divorce attorneys about it?

A.   No.

Q.   No.   Okay.

Since moving out in November 2018, have you dated anyone else?

A.   No.

Q.   Have you gone out on a single date with anyone else?

A.   I have gone on dates.

Q.   But nothing more than just a date here or there?

A.   Yeah.

Q.   Okay.   Do you recall when that was?

A.   It was around the pandemic.

Q.   Have you gone on any dates in the past couple of years?

A.   No.

Q.   No.   So, when you started going on those dates, was that also kind of the time that you were considering divorce?

A.   I can't even recall when I tried filing. It wasn't during that time, though.   I think it was a couple years ago.

EXHIBIT 13
PAGE 8 OF 11

Q.    Okay.

A.    Yeah.

Q.    Did Cory know that you were going on dates?

A.    Not at the time, but we both talked about it.

Q.    Do you know if Cory has dated at all in the past five years?

A.    He told me he has.

Q.    When did he tell you that?

A.    Hmmm.    That's hard to remember.    I mean, there's so many phone conversations.    I mean, I think also a couple years ago.

Q.    Did you tell Cory that you were considering filing for divorce?

A.    I've talked about it with him, yeah.

Q.    Okay.    Do you know if the dates that, you know, he went on was before or after you kind of talked about that with him?

A.    I don't know.    I don't know the details.

Q.    Do you know if Cory's dating life has kind of been similar to yours, like he's gone on a few dates but there's been nothing serious?

A.    I believe so.

Q.    Have there been any attempts to kind of

EXHIBIT 13
PAGE 9 OF 11

Page 32

reconcile your relationship in the previous few years?

A.   I mean, we've spent time together and talked about it, but not -- no real attempt.  You know, I never tried moving back in, that kind of thing.

Q.   Have you and Cory gone on any dates in the past five years?

A.   I suppose you could call it that.  We've gone out to eat together and that kind of thing, so...  Yeah.

Q.   Yeah.  I guess I'll try and clarify like the distinction between meeting with Cory to kind of talk about things and what I'll, just for this question, call a date of you're trying to reconcile and, you know, you're going on a date to try and build back that relationship.

So, was it more just kind of meeting with Cory to talk about certain things?

A.   Yeah, just kind of to hang out, spend time together and see how it goes, you know.

Q.   Okay.  Are you -- do you think that you're on a path towards reconciling the relationship or do you view the relationship with Cory as being over?

EXHIBIT 13
PAGE 10 OF 11

Page 74

REPORTER'S CERTIFICATE

I, VALERIE PADILLA, a Shorthand Reporter, State of California, do hereby certify:

That HILLARY HAMILTON, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 2nd day of March 2026.

_____
VALERIE PADILLA, CSR NO. 3081
State of California

EXHIBIT 13
PAGE 11 OF 11

# EXHIBIT 14

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---o0o---

CORY MAYER,

     Plaintiff,

vs.                  No. 5:25-cv-00812-NW

DEUTSCHE ALT A SECURITIES
MORTGAGE LOAN TRUST SERIES
2006-A; PHH MORTGAGE
CORPORATION; WESTERN
PROGRESSIVE, LLC; DOES
1-20; and all persons
unknown claiming any interest
in the property, inclusive,
and DOES 1 through 50,
inclusive,

     Defendants.

_____/



ZOOM VIDEOCONFERENCE DEPOSITION OF CHRISTOPHER MAYER

February 12, 2026




Reported by Valerie Padilla, CSR No. 3081

Job No. NY 7883388

Pages 1 - 49

EXHIBIT 14
PAGE 1 OF 8

Page 3

ZOOM VIDEOCONFERENCE DEPOSITION OF

CHRISTOPHER MAYER


BE IT REMEMBERED, that pursuant to Notice, and on the 12th day of February 2026, commencing at the hour of 12:02 p.m., virtually appeared CHRISTOPHER MAYER, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.


---o0o---

APPEARANCES:

(All parties appearing remotely)


For the Plaintiff:

        ANDREW JOE CHRISTENSEN, ESQ.

        2063 Mountain Boulevard, Suite 2

        Oakland, CA 94611

        (510) 761-7182

        andrew@californiahomelawyer.com


For the Defendants:

        TIMOTHY A. SCHNEIDER, ESQ.

        Houser LLP

        9970 Research Drive

        Irvine, CA 92618

        (949) 679-1111

        tschneider@houser-law.com

EXHIBIT 14
PAGE 2 OF 8

Page 27

settlement in 2020?

A.    No, the interest rate was the big issue.

Q.    Okay.  So, in 2016, 2017, did Cory kind of talk to you about what was going on in his marriage with Hillary?

A.    Yeah.  We heard about it, yeah.

Q.    And what was he telling you?

A.    Well, they still remain married but they had separated.  You know, I don't recall the exact date of the accident, but, you know, I'm sure that was a factor and now her -- they're still married but living apart, so...  He still loves her.  They still talk.

Q.    Do you recall when your son first told you that he and his wife had separated?

A.    I don't recall exact date, no.

Q.    Do you recall if it was before the 2020 settlement?

A.    No, I don't recall the date.

Q.    Okay.  Then you mentioned this 2017 accident.  I think you mentioned that, in your opinion, it probably had some sort of impact on their relationship; is that correct?

A.    Yes.

Q.    Okay.  And why do you think that?

EXHIBIT 14
PAGE 3 OF 8

Page 28

A.    Well, I mean, she was -- she was badly injured from that.  They still communicated, so -- but at that point, she was living -- they weren't living together at that -- from that point on, I believe.

Q.    Did Cory tell you what happened during that accident?

A.    Yes.

Q.    Okay.  And what is your understanding of what happened that night?

A.    Well, they -- they were out at a bar and drinking and he drove home intoxicated and lost control of the vehicle.  They say he and Hillary were arguing, I guess.  Anyway, he lost control and hit an embankment pretty hard, yeah, caused injuries to the vehicle and to Hillary.

Q.    Hillary sustained some serious injuries in that accident?

A.    That's right.

Q.    Do you recall what her injuries were?

A.    Yeah, her leg, I think she broke her leg. She had some damage to her leg.

Q.    Do you recall if Cory was injured during that accident?

A.    I don't believe he was injured, no.

EXHIBIT 14
PAGE 4 OF 8

Q.    What was your reaction after kind of hearing about that accident, other than obviously just being concerned for the physical well being of both your son and daughter-in-law?  I mean, were you mad at your son for what happened that night?

A.    I was, yeah.  Yeah.  I wasn't happy about him drinking and driving.

Q.    Did that put any kind of strain on your guys's relationship or was it just father being upset with son?

A.    No, not with Cory.  I mean, we -- you know, we stood by him.  We tried to help him what we could.   We helped Hillary, taking her to Watsonville Hospital or Salinas Hospital while she got treatments, so...  Us parents were trying to help out where we can.

Q.    Did Hillary ever communicate to you, you know, how that crash may have impacted her feelings toward your son or toward her stance in the relationship?

A.    No, we never had that conversation.

Q.    When was the last time you spoke with Hillary?

A.    Today in the office.  She was just leaving.  Before that, it's probably been, I don't

EXHIBIT 14
PAGE 5 OF 8

Page 38

talkative, very social person.

Q.    But if he had his choice of, you know, weekend activity, is it, from your experience with him, that he could be more of a homebody in those types of decisions?

A.    Well, he'll go out with friends if some particular event comes off.

He likes flying his glider airplanes on Sundays, that's one of his hobbies, and he fixes the planes and flies them, and so -- so, mostly a homebody, though.

Q.    You mentioned these gliders.  Does he build these himself or --

A.    Yeah.  Well, they come as kits and he puts them together.

Q.    Do you know if he's part of any like clubs or associations for that?

A.    Yeah, there's -- there's a group, I think it's out of Watsonville, he's a member with.

Q.    Do you know the name of the group?

A.    I -- I don't, no.  He flies them at Sky Park on Sundays.  Sometimes I'll go out and watch him in Scotts Valley.

Q.    Can you spell the name of that park?

A.    Sky Park, S-k-y, P-a-r-k.

EXHIBIT 14
PAGE 6 OF 8

Page 39

Q.   And how long has he been doing that for?

A.   Oh, I don't know, about six or seven years probably.

Q.   And at least, to your understanding, has he done it kind of consistently for the past six or seven years?

A.   Has he done what now?

Q.   Has he done that consistently now for the past six or seven years?

A.   Yeah, very consistently, yeah.

Q.   Do you know if your son has any other hobbies?

A.   Oh, he likes barbecuing and surfing.  I mean, that's his biggest passion is surfing.

Q.   Do you surf?

A.   Used to, till I fell.

Q.   Is that where the passion comes from, it's all from you?

A.   Oh, I like to get -- I like to take credit for it.  That's his wood shop teacher that took him out for the first time, so....

Q.   Interesting.

A.   Yeah.

Q.   I understand you have a daughter, as well, correct?

Page 46

REPORTER'S CERTIFICATE

I, VALERIE PADILLA, a Shorthand Reporter, State of California, do hereby certify:

That CHRISTOPHER MAYER, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 2nd day of March 2026.

_____

VALERIE PADILLA, CSR NO. 3081
State of California

EXHIBIT 14
PAGE 8 OF 8

# EXHIBIT 15

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---o0o---

CORY MAYER,

     Plaintiff,

vs.                                  No. 5:25-cv-00812-NW

DEUTSCHE ALT A SECURITIES

MORTGAGE LOAN TRUST SERIES

2006-A; PHH MORTGAGE

CORPORATION; WESTERN

PROGRESSIVE, LLC; DOES

1-20; and all persons

unknown claiming any interest

in the property, inclusive,

and DOES 1 through 50,

inclusive,

     Defendants.

_____/


ZOOM VIDEOCONFERENCE DEPOSITION OF HELEN MAYER

February 12, 2026


Reported by Valerie Padilla, CSR No. 3081

Job No. NY 7883388

Pages 1 - 48

EXHIBIT 15

PAGE 1 OF 8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---o0o---

CORY MAYER,

     Plaintiff,

vs.                                No. 5:25-cv-00812-NW

DEUTSCHE ALT A SECURITIES

MORTGAGE LOAN TRUST SERIES

2006-A; PHH MORTGAGE

CORPORATION; WESTERN

PROGRESSIVE, LLC; DOES

1-20; and all persons

unknown claiming any interest

in the property, inclusive,

and DOES 1 through 50,

inclusive,

     Defendants.

_____/


ZOOM VIDEOCONFERENCE DEPOSITION OF HELEN MAYER

February 12, 2026


Reported by Valerie Padilla, CSR No. 3081

Job No. NY 7883388

Pages 1 - 48

EXHIBIT 15
PAGE 2 OF 8

Page 3

ZOOM VIDEOCONFERENCE DEPOSITION OF HELEN MAYER

BE IT REMEMBERED, that pursuant to Notice, and on the 12th day of February 2026, commencing at the hour of 2:33 p.m., virtually appeared HELEN MAYER, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

---o0o---

APPEARANCES:

(All parties appearing remotely)

For the Plaintiff:

    ANDREW JOE CHRISTENSEN, ESQ.

    2063 Mountain Boulevard, Suite 2

    Oakland, CA 94611

    (510) 761-7182

    andrew@californiahomelawyer.com

For the Defendants:

    TIMOTHY A. SCHNEIDER, ESQ.

    Houser LLP

    9970 Research Drive

    Irvine, CA 92618

    (949) 679-1111

    tschneider@houser-law.com

EXHIBIT 15
PAGE 3 OF 8

Page 24

about what he's hoping to get out of this lawsuit as, you know, a resolution?

A.    Well, he wants -- he wants to be able to pay his mortgage, and that's what he -- that's what he wants, to be able to pay what he's supposed to pay.

Q.    Has he talked about any other goals that he's trying to get out of this settlement --

A.    No.

Q.    -- other than just --

A.    No.

Q.    -- paying the right amount for his mortgage?

A.    Yup, that's it.

Q.    Did Cory ever talk to you about any of the counseling or potentially going to counseling with Hillary?

A.    No.

Q.    Do you know what your son likes to do in his free time, what kind of hobbies he has?

A.    Oh, he surfs when he can and he has a remote control airplane that he builds models and flies those.  That's his latest thing.  He's been doing it for about three years, three or four years.  And surfing when he can.  Both my kids

EXHIBIT 15
PAGE 4 OF 8

surf.

Q.   Yeah.   Sounds like they got that passion from your husband.

A.   Right.   Yup.   Not me.

Q.   You won't find me out there.   I have kind of an inane fear of sharks, so...

A.   Yeah.

Q.   Are you aware of the accidents that your son has been in in the past ten years?

A.   Yes.

Q.   And I understand there's one in 2017.   Is that your understanding, as well?

A.   Right.

Q.   Do you know what happened that night?

A.   Yeah.   He was at a wedding and -- wedding reception and they went to Capitola.   Oh, he was with another couple and they went into Capitola to walk around 'cause he had been drinking and -- at the reception.   And Cory was the only one, what he says was the only one sober enough to drive home, and so he got behind the wheel, and after, you know, hours of not drinking, he said he drank coffee and then he got in an accident on the way home.

Q.   You said he was there with another

EXHIBIT 15
PAGE 5 OF 8

Q.    Do you know when the last time is your son took a vacation, something outside of Santa Cruz County?

A.    It's been a while.  No.  He doesn't -- he goes to Indonesia.  That's where he goes when he goes on vacation.  It's been a while.

Q.    Do you know the last time --

A.    About four years.

Q.    How frequent would he go to Indonesia before then?

A.    When he turned 18.  He's 44 now, yeah, 46.  46.  He would go like every other year in August.

Q.    Since he turned 18?

A.    Yes.

Q.    Wow.

A.    I know.  That's his home away from home. He hasn't gone -- he hasn't gone in a long time.

Q.    Do you know if he's tried getting back to Indonesia in the past four years?

A.    No.

Q.    Have you had any conversations with him as to why he hasn't gone back?

A.    Well, financially he couldn't afford it, so he would stay -- stay home.

EXHIBIT 15
PAGE 6 OF 8

Page 32

Q.    Did he say much more than that, other than it just wasn't in the finances?

A.    Right.

Q.    Did he say there was time commitment problems from him being too busy with work?

A.    Too busy with work and basically not being able to afford it.

Q.    Did he tell you why he was unable to afford the trip?

A.    No.

Q.    Has Cory ever mentioned to you missing out on any family events or friends' parties or anything like that since 2020?

A.    Yeah, he would -- he just stayed home a lot from just the stress of, you know, bank stress and all that.  He didn't go out at all.  He's a homebody.

Q.    Was he a homebody kind of before this all started?

A.    Yes.

Q.    So, him being a homebody wasn't really anything new, that's just kind of who he is?

A.    Uh-huh.

Q.    Did Cory ever mention any other problems that he was having with Hillary before they got

EXHIBIT 15
PAGE 7 OF 8

Page 45

REPORTER'S CERTIFICATE

I, VALERIE PADILLA, a Shorthand Reporter, State of California, do hereby certify:

That HELEN MAYER, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 2nd day of March 2026.

_____

VALERIE PADILLA, CSR NO. 3081
State of California

EXHIBIT 15
PAGE 8 OF 8

# EXHIBIT 16

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CORY MAYER,

          Plaintiff,

     v.

HSBC BANK USA, NATIONAL ASSOCIATION, et al.,

          Defendants.

Case No. 25-cv-00182-NW   (SVK)

**CORRECTED ORDER ON DISCOVERY DISPUTES**

Re: Dkt. Nos. 126, 127, 128, 129, 130, 139, 140, 141, 142, 143, 144, 145

Before the Court are nine discovery disputes filed at the close of fact discovery, seven by Plaintiff and two by Defendants. These matters may all be resolved without further oral argument. Civ. L.R. 7-1(b). Having considered the relevant facts, law and extensive litigation history between the Parties and in this action in particular, the Court rules as set forth herein.

For ease of reference, the disputes are summarized in the following table:

| Joint Submission Dkt. No. | Supplemental submissions Dkt. No. | Propounding Party | Dispute Subject Matter |
|---|---|---|---|
| 126 | 141 | Plaintiff | Pierre deposition and emails – challenge to attorney-client privilege |
| 127 | 141 | Plaintiff | Drexel deposition and emails – challenge to attorney-client privilege |
| 128 | 141 | Plaintiff | Pierre deposition and emails – challenge to attorney-client privilege |
| 129 | | Plaintiff | Defendants' document production |
| 130 | 143, 145 | Plaintiff | Defendants' supplemental interrogatory responses |

EXHIBIT 16
PAGE 1 OF 15

United States District Court
Northern District of California

| 139 | | Defendant | Third-party production of documents - Argus Home Loans |
| 140 | | Defendant | Protective order re former in-house counsel |
| 142 | | Plaintiff | Defendant's document production |
| 144 | | Plaintiff | Defendants' 30(b)(6) deposition testimony |

Most of Plaintiff's dispute statements challenge Defendants' claims of attorney-client privilege, which Plaintiff seeks to abrogate and thereby gain additional documents and take additional depositions.  At a short interim hearing to respond to specific questions raised by the Court, Plaintiff offered the following perspective:

> [T]here are these five pending discovery disputes, three of which we're talking about today.  There are five more that are going to be filed in the next few days, and all of them are centered around the same concept of privilege.  So, the reason I bring this up is because I -- we would suggest that the Court do all of these together because it's all the universal -- the resolution for all of these comes to the same thing, which is this blanket claim of privilege.  And I just want to put in front of the Court that we have extensive evidence in this case that all of these witnesses and these things they're claiming are privileged in these emails, but they are not.  They're acting as business agents, not giving legal advice.

Dkt. 138 (2/19/26 Hrg. Tr.) at 17:7-20.  Plaintiff further urged:

> So, in reviewing these 10 discovery disputes, our position fundamentally is they have not met their burden to show that anything is privileged, and the Court can end it at that.

*Id.* at 18:4-7.

The Court concurs with Plaintiff's characterization that a core issue as to most of the disputes is Defendants' claim of privilege.  Accordingly, the Court addresses the disputes set forth at Dkts. 126, 127, 128, 129, 140, 141[1] and 142 collectively, as Plaintiff requests.

## I.     RELEVANT FACTS

Plaintiff first sued Defendants in 2017 for failure to properly administer his home loan.  Dkt. 34 (First Amended Complaint) ¶ 15.  The Parties litigated the dispute for three years before

---

[1] Dkt. 141 was a Court-requested supplementation to address non-privilege related issues raised in Dkts. 126-128.

United States District Court
Northern District of California

2

EXHIBIT 16
PAGE 2 OF 15

settling in 2020. *Id*. ¶ 17. In 2021 and again in 2024, Plaintiff filed motions to enforce the settlement agreement in state court, alleging failures of Defendants to properly carry out terms of the settlement agreement. *Id.* at ¶¶ 18-42, 43, and 49. In 2025, Plaintiff filed a new action in state court, which Defendants removed to this court. *Id*. at ¶¶ 52 and 54. The present action, like the motions to enforce that preceded it, alleges a parade of irregularities by Defendants in administering the terms of the 2020 settlement agreement.

## II.    ATTORNEY-CLIENT PRIVILEGE[2]

### A.    The appropriate legal standards

Relevant to the case at hand, the attorney-client privilege protects "confidential communications between a client and his or her attorney" in the course of the attorney-client relationship "regardless of whether the information transmitted is otherwise privileged." *DP Pham, LLC v. Cheadle*, 246 Cal. App. 4th 653, 664, 666 (2016) (citing *Costco Wholesale Corp. v. Super. Ct*., 47 Cal. 4th 725, 732 (2009)). The protection the privilege provides is absolute and prevents the disclosure of any part of a privileged communication regardless of its content or any particularized need for disclosure. *DP Pham*, 246 Cal. App. 4th at 666 (citing *Kerner v. Super. Ct.,* 206 Cal. App. 4th 84, 111 (2012)).[3]

### B.    Establishing the privilege

In asserting privilege, a party must provide sufficient information to allow for evaluation of the assertion, such as each document for which privileged is claimed, its author, date of preparation, recipients and the specific privileged claimed. *See Bank of America*, *N.A. v. Super. Ct.*, 212 Cal. App. 4th 1076, 1098 (2013); *Hernandez v. Super. Ct.*, 112 Cal. App. 4th 284, 291 n.6 (2003). This information in a privilege log may satisfy a party's burden of establishing the

---

[2] Although Defendants' privilege log asserts both attorney-client privilege and attorney work-product protections, Plaintiff's arguments are directed only to attorney-client privilege, therefore the Court's analysis and holdings are similarly focused.

[3] In the Joint Submissions concerning attorney-client privilege issues, both sides rely primarily on California law. The Parties do not identify any meaningful differences between state or federal law on the relevant privilege issues in this case, and, as discussed in section II.D.5. below, the Court concludes that the outcome on the key points discussed below would be the same under federal law.

United States District Court
Northern District of California

3

EXHIBIT 16
PAGE 3 OF 15

preliminary facts necessary to invoke privilege. *See Bank of America*, 212 Cal. App. 4th at 1099-1101. Furthermore, "[t]he privilege is not limited to confidential communications between attorney and client, but may also encompass internal client communications that contain a discussion or summary of counsel's legal advice." *AdTrader, Inc. v. Google LLC,* 405 F. Supp. 3d 862, 865 (N.D. Cal. 2019) (citing *Zurich Amer. Ins. Co. v. Super. Ct.,* 155 Cal. App. 4th 1485, 1502, 1503 (2007); and *Ins. Co. of N. Am. v. Super. Ct.*, 108 Cal. App. 3d 758, 766 (1980)).

### C.    Challenging the privilege

"Once [the party claiming privilege] establishes facts necessary to support a prima facie claim of privilege, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish the communication was not confidential or that the privilege does not for other reasons apply." *Costco,* 47 Cal. 4th at 733 (citing Cal. Evid. C. § 917(a)); *Wellpoint Health Networks, Inc. v. Super. Ct.*, 59 Cal. App. 4th 110, 123-24 (1997)). The court in *Ritchie v. Sempra Energy* found that:

> Here, there are no facts from which this Court could conclude that defendant is "over-reaching" by withholding non-privileged attachments or withholding relevant factual and investigative materials by attaching them to privileged documents. As noted above, defendant submitted enough information to support a *prima facie* claim of privilege as to all of the documents on the privilege log. Plaintiff has offered nothing but speculation that defendant has no viable claim of privilege as to any or all of the attachments listed on the privilege log.

No. 10CV1513-CAB(KSC), 2015 WL 12912030, at *8 (S.D. Cal. June 10, 2015).

Additionally, the Court cannot use in-camera review to determine whether privilege applies. "[I]t is neither customary nor necessary to review the contents of the communication in order to determine whether the [attorney-client] privilege applies...." *DP Pham*, 246 Cal. App. 4th at 666 (quoting *Cornish v. Super. Ct.*, 209 Cal. App. 3d 467, 480 (1989)). A court's determination of whether the privilege applies "does not involve the nature of the communications or the effect of disclosure but rather the existence of the relationship at the time the communication was made, the intent of the client and whether the communication emanates from the client." *DP Pham*, 246 Cal. App. 4th at 666 (citing *Cornish*, 209 Cal. App. 3d at 480; *Costco*, 47 Cal. 4th at 739).

United States District Court
Northern District of California

EXHIBIT 16
PAGE 4 OF 15

United States District Court
Northern District of California

### D.    Attorney-Client Privilege:  Discussion

Defendants' privilege log in this case provides the date prepared; a general description (*e.g.,* email); the subject matter (*e.g.,* Borrower's loan/litigation); the purpose of the communication; the author, recipients and cc's; and the basis for the privilege.  *See, e.g.,* Dkt. 128-3; 142-5; 142-6.  The logs also provide job titles for most, albeit not all, authors/recipients as required by the Court's standing order.  Accordingly, the Court finds that the privilege log provides sufficient factual basis to invoke the privilege.  *Hernandez,* 112 Cal. App. 4th at 291 n.6.

The Court now turns to Plaintiff's challenges to Defendants' privilege log, which are repeated throughout the Joint Submissions and can be summarized as follows:

1. "The evidence shows in-house and outside counsel were acting as business agents engaged in servicing the loan after the settlement agreement, not giving legal advice." Dkt. 127 at 5; Dkt. 128 at 6; Dkt. 140 at 9.[4]

2. Documents withheld as privilege should be produced under the "crime-fraud" exception.  Dkt. 140 at 10; Dkt. 142 at 3.

3. Defendants waived privilege by asserting "advice of counsel" to defeat punitive damages claims.  Dkt. 129 at 5.

4. "The privilege log shows no attorney was included in the most of the communications."  Dkt. 126 at 4; Dkt. 128 at 2.

5. The privileged documents are critical to Plaintiff's case.  Dkt. 127 at 3; 128 at 3.

6. Defendants' "bare-bones boilerplate privilege logs" are asking this Court to "take their word for it."  Dkt. 140 at 9.

#### 1.    Plaintiff does not carry his burden of demonstrating that defense counsel was not providing legal advice

The Court first addresses Plaintiff's primary, most-oft repeated, argument:  that Defendants' representatives were acting in a business not a legal capacity and therefore their communications were transmitting business advice and are not privileged.  Examples of Plaintiff's "business agents" argument are the following:

---

[4] The citations to Joint Submissions are exemplary, not exhaustive, as arguments are repeated across the submissions.

EXHIBIT 16
PAGE 5 OF 15

United States District Court
Northern District of California

PHH's representative Verdooren testified repeatedly that PHHs actions at issue were from the "direction" and "approval" and "request" and "decision" and "advice" of in-house counsel, and that he did not know of any other decision-makers for essentially any of the relevant conduct. When an attorney acts as a business agent the attorney client and work product protections do not apply. *Wellpoint Health Networks v. Superior Court*, 59 Cal. App. 4th 110, 122 (1997) The settlement agreement was executed in April 2020 and the emails in the logs after that involve only the core servicing function of applying funds to the loan, sending billing statements, credit reporting, and other typical functions. There were no disputes or questions or legal issues about how to do this.

Dkt. 127 at 5. Similarly:

[t]he fact that in-house counsel were acting in a business and not legal capacity is demonstrated by the fact that PHH is withholding nearly 1,000 emails responsive to this Court's orders . . . It strains credulity that essentially 1,000 emails, essentially all responsive emails, are privileged where they are all related to PHH's efforts to perform its core servicing function of applying payments to the loan and sending statements and reporting to credit.

Dkt. 129 at 4-5.

Defendants respond that their counsels' involvement arose "during the implementation of a settlement agreement resolving years-long litigation . . . [T]he attorneys identified in Defendants' Privilege Log provided advice to resolve active litigation and to prevent further litigation on the same issues." Dkt. 127 at 8. Defendants point out that Plaintiff first moved in state court to enforce the 2020 settlement and that in 2024, the state court "recognized the Parties had been engaged in a dispute concerning the settlement agreement for more than three years and the multiple Motions to Enforce in the State Court action confirm the involvement of attorneys' [sic] throughout this entire process." *Id.*

The Court finds that Plaintiff has not carried his burden of dislodging attorney-client privilege on the proffered grounds that the communications can only be about servicing the loan and therefore cannot comprise attorney-client communications. The Parties are now approaching ten years of litigation around Plaintiff's loan, which, according to Plaintiff's own allegations, began in 2017, culminated, briefly, in a settlement agreement in 2020 and then quickly fell back into litigation in 2021, 2024 and most recently in 2025. Against this backdrop, Defendants' explanation of attorney-client communications in the course of servicing the loan for the express purpose of resolving and preventing litigation is highly credible.

6

EXHIBIT 16
PAGE 6 OF 15

United States District Court
Northern District of California

Further, the Court notes that Plaintiff cites extensively to facts regarding servicing of the loan – facts supported by document productions and witness testimony to date. *See* Dkt. 126 at 3-4 ("The servicing notes, privilege logs, and testimony from Ms. Pierre show that she was involved in ensuring the $158,000 settlement reinstatement payment was applied, that she determined in 2020 that it was improperly applied, she requested that cashiering reverse and reapply the funds, and that this went on for many months, and that this long time period and the four reversals and reapplications over that many months was highly unusual."); Dkt. 129 at 4 ("[Mr. Verdooren] admitted that a main reason the Loan was not reinstated for several years after the settlement was the failure to apply the required $33,000 credit, and that PHH applied about $30,000 about two years late, and the remaining amount about four years late."); Dkt. 140 at 8 ("Verdooren's testimony established therefore that credit reporting was a material term of the settlement agreement known by PHH and its outside counsel Brian Paino to be critical for Plaintiff to refinance to pay the PHH loan in full, that the credit reporting was not done in the 30 days required, but 4 years late, and that this failure to report was intentional, that it directly caused Plaintiff's damages, and that in-house or outside counsel were the ones responsible and authorized to request the credit reporting, which includes Fantozzi."). Plaintiff's recitation of these facts demonstrates that the underlying, non-privileged *facts* relating to how the loan has been handled have been made available to Plaintiff. What has been properly withheld are the attorney-client communications that reflect advice or counseling regarding the loan.

Finally, at the interim hearing on February 19, 2026, the Court asked Defendants if they were claiming a blanket privilege over all communications related to the loan or whether defense counsel had in fact reviewed and evaluated each document for which privilege was being claimed. Dkt. 138 (2/19/26 Hrg. Tr.) at 11:20-12:15. Counsel responded satisfactorily and noted that some emails for the individuals in question had been produced, indicative that emails had been reviewed and non-privileged emails produced. *Id.* at 12:21-13:5. In sum, Defendants have sustained their burden of establishing privilege for a large swath of email communications regarding the subject loan, and Plaintiff has not carried his burden of demonstrating otherwise. Accordingly, Plaintiff's request to abrogate the claim of privilege, or to test the claim by reviewing the documents in-

7

EXHIBIT 16
PAGE 7 OF 15

camera, is denied.  Plaintiff's Joint Submissions at Dkts. 126, 127, 128, 129 and 142 are **DENIED**.

### 2.        No crime-fraud exception

The crime-fraud exception to the attorney-client privilege is codified in California Evidence Code § 956 and is a very limited exception to the privilege.  *Geilim v. Super. Ct.*, 234 Cal. App. 3d 166, 174 (1991).  The proponent of the exception has the burden of proving the existence of crime or fraud.  *Id.*  "[M]ere assertion of fraud is insufficient; there must be a showing the fraud has some foundation in fact."  *BP Alaska Exploration Inc. v. Super. Ct.*, 199 Cal. App. 3d 1240, 1262 (1988).  More specifically, the proponent must make a *prima facie* showing that an attorney was retained and utilized to commit a crime or fraud and that privileged material is "factually related" to the subject matter of the crime or fraud.  *Id.* at 1262, 1268. A *prima facie* showing is "one which will suffice for proof of a particular fact unless contradicted and overcome by other evidence.  In other words, evidence from which reasonable inferences can be drawn to establish the fact asserted, *i.e.*, the fraud."  *Id.* at 1262.

Plaintiff twice urges that the crime-fraud exception applies to Defendants' documents withheld as privileged.  First, in Dkt. 140, Plaintiff points to the fact that PHH failed to handle credit reporting and that only counsel can request credit reporting.  Dkt. 140 at 10.  From these two facts, Plaintiff concludes that (1) counsel are acting as business agents (Dkt. 140 at 10); (2) there must be an email reflecting advice to defraud Plaintiff by not reporting credit (*id.*); and (3) Defendants perpetrated this fraud for their own profit (*id.*).  In Dkt. 142, Plaintiff argues that "[t]he crime-fraud exception should apply because there are thousands of emails and dozens of people involved over five years to deal with the errors, all of which could be done in a day or two by a few people."  *Id.* at 3.  In both instances, Plaintiff proffers only argument from facts which would not, even if unrefuted, provide a sufficient basis to infer that counsel was engaged in the furtherance of a crime or fraud.[5]

---

[5] Throughout the Joint Submissions, Plaintiff suggests he has "extensive" additional evidence in support of an argument and often complains that the "page limitations and inability to submit evidence" limit his ability to prove his points.  *See, e.g.,* Dkt.142 at 6.  Plaintiff's complaint is not well founded.  Plaintiff has disregarded page limits by repeating arguments and seeking common

8

EXHIBIT 16
PAGE 8 OF 15

United States District Court
Northern District of California

### 3.    No waiver based on advice of counsel

Plaintiff attempts to argue that Defendants waived the attorney-client privilege by relying on advice of counsel. Dkt. 129 at 5. Plaintiff misunderstands, and as a result misapplies, the "advice of counsel" defense. An "advice of counsel" defense arises where a party seeks to excuse or justify wrongful acts, or failure to act, by claiming it acted based upon an opinion of counsel. *See Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1162-63 (9th Cir. 1992). Because the party is relying on an opinion of counsel as a defense, the privilege for communications regarding that opinion is waived. *Id.* The classic example is exactly that cited by Plaintiff – in the context of patent litigation a party obtains an opinion of counsel of non-infringement and asserts that opinion as a defense to willful infringement. Dkt. 129 at 5 (citing *Genentech, Inc. v. Insmed Inc*., 442 F. Supp. 2d 838, 840 (N.D. Cal. 2006)). Here there are no facts to support the suggestion that an opinion of counsel is being relied upon as a defense. Rather, there is evidence that attorneys advised Defendants regarding Plaintiff's loan, and that advice is protected as an attorney-client communication.

### 4.    The remainder of Plaintiff's arguments to abrogate the privilege are contrary to law

Plaintiff's 4th, 5th and 6th arguments summarized above — no. 4: no attorney included in the communication; no. 5: privileged documents are critical to Plaintiff's case; and no. 6: the Court is asked to take Defendants' word that the communications are privileged — are each contrary to law. First, a communication need not reflect an attorney as author or recipient on its face to qualify as privileged. *AdTrader,* 405 F. Supp. 3d at 865 (*citing Zurich,* 155 Cal. App. 4th at 1502, 1503) (privilege encompasses communications between client employees that reflect, discuss, or contain legal advice)). Second, "[t]he protection the privilege provides is absolute and prevents the disclosure of any part of a privileged communication regardless of its content or any particularized need for disclosure." *DP Pham*, 246 Cal. App. 4th at 666 (quoting *Kerner,* 206 Cal. App. 4th at 111). Thus, the importance of a communication to opposing party's case does not

---

relief across seven Joint Submissions, totaling approximately 30 pages of argument by Plaintiff alone. Nowhere in those 30 pages does Plaintiff offer a succinct, cogent factual proffer of such additional evidence. The Court has largely indulged Plaintiff's submissions here at the close of discovery, and the request for yet additional submissions is denied.

EXHIBIT 16
PAGE 9 OF 15

United States District Court
Northern District of California

extinguish the privilege. Finally, as noted above, Defendants' privilege logs are not "bare-bones," and Defendants have established the preliminary facts necessary to invoke the privilege. *Bank of America*, 212 Cal. App. 4th at 1098.

### 5.    The outcome on the attorney-client privilege issues in this case is the same under federal law

The Court concludes that the outcome on these privilege issues would be the same under federal privilege law. Under federal law the burden of demonstrating that the privilege applies is on the party claiming the privilege. *U.S. v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009). A privilege log is one means by which the privilege may be established. *In re Grand Jury Investig.*, 974 F.2d 1068, 1070-71 (9th Cir. 1992). Even if a communication has the dual purpose of providing business and legal advice, it is privileged if the primary purpose is to give or receive legal advice. *In re Grand Jury*, 23 F.4th 1088, 1092 (9th Cir. 2021). Moreover, communications may fall within the attorney-client privilege even if the attorney is not copied on every message. *See In re Kia Hyundai Vehicle Theft Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 8:22-ML-03-052-JVS-(KESX), 2025 WL 2639195, at *4 (C.D. Cal. Sept. 5, 2025); *City of Roseville Employees' Retirement Sys. v. Apple*, No. 19-cv-02033-YGR (JCS), 2022 WL 3083000, at *16 (N.D. Cal. Aug. 3, 2022).

Before a court may engage in *in camera* review of withheld documents to determine if they are privileged or to determine if the crime-fraud exception applies, the party seeking *in camera* review must make a showing of "a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence" to establish that the information is not privileged or that the crime-fraud exception applies. *United States v. Zolin*, 491 U.S. 554, 572 (1989) (internal quotation marks and citations omitted); *In re Grand Jury Invest.*, 974 F.2d at 1074-75.

Finally, there is no unavailability or necessity exception to the attorney-client privilege. *Admiral Ins. Co. v. U.S. Dist. Ct. for Dist. of Ariz.*, 881 F.2d 1486, 1494 (9th Cir. 1989).

10

EXHIBIT 16
PAGE 10 OF 15

### III.   DKTS. 126, 127, 128, 129, 141[6] AND 142 ARE DENIED FOR ADDITIONAL REASONS

Although these Joint Submissions were, at Plaintiff's behest, addressed collectively, and denied collectively for the reasons set forth above, there are additional grounds for denying each of the Joint Submissions.

**Dkts. 126 and 128 (Pierre documents and deposition).** Both of these Joint Submissions argue for the full production of all emails reflecting communications with Ms. Pierre and for a second deposition. The first, Dkt. 126, approaches the Pierre ask from the starting point of her testimony regarding whether handling of Plaintiff's loan had been "escalated" and then quickly devolves into a challenge to the attorney-client privilege that resounds throughout all of Plaintiff's Joint Submissions. The second, Dkt. 128, is just a repetition of the challenge to the attorney-client privilege. Taking these two submissions together, as Plaintiff urged the Court to do, Plaintiff's disregard for this Court's standing order is made clear. Not satisfied with one bite at the apple, Plaintiff has attempted a second bite, repeating arguments and seeking the same relief. The Court will not reward this tactic. Additionally, given that Plaintiff points out that Ms. Pierre was not a decision-maker and that her deposition was taken as a 30(b)(1) witness regarding events years in the past, a further deposition would not be proportional to the needs of the litigation. For these additional reasons, the motions are denied.

**Dkt. 127 (Drexel documents and deposition).** Plaintiff's Joint Submission tracks both Dkts. 126 and 128 so closely, that it is obvious that this issue could have been raised with the Pierre issues in a single submission. Again, Plaintiff's preference for quantity of argument, over quality, is his undoing. Additionally, Ms. Drexel was noticed as a 30(b)(1) witness regarding events years in the past. This motion is denied for the same reasons as Dkts. 126 and 128 above.

**Dkt. 141 (Court requested supplementation regarding Defendants' 30(b)(6) deposition).** At the interim hearing on February 19, 2026, the Court directed the Parties to submit portions of Defendants' 30(b)(6) deposition transcript that addressed whether this deposition addressed issues directed to 30(b)(1) witnesses Pierre and Drexel. The Court has reviewed the

---

[6] Dkt. 141 was a Court requested supplementation to address non-privilege related issues raised in Dkts. 126-128.

11

EXHIBIT 16
PAGE 11 OF 15

United States District Court
Northern District of California

United States District Court
Northern District of California

submissions and finds that the testimony proffered by Plaintiff does not support his contention that Defendants made misrepresentations at the February 19 hearing as to the scope and content of the 30(b)(6) testimony. The Court's rulings as to Dkts. 126, 127 and 128 stand.

**Dkt. 129 (Plaintiff's request for production nos. 30-49)**. This submission requests that the Court reconsider its prior rulings at Dkts. 98 and 99 regarding Defendant's production of documents, and then, like the others, restates Plaintiff's challenge to the assertion of attorney-client privilege. First, the Court's prior orders rejected certain of Plaintiff's requests for production as overbroad and not proportional to the needs of the litigation, and as captured in RFP nos. 30-49, they remain so. The Court resolved this problem by ordering limited production by Defendants as proportional to the needs of the litigation. Dkts. 98, 99; Fed. R. Civ. Proc. 26(b)(1). Reconsideration of a prior order is appropriate where there are new facts or law that have come to light since the order. Civ. L.R. 7-9(b). There are no new facts or law to justify reconsideration, and the Court declines to do so. Plaintiff's submission is denied.

**Dkt. 142 (Defendant's supplemental production).** Plaintiff argues that Defendants' supplemental production pursuant to this Court's prior orders at Dkts. 98 and 99 remains insufficient. This submission is largely a repeat of the arguments presented in Dkt. 129 (as well as Dkts. 126-128 and 140) addressed above, and as such demonstrates Plaintiff's disregard for this Court's standing order and is therefore denied. Defendants also raise the manner in which the dispute was raised, in particular the lack of opportunity to respond to arguments raised for the first time in Plaintiff's portion of the Joint Submission which was provided just hours before filing. The objective of the joint submission requirement is to allow each side an opportunity to consider the arguments of the other, which in the normal course informs meet and confer efforts and often leads to a negotiated resolution without court intervention. Plaintiff does not address this conduct and, but for the fact that discovery is now closed, would warrant further action by the Court.

**IV.    DKT. 140:  DEFENDANTS' REQUEST FOR PROTECTIVE ORDER RE FORMER IN-HOUSE COUNSEL**

Ms. Fantozzi is a former in-house counsel for Defendant PHH who represented PHH in negotiating the 2020 settlement agreement with Plaintiff. Dkt. 140 at 2. She left PHH in 2021.

12

EXHIBIT 16
PAGE 12 OF 15

United States District Court
Northern District of California

*Id.* In addition to the attorney-client privilege issues addressed above, Defendants argue that the subpoena, served before the close of discovery but noticing the deposition for after the close, is untimely. *Id*. at 4. Defendants buttress this argument with the fact that Plaintiff knew of Ms. Fantozzi's involvement at least as early the first session of the PHH 30(b)(6) deposition completed in December of 2025, allowing for timely notice. *Id*. at 5. Plaintiff does not address the timeliness issue. Accordingly, the Court concurs that the deposition notice of Ms. Fantozzi is untimely.

***

The Court now turns to the remaining Joint Submissions which do not arise from the attorney-client privilege.

## V.    DKT. 130:  DEFENDANTS' SUPPLEMENTAL INTERROGATORY RESPONSES

In this Joint Submission, Defendants stated that they would supplement their responses to the subject interrogatories seeking the identification of highest level personnel who either took or directed certain actions regarding Plaintiff's loan. Dkt. 130. At the February 19 hearing, the Court emphasized that Defendants' supplemental responses must identify specific persons. Dkt. 138 (2/19/26 Hrg. Tr.) at 23:17, 24:3-10. The responses were served as directed on February 20, 2026. Dkt. 143-1. As that date was also the last day to file a joint discovery submission with the Court, Plaintiff immediately complained to Defendants regarding the responses and promptly renewed his complaint first addressed in Dkt. 130. Dkts. 143; 143-2.

The manner in which Plaintiff has brought the continuation of this dispute to the Court's attention is not inappropriate. Defendants' objection on the basis that Plaintiff should have submitted a second joint submission, allowing an additional seven days for meet and confer is disingenuous. The dispute was already before the Court, and Defendants were well aware of their obligations, as evidenced by their acknowledgement of the need to supplement their responses. Dkt. 130.

The Court has reviewed the supplemental responses and Plaintiff's complaints regarding the same. Dkt. 143-1; 143-2. Defendants have complied with the Court's order at the hearing. The interrogatories identify the actors as to certain actions, who are primarily attorneys. Where

13

EXHIBIT 16
PAGE 13 OF 15

there is no person who fits the description set forth in an interrogatory (*e.g.*, Interrogatory no. 29), Defendants so state. Plaintiff's complaints are arguments challenging Defendants' identifications, which may be suitable for cross-examination but do not warrant further action in discovery.

## VI.    DKT. 139:  THIRD PARTY ARGUS HOMES

Defendants move to compel production of documents in support of Plaintiff's damages claims from third-party Argus Homes. Argus Homes is represented by Plaintiff's counsel. In the Joint Submission, filed on February 20, 2026, counsel represents that the documents will be ready for production "in the next week or so." Dkt. 30. Plaintiff also makes clear that the documents will reflect the redactions to third-party financial records previously allowed by this Court, which is a practical approach to forestall any dispute regarding relevance, proportionality or privacy. It is the Court's sincere hope that this matter has resolved itself. **If the documents have not yet been produced, they are to be produced within three (3) business days of the date of this Order**.

## VII.    DKT. 144:  PLAINTIFF'S MOTION TO COMPEL ADDITIONAL 30(b)(6) TESTIMONY

Plaintiff seeks to compel additional 30(b)(6) testimony on 31 of the 61 topics noticed to Defendant PHH. Dkt. 144 at 1. The Court evaluated Plaintiff's arguments as to all 31 categories and reviewed the highlighted 30(b)(6) transcript. Defendants complain about the timing of the Joint Submission and lack of meaningful meet and confer and raise general objections to the proportionality of Plaintiff's deposition topics and categories for additional testimony. *Id*. at 6-9. Having reviewed the questions, responses and arguments for additional testimony, the Court is not persuaded that additional testimony is proportional to the needs of the case. First, noticing 61 topics in a case arising out of the execution, or lack of execution, of terms of a settlement agreement strongly suggests a lack of proportionality, even allowing for Plaintiff's claims of bad faith and demand for punitive damages. Second, a number of the disputed topics drew an instruction not to answer on the basis of attorney-client privilege, which is thoroughly addressed by the Court above. Indeed, Plaintiff's ask in the Joint Submission is that the privilege objection be overruled wholesale and the witness instructed to answer. *Id*. at 6. This request demonstrates

United States District Court
Northern District of California

14

EXHIBIT 16
PAGE 14 OF 15

that this dispute is yet another restatement of Plaintiff's challenge to Defendants' privilege claims. For the reasons stated in this Order, Plaintiff's challenge is rejected. The majority of the remainder of the 31 disputed topics address details which, though Plaintiff argues vehemently are critical to his case, in fact appear to be of tangential relevance, not proportional to the needs of the case and would require a mastery of detail beyond Defendants' 30(b)(6) obligations. Fed. R. Civ. Proc. 30(b)(6). Plaintiff's request for further deposition testimony is denied.

**SO ORDERED.**

Dated: March 11, 2026

SUSAN VAN KEULEN
United States Magistrate Judge

United States District Court
Northern District of California

15

EXHIBIT 16
PAGE 15 OF 15

# EXHIBIT 17

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CORY MAYER,

                 Plaintiff,

      v.

HSBC BANK USA, NATIONAL ASSOCIATION, et al.,

                 Defendants.

Case No. 25-cv-00182-NW   (SVK)

**DISCOVERY ORDER RE DKT. 134**

Re: Dkt. No. 134

Before the Court is the Parties' Joint Submission regarding a wide range of Requests for Production and Interrogatories to which Defendants seek to compel additional responses from Plaintiff. Discovery in this matter closed as of February 13, 2026. Having considered the issues in this litigation, the relevant law and the Parties' arguments, the Court determines that this dispute may be resolved without oral argument. Civ. L.R. 7-1(b).

Guided by the parameters of relevance and proportionality set forth in Federal Rule of Civil Procedure 26(b)(1), the Court's reasoning and rulings are set forth in the attachment to this Order. Supplemental production of documents and <u>verified</u> supplemental interrogatory responses, where ordered, are to be served **no later than March 10, 2026**. The production of documents is necessarily directed and limited to documents in Plaintiff's custody and control. Where Defendants believe production remains deficient to support a claim, that deficiency can be

////

////

////

////

////

EXHIBIT 17
PAGE 1 OF 32

United States District Court
Northern District of California

addressed in remaining depositions, through motions in limine or in cross-examination of witnesses at trial.  The Parties may agree to a modest adjustment to the deadline above without further action by the Court.

**SO ORDERED.**

Dated: March 3, 2026

_____
SUSAN VAN KEULEN
United States Magistrate Judge

United States District Court
Northern District of California

2

EXHIBIT 17
PAGE 2 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | **1.  Compliance with the Settlement Agreement** | | | |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4: ALL DOCUMENTS supporting YOUR contention that DEFENDANT did not comply with the terms of the SETTLEMENT AGREEMENT. | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4: Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure.<br><br>Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in whole with the request and will produce all non-privileged documents responsive to this request that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | Compel supplemental response and production. Compel privilege log for documents withheld. | Nothing to compromise. Response is compliant with Rules, all documents produced, or will be produced. Nothing withheld. | Plaintiff's objection, to the extent it is directed to facts to be provided to experts as opposed to expert opinions, is **OVERRULED**.<br><br>Plaintiff to produce all non-privileged documents that support this contention by the deadline set forth in this Order.<br><br>For the avoidance of doubt, any responsive documents in the custody and control of Plaintiff and considered by or to be considered by Plaintiff's experts are to be produced at this time. |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 5: ALL DOCUMENTS supporting YOUR contention that HSBC did not comply with the terms of the SETTLEMENT AGREEMENT. | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 5: Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure.<br><br>Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to | Compel supplemental response and production. Compel privilege log for documents withheld based on privilege. | Nothing to compromise. Response is compliant with Rules, all documents produced, or will be produced. Nothing withheld. | Plaintiff's objection, to the extent it is directed to facts to be provided to experts as opposed to expert opinions, is **OVERRULED**.<br><br>Plaintiff to produce all non-privileged documents that support this contention by the |

1

EXHIBIT 17

PAGE 3 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | locate responsive documents, Responding Party will comply in whole with the request and will produce all non-privileged documents responsive to this request that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | | | deadline set forth in this Order.<br><br>For the avoidance of doubt, any responsive documents in the custody and control of Plaintiff and considered by or to be considered by Plaintiff's experts are to be produced at this time. |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 6: ALL DOCUMENTS supporting YOUR contention that the LOAN was not reinstated in accordance with the terms of the SETTLEMENT AGREEMENT. | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 6: Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure.<br><br>Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in whole with the request and will produce all non-privileged documents responsive to this request that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | Compel supplemental response and production. Compel privilege log for documents withheld based on privilege. | Nothing to compromise. Response is compliant with Rules, all documents produced, or will be produced. Nothing withheld. | Plaintiff's objection, to the extent it is directed to facts to be provided to experts as opposed to expert opinions, is **OVERRULED**.<br><br>Plaintiff to produce all non-privileged documents that support this contention by the deadline set forth in this Order.<br><br>For the avoidance of doubt, any responsive documents in the custody and control of Plaintiff and considered by or to be considered by Plaintiff's experts are to be produced at this time. |

EXHIBIT 17

PAGE 4 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | **2. Witness Information** | | | |
| INTERROGATORY NO. 2: IDENTIFY ALL PERSONS having knowledge of any of the facts, occurrences, and matters set forth in YOUR COMPLAINT and include the substance of the knowledge possessed by each such PERSON. | RESPONSE TO INTERROGATORY NO. 2: Cory Mayer, plaintiff, about most of the facts of the case and damages. Hillary Hamilton, Plaintiff's wife, has information regarding his emotional distress damages. Chris Mayer: Plaintiff's father has information regarding his emotional distress damages. Helen Mayer: Plaintiff's mother has information regarding his emotional distress damages. Kimberly Mayer: Plaintiff's sister has information regarding his emotional distress damages. Pamela Simmons, Bill Purdy, Brian Paino, Brian Liddicoat: these attorneys for Plaintiff and Defendant have information about the communications between them before and after the 2020 settlement, including about payments being rejected and the loan not being reinstated. Phillip Lewis at Argus Mortgage has information about Plaintiff's attempts to refinance showing that the failure of refinancing was caused by Defendants' wrongdoing. Ken Pittman at Argus Home Loans has information about refinancing. Michelle Pappas at First American Title regarding opening of escrow for the refinancing. | Compel supplemental response in which Plaintiff provides contact information for Ken Pittman, Michelle Pappas and A&D Mortgage, LLC. | There is nothing to add because Plaintiff informed Defendants that counsel represents the family members and will accept service for them, and does not have contact information for the others for service of process. PHH already found service addresses and served notices of subpoena on First American and Argus, so there is nothing else to do. | Plaintiff's objections to this request as to non-family members are **OVERRULED**. Federal Rule of Civ. Pro. 33 does not allow Plaintiff to choose what responsive information he will or will not provide. Accordingly, Plaintiff is to amend his response to provide whatever addresses are known to him for Argus Mortgage and First American Title; to include A&D Mortgage LLC if appropriate; and to provide whatever address is known to him for A&D Mortgage. |
| | **3. Reliance and Equitable Tolling** | | | |

3

EXHIBIT 17

PAGE 5 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 13: ALL DOCUMENTS supporting YOUR allegation in the COMPLAINT that YOU "relied upon the representations" of counsel for DEFENDANT. | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 13: After diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in whole with the request and will produce all relevant non-privileged documents responsive to this request that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | Compel production of Plaintiff's emails with attorneys. | None. Response is full and complete and compliant and all responsive documents have been or will be produced. PHH has no right to privileged emails which are not responsive here and outside the scope of discovery. | Plaintiff's objection is **SUSTAINED.**<br><br>Accordingly, Plaintiff is to produce all communications from Defendants' counsel to Plaintiff's counsel upon which Plaintiff relies in support of this allegation, if not already produced.<br><br>Defendants' argument of waiver of attorney-client privilege is unpersuasive. Plaintiff may rely on representations to his agent, in this case, his counsel. Such reliance in no way extinguishes the privilege as between Plaintiff and his attorney. |

4

EXHIBIT 17

PAGE 6 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 14: ALL DOCUMENTS supporting YOUR allegation in the COMPLAINT that YOU withdrew YOUR December 16, 2021 motion to enforce, as described in Paragraph 43 of the COMPLAINT, in reliance on the representations by DEFENDANT that it was "working out the numbers to fix the escrow issue." | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 14: After diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in whole with the request and will produce all relevant nonprivileged documents responsive to this request that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | Compel production of Plaintiff's emails with attorneys. | None. Response is full and complete and compliant and all responsive documents have been or will be produced. PHH has no right to privileged emails which are not responsive here and outside the scope of discovery. | See ORDER re RFP 13 above and incorporated herein by reference. |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 15: ALL DOCUMENTS upon which YOU relied in deciding not to bring suit, as alleged in Paragraph 45 of the COMPLAINT. | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 15: After diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in whole with the request and will produce all relevant non privileged documents responsive to this request that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | Compel production of Plaintiff's emails with attorneys. | None. Response is full and complete and compliant and all responsive documents have been or will be produced. PHH has no right to privileged emails which are not responsive here and | See ORDER re RFP 13 above and incorporated herein by reference. |

5

EXHIBIT 17

PAGE 7 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | | | outside the scope of discovery. | |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 16: ALL COMMUNICATIONS upon which YOU relied in deciding not to bring suit, as alleged in Paragraph 45 of the COMPLAINT. | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 16: Responding Party objects that the definition of the term "communications" is overly broad and includes information that is not in written form. Responding Party objects to the extent this request seeks information covered by the attorney-client privilege and work product and will not search for or produce any such evidence. After diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in whole with the request and will produce all relevant non-privileged documents responsive to this request that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | Compel production of Plaintiff's emails with attorneys. | None. Response is full and complete and compliant and all responsive documents have been or will be produced. PHH has no right to privileged emails which are not responsive here and outside the scope of discovery. | See ORDER re RFP 13 above and incorporated herein by reference. |
| | **4. Damages – Financial Information and Excessive Charges** | | | |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 7: ALL DOCUMENTS supporting YOUR contention in Paragraph 36 of the COMPLAINT that YOU were "ready, willing and | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 7: Responding Party objects to the extent it expressly or impliedly seeks information which is confidential or proprietary in nature and to the extent it seeks sensitive financial information pertaining to the Plaintiff, as the disclosure of such information would violate Plaintiff' right to privacy, including the right to privacy in personal financial records. Responding Party objects to producing any tax returns, tax documents or other tax documents | Compel supplemental response and production. Overrule taxpayer privilege and financial privilege. Compel privilege log for documents | No compromise, response is proper and tax returns and business financial records are private and privileged. | Plaintiff's objections are **SUSTAINED IN PART AND OVERRULED IN PART AS FOLLOWS:**<br><br>Plaintiff is to produce documents that evidence his alleged monthly payments into an escrow |

6

EXHIBIT 17

PAGE 8 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| able" to refinance the LOAN in 2020. | protected by the taxpayer privilege, as protected under California law. The Plaintiff objects to producing private financial documents on the basis that such a request violates the privacy privilege protected by Article I, Section I of the California Constitution. Responding Party does not waive the tax return privilege. Responding Party will not produce tax returns or related documents, nor the financial records for his business. Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure. Responding Party objects

Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in part with the request and will produce relevant non-privileged documents responsive to this request that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | withheld. | Defendants have all information they need. | account and documents that evidence receipt of those funds in the account. If these documents have already been produced, then Plaintiff is to identify them by bates numbers. |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 8: ALL loan applications YOU submitted in connection with YOUR efforts, if any, to refinance the LOAN between January 1, 2020, and the PRESENT DATE | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 8: Responding Party objects to the extent it expressly or impliedly seeks information which is confidential or proprietary in nature and to the extent it seeks sensitive financial information pertaining to the Plaintiff, as the disclosure of such information would violate Plaintiff' right to privacy, including the right to privacy in personal financial records. Responding Party objects to producing any tax returns, tax documents or other tax documents protected by the taxpayer privilege, as protected under | Compel supplemental response and production. Overrule taxpayer privilege and financial privilege. Compel privilege log for documents withheld. | No compromise, response is proper and tax returns and business financial records are private and privileged. Defendants | Plaintiff's objections are **OVERRULED.**

Plaintiff acknowledges that he has claimed the inability to refinance and harm to his "credit expectancy" as key elements of his damages. *See* Dkt. 116, 117. Plaintiff's inability to |

7

EXHIBIT 17
PAGE 9 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | California law. The Plaintiff objects to producing private financial documents on the basis that such a request violates the privacy privilege protected by Article I, Section I of the California Constitution. Responding Party does not waive the tax return privilege. Responding Party will not produce tax returns or related documents, nor the financial records for his business. Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure. Responding Party objects<br><br>Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in part with the request and will produce relevant non-privileged documents responsive to this request that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | | have all information they need. | refinance and loss of "credit expectancy" are "gravamens of the complaint" and therefore any privacy interest in tax returns and other sensitive financial documentation has been waived. *Wilson v. Superior Court*, 63 Cal.App.3d 825, 830 (1976).<br><br>However, Defendants' arguments for production of tax returns and other sensitive financial data as necessary to evaluate Plaintiff's claims of emotional distress are rejected for the reasons set forth in Dkt. 117.<br><br>Accordingly, Plaintiff's complete applications for refinancing, including from 2020 to present, including ALL supporting documents submitted therewith, including tax returns, are relevant and proportional to the needs of the case. Similarly, all documents submitted in support of any credit application from 2020 to |

8

EXHIBIT 17

PAGE 10 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | | | | present, including tax returns, are relevant and proportional to the needs of the case. All such documents in Plaintiff's custody and control must be produced.<br><br>Plaintiff may produce these documents as "Attorneys Eyes Only," and as such the Protective Order (Dkt. 57) adequately protects Plaintiff's privacy interests. |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 40: ALL DOCUMENTS RELATING TO any credit YOU applied for between January 1, 2020, and the PRESENT DATE. | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 40: Responding Party objects to the extent it expressly or impliedly seeks information which is confidential or proprietary in nature and to the extent it seeks sensitive financial information pertaining to the Plaintiff, as the disclosure of such information would violate Plaintiff' right to privacy, including the right to privacy in personal financial records. Responding Party objects to producing any tax returns, tax documents or other tax documents protected by the taxpayer privilege, as protected under California law. The Plaintiff objects to producing private financial documents on the basis that such a request violates the privacy privilege protected by Article I, Section I of the California Constitution. Responding Party does not waive the tax return privilege. Responding Party will not produce tax returns or related documents, nor the financial records for his business. Responding Party objects to this request on the ground that it seeks premature disclosure | Compel supplemental response and production. Overrule taxpayer privilege and financial privilege. Compel privilege log for documents withheld. | No compromise, response is proper and tax returns and business financial records are private and privileged. Defendants have all information they need. | See ORDER re RFP 8 and incorporated herein by reference. |

9

EXHIBIT 17

PAGE 11 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure.<br><br>Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in part with the request and will produce relevant nonprivileged documents responsive to this request that are presently in his possession custody and control other than the aforementioned documents. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | | | |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 9: ALL COMMUNICATIONS between YOU and any PERSON regarding YOUR efforts, if any, to refinance the LOAN between January 1, 2020, and the PRESENT DATE. | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 9: Responding Party objects to the extent it expressly or impliedly seeks information which is confidential or proprietary in nature and to the extent it seeks sensitive financial information pertaining to the Plaintiff, as the disclosure of such information would violate Plaintiff' right to privacy, including the right to privacy in personal financial records. Responding Party objects to producing any tax returns, tax documents or other tax documents protected by the taxpayer privilege, as protected under California law. The Plaintiff objects to producing private financial documents on the basis that such a request violates the privacy privilege protected by Article I, Section I of the California Constitution. Responding Party does not waive the tax return privilege. Responding Party will not produce tax returns or related documents, nor the financial records for his business. Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not | Compel supplemental response and production. Overrule taxpayer privilege and financial privilege. Compel privilege log for documents withheld. | No compromise, response is proper and tax returns and business financial records are private and privileged. Defendants have all information they need. | Plaintiff's objections are **OVERRULED.**<br><br>Plaintiff has placed his efforts to refinance and to obtain credit directly at issue in this litigation. Accordingly, Plaintiff's objections are not well-taken.<br><br>Responsive communications between Plaintiff and third parties, excluding counsel, whether originating with third parties or with Plaintiff, regarding his efforts to refinance or to object credit from 2020 to |

10

EXHIBIT 17

PAGE 12 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
|  | produce any documents relating to experts until the time for such disclosure. Responding Party objects that the definition of the term "communications" is overly broad and includes information that is not in written form. Responding Party objects to the extent it expressly or impliedly seeks information covered by the attorney client privilege or work product, and Responding Party will not search for or produce any such information.

Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in part with the request and will produce relevant non-privileged documents responsive to this request that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. |  |  | present must be produced at this time. |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 17: ALL DOCUMENTS supporting YOUR allegation in Paragraph 57 of the COMPLAINT that YOU were "denied the benefit of obtaining new financing at low rates and will be forced to pay higher interest rate [*sic*] in the future." | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 17: Responding Party objects to the extent it expressly or impliedly seeks information which is confidential or proprietary in nature and to the extent it seeks sensitive financial information pertaining to the Plaintiff, as the disclosure of such information would violate Plaintiff' right to privacy, including the right to privacy in personal financial records. Responding Party objects to producing any tax returns, tax documents or other tax documents protected by the taxpayer privilege, as protected under California law. The Plaintiff objects to producing private financial documents on the basis that such a request violates the privacy privilege protected by Article I, Section I of the California Constitution. | Compel supplemental response and production. Overrule taxpayer privilege and financial privilege. Compel privilege log for documents withheld. | No compromise, response is proper and tax returns and business financial records are private and privileged. Defendants have all information they need. | See **ORDER** re RFP no. 8 and 9 above and incorporated herein by reference. In addition, any documentation supporting Plaintiff's allegation that he will have to pay higher interest rates in the future must be produced at this time. |

11

EXHIBIT 17
PAGE 13 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | Responding Party does not waive the tax return privilege. Responding Party will not produce tax returns or related documents, nor the financial records for his business. Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure.<br><br>Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in part with the request and will produce relevant nonprivileged documents responsive to this request that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | | | |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 18:    ALL DOCUMENTS supporting YOUR allegation in Paragraph 57 of the COMPLAINT that YOU suffered a "loss of credit expectancy." | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 18: Responding Party objects to the extent it expressly or impliedly seeks information which is confidential or proprietary in nature and to the extent it seeks sensitive financial information pertaining to the Plaintiff, as the disclosure of such information would violate Plaintiff' right to privacy, including the right to privacy in personal financial records. Responding Party objects to producing any tax returns, tax documents or other tax documents protected by the taxpayer privilege, as protected under California law. The Plaintiff objects to producing private financial documents on the basis that such a request violates the privacy privilege protected by Article I, Section I of the California Constitution. Responding Party does not waive the tax return | Compel supplemental response and production. Overrule taxpayer privilege and financial privilege. Compel privilege log for documents withheld. | No compromise, response is proper and tax returns and business financial records are private and privileged. Defendants have all information they need. | See **ORDER** re RFP 8, above and incorporated herein by reference. |

12

EXHIBIT 17
PAGE 14 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | privilege. Responding Party will not produce tax returns or related documents, nor the financial records for his business. Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure.<br><br>Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in part with the request and will produce relevant nonprivileged documents responsive to this request that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | | | |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 29: ALL DOCUMENTS evidencing that YOU had the necessary funds to tender monthly payments to DEFENDANT each month between May 1, 2020, and the PRESENT DATE. | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 29: Responding Party objects to the extent it expressly or impliedly seeks information which is confidential or proprietary in nature and to the extent it seeks sensitive financial information pertaining to the Plaintiff, as the disclosure of such information would violate Plaintiff' right to privacy, including the right to privacy in personal financial records. Responding Party objects to producing any tax returns, tax documents or other tax documents protected by the taxpayer privilege, as protected under California law. The Plaintiff objects to producing private financial documents on the basis that such a request violates the privacy privilege protected by Article I, Section I of the California Constitution. Responding Party does not waive the tax return privilege. Responding Party will not produce tax returns or related documents, nor the financial records | Compel supplemental response and production. Overrule taxpayer privilege and financial privilege. Compel privilege log for documents withheld. | No compromise, response is proper and tax returns and business financial records are private and privileged. Defendants have all information they need. | See **ORDER** re RFP 7 above and incorporated herein by reference. |

EXHIBIT 17

PAGE 15 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | for his business. Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure.<br><br>Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in part with the request and will produce relevant nonprivileged documents responsive to this request that are presently in his possession custody and control other than the aforementioned documents. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | | | |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 30: ALL DOCUMENTS RELATING TO any financial losses YOU claim to have suffered as a result of the alleged acts or omissions of DEFENDANT. | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 30: Responding Party objects to the extent it expressly or impliedly seeks information which is confidential or proprietary in nature and to the extent it seeks sensitive financial information pertaining to the Plaintiff, as the disclosure of such information would violate Plaintiff' right to privacy, including the right to privacy in personal financial records. Responding Party objects to producing any tax returns, tax documents or other tax documents protected by the taxpayer privilege, as protected under California law. The Plaintiff objects to producing private financial documents on the basis that such a request violates the privacy privilege protected by Article I, Section I of the California Constitution. Responding Party does not waive the tax return privilege. Responding Party will not produce tax returns or related documents, nor the financial records for his business. Responding Party objects to this | Compel supplemental response and production. Overrule taxpayer privilege and financial privilege. Compel privilege log for documents withheld. | No compromise, response is proper and tax returns and business financial records are private and privileged. Defendants have all information they need. | See **ORDER** re RFPs 8, 9 above and incorporated herein by reference.<br><br>For the avoidance of doubt, any financial documents in the custody and control of Plaintiff and considered by or to be considered by Plaintiff's damages expert are to be produced at this time. |

14

EXHIBIT 17

PAGE 16 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure.<br><br>Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in part with the request and will produce relevant nonprivileged documents responsive to this request that are presently in his possession custody and control other than the aforementioned documents. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | | | |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 31:     ALL DOCUMENTS RELATING TO any financial losses YOU claim to have suffered as a result of the alleged acts or omissions of HSBC. | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 31: Responding Party objects to the extent it expressly or impliedly seeks information which is confidential or proprietary in nature and to the extent it seeks sensitive financial information pertaining to the Plaintiff, as the disclosure of such information would violate Plaintiff' right to privacy, including the right to privacy in personal financial records. Responding Party objects to producing any tax returns, tax documents or other tax documents protected by the taxpayer privilege, as protected under California law. The Plaintiff objects to producing private financial documents on the basis that such a request violates the privacy privilege protected by Article I, Section I of the California Constitution. Responding Party does not waive the tax return privilege. Responding Party will not produce tax returns or related documents, nor the financial records for his business. Responding Party objects to this | Compel supplemental response and production. Overrule taxpayer privilege and financial privilege. Compel privilege log for documents withheld. | No compromise, response is proper and tax returns and business financial records are private and privileged. Defendants have all information they need. | See **ORDER** re RFP no. 30 above and incorporated herein by reference. |

15

EXHIBIT 17

PAGE 17 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure.<br><br>Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in part with the request and will produce relevant nonprivileged documents responsive to this request that are presently in his possession custody and control other than the aforementioned documents. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | | | |
| INTERROGATORY NO. 20: IDENTIFY YOUR monthly net total income for each month between May 1, 2020, and the PRESENT DATE. | RESPONSE TO INTERROGATORY NO. 20: Responding Party objects to the extent it expressly or impliedly seeks information which is confidential or proprietary in nature and to the extent it seeks sensitive financial information pertaining to the Plaintiff, as the disclosure of such information would violate Plaintiff' right to privacy, including the right to privacy in personal financial records. Responding Party objects to producing any tax returns, tax documents or other tax documents protected by the taxpayer privilege, as protected under California law. The Plaintiff objects to disclosing this information on the basis that such a request violates the privacy privilege protected by Article I, Section I of the California Constitution. Responding Party does not waive the tax return privilege. This request is burdensome and oppressive and not proportional to the needs of the case because it would take dozens of hours going through five years of business records to calculate all of this information which is unnecessary because Plaintiff is producing | Compel supplemental response. Overrule taxpayer privilege and financial privilege. | No compromise, response is proper and tax returns and business financial records are private and privileged. Defendants have all information they need. | Objections **SUSTAINED**. In light of the Court's rulings above, this request is not proportional to the needs of the litigation. |

EXHIBIT 17
PAGE 18 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | certain financial records and statements demonstrating his ability to afford the loan payment every month, including documents showing where he sent his mortgage payments to his attorney's trust account because PHH refused to accept them. This is sufficient to the needs of the case for the claims and defenses of the parties. | | | |
| INTERROGATORY NO. 13: For each item or category of damages YOU claim to have suffered due to the action or inaction of DEFENDANTS, IDENTIFY and describe the nature and amount of the damages sought, how the damages were calculated, and the facts supporting YOUR claim that the damages resulted from some action or inaction on the part of DEFENDANTS. | RESPONSE TO INTERROGATORY NO. 13: Responding Party objects that the request because it seeks premature disclosure information to be furnished by experts. Responding Party will not produce such information until the time for disclosure of expert testimony. Discovery is still ongoing, and many of the documents necessary to prove the amount of these charges and fees are in possession of Propounding Party. Once the documents are obtained in discovery, they will be analyzed by experts, and expert testimony will show the amount of these damages at trial.   The exact amount of damages is still unknown to Plaintiff and it is expected that the amount of the damages shall be determined at the time of trial.

Responding Party cannot comply with this request as to punitive damages because "[l]ost punitive damages, however, are not amenable to an objective determination. "`Unlike the measure of actual damages suffered, which presents a question of historical or predictive fact, [citation], the level of punitive damages is not really a "fact" "tried" by the jury.'" (Cooper Industries, Inc. v. Leatherman Tool Group, Inc. (2001) 532 U.S. 424, 437, 121 S.Ct. 1678, 149 L.Ed.2d 674, quoting Gasperini v. Center for Humanities, Inc. (1996) 518 U.S. 415, 459, 116 S.Ct. 2211, 135 L.Ed.2d 659 (dis. opn. of Scalia, J.).) Instead, a jury's "imposition of punitive damages is an expression of its moral condemnation." (Cooper Industries, at p. 432, 121 S.Ct. 1678.) Indeed, a plaintiff is not "`entitled, as | Compel supplemental response to provide facts and calculation of damages relating to car loan and business loan applications and denials. | No compromise, response is proper and complete. PHH can ask more about details in deposition. | Objections **SUSTAINED**. Plaintiff's response is sufficient.    The additional levels of detail sought by this inquiry are more appropriate for expert discovery. |

17

EXHIBIT 17

PAGE 19 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | of right'" to an award of punitive damages (Brewer v. Second Baptist Church (1948) 32 Cal.2d 791, 801, 197 P.2d 713 (Brewer )), even if the jury finds the defendant "guilty of oppression, fraud, or malice" (Civ.Code, § 3294, subd. (a)). Thus, to award lost punitive damages, the trier of fact must determine what moral judgment would have been made by a reasonable jury. Because moral judgments are inherently subjective, a jury cannot objectively determine whether punitive damages should have been awarded or the proper amount of those damages with any legal certainty. (See Rest.3d Law Governing Lawyers, § 53, com. h, p. 393 [an award of lost punitive damages "calls for a speculative reconstruction of a hypothetical jury's reaction"].) Ferguson v. Lieff Cabraser (2003) 135 Cal.Rptr. 2d 46, 54.<br><br>Responding Party cannot comply with this request as to emotional distress damages because "In terms of emotional distress damages, courts have repeatedly ruled that a Plaintiff is not required to put a specific dollar amount on emotional distress. Plaintiffs need not provide a calculation for compensatory damages pertaining to emotional distress, as such calculations are necessarily vague and hard to ascertain. See Williams v. Trader Publishing Co., 218 F.3d 481, 486 n. 3 (5th Cir.2000); see also Creswell v. HCAL Corp., No. 04cv388 BTM (RBB), 2007 WL 628036 at 2 (S.D.Cal. Feb. 12, 2007). Indeed, CACI 3905a states that there is "no fixed number" for awarding emotional distress damages."<br><br>Damages from the inability to refinance Plaintiff's home are estimated to be not less than $500,000, as will be the subject of expert witness testimony at trial, which is the difference between what he will pay over the life of the loan at the higher rates he is stuck with currently compared to the low rates he could have | | | |

EXHIBIT 17
PAGE 20 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | qualified for in refinancing after the 2020 settlement but for the wrongdoing of Defendants rejecting his payments and not reporting him current on his payments. Plaintiff would have qualified to refinance in mid-2020 for the best rates for Fanny Mae loans around 1.9% but is now going to be required to pay 5.125% for the life of this loan. but for Defendants' wrongful conduct in not reporting timely, nor correctly, and not informing Plaintiff that they had done so, and not sending statements and not accepting payments. These damages are usually calculated by the present value of the stream of payments under his current loan over the life of the loan at the 5.125%, and the net present value of the stream of payments he could have made at the lower rates he could have obtained of around 1.9%. At this time Plaintiff does not have all the information for calculating this claim but will supplement when he has obtained it.

Interest on the loan from 2020 to present: no interest accrues on the loan from the time they failed to accept installment payments. The amount will be calculated by an expert witness at trial based on the loan documents and payment histories. This amount is accruing and ongoing. This may be calculated with a reinstatement quote or payoff quote and using amortization schedules to add up the interest that has accrued.
Loss of Credit Expectancy: Not less than $50,000 for the harm to his credit score and the inability to get credit. This will be the subject of expert witness testimony and is based on industry standard practices for calculating these types of damages.
Loan fees and charges before 2020 settlement: Defendants were obligated to waive certain fees and costs in the 2020 settlement agreement, but they failed to do so. These amounts will be calculated from the loan transaction histories and related records once they | | | |

19

EXHIBIT 17
PAGE 21 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | are obtained in discovery.<br><br>Late fees and foreclosure related charges and any other fees and costs associated with being in default from 2020 to present that accrued and were charged to the loan that would not have been incurred had Defendant's properly applied the funds to the loan and accepted Plaintiff's payments. These will be calculated by Defendants' records once they are obtained in discovery.<br><br>The damages include $33,120.95 for failing to apply that credit to the loan.  All late fees, inspection fees, and all other types of fees and costs incurred after the settlement around April 2020 that would not have been incurred but for Defendants' breaches.  The amounts will be determined after discovery based on Defendants' records and expert testimony. Defendants' are currently wrongfully withholding the information necessary to determine these amounts.<br><br>The Notice of Default and Notice of Trustee Sale impaired the marketability of the property and decreased its value. This will be the subject of expert witness testimony based on comparable sales and related methodologies.<br><br>Mayer seeks statutory damages of $2,000 under 12 U.S.C. §2605(f)(1)(B) because of PHH's pattern or practice of noncompliance with the requirements of this section. Mayer requests attorneys' fees and costs.<br><br>Plaintiff is entitled to attorney's fees and costs. | | | |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 19:  ALL | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 19: Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and | Compel supplemental response and production. | No compromise, response is proper, | Plaintiff's objections are **OVERRULED.** Plaintiff to produce documents in his custody |

20

EXHIBIT 17
PAGE 22 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| DOCUMENTS supporting YOUR allegation in Paragraph 57 of the COMPLAINT that YOU have been damaged by "excessive and wrongful charges." | will not produce any documents relating to experts until the time for such disclosure. Responding Party objects that Defendants are wrongfully withholding the evidence necessary to establish these claims and Responding Party is in the process of compelling production of that evidence.<br><br>Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in full with the request and will produce all nonprivileged documents responsive to this request that are presently in his possession custody and control other than the aforementioned expert witness evidence. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | Compel privilege log for documents withheld. | nothing withheld. | and control that evidence "excessive and wrongful charges" charged by Defendant or HSBC.<br><br>For the avoidance of doubt, any responsive documents in the custody and control of Plaintiff and considered by or to be considered by Plaintiff's damages expert are to be produced at this time. |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 20: ALL DOCUMENTS evidencing the excessive and wrongful charges YOU have paid since May 1, 2020 | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 20: Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure. Responding Party objects that Defendants are wrongfully withholding the evidence necessary to establish these claims and Responding Party is in the process of compelling production of that evidence.<br><br>Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in full with the request and will produce all | Compel supplemental response and production. Compel privilege log for documents withheld. | No compromise, response is proper, nothing withheld. | Plaintiff's objections are **OVERRULED.**<br><br>Plaintiff to produce documents in his custody and control that evidence his payment of "excessive and wrongful charges" charged by Defendant or HSBC.<br><br>For the avoidance of doubt, any responsive documents in the custody and control of Plaintiff and considered by or to be considered by |

21

EXHIBIT 17

PAGE 23 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | nonprivileged documents responsive to this request that are presently in his possession custody and control other than the aforementioned expert witness information. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | | | Plaintiff's damages expert are to be produced at this time. |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 21: ALL DOCUMENTS evidencing excessive and wrongful charges YOU contend were assessed to the LOAN | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 21: Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure. Responding Party objects that Defendants are wrongfully withholding the evidence necessary to establish these claims and Responding Party is in the process of compelling production of that evidence.<br><br>Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in full with the request and will produce all nonprivileged documents responsive to this request that are presently in his possession custody and control other than the aforementioned expert witness information. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | Compel supplemental response and production. Compel privilege log for documents withheld. | No compromise, response is proper, nothing withheld. | See **ORDER** re RFP 19, 20 above and incorporated herein by reference. |
| INTERROGATORY NO. 7: IDENTIFY ALL excessive and wrongful charges YOU contend were assessed to the LOAN, including the date | RESPONSE TO INTERROGATORY NO. 7: Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure. Responding Party objects that Defendants are wrongfully withholding the evidence necessary to | Compel supplemental response. | No compromise, response is proper, nothing withheld by Plaintiff. | Plaintiff may respond with reference to Bates nos. of documents produced pursuant to the **ORDER** re RFP 19 and 20 above. |

EXHIBIT 17

PAGE 24 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| YOU contend any such charges were assessed to the LOAN. | establish these claims and Responding Party is in the process of compelling production of that evidence. Defendants are wrongfully refusing to produce documents showing fees and charges in response to Plaintiff's RFP 1 to HSBC and RFP 1, and 2 to PHH, among other records. Defendants are withholding loan histories, lists of fees and charges, and code breakers that would enable Plaintiff to identify charges and whether the funds applied to the loan were applied to charges. The partial loan histories appear to show funds applied to unexplained items that may be such fees but Plaintiff cannot determine this yet until Defendants comply with discovery. Plaintiff will supplement this response once Defendants comply with discovery and after depositions on this topic. | | Defendants still violating this Court's prior orders by withholding extensive documents necessary to establish these facts. | |
| INTERROGATORY NO. 8: IDENTIFY ALL excessive and wrongful charges on the LOAN that YOU contend YOU have paid since April 1, 2020. | RESPONSE TO INTERROGATORY NO. 8: Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure. Responding Party objects that Defendants are wrongfully withholding the evidence necessary to establish these claims and Responding Party is in the process of compelling production of that evidence. Defendants are wrongfully refusing to produce documents showing fees and charges in response to Plaintiff's RFP 1 to HSBC and RFP 1, and 2 to PHH, among other records. Defendants are withholding loan histories, lists of fees and charges, and code breakers that would enable Plaintiff to identify charges and whether the funds applied to the loan were applied to charges. The partial loan histories appear to show funds applied to unexplained items that may be such fees but Plaintiff cannot determine this yet until Defendants comply with discovery. Plaintiff will supplement this response once Defendants comply with discovery and after depositions on this topic. | Compel supplemental response. | No compromise, response is proper, nothing withheld by Plaintiff. Defendants still violating this Court's prior orders by withholding extensive documents necessary to establish these facts. | Plaintiff may respond with reference to Bates nos. of documents produced pursuant to the **ORDER** re RFP 19 and 20 above. |

23

EXHIBIT 17

PAGE 25 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | | | | |
| | **6. Damages – Attorneys' Fees** | | | |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 23: ALL DOCUMENTS evidencing the amount of attorneys' fees YOU claim YOU are entitled to recover through the COMPLAINT. | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 23: Responding Party objects that this request seeks information covered by the attorney client privilege and work product in the billing time entries and is premature and will be handled by post-trial motion. Responding Party objects that the request is burdensome as it would require hours of redacting time records with no benefit to Defendants because it is not relevant. Responding Party objects that the request is harassing because the information produced would be partial and useless to Defendants because it will not become relevant until after a verdict after trial at the time of a fee motion. Responding Party objects that the request is outside the scope of discovery because the information is not relevant to the claims or defenses of the parties on the merits because statutory and contractual attorney's fees and costs are not party of damage claims but are determined after the merits. Courts deny such discovery. *Abels v. JBC Legal Grp., P.C.*, 233 F.R.D. 645 (N.D. Cal. 2006). Responding Party will not comply with this request. | Compel supplemental response and production with redactions of privileged information. Compel privilege log. | No compromise. Objections should be sustained, and request denied as Judge Richard Seeborg has with such requests. | Plaintiff's objections to production of fees at this time are **SUSTAINED**. Plaintiff's counsel's billing statements at this juncture are neither relevant nor proportional to the claims and defenses at issue in trial and may be properly addressed in confidential settlement negotiations or by a post-trial motion. |
| | **7. Social Media** | | | |
| INTERROGATORY NO. 16: IDENTIFY each internet-based social networking site that YOU have used during the past five years (e.g., Facebook, Instagram, MySpace, | RESPONSE TO INTERROGATORY NO. 16: Responding Party objects that this request is outside the scope of discover because it is not relevant to the claims or defenses of the parties and is not reasonably calculated to lead to the discovery of admissible evidence, it is not proportional to the needs of the case and is only harassing and serves no legitimate purpose. This information is private. | Compel supplemental response. Overrule privacy privilege. | No compromise. Sustain objection. No responsive discoverable content exists to produce | Plaintiff's objections are **SUSTAINED**. The request for years' worth of social media posts under the facts of this case, particularly where no physical injury is alleged, is an irrelevant |

24

EXHIBIT 17

PAGE 26 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| Snapchat, Twitter, Vine, TikTok, etc.). For each such site identified, please include the name and address of the service provider, the name and address of the account holder, YOUR user name or avatar, the URL where the account was/is available, and the dates during which YOU used the account. | | | even if court compels production of narrow subset of types of relevant posts. | and disproportional fishing expedition. |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 42: Copies of any and ALL online profiles and postings, including, tweets, replies, status updates, comments, blog entries, photographs, videos, memes, and online communications that YOU authored between January 1, 2020, and the PRESENT DATE. | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 42: Responding Party objects that this request is outside the scope of discover because it is not relevant to the claims or defenses of the parties and is not reasonably calculated to lead to the discovery of admissible evidence and is only harassing and serves no legitimate purpose. This information is private. | Compel supplemental response and production. Overrule privacy privilege. | No compromise. Sustain objection. No responsive discoverable content exists to produce even if court compels production of narrow subset of types of relevant posts. | See **ORDER** re Interrogatory no. 16 above and incorporated herein by reference. |
| | **7. Communications** | | | |
| REQUEST FOR PRODUCTION OF | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1: Responding Party objects to | Compel supplemental | Nothing to compromise. | Plaintiff's objection to the term |

25

EXHIBIT 17
PAGE 27 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| DOCUMENTS NO. 1: ALL DOCUMENTS RELATED TO any COMMUNICATIONS between YOU and any PERSON regarding the LOAN during the time period of January 1, 2020, to the PRESENT DATE. | this request to the extent that it seeks disclosure by the attorney-client privilege, privacy, and/or the work product doctrine. Responding Party will not search for or produce any such privileged information. Responding Party further objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure. Responding Party objects that the definition of the term "communications" is overly broad and includes information that is not in written form.

Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in whole with the request and will produce all nonprivileged documents responsive to this request that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | response and production for documents excluded based on the objection to the term communications. Compel privilege log for documents withheld. | Response is compliant with Rules, all documents produced, or will be produced. Nothing withheld. | "communications" is not well taken and is **OVERRULED**. One only has to read Fed. R. Civ. Proc. 34 to understand the term.

Accordingly, communications between Plaintiff and third parties, excluding counsel, regarding the LOAN are relevant and proportional to the needs of the case and are to be produced.

Regarding the request for privilege log, Federal Rule of Civ. Pro. 26(b)(5)(A) and this Court's standing order require a privilege log where responsive materials are withheld on the basis of privilege.

However, in this case where there has been a longstanding dispute between Plaintiff and Defendants, which pre-dates the filing of the suit by several years, and in which Plaintiff's counsel has been involved the entire time, an |

26

EXHIBIT 17
PAGE 28 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | | | | expansive, all-encompassing privilege log is not proportional to the needs of the case.<br><br>If, and only if, discovery is not yet closed, Defendants may request, and the Parties must meet and confer regarding, a log of privileged communications as to a limited topic in a limited time frame, which may be relevant and proportional. |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 2: ALL DOCUMENTS RELATED TO any COMMUNICATIONS between YOU and any PERSON regarding the PROPERTY during the time period of January 1, 2020, to the PRESENT DATE. | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 2: Responding Party objects to this request to the extent that it seeks disclosure by the attorney-client privilege, privacy, and/or the work product doctrine. Responding Party will not search for or produce any such privileged information. Responding Party further objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such disclosure. Responding Party objects that the definition of the term "communications" is overly broad and includes information that is not in written form.<br><br>Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in whole with the request and will produce all nonprivileged documents responsive to this request | Compel supplemental response and production for documents excluded based on the objections to the term communications. Compel privilege log for documents withheld. | Nothing to compromise. Response is compliant with Rules, all documents produced, or will be produced. Nothing withheld. | See **ORDER** re RFP no. 1 above and incorporated herein by reference as to communications regarding the PROPERTY. |

27

EXHIBIT 17

PAGE 29 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | | | |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 9: ALL COMMUNICATIONS between YOU and any PERSON regarding YOUR efforts, if any, to refinance the LOAN between January 1, 2020, and the PRESENT DATE. | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 9: Responding Party objects to the extent it expressly or impliedly seeks information which is confidential or proprietary in nature and to the extent it seeks sensitive financial information pertaining to the Plaintiff, as the disclosure of such information would violate Plaintiff' right to privacy, including the right to privacy in personal financial records. Responding Party objects to producing any tax returns, tax documents or other tax documents protected by the taxpayer privilege, as protected under California law. The Plaintiff objects to producing private financial documents on the basis that such a request violates the privacy privilege protected by Article I, Section I of the California Constitution. Responding Party does not waive the tax return privilege. Responding Party will not produce tax returns or related documents, nor the financial records for his business. Responding Party objects to this request on the ground that it seeks premature disclosure information to be furnished by experts and will not produce any documents relating to experts until the time for such<br><br>disclosure. Responding Party objects that the definition of the term "communications" is overly broad and includes information that is not in written form. Responding Party objects to the extent it expressly or impliedly seeks information covered by the attorney client privilege or work product, and Responding Party will not search for or produce any such information.<br><br>Subject to and without waiving the foregoing | Compel supplemental response and production. Overrule taxpayer privilege and financial privilege. Overrule objection that "communications" is overbroad. Compel privilege log for documents withheld. | Nothing to compromise. Response is compliant with Rules, all documents produced, or will be produced. Nothing withheld other than tax returns, private business financial records, and privileged emails outside the scope of discovery. | See **ORDER** re RFP no. 1 above and incorporated herein by reference as to communications regarding Plaintiff's efforts to refinance the LOAN. |

28

EXHIBIT 17

PAGE 30 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| | objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in part with the request and will produce relevant non-privileged documents responsive to this request that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | | | |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 10: ALL DOCUMENTS evidencing COMMUNICATIONS between Pamela Simmons and any PERSON representing DEFENDANT during the time period of April 13, 2021, to January 9, 2024. | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 10: Responding Party objects that the definition of the term "communications" is overly broad and includes information that is not in written form.<br><br>Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in whole with the request and will produce all relevant non-privileged documents responsive to this request that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | Compel supplemental response and production for documents excluded based on the objections to the term communications. Compel privilege log for documents withheld. | Nothing to compromise. Response is compliant with Rules, all documents produced, or will be produced. Nothing withheld other than privileged emails outside the scope of discovery. | The Parties do not address this request directly, other than a suggestion in the Joint Submission that Ms. Simmons is or was an attorney for Plaintiff. Dkt. 134 at 6.<br><br>Communications between counsel for the Parties may be relevant and are proportional to the needs of the case. Accordingly, Plaintiff is to produce any responsive documents. |
| REQUEST FOR PRODUCTION OF DOCUMENTS NO. 11: ALL DOCUMENTS evidencing COMMUNICATIONS between Pamela Simmons and | RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 11: Responding Party objects that the definition of the term "communications" is overly broad and includes information that is not in written form.<br><br>Subject to and without waiving the foregoing objections, and to the extent that the Responding Party understands the request, Responding Party responds as | Compel supplemental response and production for documents excluded based on the objections to the term communications. | Nothing to compromise. Response is compliant with Rules, all documents produced, or will be produced. | The Parties do not address this request directly, other than a suggestion in the Joint Submission that Ms. Simmons is or was an attorney for Plaintiff. Dkt. 134 at 6. |

EXHIBIT 17

PAGE 31 OF 32

| Request | Response | Defendants' Proposed Compromise | Plaintiff's Proposed Compromise | Court ORDER |
|---|---|---|---|---|
| DEFENDANT during the time period of April 13, 2021, to January 9, 2024 | follows: after diligent search and reasonable inquiry to locate responsive documents, Responding Party will comply in whole with the request and will produce all relevant non-privileged documents responsive to this request that are presently in his possession custody and control. Discovery is still ongoing. Responding Party reserves the right to supplement this response when more information becomes available. | Compel privilege log for documents withheld. | Nothing withheld other than privileged emails outside the scope of discovery. | Accordingly, on its face, this request appears to seek attorney-client communications. The Defendant has not provided the Court with sufficient information to rule on this request and accordingly it is **DENIED.** |

30

EXHIBIT 17
PAGE 32 OF 32

# EXHIBIT 18

## AMENDED TRANSCRIPT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan van Keulen, Magistrate Judge

MAYER,                          )
                                )
          Plaintiff,            )
                                )
vs.                             )   No. C 25-00182-NW
                                )
HSBC BANK USA, NATIONAL         )
ASSOCIATION, et al.,            )
                                )
          Defendants.           )
_____)

                                San Jose, California
                                Tuesday, December 16, 2025

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
     RECORDING 2:13 - 4:40 = 2 HOURS AND 27 MINUTES

APPEARANCES:

For Plaintiff:
                         Law Office of Andrew J.
                            Christensen, P.C.
                         2063 Mountain Boulevard
                         Suite 2
                         Oakland, California 94611
                    BY:  ANDREW J. CHRISTENSEN, ESQ.

For Defendants:
                         Hinshaw & Culbertson, LLP
                         350 South Grand Avenue
                         Suite 3600
                         Los Angeles, California 90071
                    BY:  HELEN G. MOSOTHOANE, ESQ.

Transcribed by:          Echo Reporting, Inc.
                         Contracted Court Reporter/
                         Transcriber
                         echoreporting@yahoo.com

32

So, it's not really what --

THE COURT:  Okay.  So, let me -- let me just stop you there.

MR. CHRISTENSEN:  Yes.

THE COURT:  Because I read that argument with care, and we -- we've had this discussion before.  The -- as to the servicing notes, the entries before April of 2020, as I've said, not relevant and, importantly, not proportional.  Now, you -- if you think you have a grounds on which, as you've just explained, that, okay, we have to start with the settlement agreement, where do these numbers come from, that -- you can ask that in deposition.  You can say, Give me the person most knowledgeable about where those numbers come from.  You don't need the hundreds of names, as you keep pointing out, that show up in servicing notes.  Ask -- set -- set that category and ask that question.  That will get you that information in a proportional and efficient way.

MR. CHRISTENSEN:  Okay.  Then I just ant to be clear about that.  The -- the timeline would be limited to January 2020 because that's when the parties agreed to the terms.  So, there's a loan, they negotiated it, and around February 19th is when they -- or just before February 19th, they came to an agreement on the terms that they'd cure the loan until then.  So, it's not April of 2020 when they're

53

PHH doesn't credit or make a -- a profit out of the property taxes because that's just been paid back by the -- the borrower.  So, I understand the allegation of ongoing violations.  I don't agree.

THE COURT:  I understand.  Okay.  All right. It will be -- I'm not going to put an end date on the discovery.  The servicing notes will have to continue to present.  You can argue with Judge Wise about what -- you know, what -- what comes in at trial, what is and isn't evidence for trial.  But for purposes of discovery, it will continue.

(Pause.)

THE COURT:  That brings us over to Document 70. That was on responses.  I issued an order on that with production dates and instructions for the parties, with the exception of RFP 5 to HSBC, and I think it's RFP 6 as to PHH.  I may not have that number exactly right.

So, let us turn our attention there, please.  And these were -- yes, it was RFP 5 to HSBC and RFP 6 to PHH.  This was a request for all electronic messages between all employees.  I'm pretty sure we talked about this last time we were all together but maybe not.  May not have been exactly this request, and I have grave concerns about proportionality given the scope, the overbreadth.  But, really, where I come back to are the servicing notes, is --

54

don't -- doesn't a complete set of servicing notes which then brings us to Document 73 and the dispute about what's been -- what's missing from servicing notes, doesn't that -- doesn't that cover and address everyone who's touched this file and the activity as it relates to this loan?  Won't servicing notes reflect -- reflect and -- and meet that objective?  Mr. Christensen, I'll hear briefly from you.  We -- we have to keep moving.  I've got a hard stop coming up.

MR. CHRISTENSEN:  Yes.  No, it does not, your Honor, because it doesn't reflect everybody that touched the loan.  This is particularly true with upper management and whoever authorized all these things.  There is -- it is not even close to all the people -- or the motion or lawsuit before people had touched the loan, and --

THE COURT:  Right.  But you don't -- you don't need everybody who touched the loan, and -- and the Rules don't let you even depose everybody who touched the loan.

MR. CHRISTENSEN:  Well --

THE COURT:  I mean, again, wouldn't the servicing -- don't the servicing notes, if they're complete -- and we'll get to Docket 70 in a minute, but don't the servicing notes, as I understand it from our discussion here this afternoon, aren't those going to reflect the PHH employees who were touching this loan?

MR. CHRISTENSEN:  Yes, but that's only part of it.

55

Again, we need to find who approved this, and all the -- so, the first level of emails needs to be every single individual that took action on servicing notes who is identified, all of their emails need to be searched to see who they were in contact with to direct them to take the actions that they took. Because of -- in this case, they took so many actions that are outside the scope of what they should do in their own policies and procedures that that can only be approved by management, and that is a critical of this case when we have punitive damages --

THE COURT: But isn't there a better and more efficient way to get to that than asking for every email between every single employee? I mean, that -- that is not proportional to the needs of the case.

MR. CHRISTENSEN: Well --

THE COURT: Isn't the question -- isn't -- isn't that a -- you know, an interrogatory about identify the persons at this level and this level and this level, attached to the loan or, you know, involved with the loan?

MR. CHRISTENSEN: Well, sure, that would be nice if they would give us a truthful answer. But we've asked that, your Honor. We tried that exact thing, and they gave us the names of someone who was not very high on the totem pole. It's hard to tell what they're hiding. So, I don't -- we don't think so. And I've never seen that in this

74

THE COURT:  -- the supplemental ROG response.

MR. CHRISTENSEN:  The precise language of our discovery request very carefully clarifies exactly what we're --

THE COURT:  Mr. Christensen --

(Simultaneous speaking.)

THE COURT:  -- you have my order.  You have my order.

MR. CHRISTENSEN:  I understand.

THE COURT:  That's what it will be.

And Docket 70 I'm -- I'm not granting the request for every email between every employee.  That is not proportional to the needs of the litigation.  We've had this discussion throughout the discovery disputes in this case, that the requests need to be focused.  It sounds like there's been some issues in terms of identifying decision makers or managing agents I think was your phrase, Mr. Christensen.

So, I'm going to give you leave to serve -- well, I'm not going to give you leave.  I will allow you to serve a further interrogatory to identify managing agents who made certain decisions.  You weren't -- you get -- you have the servicing notes.  You're going to have those -- a more complete set within a couple of weeks, and you can ask for, you know, specific actions, you know, who's -- who

76

want you to use the language that you think is appropriate. There are certain actions that you're very concerned about as to who was approving it. I'm giving you a chance to ask those questions.

MR. CHRISTENSEN: Oh, okay. I think maybe I -- maybe I'm confused. Are we still talking about the request for production for emails, right?

THE COURT: Yes. And I'm denying the request in 70 for all emails between all of your employees, RFP 5 to HSBC and RFP 6 to PHH. That -- those are the subject of Docket 70, and that request is denied. It's not proportional to the needs of the litigation.

MR. CHRISTENSEN: Okay. What about --

THE COURT: I'm giving you an option -- excuse me, Mr. Christensen. This is what you can do is you can ask a -- I'm giving you a handful of additional interrogatories to drive to that information in a more efficient manner.

MR. CHRISTENSEN: Okay. Does -- this is another question. I -- if we're -- why don't we limit the emails to just those individuals in the servicing notes to demand any emails from people in the notes to their supervisors? That would narrow it down. Because that's requests we're going to serve immediately right now is to get those emails, because this case cannot proceed without emails. That is the -- perhaps some of the most important evidence in this

77

case.  I mean, I --

THE COURT:  I don't think you need -- because you don't need all the emails from everybody reflected in the servicing notes.  You need to be, as you have had to throughout this case, ask a more focused question.  There are only certain actions reflected in the servicing notes that are relevant and material in this case.  There are only -- and proportional.  There are only certain actions.  It's not everybody who touched the loan.  So, you're not getting --

MR. CHRISTENSEN:  Correct.

THE COURT:  -- the mail -- I'm just telling you, Mr. Christensen, you are not getting the emails form every employee who touched the loan.  So, your request for everybody's who's reflected in the servicing notes is denied.  You can -- if you want to wait and get the servicing notes, if you want to ask then a request much more focused, you can try that.  I'm trying to expedite that process for you.

MR. CHRISTENSEN:  Okay.  So, on that point, expediting the process, I'm definitely open to that because it's getting close to two months.  So, there's literally almost no way at this point we can get the evidence that we need before the close of discovery.  So, if we want -- if -- if the Court's willing, you know, because we -- we'd love to

EXHIBIT 18
PAGE 8 OF 10

80

Honor, it's to just this exact issue that I brought -- raised to the Court back in June is this -- we know this is going to happen.  This happens in every case.  And, so, if we have an ESI liaison, we could have searched --

THE COURT:  You're going way --

MR. CHRISTENSEN:  -- those emails --

THE COURT:  -- too fast --

MR. CHRISTENSEN:  -- discovery --

THE COURT:  -- Mr. Christensen.  You need to slow down.

MR. CHRISTENSEN:  Okay.  I'm sorry.  We -- I would have loved to have addressed all this back in March or in June so that we wouldn't be here with this dispute so that we have an ESI liaison that could identify witnesses, right, for their, you know, initial disclosures, but they didn't.

THE COURT:  Thank you, Mr. Christensen.

MR. CHRISTENSEN:  The point --

THE COURT:  I'm going to interrupt you right there because an ESI liaison would not have fixed the overbroad and unproportional requests that we have been struggling with in this case from the beginning.  Now, there have equally been deficient response issues on Defendants' side.  So, this has been a two-sided issue, and I have never been persuaded or it has never made sense to me that an ESI liaison is the fix, and it still does not.  So, the answer

111

## CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Monday, January 12, 2026

# EXHIBIT 19

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan van Keulen, Magistrate Judge

MAYER,                          )
                                )
          Plaintiff,            )
                                )
vs.                             )   No. C 25-00182-NW
                                )
HSBC BANK USA, NATIONAL         )
ASSOCIATION, et al.,            )
                                )
          Defendants.           )
_____)

                                San Jose, California
                                Thursday, February 19, 2026

   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
              RECORDING 9:00 - 9:36 = 36 MINUTES

APPEARANCES:

For Plaintiff:
                      Law Office of Andrew J.
                        Christensen, P.C.
                      2063 Mountain Boulevard
                      Suite 2
                      Oakland, California 94611
                 BY:  ANDREW J. CHRISTENSEN, ESQ.

For Defendants:
                      Houser, LLP
                      9970 Research Drive
                      Irvine, California 92618
                 BY:  ROBERT W. NORMAN, JR., ESQ.
                 BY:  TIMOTHY A. SCHNEIDER, ESQ.

Transcribed by:       Echo Reporting, Inc.
                      Contracted Court Reporter/
                      Transcriber
                      echoreporting@yahoo.com

*Echo Reporting, Inc.*

EXHIBIT 19

PAGE 1 OF 3

27

THE COURT:  Okay.  If --

MR. CHRISTENSEN:  -- we should not --

THE COURT:  -- there's lots of evidence, of course --

(Simultaneous speaking.)

THE COURT:  -- I'm scratching my head as to why we're still having discovery disputes.

MR. CHRISTENSEN:  Well, the evidence --

THE COURT:  This case is actually --

MR. CHRISTENSEN:  -- is that there --

THE COURT:  Excuse me, Mr. Christensen.  This case is not that complicated.  It's a breach of contract case, and there's a -- there is -- by Plaintiff's own allegations, there's a significant paper trail which Plaintiff has.  Now you have additional documents and testimony from Defendants, but I will let you all figure that --

MR. CHRISTENSEN:  Well --

THE COURT:  -- out.  Excuse me.  I have to go. I've got people waiting here for a settlement conference.

MR. CHRISTENSEN:  Okay.

THE COURT:  So, that --

MR. CHRISTENSEN:  -- it's a punitive damage --

THE COURT:  Excuse me --

MR. CHRISTENSEN:  -- case, not --

THE COURT:  -- Mr. Christensen --

EXHIBIT 19
PAGE 2 OF 3

29

CERTIFICATE OF TRANSCRIBER


I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Friday, February 20, 2026