Andrew J. Christensen (SBN: 260748)
Law Offices of Andrew J. Christensen, P.C.
2063 Mountain Blvd. Suite 2
Oakland, CA 94611
Tel: (510) 761-7183
Fax: (510) 680-3430
Andrew@CaliforniaHomeLawyer.com

Nicholas Heath Wooten (Pro Hac Vice)
3125 Carlton Road
Cumming, GA. 30041
Tel: (833) 937-6389
nick@nickwooten.com


Attorneys for Plaintiff
Cory Mayer

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| Cory Mayer,<br><br>        Plaintiff,<br><br>    v.<br>DEUTSCHE ALT A SECURITIES MORTGAGE LOAN TRUST SERIES 2006-A.;<br>PHH MORTGAGE CORPORATION; WESTERN PROGRESSIVE, LLC; DOES 1-20; and all persons unknown claiming any interest in the property, inclusive and DOES 1 through 50, inclusive,<br><br>        Defendants. | CASE NO.:  5:25-cv-00182-NW<br>Unlimited Jurisdiction<br><br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF BERNARD JAY PATTERSON**<br><br><br>Hearing: July 15, 2026<br>Time:     9:00 a.m.<br>Place: San Jose Courthouse, Courtroom 3 – 5th Floor, 280 South 1st Street, San Jose, CA 95113<br><br>Honorable Judge Noël Wise<br>Action Filed: August 9, 2024<br>Trial Date: September 28, 2026 |

# Table of Contents

I. INTRODUCTION ........................................................................................................ 4

II. BACKGROUND ........................................................................................................ 5

III. LEGAL STANDARD ............................................................................................... 6

IV. ARGUMENT ............................................................................................................ 7

A.  Patterson Is Qualified as an Expert in Mortgage Loan Servicing Forensic Accounting....... 7

B.  Patterson's Mortgage Loan Analysis Methodology Is Reliable Under Daubert .................. 9

  1.  **Daubert's peer review factor carries little weight for forensic accounting reconstruction.** ............................................................................................................ 10

  2.  **The MLA methodology employs recognized forensic accounting principles.** ......... 11

  3.  **Patterson's MLA has been admitted in comparable cases.** ....................................... 12

C.  Patterson's Report Is Not a Mere Factual Narrative — It Applies Expert Methodology to Produce Genuinely Expert Opinions ........................................................................................ 12

  1.  **Expert forensic accounting reconstruction is not mere narration.** ........................... 13

  2.  **Patterson's deposition testimony is taken out of context.** ......................................... 14

  3.  **Patterson's opinions are directly and concretely disputed in this case.** ................... 15

D.  The Report's Variance Analysis Tables Are Accurate, Not Misleading ............................. 16

E.  Patterson's Servicing Fee Analysis Is Admissible as a Relevant Hypothetical Calculation 17

F.  Patterson's Refinance Calculations Are Admissible and Are Based on Facts to Be Established at Trial ................................................................................................................. 18

G.  The Candor Issue Does Not Require Exclusion and Is Properly Addressed Through Cross-Examination .......................................................................................................................... 19

H.  Exclusion Would Unfairly Deprive the Jury of the Only Expert Able to Explain the Loan Records .................................................................................................................................. 21

Plaintiff's Opp to Motion to Exclude Expert Jay Patterson 5:25-CV-00182-BLF

V. CONCLUSION ................................................................................................................. 23

**TABLE OF AUTHORITIES**

**Cases**

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc., 613 F. Supp. 3d 1308, 1322 (S.D. Cal. 2020)* ............................................................................................................................. 13

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993).. 6, 15, 17

*In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-MD-2670 DMS (MSB), 2024 U.S. Dist. LEXIS 52978, at *57-58 (S.D. Cal. Mar. 25, 2024) ...................................................... 10

*Ishee v. Fannie Mae*, No. 2:13-CV-234-KS-MTP, 2015 U.S. Dist. LEXIS 4918, 2015 WL 224800, at *6 (S.D. Miss. Jan. 15, 2015) ......................................................................... 14, 22

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)7, 10

*Neel v. Fannie Mae*, No. 1:12CV311-HSO-RHW, 2014 U.S. Dist. LEXIS 36653, 2014 WL 1117247, at *1 (S.D. Miss. Mar. 20, 2014)............................................................... 14

*Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ............................................................. 7, 21

*Saccameno v. Ocwen Loan Servicing, LLC,* No. 15 C 1164, 2018 U.S. Dist. LEXIS 235801, at *5 (N.D. Ill. Mar. 21, 2018) ........................................................................ 8, 12, 22

*SEC v. Retail Pro, Inc.*, No. 08cv1620-WQH-RBB, 2011 U.S. Dist. LEXIS 13095, at *13 (S.D. Cal. Feb. 10, 2011)............................................................................................... 18, 19

*Siqueiros v. General Motors LLC*, No. 16-CV-07244-EMC, 2022 WL 74182, at *9 (N.D. Cal. Jan. 7, 2022).............................................................................................................. 13

*Trustees of Chi. Painters & Decorators Pension v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787–88 (7th Cir. 2007) ...................................................................... 7

*Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000)................. 7

*United States ex rel. Jordan v. Northrop Grumman Corp.*, 2003 U.S. Dist. LEXIS 29067, at *19 (C.D. Cal. Jan. 6, 2003)............................................................................................ 8

*United States ex rel. Macias v. Pac. Health Corp.*, No. CV 12-00960-RSWL-AJWx, 2018 U.S. Dist. LEXIS 27891, at *11 (C.D. Cal. Feb. 20, 2018) ............................................................................. 9

*United States v. Anagal*, No. 24-3099, 2026 U.S. App. LEXIS 11435, at *2 (9th Cir. Apr. 22, 2026) ..................................................................................................................................................... 10

*United States v. Holmes*, 163 F.4th 547, 562 (9th Cir. 2025) ........................................................ 7

**Statutes**

California Civil Code § 3294 ............................................................................................................. 17

**Rules**

Fed. R. Evid. 702 ............................................................................................................................... 23

Fed. R. Evid. 703 ............................................................................................................................... 19

Fed. R. Evid. 704 ............................................................................................................................... 14

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Plaintiff Cory Mayer respectfully submits this opposition to Defendants PHH Mortgage Corporation and HSBC Bank USA's motion to exclude the opinions and testimony of Bernard Jay Patterson. Notably, Defendants seek total exclusion without proposing any limiting alternative — a posture that underscores the weakness of the motion, as even partial limitation would require a more precise identification of which specific opinions are allegedly unreliable. All this while Defendants' motion fails to challenge — and therefore implicitly concedes the admissibility of — Patterson's opinions regarding: Whether Mayer's tendered payments were sufficient at the time PHH rejected them; PHH's compliance with RESPA and Regulation X regarding escrow account statements; the accuracy of PHH's monthly billing statements; the accuracy of the payoff quotes and the 2023 Notice of Default.

At base, Mr. Patterson does what no one from PHH Mortgage could do over the course of many years. Patterson reconciles PHH's own accounting records to show exactly how and exactly

where PHH repeatedly misapplied credits and payments to Mayer's mortgage loan account totaling over $200,000 for a period of years. PHH's fundamental inability to properly apply funds and credits to Mayer's mortgage account created this multi-year fiasco.

Patterson was retained to provide forensic and investigative accounting analyses of the loan transactions, filings, data and documents relating to the servicing of the Mayer mortgage loan by PHH. The scope of Mr. Patterson's work on this front involved: (a) providing forensic accounting reconstruction of the loan servicing transactions; (b) identifying any irregularities, inconsistencies, and/or variances in the accounting, posting, applications of payments, data, document production or assertions; (c) providing an analysis of certain financial effect(s) of re-financing the current mortgage loan using provided assumptions; (d) providing findings, expert report(s), deposition, and/or trial testimony as needed. All these opinions fall squarely within the ambit of forensic accounting.

Defendants' motion rests on four principal contentions: (1) Patterson is not qualified; (2) Patterson's Mortgage Loan Analysis spreadsheet (MLA) is unreliable methodology; (3) Patterson's report is a mere factual narrative; and (4) Patterson's servicing fee and refinance calculations are speculative. Each argument fails. Patterson is a nationally recognized forensic accountant with nearly twenty years of specialized experience in mortgage loan servicing accounting. His opinions are grounded in accepted forensic accounting principles, directly relevant to contested issues in this case, and essential to the jury's understanding of extraordinarily complex mortgage loan servicing records. Defendants' motion should be denied in its entirety.

## II. BACKGROUND

This case involves a 2006 mortgage loan on Mayer's home at 8650 Hihn Road, Ben Lomond, California. After a 2016 wrongful foreclosure that was subsequently rescinded, the parties entered into a Settlement Agreement ("SA") in April 2020 requiring PHH to reinstate the loan to current

status by applying approximately $158,125.89 in funds Mayer would pay to PHH to specified allocations of principal, interest, escrow advances, and fees, and for PHH to apply a credit of $33,120.95 to Mayer's mortgage loan account. Mayer paid PHH as required by the SA. But this is where the chaos began.

After PHH received Mayer's funds, PHH failed to apply them correctly **and** failed to properly credit the $33,120.95 to Mayer's account — not once, but across four separate reversal-and-reapplication events spanning May 2020 through August 2021. PHH also failed to perform the credit reporting required by the SA, preventing Mayer from refinancing at historically low 2020 interest rates. Defendants dispute liability on all counts, including the application and crediting of Mayer's mortgage loan account within the arcane mortgage servicing platform operated by PHH. This position creates contested factual issues that will be critical to the jury's determinations that require the assistance of an expert to marshal PHH's account records and explain the complex accounting actions that took place over a period of years. Patterson was disclosed as an expert on April 1, 2026, pursuant to Rule 26(a) with a comprehensive report (Exhibit 633). He was deposed on April 21, 2026 (Exhibit 634). Patterson's accounting, through his MLA, is invaluable to the Court and the jury, and even PHH, to gain an accurate understanding of where PHH's payment and credit applications went wrong, why they were wrong, and how those actions prevented Mayer's account from being brought current as it should have been under the terms of the SA.

## III. LEGAL STANDARD

Expert testimony is admissible under Federal Rule of Evidence 702 if the witness is qualified by "knowledge, skill, experience, training, or education," the testimony is based on sufficient facts or data, the testimony is the product of reliable principles and methods, and the expert has reliably applied those principles and methods to the facts of the case. Fed. R. Evid. 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993). The *Daubert* inquiry is

flexible; the factors identified in *Daubert* are non-exclusive and must be adapted to the type of expertise at issue. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). Rule 702's requirements are "not meant to be applied in a way that prevents the jury from hearing relevant and reliable expert testimony." Fed. R. Evid. 702 advisory committee's note (2023 amendment). Doubts about admissibility should be resolved in favor of admission, with deficiencies going to weight. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

## IV. ARGUMENT

### A. PATTERSON IS QUALIFIED AS AN EXPERT IN MORTGAGE LOAN SERVICING FORENSIC ACCOUNTING

Defendants' qualification challenge fails because it misapplies Rule 702 and ignores the depth of Patterson's specialized experience. The Ninth Circuit has made clear that experience alone is sufficient to qualify a person as an expert. *United States v. Holmes*, 163 F.4th 547, 562 (9th Cir. 2025). Rule 702 requires only that a witness be qualified "by knowledge, skill, experience, training, *or* education." The disjunctive is critical: qualification does not require any particular credential, employer, or formal title. *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) ("The notion that [Daubert] requires particular credentials for an expert witness is radically unsound."); *Trustees of Chi. Painters & Decorators Pension v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787–88 (7th Cir. 2007) ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.")

Patterson's qualifications are extensive and directly relevant: He has practiced forensic accounting since 2007 with a practice limited exclusively to mortgage loan servicing transactions, structured finance, and document forensics. (Exhibit 633, ¶6). He has held a Certified Fraud Examiner credential since 2009. (*Id.*). He holds a Bachelor of Science in Accounting. (Exhibit 630). He has testified as an expert in federal courts, state courts, and before legislative bodies across the country. (Exhibit 631). He serves as a testifying expert for the California Attorney General in current

litigation concerning mortgage servicing industry practices. He has developed specialized methodologies for reconstructing mortgage servicing accounting from the major loan servicing platforms, including MSP — the same platform PHH used to service Mayer's loan. (Exhibit 633, ¶6).

PHH's arguments that Patterson has never worked at an accounting firm are irrelevant to his expertise. Patterson built his firm *around* the specific subject matter of this case — and that is a *feature* of his expertise, not a defect. Courts have repeatedly admitted Patterson's testimony over objections nearly identical to those raised here. In *Saccameno v. Ocwen Loan Servicing, LLC*, No. 15 C 1164, 2018 U.S. Dist. LEXIS 235801, at *5 (N.D. Ill. Mar. 21, 2018) the Northern District of Illinois Court rejected the same attack — that Patterson was unqualified because he had never worked for a mortgage company, servicer, bank, or accounting firm, and lacked formal industry training — and admitted his forensic accounting opinions. The court held that "[b]y its plain terms, Rule 702 makes clear that expertise may be gained in a variety of ways" and assigned "little importance" to the lack of direct industry employment. (*Id*.). PHH was formerly known as Ocwen. It made these same arguments and lost.

Defendants' argument that Patterson's CFE credential is "irrelevant" because the case does not allege fraud misunderstands what Certified Fraud Examiners do. The ACFE describes fraud examination as encompassing "accounting and auditing, criminology and ethics, legal elements of fraud, and fraud investigation." Patterson's CFE designation reflects rigorous training in financial investigation and forensic auditing — precisely the skills at issue here. The absence of a CPA or "Certified Forensic Accountant" designation is not a disqualification. Defendants cite no authority requiring either credential for the forensic accounting of the servicing of a mortgage loan account, and none exists. See *Tuf Racing Prods., Inc.,* supra, and *United States ex rel. Jordan v. Northrop Grumman Corp.*, 2003 U.S. Dist. LEXIS 29067, at *19 (C.D. Cal. Jan. 6, 2003) and *United States*

*ex rel. Macias v. Pac. Health Corp.*, No. CV 12-00960-RSWL-AJWx, 2018 U.S. Dist. LEXIS 27891, at *11 (C.D. Cal. Feb. 20, 2018) citing *Tuf Racing* favorably.

Defendants' claim that Patterson lacks "experience or substantial exposure to PHH's MSP servicing platform" is factually incorrect. Patterson's report states he has "specialized knowledge of the data output and functions of most major mortgage servicing systems of record including Loansphere MSP." (Exhibit 633, ¶6). At deposition, Patterson confirmed he has "worked with, you know, PHH's system and data for years" and demonstrated knowledge of when PHH transitioned from its own proprietary loan servicing platform, RealServicing, to the MSP platform. (Exhibit 634, p. 23, 67). As evidence of Patterson's familiarity with MSP, the Court may look to one of the specific technical decisions Patterson made in his MLA — splitting the SA's "Other Fees" category into separate late charge and corporate advance lines because the MSP platform tracks them in that manner and has a separate code for each type of entry in its record system — this reflects genuine platform-specific knowledge of MSP's accounting processes. (Exhibit 633, ¶26).

B. **PATTERSON'S MORTGAGE LOAN ANALYSIS METHODOLOGY IS RELIABLE UNDER DAUBERT**

Defendants argue Patterson's MLA fails *Daubert*'s reliability standard because it has not been peer reviewed. This argument fundamentally misapplies the *Daubert* framework to an experience-based forensic accounting methodology. Patterson's MLA is reliable for three independent reasons: First, its mathematical logic is verifiable — it applies the same allocation rules as MSP, and every calculation can be checked against PHH's own produced records. PHH has not identified a single arithmetic error. Second, it has been subjected to adversarial testing in hundreds of cases and has survived cross-examination and Daubert challenges repeatedly. Third, its outputs are auditable — Patterson's source documents are coded to each MLA line, allowing any expert reviewer to trace each entry to its source. These are more rigorous reliability indicia than many expert methodologies courts routinely admit.

Beyond that, PHH cannot point to a single penny in the entire forensic accounting that is not accounted for or explained by Mr. Patterson's work. On the other hand, PHH's own employees, given years of repeated efforts, could not accurately account for payments and credits required under the SA.

1. **<u>Daubert's peer review factor carries little weight for forensic accounting reconstruction.</u>**

The *Daubert* factors — testing, peer review, error rates, and general acceptance — were designed for *scientific* testimony and apply with diminished force to experience-based expertise. "But "the law grants a district court . . . broad latitude when it decides how to determine reliability" for purposes of Rule 702's standards governing expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (emphasis omitted) […] *Kumho* makes clear that the specific reliability factors it identifies (such as a "potential rate of error") "do *not* constitute a definitive checklist or test" and that the Rule 702 "gatekeeping inquiry must be tied to the particular facts of a particular case." *Id.* at 150 (simplified)." *United States v. Anagal*, No. 24-3099, 2026 U.S. App. LEXIS 11435, at *2 (9th Cir. Apr. 22, 2026). Forensic accounting reconstruction of mortgage loan payment histories is not a scientific theory to be tested in a laboratory — it is an application of fundamental accounting principles to financial records, analogous to the kind of specialized expertise courts routinely admit without peer-reviewed publication. Another District Court examining a challenge to a forensic accountant held "DeMario's Report and Rebuttal are based on her specialized knowledge of forensic accounting. The reliability of such testimony depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it." *In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-MD-2670 DMS (MSB), 2024 U.S. Dist. LEXIS 52978, at *57-58 (S.D. Cal. Mar. 25, 2024) (internal citations omitted, emphasis in original).

Moreover, the absence of peer review does not indicate unreliability. Patterson's MLA

methodology is not a novel scientific hypothesis. Patterson's methodology takes the MSP internally coded accounting transactions and ingests them into his MLA spreadsheet where they can be identified, examined, and properly accounted for using standard accounting practices and methodologies used by forensic accountants. Using this methodology, Patterson can take the MSP coded transactions and determine where the mortgage servicer misapplied money or failed to apply credits to the mortgage servicing account being examined. This allows for the identification of errors in that process, the reconciliation of those errors, and the reporting of those errors in a format that is readable, understandable, and comprehensible to the layman, the jury, the Court, and oftentimes, such as in this case, the mortgage servicer who could never get the accounting right despite years of effort. (Exhibit 633, ¶¶17–18). This is not a novel technique needing peer review; it is a forensic accounting of the loan transactions. If there were mistakes in the accounting, then PHH and its experts would have surely pointed them out. None have been identified. This fact alone supports the reliability of Patterson's accounting work.

2. **The MLA methodology employs recognized forensic accounting principles.**

Patterson's report identifies the specific methodologies used: (1) Reconstruction of Accounting Transactions, and (2) Comparative Analysis with Variances. (Exhibit 633, ¶13). This includes identifying any irregularities, inconsistencies, and/or variances in the accounting, posting, applications of payments, data, document production or assertions. These are recognized forensic accounting frameworks. The Reconstruction methodology applies the same allocation logic as the MSP servicing system — applying payment amounts to separate running accounts for principal, interest, escrow, late charges, corporate advances, and suspense — and generates true running balances for all accounts. (Exhibit 633, ¶¶16–18). The Comparative Analysis methodology then compares actual posting data to what the SA required, producing variance tables that quantify the discrepancies. These are standard techniques in forensic accounting and audit.

Defendants complain that the MLA and report "do not identify or describe the methodologies." This is incorrect. The report devotes three paragraphs to explaining the reconstruction methodology (¶¶16–18), explains the MLA's structure and logic (¶¶17–18), and describes the specific data sources used (¶¶11–12, 20). Patterson also explained his methodology extensively at deposition. (Exhibit 634, pp. 72–75).

3. **Patterson's MLA has been admitted in comparable cases.**

The most persuasive evidence of the MLA's reliability is its track record of admission. Patterson has used this methodology in hundreds of cases over nearly two decades. (Exhibit 631). It was admitted in *Saccameno v. Ocwen* on materially identical facts — forensic examination of the predecessor of this mortgage loan servicer's application of payments compared to what a controlling legal document (there, a bankruptcy plan; here, a Settlement Agreement) required. The *Saccameno* Court held that "[t]he materials on which Patterson bases his conclusions—Ocwen's transaction histories, payment reconciliations, and comment logs—are voluminous and not easily deciphered. Patterson's testimony regarding the relevant data will assist the jury." *Saccameno v. Ocwen Loan Servicing, LLC*, No. 15 C 1164, 2018 U.S. Dist. LEXIS 235801, at *7 (N.D. Ill. Mar. 21, 2018). This methodology has been tested in the crucible of *Daubert* hearings and cross-examination across many jurisdictions and has withstood those challenges. Here, as in *Saccameno*, Ocwen's successor PHH cannot argue with a straight face that its records are simple and easy to understand when its own witnesses and experts do not understand its accounting history.

C. **PATTERSON'S REPORT IS NOT A MERE FACTUAL NARRATIVE — IT APPLIES EXPERT METHODOLOGY TO PRODUCE GENUINELY EXPERT OPINIONS**

Defendants argue Patterson's report is merely a "regurgitation" of PHH's data and that his testimony is inadmissible because he characterized certain findings as "facts" rather than "opinions." This argument both overstates the deposition testimony and misunderstands the nature of forensic

accounting.

### 1. **Expert forensic accounting reconstruction is not mere narration.**

The cases Defendants cite for the prohibition on expert "narrative" — *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1322 (S.D. Cal. 2020), and *Siqueiros v. General Motors LLC*, No. 16-CV-07244-EMC, 2022 WL 74182, at *9 (N.D. Cal. Jan. 7, 2022) — are completely distinguishable from the present situation. The expert in *Aya* was excluded for interpreting a contract and opining on the state of mind of market participants. Both clearly disallowed. *Siqueiros* held that an expert may not restate or summarize record evidence and then state a conclusion without applying a methodology that is reliable and which evinces his/her expertise.

Unlike the experts in PHH's cases, Patterson is transforming thousands of lines of proprietary MSP transaction codes each assigned to a specific accounting entry — which a lay juror could not interpret — into a comprehensible reconstruction of the mortgage loan's accounting. The raw loan transaction history (Exhibit 400) does not contain the running account balances, cross-account reconciliation, or SA-comparison analysis that Patterson's MLA produces. Patterson does not summarize evidence; he is creating evidence that would not otherwise exist in accessible and comprehensible form for the finder of fact. It bears repeating that PHH's own employees could not properly reconcile Mayer's accounts over a period of years. Why would anyone assume that 12 jurors could make heads or tails of this evidence without assistance from an expert?

Patterson's MLA is categorically different from any of the cases cited by PHH because Patterson converts PHH's loan transaction history into an analytical structure needed to understand what happened with Mayer's mortgage loan accounting. No lay juror could take PHH's data, identify the four separate reversal-and-reapplication events, reconstruct the allocation of each event across principal, interest, escrow, late charges, corporate advances, and suspense, reconcile those

-13-

allocations against the SA's specific requirements, and produce the variance tables Patterson's MLA contains. That is precisely the expert work at issue. Multiple courts have understood the importance of making this information accessible and understandable for the jury including *Saccameno, supra*; *Ishee v. Fannie Mae*, No. 2:13-CV-234-KS-MTP, 2015 U.S. Dist. LEXIS 4918, 2015 WL 224800, at *6 (S.D. Miss. Jan. 15, 2015); *Neel v. Fannie Mae*, No. 1:12CV311-HSO-RHW, 2014 U.S. Dist. LEXIS 36653, 2014 WL 1117247, at *1 (S.D. Miss. Mar. 20, 2014).

A concrete example illustrates the importance of Patterson's work. After the first application of the reinstatement funds in May 2020, Patterson determined a variance of $30,266.28 remained in unpaid escrow advances and $33,120.95 overall. (Exhibit 633, ¶35–36). That $33,120.95 variance figure does not appear anywhere in PHH's produced records. Patterson derived it by applying the allocation logic of the MSP system to the SA's specified line items and computing the difference. When asked at deposition whether that figure was his "opinion," Patterson correctly identified it as a calculated "fact" — meaning it is an arithmetically derived result of his expert methodology, not a subjective judgment. Defendants' attempt to use this to argue he has "no opinion" inverts the logic: an expert who has correctly applied his method to produce an accurate result is *more* reliable, not less admissible, when he can ground his conclusions in specific arithmetic.

2.   **Patterson's deposition testimony is taken out of context.**

Defendants' deposition excerpts are carefully selected to show Patterson saying he was stating "facts" rather than "opinions." Read in full context, these exchanges reveal something different: Defendants' counsel was pressing Patterson to admit he was not offering *legal* conclusions — i.e., that he was not opining on whether PHH's conduct was "proper" or "improper" as a matter of law. Patterson appropriately agreed he was not offering improper and inadmissible legal conclusions. That is a far cry from stating he offered no expert opinions. Expert witnesses are *supposed* to stop short of legal conclusions. Fed. R. Evid. 704 advisory committee's note. Patterson's

variance tables, escrow analysis corrections, NOD reconciliation, and payment sufficiency analysis are all expert opinions grounded in forensic accounting methodology — not legal conclusions about liability.

In forensic accounting, the distinction between "fact" and "opinion" is not the same as it is in lay testimony. When an expert derives a number through methodology, that derived number is simultaneously a "fact" (an accurate arithmetic result) and an "opinion" (the product of applied expertise). Patterson calling his variance calculations "facts" actually *strengthens* admissibility — it means his conclusions are objectively verifiable, not merely impressionistic. *See Daubert*, 509 U.S. at 590 ("Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified."). A forensic accounting conclusion that PHH underapplied the SA credit by $33,120.95 is testable, auditable, and falsifiable — which is *more* than most expert opinions can claim.

3.   **Patterson's opinions are directly and concretely disputed in this case.**

The contrast between Patterson's methodology and that of Defendants' own expert illustrates why Patterson's work is not merely a factual narrative. PHH's accounting expert Gary Krausz, a CPA with a master's degree in accounting but *no experience* in consumer mortgage loan servicing analysis, submitted a report claiming PHH applied more than the required $33,120.95 in credits by March 2023. (Exhibit 673). But Krausz could not determine at deposition which credits were applied to pre-settlement obligations versus post-settlement charges: "I don't have a way to know which credits apply to which charges." (Exhibit 674, pp. 65–66). That is because Krausz based his tally on monthly billing statements rather than the MSP transaction data. (Exhibit 673, p. 5). To answer in this way, Krausz also would not have considered the internal MSP coding for each transaction in the loan history nor would Krausz have performed the forensic accounting reconciliation that *properly* accounts for every penny in the mortgage loan accounting history.

Patterson, by contrast, traced each of the dozens of credits in the loan history to specific allocation accounts and time periods, used MSP data rather than formatted billing statements, and identified which credits addressed SA obligations versus post-SA fees and charges. (Exhibit 633, ¶¶51–62). This is exactly the kind of expert analysis — going beyond what a lay juror or even a generalist CPA could do with the raw records — that Rule 702 is designed to admit.

D. **THE REPORT'S VARIANCE ANALYSIS TABLES ARE ACCURATE, NOT MISLEADING**

Defendants argue Patterson's variance tables use "inconsistent headings" because his "Per SA" column includes the three post-SA monthly payments (March, April, and May 2020) that were not literally part of the SA reinstatement table. This is a question of presentation, not admissibility. Patterson's report and deposition explain precisely what the "Per SA" column means — it represents the full Settlement Reinstatement Event (SRE), which includes both the SA's specified allocation amounts and the three additional monthly payments the borrower was required to tender. (Exhibit 633, ¶¶28–30). The column heading is a shorthand label for a defined concept that Patterson fully explains. Disagreement with how Patterson labeled a column heading is not a basis for exclusion; it is precisely the kind of issue that cross-examination addresses.

Defendants also argue that Patterson selectively excluded a $99.05 credit for interest on escrow from his credit calculations. Patterson testified this credit was excluded because it represents legally required interest on escrow funds under RESPA — an entitlement to which Mayer was already due under law, not a credit PHH voluntarily applied toward the SA's obligations to make certain credits. (Exhibit 634, pp. 121–122). This distinction between a statutory entitlement and a contractual credit is precisely the kind of expert judgment that forensic accountants make in reconstructing loan histories, and it is appropriate subject matter for cross-examination, not exclusion.

E. **PATTERSON'S SERVICING FEE ANALYSIS IS ADMISSIBLE AS A RELEVANT HYPOTHETICAL CALCULATION**

Defendants argue the servicing fee analysis is "wholly inapplicable" to the issues in this case. This misreads both the complaint and the purpose of Patterson's opinions. The First Amended Complaint specifically alleges that Defendants' wrongful conduct was motivated by the profit differential between servicing a performing loan and servicing a defaulted loan in recovery. (FAC ¶101). This profit-motive allegation is directly relevant to punitive damages, which require a showing of malice, oppression, or fraud under California Civil Code § 3294. The degree to which PHH financially benefited from maintaining Mayer's loan in apparent default — receiving $65/month rather than $6/month, and potentially 40% of recovery — is relevant to whether its conduct was willful rather than merely negligent.

Patterson's analysis is grounded in the Servicing Agreement PHH itself identified as the governing document (PHH_HSBC 002512–002889), with specific fee provisions Patterson excerpted at paragraph 102 of his report. Patterson calculated three scenarios: regular servicing at $6/month, default servicing at $65/month, and recovery collection at 40% of the unpaid principal balance. (Exhibit 633, ¶103). Expert testimony presenting hypothetical calculations grounded in a specific contract is a recognized and routine form of damages opinion. *See Daubert*, 509 U.S. at 592 (expert may rely on hypothetical facts that will be established at trial).

The fact that Patterson acknowledged at deposition that he was not opining that PHH *would* receive the 40% recovery fee does not render the analysis inadmissible — it confirms he was properly presenting a conditional analysis tied to the contract terms, not making a definitive damages claim. Plaintiff's liability theory establishes why the comparison is relevant; Patterson's role is to calculate the figures so the jury can assess the financial incentive.

Lastly, PHH might argue the 40% recovery collection fee is a contingent contractual right, not a servicing fee PHH would receive merely by keeping the loan in default. In other words, PHH

doesn't earn $179,062 just by servicing a defaulted loan; it would only earn that by actually collecting on a foreclosure or workout. But the relevance of the 40% figure is not that PHH necessarily collected that amount, but that this contract provision demonstrates the magnitude of the financial incentive structure that could motivate a servicer such as PHH to maintain a loan in default status. The jury should be permitted to evaluate whether that incentive structure influenced PHH's conduct. Patterson's role here is to quantify the contractual incentives — not to determine whether they were ultimately collected.

F.  **PATTERSON'S REFINANCE CALCULATIONS ARE ADMISSIBLE AND ARE BASED ON FACTS TO BE ESTABLISHED AT TRIAL**

Defendants argue that Patterson's refinance calculations are speculative because he did not independently verify Mayer's credit or financial qualifications. This argument fails because expert opinions may properly be based on hypothetical facts assumed for purposes of calculation, provided those facts will be established by other evidence at trial. ""The language 'facts or data' [in Rule 702] is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence." Fed. R. Evid. 702, advisory committee's cmt. (2000 amd.)." *SEC v. Retail Pro, Inc.*, No. 08-cv-1620-WQH-RBB, 2011 U.S. Dist. LEXIS 13095, at *13 (S.D. Cal. Feb. 10, 2011).

Here, the foundational facts for Patterson's refinance calculations will be established through: (1) the testimony of Phil Lewis, Mayer's mortgage broker, who reviewed Mayer's complete financial records and determined he qualified for a 30-year conventional loan at prevailing rates in mid-2020; (2) the testimony of refinance expert Doug Minor, who will confirm qualification at the applicable rate; and (3) Freddie Mac PMMS historical rate data confirming the 3.07% rate as of July 2, 2020 and 2.78% rate as of November 5, 2020. Patterson relied on these established inputs and computed the financial impact over the loan's remaining term to April 1, 2036 — a straightforward application of standard present value and future value methodology within the realm of basic accounting. The reason Mayer did not complete a refinancing — the sole basis for the speculative

label — is itself one of the central disputes in this case. Plaintiff's evidence will demonstrate that PHH's failure to do credit reporting as required by the SA, combined with its failure to properly apply the reinstatement payment and its rejection of subsequent monthly payments, made it impossible for Mayer to refinance. Patterson's calculations quantify the financial harm if that evidence is credited. That is precisely what damages experts do. And reliance on the assumption that those facts will come into evidence is perfectly reasonable for an expert's work. "Provided any hypothetical posed to an expert witness is supported by evidence admitted at trial and is otherwise proper, the expert's opinion testimony is admissible." *SEC v. Retail Pro, Inc.*, No. 08-cv-1620-WQH-RBB, 2011 U.S. Dist. LEXIS 13095, at *14-15 (S.D. Cal. Feb. 10, 2011). Requiring Patterson to independently re-verify all foundational facts before calculating damages would turn every damages expert into a fact investigator. Rule 702 does not impose that requirement. Patterson identified the inputs that will be established by other witnesses and calculated the financial consequence. That is exactly how damages experts operate in every complex case. *See* Fed. R. Evid. 703 (expert may rely on facts supplied by others if experts in the field reasonably rely on such data).

Defendants also complain that Patterson assumed a 4% investment return on the monthly savings without evidence that Mayer actually invests. Patterson identified this as a "conservative" return assumption for the future value analysis. (Exhibit 634, p. 171). The future value calculation is an optional component of the analysis showing what the cash flow savings would be worth if invested at a modest return — a standard component of economic damages analysis. It is not required that a plaintiff have a pre-existing investment portfolio for a damages expert to present future value calculations; such calculations present to the jury one measure of the economic significance of the loss. The assumption can be explored on cross-examination.

G. **THE CANDOR ISSUE DOES NOT REQUIRE EXCLUSION AND IS PROPERLY ADDRESSED THROUGH CROSS-EXAMINATION**

Defendants argue that Patterson has a history of "false testimony" regarding his prior

exclusion in *Bank of New York v. Marin* (Miami-Dade 2014) and that this warrants exclusion here. Patterson addresses this directly in his declaration (Exhibit 636), and the record does not support treating the prior denials as deliberate perjury.

The factual context is important: In the *Marin* case, Bruce Jacobs, a subsequently disbarred Florida attorney (Disbarment Order, Exhibit 696), disclosed Patterson as an expert in a case without having hired him, without Patterson's knowledge or consent, and without informing Patterson that the court had granted an oral pretrial motion to strike Jacobs' earlier disclosure of Patterson. (Exhibit 636, pgs. 7-10, Bruce Jacobs Declaration). The court's ruling was that expert testimony about "fraud on the court" was irrelevant to the foreclosure proceeding — not a determination that Patterson's qualifications were deficient or that he was otherwise unfit to testify. The following year, Jacobs hired Patterson for work in the same *Marin* case without disclosing his prior actions and the Court's prior order. Patterson reasonably relied on the attorney who retained him to disclose any prior proceedings in that case. An expert witness has no independent obligation to audit the procedural history of every case in which an attorney claims to have disclosed him, particularly where — as here — the attorney subsequently hired Patterson for the same matter without disclosure. The failure of diligence was Jacobs', not Patterson's, as confirmed by Jacobs' own declaration. Patterson did not learn of the 2014 *Marin* order until August 2021 when it surfaced in another case. (Exhibit 634, pp. 43–44).

Every prior statement in which Patterson denied being excluded as an expert was made before August 2021 — before he was aware of the *Marin* order. (See Docket 164-1, Exhibits 4–7, all from depositions and trial testimony between 2017 and May 2021). Once Patterson learned of the *Marin* order, he disclosed it in his CV and case listing, as Defendants acknowledge. (Exhibit 634, p. 42–44). The prior denials were not knowingly false. Clearly, Patterson could not disclose the *Marin* order before he learned of its existence.

Critically, the *Marin* exclusion has nothing to do with Patterson's qualifications to testify about mortgage loan servicing accounting. The Miami-Dade court struck Patterson based on Jacobs' disclosures of Patterson, not any work of Patterson, on the ground that the proposed "fraud on the court" testimony was irrelevant to that foreclosure proceeding — not that Patterson was unqualified, not that Patterson's methodology was unreliable, and not that his accounting reconstruction opinions were inadmissible. The *Marin* fiasco was induced by a rogue lawyer who was subsequently disbarred. That exclusion does not have any bearing on the admissibility of Patterson's opinions here.

The appropriate vehicle for Defendants to raise credibility challenges is cross-examination and jury argument, not wholesale exclusion under *Daubert*. *See Primiano*, 598 F.3d at 564 ("[S]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."). Defendants have not cited, and cannot cite, authority for the proposition that a misstatement premised upon the occurrence of an event unknown to the expert — and immediately corrected upon discovery — require *Daubert* exclusion.

H. **EXCLUSION WOULD UNFAIRLY DEPRIVE THE JURY OF THE ONLY EXPERT ABLE TO EXPLAIN THE LOAN RECORDS**

Even setting aside the legal analysis, the practical consequence of excluding Patterson's testimony warrants serious consideration. The loan records in this case span over a decade and involve thousands of entries across multiple filtered reports produced by PHH — a general loan transaction history, payment histories, fee reports, and investor remittance reports — none of which, standing alone, allows a juror to understand what happened. (Exhibit 634, pp. 73–75). As one court noted:

> "Defendant seek[s] the exclusion of Patterson's summaries of payment and transaction histories, arguing that the subject matter does not require scientific, technical, or other specialized knowledge, and will not assist the jury. The Court disagrees, as the transaction records may be difficult for an average juror to understand. In fact the Court believes it safe to assume that an average juror may

have difficulty understanding how *their own* mortgage payments are applied. Understanding banking records can sometimes require more than "the ability to read," as Defendant urges. Patterson's explanation of the sequence of events may, at the very least, help the jury to understand what occurred."

*Ishee v. Fannie Mae*, No. 2:13-CV-234-KS-MTP, 2015 U.S. Dist. LEXIS 4918, at *16 (S.D. Miss. Jan. 15, 2015).

The *Saccameno* Court also agreed finding "[t]he materials on which Patterson bases his conclusions—Ocwen's transaction histories, payment reconciliations, and comment logs—are voluminous and not easily deciphered. Patterson's testimony regarding the relevant data will assist the jury." *Saccameno v. Ocwen Loan Servicing, LLC*, No. 15 C 1164, 2018 U.S. Dist. LEXIS 235801, at *7 (N.D. Ill. Mar. 21, 2018).

The same holds true here. PHH is the successor of Ocwen. The account records are voluminous. Patterson's MLA combines PHH's voluminous data sets covering hundreds of pages and thousands of transactions into a single, comprehensible reconstruction that shows running balances, cross-references entries across sources, and identifies discrepancies. PHH could not identify one error in Patterson's accounting set out in the MLA. On the other hand, PHH's own corporate representative could not explain how the credits were applied to pre-versus-post SA obligations. (Exhibit 639, pgs. 49-50). PHH's own expert Krausz admitted he "ha[d] no way to know which credits apply to which charges." (Exhibit 674, pp. 65–66). It is clear that PHH's own employees and experts do not understand the accounting of Mayer's mortgage loan. If they did, then likely PHH could have correctly applied the payments and credits many years ago and avoided this imbroglio entirely.

Without Patterson's expertise, the jury will confront an incomprehensible mountain of accounting records unable to understand Mayer's loan accounting. Presenting that evidence without an expert would overwhelm the Court and jury and consume many valuable days of trial. With Mr.

Patterson's expertise, the issues can be identified, illustrated, and explained in a little over an hour.[1] This will allow the jury to hear the evidence of how the accounting went wrong, see PHH's failed attempts to get it right, and show what remained wrong in a compressed time frame. The exhibits used will summarize and explain the voluminous evidence in a way that maximizes trial efficiency and promotes the fact finders' understanding of the issues. This fulfills Rule 702's purpose of helping the trier of fact understand complex evidence. *See* Fed. R. Evid. 702 advisory committee's note (2023 amendment) ("[T]he rule is not intended to prevent the admission of relevant expert testimony.").

## V. CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motion to Exclude the Opinions of Bernard Jay Patterson in its entirety. Patterson is qualified by nearly two decades of specialized forensic accounting experience. His MLA methodology is reliable, grounded in recognized forensic accounting principles, and has been admitted in comparable cases even against PHH's predecessor. Patterson's opinions address genuinely disputed issues of central importance to this case. His servicing fee and refinance calculations are based on facts to be established at trial and are standard forms of damages analysis. The candor issues raised by Defendants are properly addressed through testimony, cross-examination, and jury argument, not exclusion. In the alternative, if the Court has any remaining doubt about Patterson's qualifications or methodology, Plaintiff respectfully requests a *Daubert* hearing at which Patterson can demonstrate his competency through examination and cross-examination before the Court.

---

[1] Based on Counsel's last presentation of Mr. Patterson in the *Saccameno* trial.

Respectfully submitted,


Dated: June 5, 2026




/s/ Nick Wooten

Nicholas Heath Wooten
Attorney for Plaintiff Cory Mayer
Pro Hac Vice

And

Andrew J. Christensen (SBN 260748)
Law Offices of Andrew J. Christensen, P.C.
Attorney for Plaintiff Cory Mayer