UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CORY MAYER,                           }
                                      }
              Plaintiff,              }
                                      } Case No.
        vs.                           } 5:25-cv-00182-NW
                                      }
DEUTSCHE ALT A  SECURITIES            }
MORTGAGE LOAN TRUST SERIES            }
2006-A.;  PHH MORTGAGE                )
CORPORATION;  WESTERN                 )
PROGRESSIVE,  LLC; DOES 1-20;         )
and all persons unknown claiming      )
any interest in the property,         )
inclusive and DOES 1 through 50,      )
inclusive                             )
              Defendants.             )
_____       )

REMOTE DEPOSITION OF BERNARD JAY PATTERSON

Little Rock, Arkansas

Tuesday, April 21, 2026, at 11:00 a.m. CDT

Reported remotely and stenographically by:
Christine M. Cradit, CSR No. 3805

Veritext Job No. 8010526

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CORY MAYER,                          )
                                     )
          Plaintiff,                 )
                                     )
     vs.                             ) Case No.
                                     )
DEUTSCHE ALT A  SECURITIES           )
MORTGAGE LOAN TRUST SERIES           ) 2:25-cv-04379-
2006-A.;  PHH MORTGAGE               ) HDV-MBK
CORPORATION;  WESTERN                )
PROGRESSIVE,  LLC; DOES 1-20;        )
and all persons unknown claiming     )
any interest in the property,        )
inclusive and DOES 1 through 50,     )
inclusive                            )
          Defendants.                )
                                     )

The deposition of Bernard Jay Patterson was taken remotely via Zoom videoconference, on behalf of Defendants, with the witness not in the physical presence of the court reporter, at 11:00 a.m., on Tuesday, April 21, 2026, before Christine Cradit, California Certified Shorthand Reporter No. 3805.

Page 2

REMOTE APPEARANCES

Attorneys for Plaintiff(s):

Andrew Joe Christensen

2063 Mountain Boulevard, Suite 2

Oakland, California 94611-2836

510.761.7183

Andrew@CaliforniaHomeLawyer.com

Attorneys for Defendants, PHH MORTGAGE CORPORATION, NOW KNOWN AS ONITY MORTGAGE CORPORATION and HSBC BANK USA, NATIONAL ASSOCIATION, AS TRUSTEE FOR DEUTSCHE ALT-A SECURITIES MORTGAGE LOAN TRUST, SERIES 2006-AR2:

HOUSER LLP

BY:  TIMOTHY A. SCHNEIDER

9970 Research Drive

Irvine, California 92618

949.679.1111

Tschneider@houser-law.com

--o0o--

Veritext Legal Solutions
866-299-5127        calendar-ca@veritext.com        www.veritext.com

INDEX OF EXAMINATIONS

| Examination | Page |
|---|---|
| By Mr. Schneider | 5 |

--oOo--

INDEX OF EXHIBITS

| Exhibit No. | Description | Page |
|---|---|---|
| Exhibit 1 | Deposition subpoena | 176 |
| Exhibit 2 | Expert witness report | 62 |
| Exhibit 3 | Report exhibits | 8 |
| Exhibit 4 | Documents produced by Mr. Christensen's office | 177 |

--oOo--

Page 4

Little Rock, Arkansas

Tuesday, April 21, 2026, at 11:00 a.m. CDT

--o0o--

THE REPORTER:  We are on the record.  My name is Chris Cradit, California CSR No. 3805.  I am the court reporter, and I will now swear in the witness.

--o0o--

BERNARD JAY PATTERSON,

a witness herein, after having been administered the oath by the court reporter, was examined and testified as follows:

--o0o--

EXAMINATION

BY MR. SCHNEIDER:

Q.   Good morning, Mr. Patterson.

A.   Good morning.

Q.   My name is Tim Schneider.  I represent the Defendants PHH Mortgage Corporation and HSBC Bank USA National Association as Trustee for Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR2.

Just as a kind of an initial point of clarity, for those who don't know, PHH Mortgage Corporation is now known as Onity Mortgage and Onity Group.

For purposes of today, I will continue to refer to them as PHH since that is how they are named in the

Page 5

case, and I think that is how everyone is most familiar with them right now.  Does that make sense?

A.    Yes.

Q.    Okay.  Great.  You have been deposed before, correct?

A.    Yes.  Yes.

Q.    So you understand you've been placed under oath today, correct?

A.    Yes.

Q.    And that is the same oath as if you were in a court of law, correct?

A.    Correct.

Q.    I'll just go through some instructions very quickly because I know that you've been through this a number of times, but please wait to hear my entire question, give your attorney a chance to respond and then answer to the best of your ability.

If you do not understand a question, you can ask me to clarify and I will do my best to do so.  If you need a break at any time, let me know.  And, of course, please avoid nodding your head and please respond with complete answers.  That will make everything much easier for the court reporter.

Are you taking any medication or do you suffer from any physical or emotional conditions that would

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

prevent you from answering truthfully and accurately today?

A.   No.

Q.   Have you had any alcohol or taken any drugs that would affect your memory during the past 12 hours?

A.   No.

Q.   Is there any reason to your knowledge that you would not be able to provide your full and complete testimony this morning?

A.   No reason.

Q.   What did you do to prepare for this deposition?

A.   I went through my report this morning.

Q.   Did you review anything in addition to your report?

A.   No, I did not.

Q.   So, to confirm, you've not reviewed any court orders or previous depositions in this matter other than the one specifically referenced in your report, correct?

A.   That's correct.

Q.   Did you speak to anyone to prepare for your deposition today?

A.   No.  I spoke to Mr. Christensen yesterday but that was it.

Q.   Have you spoken to anybody other than your counsel for today's deposition?

Page 7

A.   No, I have not.

Q.   Having reviewed your report for the deposition today, is there anything in your report would you like to change or update at this time?

A.   Not at this time.  I haven't found anything.

Q.   Can you state for the record your full name and business address.

A.   Bernard Jay Patterson.  My address is 6025 Battle Trail, Little Rock, Arkansas 72223.

Q.   I'm going to mark what will be Exhibit 3.

(Exhibit No. 3 was introduced.)

BY MR. SCHNEIDER:

Q.   I'll represent to you this is -- these are the exhibits that were attached to your report in this matter, and what was marked as Exhibit 1 by you for your report is your CV.  Is this the most current version of your CV?

A.   I believe it is.  There might have been something added to my case listing since then, but I don't think so.  I would just have to look, but it would be the most current version.

Q.   Okay.  So everything else on the CV would be accurate except there might be an additional matter added to your testimony case list; is that correct?

A.   Correct.

Page 8

Q.    And you attended the University of Arkansas Fayetteville from 1978 to 1981, correct?

A.    Correct.

Q.    And your major during that time was accounting, correct?

A.    Yes.

Q.    And from the University of Arkansas Fayetteville you obtained more than 90 percent of the credit hours in order to complete your bachelor's degree; is that correct?

A.    That sounds like a good percentage.

Q.    And when you left University of Arkansas Fayetteville in 1981, you did not have a college degree, correct?

A.    Correct.

Q.    What stopped you from completing your bachelor's degree in accounting at the University of Arkansas at Fayetteville in 1981?

A.    What stopped me?  Well, I had a job waiting for me was the main thing, and I ran out of time.

Q.    And was that job with Hill Insurance?

A.    Yes.

Q.    And then eventually you went back to school at the University of Arkansas in Little Rock in 2014; is that correct?

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

A.    Well, I started in -- a few years before that. I graduated in 2014.

Q.    And you've taken your bachelor's degree from accounting from University of Arkansas Little Rock in 2014, correct?

A.    Yes.

Q.    And I believe you just touched on this. After leaving the University of Arkansas Fayetteville in 1981, that's when you began working for Hill Insurance, correct?

A.    Correct.

Q.    And you were an insurance broker for Hill Insurance; is that correct?

A.    Yes.

Q.    And you did that until about 1985. Does that sound about right?

A.    Close enough.

Q.    And while you were an insurance broker for Hill Insurance, were you selling property and casualty insurance?

A.    Mainly, yes.

Q.    And then around 1985, you started your own insurance company; is that correct?

A.    Yes.

Q.    And then you did that until 1998 or 1999; is

Page 10

that correct?

A.    Yes.

Q.    And at that point you took a break from work, right?

A.    Yes.

Q.    And then in 2002, is that when you formed your own home improvement company?

A.    Yes.

Q.    And that home improvement company had a contract with Lowe's; is that correct?

A.    Correct.

Q.    Did you have contracts with anybody else?

A.    No.

Q.    And part of that contract with Lowe's was to install appliances for them; is that correct?

A.    Appliances and other things that they typically install for its customers.

Q.    Other than the installation work, what other work did you do for Lowe's?

A.    That's all.

Q.    And then you did that until about 2009; is that correct?

A.    Yes.

Q.    And then at that time, that's when you formed Full Disclosure LLC; is that correct?

Page 11

A.   Yes.  I believe sometime around then.

Q.   Now, when you obtained your bachelor's degree in accounting, did you have to do any thesis or dissertation to obtain that degree?

A.   No.

Q.   Was mortgage servicing a topic in any of the courses that you took to get your accounting degree?

A.   Mortgage servicing was not a main topic of any course that I took.

Q.   Do you recall any course that focused on mortgages or mortgage servicing?

A.   Not focused on.  Might have touched on at some point during one of the courses but nothing that focused on it.

Q.   Did you take any courses in lending?

A.   No.

Q.   Did you take any courses that focused on refinancing?

A.   No.

Q.   Did you take any courses in real property?

A.   Other than business law probably, that would be the only thing close to real property I can think of.

Q.   In obtaining your degree you obtained -- or you're a member of a couple of different honor societies; is that correct?

Page 12

A.    Excuse me.  The what?

Q.    You became a member of a couple different honor societies while you were obtaining your degree; is that correct?

A.    Yes.

Q.    And one of those honor societies was Beta Gamma Sigma; is that correct?

A.    Yes.

Q.    Do you recall what the requirements were for becoming a member of that honor society?

A.    I do not.

Q.    Do you know if that honor society was specific to the accounting degree or if it was just a schoolwide honor society?

A.    I don't remember.

Q.    And then the other honor society was Pi Kappa Phi; is that correct?

A.    Yes.  Sound right, yes.

Q.    And do you recall the requirement for becoming a member of that honor society?

A.    I do not.

Q.    And do you recall if that honor society was specific to your accounting degree?

A.    I do not recall.

Q.    Were you ever a teaching assistant while you

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

were or obtaining your bachelor's degree?

A.   No.

Q.   Have you done any follow-up work on additional degrees since obtaining your bachelor's?

A.   Can you be more specific on follow-up work. I'm not sure I understand.

Q.   Sure.  Have you completed any courses towards obtaining a master's degree in accounting?

A.   Not completed any courses, no.

Q.   Have you made any efforts to obtain your master's degree in accounting?

A.   I started on a project to -- that was -- would have been for a master's degree but the school -- I don't know how to put it.  I guess they dropped their master's program in accounting so I just didn't do anything after that with that.

Q.   Just for clarity, you do not have master's degree in accounting, correct?

A.   I do not.

Q.   Other than your bachelor's degree in accounting, do you have any other degrees?

A.   No, I do not.

Q.   Do you know the term CPA?

A.   Yes.  Certified public accountant.

Q.   Are you a CPA?

Page 14

A.   I am not.

Q.   Do you know what is required to become a CPA?

A.   Generally, yes.

Q.   And what is your understanding as far as the experience you have to have to become a CPA?

A.   The experience -- well, besides having an accounting degree, you have to pass a test, you know, take a test and pass it, and then you have to have some actual experience in the accounting field, practical experience, certain number of hours.  Can't remember the exact number right offhand, but --

Q.   Have you ever sat for any part of the CPA examination?

A.   I have not.

Q.   And then you obtained your credential as a certified fraud examiner in November 2009, correct?

A.   Yes.

Q.   Other than your credential as a certified fraud examiner, do you have any other professional licenses or credentials?

A.   No.

Q.   At the time you became a certified fraud examiner, you did not have a college degree, correct?

A.   That is correct.

Q.   Now, if I refer to certified fraud examiner as

Page 15

a CFE, does that make sense to you?

A.    Yes.

Q.    Okay.  So how did you attain your credential as a CFE?

A.    Well, they had a test as well that I took and passed four parts, and then you had to have practical experience which I had at that time, and you have to have a certain number of college credits, which I had those at that time as well.

Q.    Do you recall what the practical experience required was to become a CFE?

A.    Generally, practical experience, in active at fraud examination.  That's it generally.  I don't recall the exact requirement, but somewhere along those lines.

Q.    And you're a member of the Association of Certified Fraud Examiners, correct?

A.    Yes.

Q.    Do you recall when you first became a member?

A.    I do not.  I would have -- I just don't recall the exact time.  Sometime around 2009, maybe a little before that.

Q.    Do you recall if you had to have recommendations to become a CFE?

A.    I do recall, yes.

Q.    Do you recall any of the individuals that

Page 16

recommended you?

A.   I would imagine -- I don't recall who they -- I mean, I could guess.  I think I remember but I would be guessing.  It's been a while.

Q.   Do you recall if any of the recommendations were done by attorneys?

A.   I would imagine they would have been since that was who I mainly did my work for.

Q.   Do you know a person named Joel Hargus?

A.   I do.

Q.   Did he recommend you for your CFE?

A.   He probably did, yes.

Q.   Do you know a person named Kyle Hefner?

A.   Yes.

Q.   And did he recommend you for your CFE?

A.   He could have, yes.  I think he did now that you mentioned his name.

Q.   For Joel Hargus, you say he probably did.  What prompts you to believe that it was probably -- he was probably one of your recommendations?

A.   I just don't remember who all recommended me just specifically.  It was, you know, 18 years ago, so I just don't remember, but he very well could have because I worked pretty closely with him at that time.

Q.   That was going to be my next question is, you

Page 17

know, do you remember if you were doing a substantial amount of work for him at the time and that kind of leads you to believe that he may have been one of the persons that recommended you?

A. Yes.

Q. Do you recall how many components there were for the CFE examination?

A. I believe there's four if I remember correctly.

Q. And you passed all four of those components?

A. Yes.

Q. Did you take any of those components more than one time?

A. No.

Q. Just for clarity, you passed each part of the CFE examination on your first try, correct?

A. Yes.

Q. Has your CFE credential ever been revoked?

A. No.

Q. Has your CFE credential ever been suspended?

A. No.

Q. Do you know if the licensing body for the certified fraud examiners has a disciplinary board?

A. Yes, I do.

Q. Have you ever been a subject of a disciplinary inquiry or proceeding before that board?

Page 18

A.   No.

Q.   Do you know if you have an obligation to self-report any possible violations of your CFE certification to the disciplinary board?

A.   Yes.

Q.   Have you ever done any self-reporting to the disciplinary board?

A.   No.

Q.   And do you have any continuing education to maintain your CFE certification?

A.   Yes.  Twenty hours per year.

Q.   Is that 20 hours of educational programming per year?

A.   Yes.

Q.   Is there any exemption where you can buy hours where you were teaching instead of taking a course?

A.   Yes.

Q.   And have you taken advantage of teaching instead of taking in order to complete your 20 hours?

A.   Oh, yes.  I have, sure.

Q.   Has any of your continuing education been focused on mortgages or mortgage servicing?

A.   Some of -- no, not specifically, no.  No.  Now, I might clarify that they're really available to the mortgage servicing courses that are approved by the CFE

Page 19

or AICPA.

Q. I'm sorry. You say ASCPA?

A. AICPA.

Q. And what is that?

A. American Institute of Certified Public Accountants. They have had educational programs that are interchangeable with CFE, educational requirements so you can take some from either place and they'll reciprocate.

Q. As part of all of your education, so your bachelor's degree, all of the efforts you made towards your master's degree, your training to become a CFE and your continuing education, have you ever taken any courses or education specific to mortgage lending?

A. No.

Q. How about refinancing?

A. No.

Q. What about investing?

A. No.

Q. What about reviewing and interpreting the terms of a mortgage note?

A. No. If one would exist. I don't know of one.

Q. What about a mortgage deed of trust?

A. Again, I don't know of a course that would focus on mortgage deed of trust that I would have taken.

Page 20

Q.   And what about --

A.   Or that exists.

Q.   And what about for mortgage modifications?

A.   No, not that I know of.

Q.   Are there any subspecialties for certified fraud examiners?

A.   I don't know.  I don't believe there are.

Q.   Do you recall if you received any training for becoming a CFE specifically for mortgage servicing?

A.   Could you repeat that again.

Q.   Do you recall if you received any training for when you were becoming a CFE specifically for mortgage servicing?

A.   You mean for my requirement for my CFE?  Is that what you're --

Q.   Yes.

A.   No.  I received -- no, I did not.  Did not.

Q.   Do you recall if you had any practical work experience in mortgage servicing that you used as part of the credits that you had to complete for your CFE?

A.   No, I did not.

Q.   Have you ever worked with another CFE on any project?

A.   No.

Q.   Have you ever been mentored by another CFE?

Page 21

A.    Not that I recall, no.

Q.    Have you ever received training from any individual with a background in mortgage servicing?

A.    If I received any training, is that what you're -- I worked alongside and received some training from a couple of attorneys who used to work for mortgage servicers.  They've helped educate me in some of the nuances of mortgage servicing in their systems.

Q.    Do you recall who that was?

A.    One of them was Marjorie Galant.  She's an attorney in Florida.  She used to work for Ocwen, predecessor to PHH, and then another guy was named Dick Shepherd.  He used to work as -- for Saxon Mortgage Company.

Q.    What type of training did they give you?

A.    Their systems, what type of systems there were, ins and outs of them, policies and procedures, that kind of thing.

Q.    Do you recall when this was, what year?

A.    I do not, no.

Q.    Do you recall if it was still when Ocwen was called Ocwen Loan Servicing?

A.    Yes, it would have been when they were still Ocwen.

Q.    Do you recall what platforms you received

Page 22

training on?

A.   Well, at that time, Ocwen used a system called Real Servicing, so it would have been in that.

Q.   And what about for Saxon Mortgage?

A.   I don't recall too much about Saxon because they've been gone for a while.  So I really just don't recall what Saxon had because I just don't -- I haven't, you know, been exposed to them very much in recent years.

Q.   Do you know if you received any training for platforms that are currently used by Onity Group, formerly known as PHH Mortgage Corporation?

A.   Well, they use the MSP system and I have not received any formal training, no.

Q.   How do you know that they use MSP?

A.   It's pretty general knowledge that they do.  I mean, I've worked with, you know, PHH's system and data for years, so I just know that they do.  That's their system of report.

Q.   Does that understanding come from previous cases that you have worked on where you've seen that that's the platform that they have been using?

A.   Yes.

Q.   Has any of the work you've done in preparing an expert report for any case been peer reviewed by another

Page 23

CFE?

A.    Not that I know of, no.

Q.    Do you have any quality control measures when generating an expert report?

A.    Quality control, no, other than my review.  I usually don't share it with anybody, just confidentiality sake.  Go through it, make sure it doesn't contain errors.  Not saying they don't, but I try to catch what I can.

Q.    And what do you do to ensure your report is accurate?

A.    Doublecheck my calculations, triple-check.

Q.    Manual review by yourself.  Is that fair?

A.    Fair.

Q.    Your company is Full Disclosure LLC, correct?

A.    Yes.

Q.    And you own that company, correct?

A.    Yes.

Q.    And has anyone other than yourself ever done any work for Full Disclosure LLC?

A.    I've subcontracted out some work occasionally but mainly it's just me.

Q.    When was the last time that you subcontracted out some work?

A.    Probably back early fall this past year.  I

Page 24

just had another accountant do some work for me when I was backlogged and needed some help on a case or two, so --

Q.   When you subcontract work, is it for a specific purpose or is it because you have too much work and you just, you know, need another set of hands?

A.   Well, it could be for a specific purpose.  Some work I've contracted as, you know, more tailored to maybe what their specialty is, maybe in data, some type of data programming, that type of thing.  Just depends.

Q.   You just testified that, you know, back in the fall that you subcontracted out to an accountant, correct?

A.   Yes.

Q.   Is that accountant a CPA?

A.   Yes.

Q.   Did you specifically choose him because he was a CPA?

A.   Well, I chose her, not him, but no, not because she was a CPA.  It's because she -- personally know her. She was in between jobs and needed some -- you know, was available to work, and so I used her.

Q.   Have you ever specifically chosen to subcontract to a CPA to assist in an expert report where you felt that accounting was something that required

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

somebody with a CPA license?

A.    No.

Q.    And have you ever had any employees since inception of Full Disclosure LLC?

A.    No.

Q.    What services does Full Disclosure LLC provide?

A.    Forensic investigative accounting related to the mortgage loan servicing industry segment.

Q.    Is it specific to that industry only?

A.    Ninety-nine percent of it is, yes.

Q.    And what majority of that work is as an expert witness?

A.    Probably -- and, again, this is a guess, but I would say 50 percent.

Q.    So what other services do you provide other than your expert witness services for Full Disclosure LLC?

A.    Well, it would be consulting work.  It would just be the same type of work, just not as an expert, not as a testifying expert.

Q.    Is Full Disclosure LLC your only employment?

A.    Yes.

Q.    Have you ever done any work as a CFE for any business other than Full Disclosure LLC?

A.    No.

Page 26

Q.   Approximately how many matters do you work on at any given time for Full Disclosure LLC?

A.   At any given time.  It would just be a guess.  I don't know.  I probably have 10 cases I'm working on right now.

Q.   Okay.  Are some cases -- do some cases require less work than others?

A.   Yes.

Q.   So do you have, you know, some smaller cases and some larger cases?

A.   Yes.  Small cases, you know, come in and out, get resolved quickly or get in and out of my hands quickly, so I don't.  It just depends.  But 10 cases is a good number.

Q.   What would you consider a large case?

A.   That is a good question.  I don't know.  A large case would be dependent on how much time I have to spend with it.

Q.   If you're generating an expert report, would you consider that a large case?

A.   Not necessarily.  Depend on the complexity of the case.

Q.   So it's really just about the amount of hours that would be required for that particular project would have it be considered a small case or a large case?

Page 27

A.    That's fair.

Q.    Do you do any work for anybody other than attorneys?

A.    I have worked for some other than attorneys, yes.  I try to limit my engagement to attorneys only, and -- but I've worked for some government agencies. I'm currently working for the Department of Justice in California, so -- but they're attorneys so, you know.

And occasionally I'll take on individual case of something that might be outside of the mortgage area, but I don't have any at this time.

Q.    Is the work you're completing right now for California DOJ confidential?

A.    No.

Q.    What are you doing for the California DOJ?

A.    I'm working on a case for -- that was brought against the State of California by California Mortgage Bankers Association.  They sued the state due to -- they said that a new law that involved second mortgages was unconstitutional, and so I'm working on that case for them, for the state.

Q.    What are your responsibilities for that case?

A.    Well, right now, it was in the preliminary -- right now, it's on hold.  It's waiting a decision for preliminary injunction, so it's pretty early in the

Page 28

case.  And my involvement at this point was to do a declaration just with my experience with second mortgages, and zombie.  Also involves what they call zombie second mortgages.  So my experience in my practice dealing with those, I submitted a declaration.

Q.  Did you state any opinions or findings in that declaration?

A.  Yeah.

Q.  What were your opinions in that declaration?

A.  Oh, gosh, I don't know.  I could be happy to -- you could look it up.  It's on court's website.  I don't know.  There were several.  It was a pretty lengthy declaration.

Q.  Do you recall any specific finding that stood out?

A.  Not that I recall.  Just it was mainly focused on my experiences in my accounting practice of what I have experienced with zombie seconds and second mortgages, and types of procedures that mortgage servicers are following or not following and borrowers also, so --

Q.  Did that work relate to any of the accounting on the second mortgages?

A.  It -- yeah.  It could, sure.

Q.  Do you know if the opposing party in that case

Page 29

submitted any challenge or objection to your declaration?

A.    Yes, they did.

Q.    And do you recall or do you know if the judge has ruled on that?

A.    I don't think the judge has ruled on it.

Q.    And you're not an attorney, correct?

A.    That's correct.

Q.    And you've never taken any formal education or training to become an attorney, correct?

A.    That's correct.

Q.    Okay.  Would you consider yourself a forensic accountant?

A.    Yes.

Q.    And what's that mean to you?

A.    Well, it's kind of a more specific type of accounting that deals with testifying in court forensically reconstructing numbers in a little bit more transactional way than a regular accountant preparing financial statements does.

Q.    Would you describe your work in this matter as involving forensic accounting?

A.    Yes.

Q.    And when you are doing forensic accounting, what type of stuff do you typically review?

Page 30

A.    Well, in the mortgage servicing end typically the data that's output by the mortgage servicer system, all the documents in the servicing file.  Those are mainly the things that I review.

Q.    Is that typically what you would review for any report?

A.    Typically, yes.

Q.    Have you ever worked for an accounting firm?

A.    No.

Q.    Have you ever worked for a bank?

A.    No.

Q.    Have you ever worked for a mortgage lender?

A.    No.

Q.    Have you ever worked for a mortgage servicer?

A.    No.

Q.    Have you worked for any financial institution?

A.    No.

Q.    Have you ever worked for any law firm?

A.    No.

Q.    Have you ever audited financial statements of a financial institution?

A.    No.

Q.    Have you ever worked for a mortgage loan custodian?

A.    No.

Page 31

Q.   Have you ever worked for a securities administrator?

A.   No.

Q.   Have you ever worked for a depositor?

A.   No.

Q.   Have you ever worked for any government agency other than California DOJ?

A.   You mean in my practice, have I been engaged by a government agency?

Q.   Yes.

A.   Yeah.  Well, I did some work for the Nevada Attorney General years and years ago, and I guess government agency was -- I'm trying to think.  I think that would be it.

Q.   Did that work relate in any way to the type of work you completed here for your expert report?

A.   No.  It was something completely different.

Q.   Did it in any way involve the involvement of payment records for mortgage loans?

A.   No.

Q.   Have you ever completed any work for a government agency to review payment records?

A.   I'm sorry.  For who?

Q.   Have you ever worked for a government agency to review payment records?

Page 32

A.    What kind of payment records?

Q.    Any payment records for work you completed for a government agency.

A.    Not that I recall, no.

Q.    Have you ever testified before a legislative body?

A.    Yes.

Q.    Okay.  And was that with the Arkansas State Judiciary Committee?

A.    Yes.

Q.    Do you recall what topic you testified on?

A.    It's been a while back, but I think it was on the nonjudicial foreclosures in the State of Arkansas.

Q.    Do you recall what the subject matter of your testimony was?

A.    No.

Q.    Have you testified before any other legislative body other than the Arkansas State Judiciary Committee?

A.    No.

Q.    Have you had occasions where you've had --
strike that.

Have you had any occasions where you've had issued corrections to your written expert reports?

A.    Yeah, probably had.

Q.    Do you recall any specific instances?

Page 33

A.   I mean, I have amended my reports several times.  I don't recall any, you know, specific instances but it's not -- it doesn't happen all the time but it's not unusual for me to amend my report to correct an error I found or something that came up afterwards, so it's happened several times.  But I don't recall any specific instances, no.

Q.   Have you ever been retained as an expert to testify for Onity Group formerly known as PHH Mortgage Corporation formerly known as Ocwen Servicing?

A.   No.

Q.   Have you ever been retained as an expert for any mortgage loan servicer?

A.   No.  I've been asked to but I have not.

Q.   Do you recall when you were asked to?

A.   Well, I've been asked several times but I'm usually conflicted out because I have a case against that mortgage company.

Most of my cases are against the main large mortgage servicers, and if I get asked, you know, by someone to work on a case on the mortgage servicer side I'm usually in conflict.  It's happened every time, it seems like, but I'd be happy to do it.

Q.   So each time that a mortgage servicer has come to you and asked you to a be an expert, you have not

Page 34

been able to say yes because you have had an active case against that same mortgage servicer; is that correct?

A. That's correct.

Q. All right. Have you ever been retained as an expert for any mortgage lender?

A. No, I don't believe so.

Q. Have you ever been retained as an expert for any mortgage owner or beneficiary?

A. Mortgage loan owner?

Q. Yes.

A. No.

Q. Have you ever been retained as an expert to testify against Onity Group formerly known as PHH Mortgage Corporation, formerly known as Ocwen Loan Servicing?

A. That's a lot of words. Yes, I have.

Q. Do you recall on how many occasions?

A. No.

Q. And would all of those occasions be listed in your testimony case list?

A. Yes.

Q. Have you heard of a company or business called Gursey Schneider LLP?

A. No. Doesn't ring a bell.

Q. Do you know who Gary Krausz is?

Page 35

A.   No.

MR. CHRISTENSEN:  Can you -- I didn't hear the one before Gary Krausz.  Can you spell that.

MR. SCHNEIDER:  The name of the business, Gursey Schneider LLP.  It will be included on Gary Krausz's expert report.  G-u-r-s-e-y.  Schneider is what you see before you, S-c-h-n-e-i-d-e-r, LLP.

Q.   So do you recall if you've ever been retained as an expert for accounting-related opinions similar to this case where the opposing party's expert was Gary Krausz?  And that's K-r-a-u-s-z.

A.   I don't recall.  It could have been, but I just don't recall because there's opposing experts in a lot of the cases I would work on so could have been but I don't recall.

Q.   Your wife's an attorney, correct?

A.   She's retired.

Q.   Prior to retiring, was your wife an attorney?

A.   She was, yes.

Q.   And prior to retiring, what type of law did she practice?

A.   Bankruptcy.

Q.   Did she represent the creditor or the debtor in the bankruptcies?

A.   Both.

Page 36

Q.   Is that what your wife practiced for the past 20 years of her career?

A.   Fair enough, yes.

Q.   Were you ever retained as an expert for a client that your wife represented?

A.   Of course not.

Q.   Why do you say of course not?

A.   I mean, I would never be an expert on a case that my wife has.  I mean, that's against all rules.  I mean, that could never fly anywhere, so --

Q.   Do you recall if your wife ever asked you to be an expert in any one of her cases?

A.   I -- no, she would not have done that.

Q.   Have you ever received a national recognition for any of your work?

A.   Have I ever received it?

Q.   Received.

A.   Received.  No.

THE REPORTER:  Counsel, I'm afraid I'm going to have to take a quick break.

MR. CHRISTENSEN:  Take a quick five-minute break.

(Break taken from 11:51 a.m. to 11:56 a.m. CDT.)

BY MR. SCHNEIDER:

Page 37

Q.   Going back to Exhibit 3, this is the CV you provided in this case and on page three of the CV there's instructor and speaking engagements.  Is this a complete list of your speaking engagements?

A.   It should be, yes.

Q.   And it looks like a pretty good majority of these speaking engagements are with Max Gardner.  Is that a fair assessment?

A.   Yes.

Q.   And who was Max Gardner?

A.   Mr. Gardner was a consumer attorney in North Carolina.  He's now retired so no longer does this anymore, but he was a long-time consumer lawyer in North Carolina who taught attorneys bankruptcy-related education.

Q.   How did you first connect with Mr. Gardner?

A.   I met him at -- well, my wife went to his -- one of his seminars a long time ago, and then I met him at a MACNA conference in San Francisco.

Q.   Okay.  Moving to the next page on your CV, there's a section called publication, slash, papers.  The first publication is Foreclosure in California Crisis of Compliance.  You were a co-author of that publication, correct?

A.   Yes.

Page 38

Q.   And do you recall who the other authors of that publication were?

A.   Lou Kazante and Mark Rappaport.

Q.   And were you paid for that publication?

A.   Yes.

Q.   And that publication was commissioned by the San Francisco County Recorder in California; is that correct?

A.   Yes.

Q.   And how did you secure that opportunity to be a co-author of that publication?

A.   Well I was asked to do that by Mr. Kazante, Mr. Rappaport.  They're the ones that actually secured the contract with the county recorder, but I worked on the report with them.  They paid me.

Q.   And prior to this publication, did you do any work for Mr. Rappaport?

A.   Probably yes, if I recall.

Q.   And prior to this publication, did you do any work for Mr. Kazante?

A.   Not that I recall.

Q.   The next paper listed on here is titled "Mortgage Loan Document Custodians, Their Roles Functions and Issues."  This paper is not published; is that correct?

Page 39

A.    Correct.

Q.    Have you ever submitted this paper for publication?

A.    It was actually published at one time and then it was taken down.  I don't know what website.  It's down now.  It was a website for attorneys and had different publications on there for them to review but it's not anymore, so that's why I put it's not published.

Q.    Do you recall when it was taken down or when that web page was removed?

A.    I do not, no.

Q.    And what is this paper about?

A.    Which one?

Q.    The mortgage loan document custodians, their roles, functions and issues.

A.    Well, just basically what it says.  Just kind of details document custodians and the processes by which mortgage loan documents go through the custodial process and function and some of the issues surrounding that that came about back there in that time.

Q.    What experience did you have with mortgage loan custodians at that time?

A.    Just my case work.

Q.    Were you hired to write this paper?

Page 40

A.   No.

Q.   Was there a specific reason you chose to write this paper?

A.   No.  No.  I just had a lot of information on it.  Decided to put it down, organize it in paper.

Q.   The final paper on here is titled Accounting Treatment of Mortgage Loans, It Is All About Control. And it states this paper is not published; is that correct?

A.   Correct.

Q.   Have you ever submitted this paper for publication?

A.   It was submitted for publication but it was not published.

Q.   Were you provided a reason that your request for publication was denied?

A.   No.

Q.   Were you hired to write this paper?

A.   No.

Q.   Is there a specific reason you decided to write this paper?

A.   Yeah.  This one was written as part of my courses I took when I was doing my accounting degree.

Q.   Okay.  So this was part of kind of your studies that you were undertaking for your master's degree in

Page 41

accounting; is that correct?

A. Well, it started out, the paper was originally written for a course that I was taking in my undergraduate but then after I graduated, we took the paper and expanded it with the help of the accounting professor there at the University of Arkansas, expanded it and submitted it for publication.

Q. Do you recall the name of the professor that you were working with?

A. Cynthia Taylor.

Q. Have you ever been excluded from a case as an expert?

A. Yeah. I've listed those on my CV in the last page of my case listing all the cases where my testimony's been limited or excluded.

Q. Do you recall a case called Bank of New York versus Donny Marin in Miami Dade County?

A. Absolutely I do.

Q. Do you remember the attorney that hired you for that case?

A. Marin -- let's see. Was that the case -- I'm trying -- forgive me. Let me -- can I pull up my CV so I can look at that. I'll do that here.

Q. I'm just asking for what your memory is right now.

Page 42

A.    Yeah.  My memory -- okay.  Yeah.  So that case was the one where the -- the reason I asked you that or I wanted to go look at this, because I couldn't remember the name.  Jacobs was the lawyer involved in that case.  And, no, he did not hire me.  That was the case where I found out years later that I had been struck as a witness due to irrelevant expertise and I didn't even know he -- he never hired me.

He disclosed me as an expert in the case without my knowledge without hiring me, and I found out seven years later that I was struck as an expert in a case, you know.

Q.    Do you recall a case called Bank USA National Association versus Kathleen Ryan?

A.    Ryan.  No, I don't recall it.

Q.    You have your CV open; is that correct?

A.    Yeah.

Q.    Okay.  So if you go to January 2019.

A.    Okay.

Q.    There's one case, case number is 18CA013801.  You see that?

A.    Yes.

Q.    And that case is HSBC Bank versus Kathleen Ryan.  Do you see that?

A.    Yes.

Page 43

Q.   And there's a second case August 2021.

A.   Okay.

Q.   I should say second entry.

A.   Okay.

Q.   The case name is HSBC Bank versus Kathleen Ryan.  Case number is listed there as 2018-CA-013-01.  Do you see that?

A.   Yes.

Q.   Does this kind of refresh your recollection on that case?

A.   Yes, it does.

Q.   Do you recall having your deposition taken in that case?

A.   I do.  That's where I found out about the Marin case.

Q.   Do you recall testifying in that case that you were in fact hired by Bruce Jacobs?

A.   I don't recall.

Q.   But sitting here today, your testimony is that Bruce Jacobs never hired you and you had no idea about the Donny Marin case until the deposition in the Kathleen Ryan case in August 2021, correct?

A.   Well, let me clarify that a little bit, okay, because I know where you're going with this.

So in the Kathleen Ryan case, I was in a

Page 44

deposition.  They pulled out this order striking me as an expert, which I knew nothing about, and that's what I testified to.

Now, later in that case, after I was struck as an expert, Mr. Jacobs did hire me in that case to do an affidavit, I believe, but this was like a year or two after that.  But I didn't know, still didn't know about that order striking me even after he hired me for the case.  So I just want to make that clear.

Q.   Okay.  So you recall being hired by Bruce Jacobs for the Donny Marin case at some point, correct?

A.   At some point, but after that happened, the motion or the motion and order to strike me that I did not know about, and I was never hired for that part of it.  I just was not.

Q.   Right.  No.  That's fine.  I'll clarify.

So in the Donny Marin case, there was an order striking you as an expert witness; is that correct?

A.   It was striking me as an expert witness due to irrelevant expertise.

Q.   Okay.  And you did not become aware of that order until your deposition in the Kathleen Ryan case in August 2021, correct?

A.   That's correct.

Q.   And then at some point after the order was

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

entered in that case, Bruce Jacobs eventually hired you for that case as an expert, correct?

A.   Yes.

Q.   Do you recall preparing an expert report or testifying as an expert or preparing an affidavit for the Donny Marin case?

A.   I mean, I know I did prepare a report.  I don't recall it, though.

Q.   Do you recall a case called Teresa Trevino versus U.S. Bank Trust in the Southern District of Texas?

A.   Yes.

Q.   And do you recall testifying for the court in the Trevino case that you've never been disqualified as an expert?

A.   I don't recall but I probably did at that point.

Q.   And your testimony in the Trevino case happened before you became aware of the issue in the Donny Marin case, correct?

A.   Yes.

Q.   Have you done anything to correct the testimony you provided in the Trevino case?

A.   I've been asked this question many times before.  Yes, I've notified the attorney in the Trevino

Page 46

case, told him what happened and they were -- they need to correct the record or not.  I don't know what they did, if they did or did not, but I did notify the attorney.

Q.   Do you recall a case called Bank of New York Mellon versus Julie Nicolas?

A.   Yes.

Q.   And do you remember the attorney that hired you for that case?

A.   I believe that was Mr. Jacobs.

Q.   And according to your case listing, that was in May 2021; is that correct?

A.   Yes.

Q.   So that would have been before, according to your testimony, that you found out about the issue with the Donny Marin case; is that correct?

A.   Yes.

Q.   Since the Julie Nicolas case, have you done any more work for Bruce Jacobs?

A.   No.  Jacobs has been disbarred.

Q.   I suppose that will answer my next question then.

Would you ever complete any future work for Mr. Jacobs in view of your previous experiences?

A.   No.  I had to hire a lawyer and spend a lot of

Page 47

money just to get this straightened out.

Q. Do you recall a case titled Fitzpatrick versus Bank of America in the Southern District of Alabama?

A. That was a long time ago, wasn't it?

Q. I believe that was 2011.

A. Yeah. I don't recall it. I would just have -- yeah, I mean, I don't recall the case.

Q. Do you recall if you were excluded as fraud examiner in that case?

A. I don't recall.

Q. Do you recall a case Dean Zinetti versus Georgia Bank National Trust Company?

MR. CHRISTENSEN: Could you spell that, Mr. Schneider.

MR. SCHNEIDER: Zinetti is Z-i-n-e-t-t-i, and it's on his CV in September 2020.

THE WITNESS: Go back to the Fitzpatrick case. You said do I recall if I was excluded as a CFE?

BY MR. SCHNEIDER:

Q. Not as a CFE, but just as a fraud examiner.

A. I don't recall. Was I? I don't know. I don't recall. Are you saying I was?

Q. In that case you were in fact excluded.

A. Really.

Q. Yes.

Page 48

A.   Okay.  That was a long time ago.  Okay.  Maybe go back and look at that.

Q.   So going back to Dean Zinetti, do you recall that case?

A.   Yes.

Q.   Do you recall that a summary judgment was issued against the borrowers in that case?

A.   Yes.

Q.   And you were an expert retained by the borrowers in that case; is that correct?

A.   Yes.

Q.   And have you seen the Court's order on the motion for summary judgment?

A.   I have.

Q.   And do you recall that that order states that your opinion regarding errors committed by Ocwen in calculating the escrow amount due each month are therefore entitled to no weight?

A.   Yes, I do.

Q.   Are you aware of any other cases where a judge made a similar finding, that your opinion was entitled to any weight?

A.   Not right offhand, no.

Q.   Is it possible there are other cases where a judge has made a similar finding?

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

A.    Certainly.  They can find either for what I said or against what I said.  I'm not -- not under my control.

Q.    Do you recall the case called Batemen versus Southern Development?

A.    Yes.  I mean, it's been a long time.

Q.    We're going way back.  This is from 2010, so yeah.

Do you recall providing trial testimony in that case?

A.    I mean, I did provide it.  It's on my CV that I did, but I don't recall the case.

Q.    Do you recall if there was an opposing expert to you in that case?

A.    I do not recall.

Q.    Do you recall the outcome of that case?

A.    I have no idea.

Q.    Do you recall the case called Jackie Krell versus Chase Home Finance?

MR. CHRISTENSEN:  How do you spell that, Mr. Schneider?

MR. SCHNEIDER:  Krell is K-r-e-l-l.  Just for clarity here, Mr. Christensen, all of these cases are included on his CV and indicated that he provided trial testimony.

Page 50

MR. CHRISTENSEN:  I understand.  Just spellings are not easy.

THE WITNESS:  I don't recall the case but I did provide trial testimony in May of 2012 according to my CV.

BY MR. SCHNEIDER:

Q.   Do you recall the outcome of that case?

A.   I do not, no.

Q.   Do you recall the case Donald Distefano versus is HSBC Bank USA as Trustee?

A.   Yes.

Q.   And Distefano is D-i-s-t-e-f-a-n-o.

A.   Correct.

Q.   Do you recall providing trial testimony in that case?

A.   Yes.

Q.   Do you recall if there was an opposing expert to you in that case?

A.   I don't recall.

Q.   Do you recall --

A.   I don't believe there was an opposing expert.

Q.   Do you recall the outcome of that case?

A.   No, I do not.

Q.   Do you recall a case called Lapour versus Onewest Bank FSB?

Page 51

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

A.    Yes.

Q.    And that's L-a-p-o-u-r.

A.    Yes.

Q.    Do you recall providing trial testimony in that case?

A.    I did, yes.

Q.    Do you recall if there was an opposing expert to you in that case?

A.    I don't recall.

Q.    Do you recall the outcome of that case?

A.    I do not, no.

Q.    Do you recall the case called JP Morgan Chase Bank versus Frederick Buckler?

A.    Which month and year?

Q.    January 2014.  Getting closer to this decade.

A.    Don't recall the case.  I just don't.

Q.    Do you happen to recall the outcome of that case?

A.    No.

Q.    It's fair to say you don't recall anything specific about the case?

A.    I don't really recall anything specific about the case.

Q.    Do you recall the case Charles Neel versus Fannie Mae?  That's N-e-e-l.

Page 52

A.    Yes.

Q.    Do you recall providing trial testimony in that case?

A.    Yes.

Q.    Do you recall what you were testifying about?

A.    No, I don't.

Q.    Do you recall if there was an opposing expert to you in that case?

A.    I do not recall.

Q.    And do you recall the outcome of that case?

A.    I don't know the outcome of that case.

Q.    Do you recall the case U.S. Bank NA, as Trustee, versus Duthie, D-u-t-h-i-e?

A.    What year?

Q.    December 2014.

A.    I do not recall this case at all.

Q.    Do you recall a case called Wells Fargo Bank versus Niles Webster?  That's N-i-l-e-s.

A.    I recall the case but I just don't recall anything about it.

Q.    Do you recall the outcome of that case?

A.    No.

Q.    On your CV, you know, there's a series of footnotes after your case listing and, you know, some of the those footnotes explain, and this is when your

Page 53

testimony was not permitted or this is why it's stricken, kind walks through, you know, a handful of times where you were perhaps excluded as an expert for various reasons.

Is that to your understanding a complete list of all the instances where you were excluded as an expert?

A.   As best I could remember when I did this list, as best I can remember, that's what I put and I'm concerned about the Fitzpatrick case you just mentioned. I haven't -- that was a long time ago but I need to go back and look at that.  I don't recall that, but that might possibly need to be entered on there if I was in fact excluded in that case.  I just don't remember, but this is my best attempt to list everything and disclose that.

Q.   Okay.

A.   Let's been a long time.

Q.   If I were to ask you for any of these cases that we're discussing about trial testimony whether you were excluded as an expert, if it's not included in those footnotes, then to your knowledge there was no finding that you were excluded as an expert.  Is that fair to say?

A.   To my knowledge, yes.  And, again, the

Page 54

Fitzpatrick deal has me concerned but I'm going to look at that.

Q.   Okay.  So do you recall the case U.S. Bank NA, as Trustee versus Soledad Morillo?  That's M-o-r-i-l-l-o.

A.   I do not.

Q.   You don't recall anything specific about that case, fair?

A.   No, I do not.

Q.   Do you recall the case 5th Third Mortgage Co. versus Cynthia V. Hunter?

A.   Yes, I do.

Q.   And do you recall providing trial testimony in that case?

A.   I did provide trial testimony.

Q.   Do you recall what that trial testimony was about?

A.   I don't recall.  It was mortgage servicing obviously.  But I do not recall exactly what it's about, no.

The judge excluded my testimony after the trial was over in that case.

Q.   Do you recall if there was an opposing expert to you in that case?

A.   There was not.

Page 55

Q.    Do you recall the outcome of that case?

A.    I do not.

Q.    Do you recall a case D-o-n-y, as Trustee, versus SSG Worldwide and Nathalian Mello?  And that's N-a-t-h-a-l-i-a-n.

A.    What year?

Q.    January 2016 immediately after the 5th Third Mortgage Company case.

A.    Yeah.  I think that was a Bruce Jacobs case as well, and I did provide trial testimony for that as well, yeah.

Q.    Do you recall if there was an opposing expert in that case?

A.    I don't recall.

Q.    Do you recall the outcome of the case?

A.    No.

Q.    Do you recall the case James Levitt versus CitiMortgage Inc.?  November 2016.

A.    Yes, I did.  I recall going up to testify in that case.

Q.    Do you recall providing trial testimony in that case?

A.    Yes.

Q.    Do you recall if there was an opposing expert in that case?

Page 56

A.    I don't recall.  I don't think there was.

Q.    Do you recall the outcome of that case?

A.    I do not remember.

Q.    Do you recall the case U.S. Bank NA, as Trustee, versus Thomas Manning in February 2018?

A.    Yes.

Q.    Do you recall providing trial testimony in that case?

A.    Yes.

Q.    Do you recall what your testimony was about?

A.    Yeah.  I think it was about -- involved loan modification and whether borrower or the borrower was offered the correct terms for a loan modification for the investor guidelines, investor matrix, so I think that's what that was about if I remember right.

Q.    And were you retained as an expert for the borrower, Thomas Manning?

A.    Yes.

Q.    Do you recall if there was an opposing expert to you in that case?

A.    I don't believe there was.

Q.    Do you recall the outcome of that case?

A.    No, I don't.

Q.    Do you recall the case Monnette Saccameno versus Ocwen Loan Servicing?  That's M-o-n-e-t-t-e,

Page 57

S-a-c-c-a-m-e-n-o from April 2018?

    A.   Yes.

    Q.   Do you recall providing trial testimony in that case?

    A.   Yes.

    Q.   Do you recall what your testimony was about?

    A.   The loan servicing, accounting, bankruptcy, yeah.

    Q.   Do you recall if there was an opposing expert to you in that case?

    A.   I don't believe there was.

    Q.   Do you recall the outcome of that case?

    A.   I believe that one was the jury found for Ms. Saccameno.

    Q.   And were you retained as an expert for Ms. Saccameno?

    A.   Yes.

    Q.   Do you recall the case U.S. Bank, as Trustee versus Joshua Gottlieb, and that's G-o-t-t-l-i-e-b, from August 2018?

    A.   Yes.

    Q.   And do you recall providing trial testimony in that case?

    A.   Yeah.  I recall that case.  I do.  It was involving a loan modification as well.

Page 58

Q.   Do you recall if there was an opposing expert to you in that case?

A.   I don't recall.

Q.   Do you recall the outcome of that case?

A.   I do not recall or I don't remember.

Q.   Do you recall the case Allana Baroni versus Nationstar Mortgage LLC from 2018?

A.   Yes.

Q.   Do you recall providing trial testimony in that case?

A.   I did.

Q.   Do you recall what your testimony was about?

A.   I don't recall exactly what it was about.  I don't recall.

Q.   Do you recall if there was an opposing expert to you in that case?

A.   I don't believe there was.

Q.   And do you recall the outcome of that case?

A.   No, I don't know the outcome of that case.

Q.   Do you recall the case Musteen versus Carrington Mortgage Services from February 2019?  And that's M-u-s-t-e-e-n.

A.   Yeah.  Arkansas.

Q.   Do you recall providing trial testimony in that case?

Page 59

A.    Yes.

Q.    Do you recall what your testimony was about?

A.    I believe it was bankruptcy, accounting servicer issues.

Q.    Do you recall if there was an opposing expert to you in that case?

A.    I don't recall.

Q.    And do you recall the outcome of that case?

A.    I do not.

Q.    Do you recall the case Cristina Angelina Neria versus Wells Fargo Bank?  That's N-e-r-i-a.

A.    Neria.  Yes, I recall that.

Q.    Do you recall providing trial testimony in that case?

A.    Yes.

Q.    Do you recall what your testimony was about?

A.    Mortgage servicing and accounting.  Yeah.

Q.    Do you recall if there was an opposing expert to you in that case?

A.    I believe there was.

Q.    And do you recall who the opposing expert was?

A.    No.

Q.    Do you recall the outcome of that case?

A.    No.

Q.    And do you recall the case Guannan Shi versus

Page 60

Plaza Mexico Residences, LLC? And that's G-u-a-n-n-a-n.

A. Yes. Christensen.

Q. Do you recall providing trial testimony in that case?

A. Yeah. Arbitration testimony, yes.

Q. Okay. It was listed as Superior Court, County of Los Angeles, but then there's a note there's a JAMS arbitration; is that correct?

A. Yes.

Q. Do you recall what opinions you provided in that case?

A. Yeah. It's -- since it's so recent. The accounting records of the Defendant and the reliability on them and incompleteness of them in order to try to arrive at how much money was owed the Plaintiffs is what I testified about.

Q. Do you recall if there was an opposing expert to you in that case?

A. I don't believe there was, no.

Q. And do you recall the outcome of that case?

A. I don't remember if there is even an outcome yet. I don't remember. I don't know.

Q. Okay. Prior to being retained for this case, did you have any personal knowledge of this case?

A. No.

Page 61

Q.   And when were you retained?

A.   February 24, give or take a couple days.

Q.   And for clarity, is that February of 2026?

A.   Correct.

Q.   I'm going to attach what will be marked as Exhibit 2.  This is the expert witness report that was produced in this case without the exhibits.  It's just the report itself.

(Exhibit No. 2 was introduced.)

BY MR. SCHNEIDER:

Q.   Do you have a copy of this report in front of you?

A.   I do, yes.

Q.   Do you also have a copy of the report exhibits in front of you?

A.   I do.

Q.   Okay.  And some of the exhibits to that report appear to be PDF printouts of what looked like Excel spreadsheets; is that fair?

A.   That's fair.

Q.   Do you have access to those Excel spreadsheets to look at them in front of you?

A.   I can, yes.

Q.   It may be easier as we're talking about these exhibits for you to look, you know, directly at the

Page 62

copies that are in front of you so that you have direct access.

A.   Yes.

Q.   So I will share this right now just so we know, you know, what we're talking about.  This is what is being marked as Exhibit 2.  Feel free to use the version in front of you and be able to control the pages.

A.   Good.

Q.   So if we go to page three of this document, it has a section titled "Engagement."  Is the scope of your engagement accurately reflected in this report?

A.   Yes.

Q.   Has your assignment changed in any way from the time you were initially retained to now?

A.   No.

Q.   Do you recall how many hours you have worked on this case to date?

A.   I don't recall but I can look it up right now if you need me to.

Q.   No.  That's fine.  Do you recall if you have done any work after submitting your final report prior to preparing for your deposition?

A.   I don't recall, but I think I might have done some small amount, just review for the deposition.  I haven't done any additional work as far as substantive

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

work to my report or anything if that makes sense.

Q.   Have you been compensated for your services?

A.   Yes.

Q.   Do you recall how much you have received in compensation?

A.   Mr. Christensen paid me a $20,000 retainer, and I've billed against that.

MR. CHRISTENSEN:  I'm sorry.  Did you get those?  I thought we sent those.

MR. SCHNEIDER:  Yeah, we received some documents on Friday.  We can touch on those later.

MR. CHRISTENSEN:  All right.  Just worried you might not have received it.  All right.  That's all.

BY MR. SCHNEIDER:

Q.   Have you been paid in full to date?

A.   Yes.

Q.   Did you work in any way in responding to discovery in this case?

A.   No.

Q.   Has the entirety of your work on this case been related to preparing your report and preparing and attending the deposition?

A.   Yes.

Q.   Do you recall who reached out to you to retain you in this matter?

Page 64

A.   Mr. Christensen.

Q.   Do you recall how he reached out to you?

A.   Sure.  He called me or e-mailed me, one of the two.

Q.   And I believe as we were going over some of the trial testimony that you provided for the Guannan Shi case, you referenced that that was with Mr. Christensen as well; is that correct?

A.   Yes.

Q.   So other than that particular case, have you completed expert reports for Mr. Christensen before?

A.   I've worked a couple of cases with him.  I don't know if I've prepared expert reports but I have worked on a couple of cases prior to the Shi case.

Q.   Do you recall what those other cases were?

A.   No.

Q.   Do you know if those cases are listed in your CV?

A.   If I provided an expert report or a deposition or trial testimony, they would be listed.  If I did not, then they would not be listed.

Q.   Do you recall being deposed in any prior cases that you have had with Mr. Christensen?

A.   I have not been deposed.

Q.   Do you recall if you provided trial testimony

Page 65

in any of the prior cases with Mr. Christensen?

A.    Other than the Shi case, no.

Q.    Did you personally do all of the work on the report for this case?

A.    Yes.

Q.    Did anyone else make changes to your report?

A.    No.

Q.    In your own words, what were you asked to do when you were first retained in this case?

A.    Get a handle on the accounting because there were a lot of reversals and reapplications that was -- that's in my own words.  That was one of the main things.  And try to figure out exactly where all the money coming in and going out went and how it was applied.

Q.    Do you recall whether you were asked to provide an expert opinion in preparing your report?

A.    Expert report is all my opinions.

MR. CHRISTENSEN:  Mr. Schneider, is this a good time for a five-minute break.  If not now, sometime soon will be fine.

MR. SCHNEIDER:  No.  This is fine.

(Break taken from 12:41 p.m. to

12:50 p.m. CDT.)

BY MR. SCHNEIDER:

Page 66

Q. What do you recall doing as part of your investigation for this case?

A. Well, I initially got all the documents from Mr. Christensen. All the document production depositions that he had taken. I believe there was only one that were taken. And then I worked up the accounting on it, reconstructed all of the accounting transactions from the date of PHH took over servicing from Real Servicing to MSP in 2019. I got started that date and moved forward, reconstructed all of the accounting transactions, trying to get a handle on what exactly happened, where all the money went and how it was applied.

Q. When you say Mr. Christensen provided you materials, how were those materials provided to you?

A. Electronically.

Q. Were they sent via e-mail?

A. I believe they were Drop Box'd if I'm not mistaken.

Q. Do you recall if it was an e-mail with a Drop Box link or did you receive just a notification from Drop Box that a folder had been shared with you?

A. I'd have to look. I don't recall.

Q. What is your general procedure for identifying matters you need to develop your findings?

Page 67

A.   Well, my first procedure is to work up the accounting, reconstruct it, get it in a format where I can see exactly what happened.  That's my initial procedure in every case, kind of case I work up.

Q.   Do you believe you reviewed all records necessary to support your findings in this case?

A.   Yeah.

Q.   Do you believe -- strike that.

Have you deviated at all from your general procedures in this case?

A.   No.

Q.   Did you review any materials that are not reflected in your report?

A.   No.

Q.   And for clarity, if we go to page three of your report, there's a section titled "Document examined and relied upon."  Do you see that?

A.   Yes.

Q.   Paragraph 11 identifies the First Amended Complaint, the Defendant document production, Bates PHH_HSBC 000001-008278.  Plaintiff document production and deposition transcripts of Benjamin Verdooren, volumes one and two.  Are those all of the documents you relied upon that were provided to you by Mr. Christensen?

Page 68

A.   Yes.

Q.   And section or paragraph 12 also identifies Office of Management and Budgets Circular Number A-4, the growth rate forecast data from Van Guard's U.S. Equities and Fixed Income segments, the Federal Home Loan Mortgage Corporation DMS historical interest rate archives in the Consumer Financial Protection Bureau interactive bureau regulations.

Were those all of the external sources that you relied upon for your report?

A.   Yes.

Q.   So together the items listed in paragraphs 11 and 12 was everything you relied upon for your report, correct?

A.   Yes.

Q.   Did you receive any information orally that you relied upon for your report?

A.   Not that I recall, no.

Q.   Did you obtain any information orally that you used as part of your investigation?

A.   No.

Q.   Did you rely on any information obtained orally in any way for your expert report?

A.   No.

Q.   Did you speak with anyone other than

Page 69

Mr. Christensen as part of your investigation?

A.   No.

Q.   So you have not spoken with Cory Mayer, correct?

A.   That's correct, I have not.

Q.   And have you spoken with Pamela Simmons?

A.   No.

Q.   And you have not spoken with Bill Purdy, correct?

A.   No, I have not.

Q.   I will clarify just so we're clear.  You have not spoken with Bill Purdy as it relates to this case; is that correct?

A.   Hang on.  I did speak with real estate, and I'm trying to remember his name, the real estate guy.

Q.   We can jump --

A.   I couldn't remember his name so I wasn't for sure.

Q.   Have you spoken with Phil Lewis?

A.   Yes.  Phil Lewis.

Q.   What did you discuss with Phil Lewis?

A.   I just asked him about the interest rates at the time or, really, I was concerned about the dates of the refinance opportunity for Mr. Mayer, and so I wanted to clarify the dates so I could get the interest rates

Page 70

from Freddie Mac for those dates, and that's what I spoke to Mr. Lewis about.

Q.    Would you say you relied on the information you obtained orally from Mr. Lewis for your report?

A.    He gave me the dates of November of -- let me look at it again here.  Bear with me just a second here.

Q.    Just for clarity, you're looking at your expert report right now to confirm what dates?

A.    I'm confirming the date of the refinance calculations I did to see -- because that's the date that he gave me and I think I confirmed that and another date with Mr. Christensen after I spoke with Mr. Lewis. And those are the two dates I used in my report for the refinance calculations.

Q.    Okay.  So in your report -- we'll get there later, but there's a section where you do calculations on potential refinancing options, and the date for those options were January 2020 and November 2020, correct?

A.    Yeah.  Mr. Lewis gave me the 11/1/2020 date, so that's what I used and Mr. Christensen also wanted me to use the 7/1/2020 date, so those are the two dates I used.

Q.    And you obtained that information orally from Mr. Lewis and Mr. --

A.    Yes.

Page 71

Q.   And you relied on that information orally then, correct?

A.   Yes.

Q.   Have you spoken to Hillary Hamilton?

A.   I have not.

Q.   Have you spoken to Christopher Mayer?

A.   No.

Q.   Have you spoken with Helen Mayer?

A.   No.

Q.   Have you spoken with Kimberly Mayer?

A.   No.

Q.   Is there any information that you believe you needed that you did not have in order to finalize your report?

A.   No.

Q.   So if your report does provide any additional records or information you need, then you believe you had everything that you needed, correct?

A.   Unless there's anything new that comes about, I'm good with it.

Q.   Do you have a specific method that you've used to support your opinions in this report?

A.   Well, they're listed on my report as the methods that I used.  I reconstructed the transactions, I used comparative analysis experiences, and I did a

Page 72

refinance analysis and I go into the methods, pretty good detail.

Q.   And is one of these methods the mortgage loan analysis?

A.   Yes.

Q.   Is this the system or methodology you've utilized in all your reports?

A.   All of them that have to do with accounting, yes.

Q.   And you used the mortgage loan analysis methodology here, correct?

A.   I did, yes.

Q.   Did you use any other methodology?

A.   The analysis with variances different places. And then refinance analysis.

Q.   I believe in your report, you refer to the mortgage loan analysis as the MLA; is that correct?

A.   For the short, yes.

Q.   So moving forward, if I say MLA, you'll understand I mean mortgage loan analysis?

A.   Yes.

Q.   And the MLA is something you developed yourself, correct?

A.   Yes.

Q.   So that is your procedure, correct?

Page 73

A.    That is my procedure.

Q.    Has the MLA ever been peer reviewed?

A.    No.

Q.    Did anyone else work with you to establish the MLA?

A.    No.

Q.    Have you ever submitted the MLA to somebody else for peer review?

A.    No.

Q.    To your knowledge, does anyone else in the certified fraud examiner profession utilize the MLA?

A.    Not to my knowledge.

Q.    To your knowledge, does anyone else in the certified fraud examiner profession use similar methodology to the MLA?

A.    I don't know.

Q.    Have you ever published your MLA?

A.    No.

Q.    Are there any publications or publicly-available web pages that reference your MLA?

A.    No.

Q.    Did you prepare any draft reports for this case prior to its final form?

        MR. CHRISTENSEN:    Objection.    Attorney-client privilege and work product.

Page 74

MR. SCHNEIDER:  Is that an instruction not to answer?

MR. CHRISTENSEN:  No.  He can answer but we don't waive the privileges to the production or content.

THE WITNESS:  I did produce three drafts.

BY MR. SCHNEIDER:

Q.    Did you say three drafts?

A.    Yes.

Q.    Did you provide those drafts to Mr. Christensen?

A.    Yes.

Q.    And did Mr. Christensen make any edits to those drafts?

A.    I would have to look, but I don't think he would have made the edits, but we might have discussed any changes that he might have wanted, grammar, wording type thing.

Q.    For any findings or opinions on any topics that are not addressed in your report?

A.    Was I asked about anything that's not addressed to do anything, I don't.  No.

Q.    Did you rely on any specific literature for any of your findings or opinions in the report?

A.    Other than what I've listed as documents I relied upon, that's it.

Page 75

Q.    And do you believe your report contains a complete statement of all of the basis for your findings?

A.    Per the document, everything that I received so far, complete statements.

Q.    So if there's a statement that is not addressed in your report, then you did not have any opinions or findings concerning them; is that correct?

A.    Yes.

Q.    Okay.  So going to paragraph 17 of the report, it talks about the MLA, and you've attached the MLA for this loan as Exhibit 2 to your report, correct?

A.    Yes.

Q.    And that is the MLA that you created, correct?

A.    Yes.

Q.    Now, the exhibits to your report has been marked as Exhibit 3 for the deposition, so if we go to that document looking at what's called Exhibit 2 in your report.  All right.  So if we look at -- I'm looking at page 30 of the PDF that was provided for the exhibits to the report and it's titled "Mortgage Loan Reconstruction Analysis."  Do you see that?  It's the cover page.

A.    Yes.

Q.    It says, "Prepared by Full Disclosure LLC," and it says, "Date prepared, January 30th, 2026."

Page 76

A.    That's probably wrong.  That's the wrong date.

Q.    What date do you believe it's supposed to be?

A.    I don't know but it's not January 30th. Whatever date I started it and I completed it on April 1st was the last work I did on it.  I'd have to go back and look at the history of it and see if you want me to look at the date I actually calculated it, but that date on that cover page was not correct because I didn't even know about this case until January 30th, so --

Q.    So the date prepared is a typographical error because you were not retained until February of 2026, correct?

A.    Correct.

Q.    So if we go now to the MLA itself, is this essentially an Excel spreadsheet?

A.    Yes, it is.

Q.    And are there formulas built into the MLA?

A.    There are.

Q.    And it looks like there might be a number of formulas scattered throughout the MLA but are there specific columns that have formulas?

A.    Well, of course, all the balances and all of those tables above, I mean, all of it's tied together and they help produce sub reports, you know, that break

Page 77

down different things.  So I mean there's formulas scattered all throughout these things.

Q.   So if we're looking at the MLA, instead of having you look at your version because it's a pretty difficult item to share on a screen, it's rather small, but my version of these has, you know, certain color-coded sections.  For instance, there's a row or a section that's called applied account balances, and it's all color-coded light blue.  Do all of those columns have built-in formulas?

A.   They do, yes.

Q.   And then if we are looking at the applied account transactions section, do all of those columns have formulas built in?

A.   No, those don't have formulas.

Q.   Are there any formulas in the applied account transaction section?

A.   The only time there would be formulas in there are if I import any transaction date in there, I use it to facilitate calculating the interest.  Instead of having to manually enter it, I might put formulas in there to help speed that along, but I don't think that was done in this case.  But I can't tell for sure.  I'd have to look.  But there might be some formulas imbedded in there just to help facilitate some of those

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

repetitive transactions.

Q.   Then if we look above that applied account transaction section, there's some color-coded boxes left to right painted green, blue, beige, the colors that I'm looking at, so on the very right side it has "Applied Totals Schedule."  Are all of the monetary amount stated in there derived from formulas?

A.   Yes.

Q.   Okay.  So none of these numbers in this applied totals schedule are manual entries; is that correct?

A.   That's correct.

Q.   These are just formulas based on entries within the MLA?

A.   That's correct.  That's a good way to put it.

Q.   The section next to that title "Payment Total Schedule," just a few numbers in here.  Are these manual entries or are these derived from formulas?

A.   They're derived from formulas.

Q.   Is the formula kind of an -- what's the best way of putting this.

Is this formula basically manual entries by you, for instance, entering specific boxes into a formula, for example, an Excel spreadsheet of E12 plus E16 equals a number or is this an automated formula based on entries within the MLA?

Page 79

A.   Well, I mean, no.  It's not just a E12 plus A13.  These numbers in these boxes are dependent upon what the codes are and the payment codes, the applied code, the event code, and they break them out so we can have different totals for different subsections depending on what I'm analyzing.

Q.   Okay.  So this is -- this sounds like it's a pretty complicated formula.  Is that fair?

A.   Yeah.

Q.   For the formulas used in this specific MLA, are these the same formulas that you use in all and lease?

A.   Yes.

Q.   And?

A.   Well, the situation might be different.  I mean, this instance, this particular case, we had four instance -- four different events of reversals and reapplications.

In another case, I might have a bankruptcy that I might have to separate out all the totals or I might have two or three bankruptcies.  Just depends on the case, but the MLA is geared up to break down different subsections so we can show the numbers for each one of those subsections if we need to.

Q.   I guess what I'm trying to understand is the formulas for the MLA that you use, is it essentially the

Page 80

same; it's just dependent upon the various factors that go into that specific case?  It could slightly alter the number of events in calculations within that formula. Is that fair?

A.    That's fair, yeah.

Q.    Okay.  So then looking at the transaction data section of the MLA, there's a number of columns, and the first column -- well, the second column says source code, and then if I look at the top, it looks like there's a source code legend that's color coded green, so is the source code within the transaction data identifying the source in this legend?

A.    Yes.  That's identifying where the number that you're seeing on that particular line came from whatever I've put in this as a source code, whatever document.

Q.    So for line one, it says source code one, and if we look at the source code legend, source code one states PHH payment history March 21st, 2025.  Is that correct?

A.    Yes.

Q.    So for any -- for every single line the MLA there will be a source code identifier of where you pulled that data from; is that correct?

A.    Yes.

Q.    How did you decide which source to pull the

Page 81

data from for each entry in MLA?

A.    Well, it's -- depends on where the data is. You know, there's additional data on -- between the two payment histories because they're dated differently so I went to the latest -- you know, I wanted to get data in there for the latest date.  And then there's a breakdown of how the corporate advances were classified, not in the payment history but in the fee report so I incorporated that into the MLA which is why you have a fee report because I was able to distinguish what was recoverable and not recoverable so --

Q.    And notice in your source -- the sources that you relied on, so just for clarity, when we're looking at this MLA, the source legend identifies three sources. First is PHH payment history March 21st, 2025.  The second is PHH history April 14th, 2025.  And the third is fee report, hyphen, recoverable.  Are those the only sources you relied upon in generating your MLA?

A.    Yeah.

Q.    Now, I noticed that one of the items that you did not use are the mortgage statement for the loan.  Is there a reason why?

A.    Well, I would have gotten the data from the payment history.  That's where I want to get it from, from the system history.  That's my primary source.

Page 82

Q.   Okay.

A.   If I had payment statements that were dated after payment history and I needed to put them in there, then I would have, but usually I rely on payment history as my primary source.

Q.   And source code one says, you know, PHH payment January 21st, 2025.  Can you explain to me what that is.

A.   That's the customer account activity statement.

Q.   And what's the date referenced on there?

A.   The date the report was run, the payment history was run.  I believe.  I'd have to go look, but --

Q.   Okay.  So if we look at line one of the MLA, it's highlighted yellow, beginning balances, and the only information on line one is within the applied account balances section.  Do you see that?

A.   I do.

Q.   Were these numbers manually entered by you?

A.   Yes.

Q.   So then if we go to line two, it says source code one, and then has, it says CA code.  What is that?

A.   Corporate advance code.

Q.   And it says one.  What does that mean?

A.   One would be recoverable.

Q.   And where did you pull that information from?

Page 83

A.    The fee report.

Q.    So the fee report states recoverable or nonrecoverable; is that correct?

A.    Well, line two was derived from the payment history, but I pulled the fact that it was recoverable under the CA code, I would have pulled that from the fee report because that's where it distinguishes what's recoverable or not.  The payment history does not distinguish that.

Q.    Then you have a code either one or two for whether it is identified within that source code as recoverable or nonrecoverable; is that correct?

A.    I was looking at these codes.  Let's see what I used them for.  I'd have to go back and look on the CA code and see exactly what the one and two were.  I don't think they were for recoverable or not.  They might have been used for a different event.  I'd have to go back and look and see exactly what I used them for.

Q.    What would you have to look at to verify that?

A.    I don't know.  I need to just see what the difference.  I think they might have been for what was included in the settlement agreement and not in the corporate advances that were in the settlement agreement.  And corporate advances that were not in the settlement agreement, I think I might have used

Page 84

different CA codes for that.  I need to double check that.  It looks like that's what I did.

Q.   So if we're looking at -- if we go back to the top where it says payment total schedule, the section that's color coded blue, it says code.  It's the first column of that color-coded section?

A.   Right.

Q.   And has description.  So code one description is S-A R-E-I-N-S-T-P-M-T is that the shorthand for settlement agreement reinstatement payment?

A.   Yes.

Q.   So code one is settlement agreement and code two says PHH hyphen credit?

A.   Those one and two in that particular type will go into the payment code column, not the CA code column.

Q.   Okay.  So if we -- looking back in the transaction data section under the MLA, there is another column, looks like it's the fourth column.  It says PMT code.

A.   Right.

Q.   So that is where the code for the payment total schedule section would appear, correct?

A.   Correct.

Q.   Okay.  So then it does not appear that this CA code has a legend for it within the MLA; is that

Page 85

correct?

A.    That's correct, but just looking at it and I can tell you it was the one and the two and the threes were used.  One was what corporate advances were incorporated in the settlement agreement.  Two and three were what were assessed outside of the settlement agreement.

Q.    What's the difference between two and three?

A.    I don't know.  Maybe when we take our break, I'll check it.  I don't remember and I just need to look.

Q.    So in looking back at the top, there's a section that's inkish purplish color.  Says, "Time period, slash, event legend."  Do you see that?

A.    I do.

Q.    And it has codes in capital letters A, B, C, D, E, F.  Where would I find those codes within the MLA?

A.    Under period code, P-E-R code, the third column.

Q.    Okay.  And in the fifth columns where it says PMT space CT, what is that?

A.    A count so I can keep track of how many payments were applied.

Q.    Payments applied from what time period?

A.    Any time period.  Just keeps a running count of

Page 86

how many payments were applied.  And the reason for this is because we have so many reversals and reapplications, we have to count how many ultimate payments were applied.

Q.   And in this column looks like there's a series of just ones and negative ones.

A.   Correct.

Q.   So that's not a running total then, correct?

A.   Well, it's a total so I can count how many payments were applied.  So if you have a payment that's applied and then that payment was reversed, it's a one and a minus one, so it cancels out.  So we want to find out during each one of these events how many payments were applied during those events.

Q.   Now, is it the number of total payments or is it payment for that specific due date of the loan?

A.   For how many -- well, payments are contractual due date, so each one of those counts as one payment.

Q.   So, for instance, if we go to MLA, line 558.

A.   Okay.

Q.   This is after series of reapplication of payments that, you know, according to your MLA it started on line five of nine for the dates August 31st, 2021 and September 1st, 2021, and I see the number one in that column for, you know, all of those payments.  So

Page 87

I'm trying to understand, you know, it's one payment for that month that was applied?

A.    No.    That's one payment for that due date, and if you go look at the breakdown of each event and how many payments were applied like for each application and reapplication tells you 59 or 47 or whatever, that counts.    For those events, it counts how many of those ones and minus ones there are.

Q.    Okay.    So that's all I'm trying to understand. In this column, the column itself, is it a running total, for instance, it's not counting from zero to 59, you go back down to zero?

A.    No.    It's one minus one, and it's just keeping count so I can total up how many payments were applied for each event.    If it's not this long, it would be for the whole thing.

Q.    And the next column says BK code.    I assume that's for bankruptcy.    Is that correct?

A.    Yes.

Q.    And there's nothing within that column because there's nothing here for bankruptcy, correct?

A.    That's right.

Q.    And in the next code says ESC code.    Is that escrow code?

A.    That's right.

Page 88

Q.    And there's a few entries in here, some shorthand.  I don't believe I saw a legend for this, but when it says HAZ, is that for hazard disbursements?

A.    Yes.

Q.    And T-A-X, those are property tax disbursements.

A.    Yes.

Q.    And there's another entry in here that says EV.  What is that?

A.    Event.  If I put a different event in there, I'll mark it with an E-V, so when I do a detailed schedule for the escrow account, the events can be listed in there so you can see what happened in between events or before or after.

Q.    And then there's another says P-M-T.  Is that anytime there was payment made for escrow?

A.    Payment applied.

Q.    So that's specifically for payment applied to escrow?

A.    Correct.

Q.    And then the next column says fee code.  I don't see anything in that column.  What was that column?

A.    Well, if there was any fees that were in the fee column over there on applied account transactions,

Page 89

if there were any fees, then I might have used some fee code to, you know, distinguish them, but there were none so all the fees were corporate advances like charges, so --

Q.   Okay.  So paragraph one of your report says the MLA uses the same mathematical functions and logic as the servicer systems use.

A.   Got it.

Q.   What foundational knowledge do you have of how the functions and logic of the servicing system are?

A.   Well, you got the basic fundamentals of accounting for mortgage loan servicing transactions. You've got the money coming in and it's allocated to different accounts.  And those accounts need to balance, so that's the foundation of logic, and that's the same logic that I'm using in the MLA except I'm keeping -- keeping it in a more organized fashion and using the running balances for all of the accounts and not just some of the accounts that the payment history shows.

Q.   So you're talking just kind of more generally this is the purpose of the servicing system to accomplish this?

A.   Well, the servicing system does accomplish that.  It takes payments and applies them and allocates them, and that's what MLA does too, uses the same logic.

Page 90

Just a little more detail.

Q.   Okay.  Moving to page six of your report at the bottom, this is part of the section called Background and Timeline.  There's an item dated May 28, 2020.  States, "Reinstatement funds were paid by borrower to PHH for the amount stated in the SA plus three additional contractual payments for a total of $168,468.78."  What did you rely on to make this conclusion?

A.   The note from the -- I think the letter from the attorney to PHH with the submitted funds.

Q.   How did you determine what the contractual payments were?

A.   Because they were listed on the transmittal letter, they were for those payments.

Q.   The amount stated here does not include the escrow payment for those three additional contractual payments, correct?

MR. CHRISTENSEN:  Objection.  Vague and ambiguous.

THE WITNESS:  I don't remember.  I'd have to look and see.

BY MR. SCHNEIDER:

Q.   Do you know if there was another portion of the contractual payment at that time?

Page 91

MR. CHRISTENSEN:  Objection to the extent it asks for legal conclusion.

THE WITNESS:  Three payments, extra payments, is that what you're asking about?

BY MR. SCHNEIDER:

Q.   Yes.  You state plus three additional contractual payments, and I'm trying to figure out how you determined that money was sufficient for the contractual payments.

MR. CHRISTENSEN:  Objection.  Misstates the report and the evidence.

THE WITNESS:  I don't know.  I'm just telling you those were those three payments per the letter.  I don't know if you're getting into the legal thing there.

BY MR. SCHNEIDER:

Q.   Do you know if the $168,468.78 was sufficient to cover the reinstatement amount for the settlement agreement plus the principal and interest and escrow for the loan at that time?

MR. CHRISTENSEN:  Objection.  Misstates facts.

THE WITNESS:  Whatever I put in my report is what I'm saying.

BY MR. SCHNEIDER:

Q.   Have you seen the annual escrow statement dated February 11th, 2020 for this loan?

Page 92

A.    I believe I have.  I'm looking for it right now.  February 11th, 2020, it's on paragraph 73 of my report.

Q.    And that annual escrow statement indicates there's a shortage in the escrow account, correct?

A.    That's correct.

Q.    And that annual escrow analysis indicates that the new payment with shortage, a total payment would be $4,749.48.  Is that correct?

A.    That's what it says, yes.

Q.    So on page six of your report when you say contractual payments, were you just pulling that language from what the letter said?

A.    I'm really quoting what the letter said, and they were for those three monthly statements and that's what they sent the money for, so --

MR. CHRISTENSEN:  I'm sorry, Mr. Schneider. Are you talking about the words contractual payments on the report on page six or on page seven?

MR. SCHNEIDER:  I'm asking him about page six.

MR. CHRISTENSEN:  Okay.

BY MR. SCHNEIDER:

Q.    All right.  Moving to page eight of your report, paragraph 25, it states that paragraph one, the settlement agreement states as follows.  It contains a

Page 93

table itemizing the allocation of the reinstatement
amount.  Do you see that?

A.   I do.

Q.   What do you mean by allocation of the
reinstatement amount?

A.   Allocation to the principal, interest, escrow
advances, fees and credits, how it's to be divided up.

Q.   Is it your position that the settlement
agreement states how the funds will be applied to the
account?

A.   All my position is that this is a table that
details the amounts that are shown.  It's not
interpreting anything that's in the settlement
agreement.  It's not interpreting any language.

Q.   I'm just backing up.  When you say allocation
of the reinstatement amount, do you mean that these were
the amounts that were calculated to determine what the
reinstatement amount was?

A.   I don't know.  I'm just telling you this is the
amounts that are shown as principal, interest, escrow
advances and other fees and credits, and this is how
they're allocated or supposed to be allocated out and
that's what I'm stating in my paragraph 25 and showing.
That's all.  I don't know if anything's right or wrong.
I'm just saying that's what it says.

Page 94

Q.   I'm just trying to understand what you mean by allocated.  Are you simply saying that these are how the amounts are allocated for creating the total reinstatement amount or are you saying this is how the amount should be allocated when the reinstatement funds are received and applied?

A.   I'm not saying --

MR. CHRISTENSEN:  Objection.  Excuse me.  I'm sorry.  Objection.  Vague and ambiguous.  Misstates testimony.  I mean, paragraph 25 is a screen shot of the settlement agreement.

MR. SCHNEIDER:  Counsel, I'm not asking about the settlement agreement.  I'm asking him about his statement and he says itemizing the allocation of the reinstatement.  I'm trying to understand if he's simply saying these are the amounts that are allocated for the reinstatement amount or this is how the funds for reinstatement should be allocated by PHH upon receipt.

THE WITNESS:  All I'm saying is it says that the $158,000 is required to reinstate the loan and this is how it's broken out in those different categories.  That's all I'm saying.

BY MR. SCHNEIDER:

Q.   Okay.  Does the settlement agreement state how the funds will be applied to the account?

Page 95

A.   I have no idea.

Q.   Do you have any opinion on whether the settlement agreement states how the funds will be applied to the account?

A.   No.

Q.   So when you use the term allocation, you're merely saying that the settlement agreement states this is total reinstatement amount and it consists of these amounts?

A.   That's correct.

Q.   All right.  And the settlement agreement also states that upon application of the reinstatement amount the unpaid principal balance will be reduced to $452,180.41.  Is that your understanding of what that says?

A.   That's what it says.

Q.   And it also says that the loan will be contractually due for the March 1st, 2020 statement; is that correct?

A.   That's what it says.

Q.   So then moving to paragraph 26, you further broke down the itemized amount included in the settlement agreement of other fees and you separate this into late charges and corporate advances.  You clearly did that because they represent different allocation

Page 96

accounts within the MSP servicing system.  Why did you do this?

A.  Because they're combined as other fees in the settlement agreement breakdown.  Other fees, 48 60, and all I did was take that and separated them between late charges and corporate advance because it does mean something later on down the line when they're reapplied, reversed and reapplied payments.  Those two numbers.

Q.  Why does that matter?

A.  Because -- well, for one thing, the 3,341.92 was the amount of corporate advances that were in the system that's recoverable at the time of the settlement agreement, and that's the amount that was ultimately given credit for that exact amount.  Plus the 1518.32 for late charges was given credit and reversed out for that exact amount or it was applied and reversed out at different times during those reversal events, so does matter.

Q.  So are you saying that these exact amounts had to be allocated in this way?

A.  Well, those were the balances of those -- they're separated.  Late charges and corporate advances are separated in MSP system.  They were combined in the settlement agreement, so I separated them back out so we can keep track of them.

Page 97

Q.   All right.  Paragraph 27 states that the borrower sent reinstatement funds in the amount of $168,468.78 on or around May 28, 2020, and this amount included the $158,125.89 shown on the table above plus an additional $10,342.89 representing three months, three contractual principal and interest payments for the months of March 1st, 2020, April 1st, 2020 and May 1st, 2020.

Do you know what the contractual principal and interest payment was for March 2020?

A.   $3,447.68.  Contractual principal and interest payments.

Q.   And how did you calculate that amount?

A.   That's the principal and interest payment for those based on the interest rate and amortization loan.

Q.   So how did you calculate that number?

MR. CHRISTENSEN:  Objection.  Misstates the report how he calculated it.

THE WITNESS:  I mean, that's the number that was sent per the borrower's letter, transmittal letter, saying we're sending those three monthly contractual principal and interest payments plus the hundred fifty-eight thousand.  I don't know how much more clear I can get.

BY MR. SCHNEIDER:

Page 98

Q.    I'm just asking you how you determined what the monthly contractual principal and interest payments were.

A.    I didn't determine it.  Those are what the monthly payments were for those three months based on what the total amount that was sent.

Q.    Right.  And then I asked you what did you believe the monthly contractual principal and interest payment was at that time, March 2020.

A.    Oh, what do I believe.  Okay.  I'm sorry.  I misunderstood you.

I believe it's the 3047.63 and -- that's what I believe it is.

Q.    Why do you believe that it's that amount?

A.    Well, because that's the amount of principal and interest that is due for those months.  I don't know any other way to put it.

Q.    How did you calculate that amount?

A.    I did not calculate it.  That's what it says.

Q.    Right.  And I'm now asking you your opinion of what you believe the amount was, how you determined that that's what the monthly principal and interest payment was and how you came to that determination.

A.    Okay.  I determined it based on the transmittal of the reinstatement amount that was sent in.  That's

Page 99

how I came to that conclusion.

Q. Have you done any calculation on your own of what you believe the monthly contractual principal and interest payment is?

MR. CHRISTENSEN: Objection. Misstates the report. Talking about whether he calculated or whether got the documents and records in the case. It's not a fact that's in dispute.

THE WITNESS: I'm sorry. I'm not understanding. Repeat the question.

BY MR. SCHNEIDER:

Q. Have you completed a calculation for what you believe the monthly contractual principal and interest payment is for March 2020?

A. I don't believe I did. I'd have to look back and see.

Q. So if we go to page 17 of your report.

A. Okay.

Q. Paragraph 66, "My examination found that this payment would satisfy the 06/01/2020 through 12/01/2020 P&I payments in the amount of $3,432.96 each with $102.69 overpaid." And as a footnote, number 10, the contractual principal and interest payment per my calculations is $3,432.96.

A. There you go.

Page 100

Q.    Have you done a calculation as to what you believe the principal and interest was?

MR. CHRISTENSEN:  Objection.  Vague and ambiguous, and misstates the testimony.

MR. SCHNEIDER:  Enough speaking objections.  I haven't misstated anything.  I asked him if he completed a calculation.  Now I'm showing him that he states he completed a calculation.  I'm simply trying to get his opinion on what he believed the principal and interest payment.  These aren't difficult questions.

THE WITNESS:  These are not difficult questions, and I would hope that this gotcha stuff has got to stop.

BY MR. SCHNEIDER:

Q.    Mr. Patterson, this isn't gotcha anything.  I'm asking you questions and your counsel is making this more difficult.  I'm simply trying to understand what you believe the principal and interest payment is.  It's in your report.  This wasn't a gotcha.  This is something that was in your report that you did.

A.    Right, and you pointed me to that right then. I'm sorry if I forgot that I made these calculations in footnote number 10, but there you go.  I don't know any other way to say it.

And so the amount that's in that -- the amount

Page 101

that's in that paragraph we just talked about, 3447, according to my calculations is not the correct amount for principal and interest contractual payment.

Q.   In fact, it's excessive, correct?

A.   It's excessive, yes.

Q.   All right.  So moving to paragraph 30 of the report, it states that according to my examination and analysis of the accounting transactions in the amounts per the reinstatement payment, a total amount of $201,589.73 was to be allocated in the loan accounting system for the Mayer loan as shown below.

These amounts will be referred to in this report as the Settlement Reinstatement Event.  Includes a chart, you know, breaking down how you calculated this total of 201,589.73.  And then the next paragraph explains that this amount includes the $168,468.78 paid by the borrower plus a credit of $33,120.95.

A.   Got it.

Q.   So to be clear for your report, you're assuming that the credit identified in the settlement agreement is a complete waiver or discharge of those amounts due from the loan, correct?

MR. CHRISTENSEN:  Objection.  Vague and ambiguous, calls for legal conclusion.

THE WITNESS:  I didn't say discharge or

Page 102

anything.  I'm just saying it was a credit.

BY MR. SCHNEIDER:

Q.  What do you mean by credit?

A.  Amount that's given subtracted from the balance due.

Q.  And how did you determine that's what it was?

A.  That's what it says in the agreement.

Q.  In what agreement?

A.  $33,120.95 credit.

Q.  In what agreement?

A.  The settlement agreement.

Q.  So the settlement agreement states a line item for credit, $33,120.95, and you interpreted that credit to be a credit of those amounts due from the loan; is that correct?

A.  Correct.

Q.  Now, while I was asking these questions, your counsel objected on the basis I was asking you to form a legal conclusion, but for purposes of your report, you assumed that the credit was in fact a credit of those amounts to the loan.  I mean isn't that correct?

A.  It says it's a credit.  I don't know any other way to put it.  I'm not saying it's right or wrong or legal conclusion or not.  It says credit, so that amount comes off of amount that's shown as a total.  I don't

Page 103

know how to be any more clear than that.

Q.   Have you reviewed any court order that has found that that is not how the credit is supposed to be treated?

A.   No, I have not.  I didn't even know there was a court order.

Q.   There is no court order right now that says that is how the credit is supposed to be treated, so my point is you are making an assumption throughout your report that that credit was supposed to be a full credit given to the borrower to reduce the amounts due on the loan; is that correct?

A.   Yeah.  Then you all eventually did that, so it what's the point of contention here?

Q.   Do you have any qualifications to make the determination that the credit is supposed to be treated in this manner?

A.   It's my accounting experience, when you see something that's a credit, then that goes against an amount that's shown as the total.  Subtraction math.  I mean, that's my experience with it.  Pretty basic.

Q.   Right.  But it's shown as an amount credited towards the amount required to reinstate.  Isn't that correct?

A.   I don't know.  There's a total amount and

Page 104

there's a credit.  An amount and less the credit, and that's what I'm showing.  Whether it's an amount to reinstate or whether it's right, wrong, does not matter to me.

Q.   Well, it matters for purposes of your report. I mean, in your report, you say the settlement agreement includes the reinstatement amount.

A.   That's what the settlement agreement says.

Q.   Right.  There's a credit included toward the reinstatement amount.  That's what the breakdown says, correct?

A.   That's what it says.

Q.   Is there anything in the settlement agreement that shows how the credit was to be applied?

A.   I don't know.

Q.   Do you know if it was to be taken off the principal balance?

A.   I don't think so.

Q.   Do you know if it was to be taken off the total interest?

A.   I don't think it was.

Q.   Is there any document you have reviewed that explains how that credit was to be applied?

A.   No.

Q.   So if we move to paragraph 34 of your report,

Page 105

has a breakdown of the initial application of the
payment on May 29, 2020 and June 1st, 2020.

A.    Okay.

Q.    How did you determine this?

A.    Broke down the amount that were applied and
reversed based on the payment history.

Q.    All right.  And are all of these numbers pulled
from your MLA?

A.    Yes.

Q.    And in paragraph -- this is the first time --
well, this is the first time you see what you call a
variance analysis.  The second column says per SA.  Does
that mean pursuant to the settlement agreement?

A.    Yes.

Q.    All right.  But this column also includes the
three additional payments for principal and interest for
March, April and May 2020, correct?

A.    Yes.

Q.    So is it your opinion that those payments were
included in the settlement agreement?

A.    I don't believe they were.

Q.    So why did you include them under your column
of per the settlement agreement?

A.    Because they were included with the amount that
was sent in after the settlement agreement was executed

Page 106

plus the three payments.

Q.   But isn't it true the settlement agreement only provided for reinstatement amounts for February 2020 to make the loan due for March 20?

A.   Yeah, that's true.  I probably could have brought them down a little further, but for this purpose, I think it serves its purpose.

Q.   The settlement agreement did not contemplate any of these post-reinstatement amounts, correct?

A.   It did not.

Q.   So I mean isn't it a little confusing to include items not contemplated by the settlement agreement and label them per the settlement agreement?

MR. CHRISTENSEN:  Vague and ambiguous.  Object to form.

THE WITNESS:  It's not to me.

BY MR. SCHNEIDER:

Q.   And in this variance analysis, you have a row titled credit hyphen per SA.  And you identified it as zero dollar requirement.  What are you saying in that row right there?  Are you saying there was no obligation to provide a credit to Mr. Mayer's loan?

A.   No.  That amount, that 32,000 is included in that 43,000 in escrow advances.

Q.   Okay.  So you moved the credit into escrow

Page 107

advances; is that correct?

A.    Well, you look at the settlement agreement, says escrow advances 43,537.56 and that's the amount of the escrow advances that were due at the time.  So I didn't move the credit.  I moved the amount.  The total amounts that were due from the settlement agreement is 201,589.73.

Q.    So then the third column says per actual.  It shows in your opinion where the $168,468.78 in funds were applied in May 29th, 2020 to June 1st, 2020; is that correct?

A.    Yes.

Q.    And then that matches kind of the same calculation from paragraph 34; isn't that correct?

A.    Yes.

Q.    And in the second row -- strike that.

So then the final column says variance, and is that simply just the difference between what you've identified as pursuant to the terms of the settlement agreement and then per your calculation of the actual application, the difference between those amounts?

A.    Correct.

Q.    And for principal and interest, the second row you indicate a variance of $44.01.  Do you see that?

A.    I do.

Page 108

Q.   Do you know why that variance exists there?

A.   44.01?

Q.   Yes.

A.   I don't.  I would have to go back and look.  I don't know why it's different.

Q.   Do you believe the difference can be explained by an improper calculation of principal and interest?

A.   Probably.

MR. CHRISTENSEN:  I'm sorry.  Objection.  Vague as to what you mean improper, which calculation you're referring to is improper.

BY MR. SCHNEIDER:

Q.   So if we go back to paragraph 30, this explains the items that you stated per settlement agreement must be paid and how you reached the total amount for the settlement agreement and includes the principal and interest payments for September 1st, 2014 to February 1st, 2020 per the settlement agreement.  Escrow advances per settlement agreement.  Fees late charges per settlement agreement.  Then it has three line items for escrow advances, late charges and corporate advances per the settlement agreement, and the next three line items are principal and interest payments for March, April and May 2020 of $3,447.63 each.  You see that?

A.   Are you asking me?

Page 109

Q.    Yes.

A.    Yes, I do.

Q.    So three monthly payments of $3,447.63, 10,342.89; is that correct?

A.    Sounds correct.

Q.    What if we take the actual principal and interest payment amount of $3,432.96, that $10,298.88; is that correct?

A.    Then that would be why the 44.01 is there.

Q.    So the variance that's listed here for principal and interest is actually based on the miscalculation by Mr. Mayer's attorneys of what the principal and interests payments were compared to what they actually are; is that correct?

A.    That's what it looks like.

Q.    So then the application of -- the initial application described in paragraph 35, the correct amounts were actually applied to principal and interest, correct?

A.    Yes.

Q.    And then paragraph 36 explains that in your opinion the amount applied does not equal the SRE and are under-applied by $33,120.95.  Is that correct?

A.    Yes.

Q.    This amount is the exact amount of what was

Page 110

labeled credit in settlement agreement; is that correct?

A.    Yes.

Q.    And then you acknowledge that the due date was brought to June 1st, 2020 which is correct.  Is that accurate?

A.    Yes.

MR. CHRISTENSEN:  Good time, Mr. Schneider, to take a two-minute break?

MR. SCHNEIDER:  That's fine.

THE WITNESS:  How long?

MR. SCHNEIDER:  Couple minutes.

MR. CHRISTENSEN:  Five minutes.

(Break taken from 2:05 p.m. to 2:13 p.m. CDT.)

BY MR. SCHNEIDER:

Q.    So prior to taking our last break, we were talking about paragraph 36 and your opinion that the only difference between the first application that was completed in June 1st, 2020 and what you call the settlement reinstatement amount was the credit of $33,120.95; is that correct?

A.    Yes.

Q.    So let's just walk through a quick hypothetical.  So in this hypothetical, the credit is actually not a credit towards a loan; it was simply just a credit towards the amount required to reinstatement?

Page 111

MR. CHRISTENSEN:  Objection.  Misstates the prior testimony.

MR. SCHNEIDER:  I'm walking through a hypothetical, Counsel.

Q.   So in this hypothetical, this credit is not a credit to the loan; it's only a reduction for what was required to reinstate the loan for settlement purposes. So this $33,120.95 remains due and owing by Mr. Mayer in this hypothetical.  So this amount remains due and owing, then the application submitted on June 1st, 2020 would be accurate, correct?

MR. CHRISTENSEN:  Objection.  Vague and ambiguous.

THE WITNESS:  I don't know what --  I'm confused as to the whole hypothetical.  You're saying -- just walk me through it again, real slow to this stuff so hypothetical, so --

BY MR. SCHNEIDER:

Q.   I'll back up and simplify it.  Paragraph 36 states that the only difference is that the credit identified in the settlement agreement was $33,120.95 was not posted to the account.  Is that your opinion, that the only difference following the first application is that the credit was not posted, correct?

A.   Correct.

Page 112

Q.   So in the hypothetical, the credit is not a credit.  It does not have to be posted to the account.  So assuming that, the application on June 1st, 2020 would be accurate.  Is that correct?

MR. CHRISTENSEN:  Objection.  Vague, the word accurate.

THE WITNESS:  So you're saying that if the -- hypothetically if the 33,000 was not in the settlement agreement, was not or if it was just supposed to be a separate credit, not applied to the loan.  Is that your hypothetical?

BY MR. SCHNEIDER:

Q.   Yeah.  In the hypothetical, the item labeled credit does not have to be applied to the loan.

A.   Would the amount that was paid, the 168, be enough to reinstate the loan?  Is that your --

Q.   No.  With the application of that amount by PHH correct?

A.   Of the 168?

Q.   Yes.

MR. CHRISTENSEN:  Objection.  Vague and ambiguous as to correct as to any number of the many ways the payment can be applied to the loan applying different items on any different date.

THE WITNESS:  Well, I don't know.  I need to

Page 113

think about it.  The actual application of the 168 is what it is.  I mean, that's what they applied as principal, interest, escrow fees, corporate advances and late charges that were assessed post-settlement agreement.  So, I mean, I don't know if I can say it was accurate or not because it doesn't appear to be.

Q.   I'll ask it in this way.

A.   Okay.

Q.   We're still on this hypothetical where this credit does not have to be applied to the loan count.

Following the June 1st, 2020 application, the loan was brought current to June 1st, 2020; is that correct?

MR. CHRISTENSEN:  Objection.  You can't ask him to confirm the hypothetical.

THE WITNESS:  No.  I mean, I told you it was brought -- you know, the loan was brought current to June 1st.  I said that.

BY MR. SCHNEIDER:

Q.   Right.  And you're also identifying that the only difference between the June 1st, 2020 application and the settlement agreement is the credit that was identified in the settlement agreement not being posted to the account; is that correct?

MR. CHRISTENSEN:  Objection.  Misstates prior

Page 114

testimony.  He was just talking about the dollar amount different than any other application is incorrect.

THE WITNESS:  I said that the 33,129 was not applied to the account.  The loan was brought current.  I did say that.

BY MR. SCHNEIDER:

Q.  That's fine.  You go on to state in paragraph 36 that $30,266.28 remain due in escrow advances.  Are you providing any opinion on that amount that remained due?

MR. CHRISTENSEN:  Objection.  Vague and ambiguous.

THE WITNESS:  That's the amount that -- I mean, that escrow advances decreased by that amount after application of that payment.  It's a fact.

BY MR. SCHNEIDER:

Q.  You also state, "It is also noted that $343.22 of these funds were applied to late charges assessed post-settlement agreement?

A.  Correct.

Q.  Do you have an opinion on the assessment of those late charges?

MR. CHRISTENSEN:  Objection.  Vague.

THE WITNESS:  No.  I just made a note that they were assessed after the settlement agreement was

Page 115

executed.

BY MR. SCHNEIDER:

Q.    Okay.    Now isn't it true that the payment post-settlement became due on March 1st, 2020, April 1st, 2020 and May 1st, 2020?

A.    That's correct.

Q.    And isn't it true that those payments were not made until May 28th, 2020?

A.    Right.

Q.    So those payments were made late then, correct?

MR. CHRISTENSEN:    Objection to form.

THE WITNESS:    Well, the point of me noting that is because the application of $168,000 paid off that were applied to the complete balance of the late charges that were outlined in the settlement agreement, so an additional amount of 343 were applied to the late charges that were assessed after the settlement agreement which is outside of those amounts that was detailed and broken out in the settlement agreement.    So that's why I made note of that.

Whether that was right or wrong or the payment was late or not is not -- you know, is immaterial for me.    It's just that they were applied to late charges that were assessed after the settlement agreement.

BY MR. SCHNEIDER:

Page 116

Q.   So you do not have an opinion on whether that was correct or incorrect?

A.   I'm not telling you whether it's right or wrong.

Q.   Paragraph 49 of your report, this is the fourth time we see what you call variance analysis, and was this completed in the same way that the first variance analysis was completed?

A.   Yes.

Q.   So everything we've discussed about the first variance analysis including what was included as the principal and interest payment and the $44.01 payments, you know, those types of things, those all remain true, correct?

MR. CHRISTENSEN:  Objection.  Vague.

THE WITNESS:  Correct.

BY MR. SCHNEIDER:

Q.   Okay.  So then going to paragraph 50, you state that the amounts applied do not equal the settlement reinstatement.  I've now forgotten how these things work.  Does not equal the SRE and are under-applied by $33,120.95; is that correct?

A.   Yes.

Q.   So now this is a slight difference from the first variance analysis we looked at that stated the

Page 117

amount difference was the full amount labeled as a credit in the settlement agreement of $33,120.95?

A.    Yeah.

Q.    Do you know where that $600 approximate difference came from?

A.    Yeah.  If you go back and look at footnote eight on page 12, I see a reversal amount increased, 168,468 to 169, and the reason was an imbalance in the reversal.  So there was an application of one amount and that $600 was not reversed, which caused it to be 600 and something dollars difference.  And that's why that amount changed.  Instead of the 32,501, it went up to the 30 whatever that number was.  That's why.

Q.    And in paragraph 50, you again confirm that the due date was brought to June 1st, 2020 which is correct. And then it also states that subparagraph D and E, that $686.44 of these funds were applied to late charges per post-settlement agreement.  Is this just you stating a fact or are you providing an opinion on how the funds were applied?

A.    Funds were applied.

Q.    Okay.  And the same goes for subsection E. Says $463.80 of these funds were applied to corporate advances post-settlement agreement.  Are you simply stating what you believe to be a fact?

Page 118

Veritext Legal Solutions

866-299-5127          calendar-ca@veritext.com          www.veritext.com

A.    That's correct.

Q.    And just to be clear, you're not providing an opinion as to whether it was proper or improper to apply the funds to post-settlement agreement corporate advances?

A.    That's correct, I'm not.

Q.    And moving to page 15, there's a section titled PHH Credit on January 6th, 2022.  Is it your opinion that this was the date of the first credit provided back to PHH?

A.    Yes.

Q.    So if we go back to your MLA, line 573, let me know when you're there.

A.    I've got it.

Q.    It states there's interest on escrow for December 31st, 2021 and it appears that there is a credit given of $99.05.  Is that accurate?

A.    Yes.

Q.    Do you know what this credit is?

A.    Interest on escrow.

Q.    And do you know what interest on escrow is?

A.    Yes.

Q.    What is it?

A.    Escrow balance gets credited with interest that's calculated on positive escrow balance.

Page 119

Q.   So why did you not count this as a credit given for Mr. Mayer's loan?

A.   Typically interest on escrow is the -- I mean, I usually don't.  I mean, I don't know what, no.  I mean, it's just interest on escrow.  It's a pretty common entry in mortgage loan accounts.

Q.   So why don't you count it?

A.   Well, I mean, I guess I could count it.  You're saying I should have said that's the first credit that was given, that PHH gave.  I mean, I guess you could say, yeah, that's the first credit to escrow, but that's not what we're talking about here.  We're talking about that, you know, $30,000 credit that they gave on January 6th, five days later.

Q.   Well, we're talking about any credits given to Mr. Mayer's loan; isn't that correct?

A.   Yeah.  Okay.  So they gave an interest on escrow credit on January 31st, 2021.

Q.   So I'll ask again because I'm not sure I've gotten an answer to it.  Why did you not count this credit as being credit provided to Mr. Mayer?

A.   Because I typically don't do that on a credit that's injected by the mortgage servicer for what we're dealing with in this case for an interest on escrow entry that's, you know, typically a common entry in all

Page 120

mortgage loan transactions.  I would never really -- I mean, I don't consider that a credit, the same type of credit they're giving on January 6th.

Q.   Well, how are you differentiating between these credits?

MR. CHRISTENSEN:  Objection.  Vague as to these credits.

THE WITNESS:  What credit?  Yeah.  I mean, escrow credits are different in my opinion because they represent different things.  A whole totally different set of circumstances.

BY MR. SCHNEIDER:

Q.   How are you differentiating that the interest on escrow should not be counted towards the credit provided to Mr. Mayer but that the separate entries on January 6th should be counted as a credit towards Mr. Mayer?

A.   Well, on the interest on escrow's on January 31st, that's one day, and a separate set of entries on January 6 for totally different set of credits, so, I mean, I just typically would not have done -- counted interest on escrow as a credit that was given to Mr. Mayer based on any type of settlement agreement or anything that happened prior to.  It's just something that he's entitled to with his escrow account

Page 121

for whatever reason he's entitled to interest on it.

Q.   Okay.  So you believe that Mr. Mayer was entitled to the credit labeled interest escrow?

A.   I don't know if he's entitled to it, but they gave it to him.  And it's a common entry.  It's something that we normally see in accounts with escrow, escrow accounts, interest on escrow.  That happens all the time.

Q.   So just based on your vast experience, you've seen that credit on other loans so you decided to not count that as a credit provided by PHH to Mr. Mayer?

MR. CHRISTENSEN:  Misstates prior testimony.

THE WITNESS:  That's exactly right.  I decided not to count it as a credit because it's a common credit.  I would not even think twice about that.

BY MR. SCHNEIDER:

Q.   Did anyone tell you to not count that as a credit for these calculations?

A.   No.

Q.   Is there anything in the documents you reviewed that state that that credit should not be counted towards the total credit provided to Mr. Mayer?

A.   No.

MR. CHRISTENSEN:  Objection.  Vague as to what documents.

Page 122

BY MR. SCHNEIDER:

Q. Did you review any documents provided or referenced in your report that you relied upon that state the credit should not count towards the total credit provided to Mr. Mayer?

A. There's no documents that say that, but I'm just telling you interest on escrow is a common entry that I would not count in another set of credits that were given for a different set of circumstances. These credits were obviously given because of the settlement agreement and trying to get the account done right, credited right. Interest on escrow really has nothing to do with it, I don't think. I mean I just don't see that. Something totally different.

Q. You testified that interest on the escrow is given when there's positive balances on escrow accounts; is that correct?

A. Yeah. Typically.

Q. And do you recall if there's ever a positive balance on Mr. Mayer's escrow account?

A. Well, there was at a point in time when they were reversing and reestablishing and reapplying his account. It was positive for a brief period of time. Maybe that's what they're giving credit on. I don't know, but I did not count it and would not count it in

Page 123

those sets of credits that were given on January 6th.

Q.   I believe you're talking about between May 2021 and August 2021; is that correct?  Sorry.  Strike that.

I believe you're talking about between March 2021 and August 2021 is when there was a positive escrow balance; is that correct?

A.   Yeah.

Q.   Did that positive escrow balance, was that a result of a misapplication of reinstatements of funds by PHH?

A.   Yeah, looks like it.  Looks like reversals and reapplications.  It was taken away as fast as it was given, within a few months.

Q.   So there should not have been a positive escrow balance during those months, correct?

A.   No.

Q.   So then any credit given for interest on escrow based upon those amounts that should not have been there should be credited towards PHH's total of credits provided to Mr. Mayer, correct?

MR. CHRISTENSEN:  Objection.  Incorrect hypothetical and misstates prior testimony, vague. Form.

THE WITNESS:  I'm not going to give interest on escrow in the same category the credits that were given

Page 124

on January 6th.  I would not do that.  I mean, that's just not something I would normally do.  So but --

BY MR. SCHNEIDER:

Q.    But that's just based on your own decision to do that.  There's no document or court order saying that you should not count that credit in your calculations, correct?

A.    There's no document or court other.  That's my decision.  I would never do that, you know.  Want to count it there, sure, why not.  They're still short.  So, you know.

Q.    Moving to paragraph 51, PHH posted a credit to the loan account, $30,787.55 on January 6th, 2022.

A.    Got it.

Q.    Paragraph 52 says, "It is believed this payment is a credit injected into the loan account by PHH."  What material did you rely upon to reach that conclusion?

A.    That's why I said I believed it is a credit injected into the loan account because I didn't see any payment from the borrower, I didn't see any -- or from the borrower's lawyer.  And it looks like there was no cash payment there.  It looks like it came from inside the -- you know, one-sided entry, so that's why I said I believed this credit was injected by PHH.

Page 125

Q.    Did you rely on anything from any of the documents that you relied on for this report to reach that belief?

A.    I said --

MR. CHRISTENSEN:  Objection.  Vague.  What documents and whether it included deposition transcripts or anything else.

MR. SCHNEIDER:  It's not vague, Counsel.  I said documents you relied on for in this report, which are specifically stated in the report.

THE WITNESS:  And I told you that the reason why I put I believe this payment was credit injected because there was no evidence of borrower payments and there was no evidence of any cash transactions in the payment history.

BY MR. SCHNEIDER:

Q.    So moving to paragraph 54 and it says, "The application of the reinstatement funds is shown in the table below," and you continue to break down these amounts pursuant to the amounts that they were applied to.  And then paragraph 55, and incorporates this section 54 per actual amount, and you have a new variance in paragraph 55 following the credit on January 6th, 2022, correct?

A.    Correct.

Page 126

Q.    So if we look at the fourth row, it's labeled "Escrow ADV."  That's advances, correct?

A.    Yes.

Q.    So the variance for escrow advances following the January 6, 2022 credits is now negative $521.21; is that correct?

A.    Yes.

Q.    So is it your opinion that as of January 6, 2022 PHH had applied amounts to the loan that had satisfied all escrow advances identified in the settlement agreement?

MR. CHRISTENSEN:  Objection.  Vague, misleading.

THE WITNESS:  Escrow advances were identified as 43,537, and they have cumulatively applied 44,058.83.  So that's the difference.  That's what the amount is.

BY MR. SCHNEIDER:

Q.    Correct.  And confirming that, as of January 6, 2022, PHH then applied amounts to the loan to satisfy all escrow advances identified in the settlement agreement, correct?

A.    Those are your words, not mine.  They applied the amounts and the exact amounts and whether they're satisfied or not, I'm not offering an opinion on that.

Q.    So your report states that per the settlement

Page 127

agreement, the escrow advances are $43,537.57, correct?

A.    Yes.

Q.    And your report also says that following January 6th, 2022, the escrow advances applied to the loan was for the $44,058.83, correct?

A.    That's right.

Q.    And that amount is in excess of what was stated in the settlement agreement, correct?

A.    $521.27.

Q.    So then your report confirms that PHH had applied amounts to the loan satisfied all the escrow advances identified in settlement agreement, correct?

MR. CHRISTENSEN:  Objection.  Misstates.

THE WITNESS:  I've never confirmed anything I'm just telling you what the numbers are.

BY MR. SCHNEIDER:

Q.    Right, and your numbers state that all of the escrow advances pursuant to the settlement agreement were paid as of January 6, 2022, correct?

A.    I'm telling you what was paid applied as to what was in the settlement agreement the difference 521.27.  You want me to make legal conclusions as to whether they were satisfied and I'm not going to do it.

Q.    That's not what I'm saying.  I'm saying, according to your report, paragraph 55 identifies a

Page 128

negative variance for the actual amounts you've identified were applied to escrow and the amounts that were identified in the settlement agreement, so according to your report PHH has over-applied $521.27 to escrow in comparison to what was identified in the settlement agreement.  That is what your report states, correct?

A.    They over-applied $521 to what was stated in the settlement agreement.

Q.    And in paragraph 56, subsection A states that the amounts applied do not equal the SRE and are under-applied but $1,714.42 for the variance analysis above.

Is it your opinion that $1,714.42 is the amount that still needed to be credited to Mr. Mayer's loan at that time?

A.    Yeah.  That's the amount that I said was under-applied, not enough credits so far.

Q.    And then paragraph C says $687.44 of these funds were applied to late charges assessed post-settlement agreement.  Once again, are you simply stating what you believe is a fact?

A.    Yes.

Q.    You're not providing an opinion as to whether or not the funds should have been applied to those late

Page 129

charges, correct?

A.    Correct.

Q.    And subsection D, $463.80 of these funds applied to corporate advances post-settlement agreement?

A.    Correct.

Q.    Once again, you were providing a fact there; is that correct?

A.    Yes.

Q.    And you're not providing an opinion as to whether or not those funds should or should not have been applied to post-settlement agreement, correct?

A.    Right.

Q.    In paragraph E, states that the fees, hyphen, corporate advances for the SA $3,341.92 remain unapplied due to a shortage in the credit and misapplication of the P&I escrow late charges.  What do you mean by that?

A.    So the unapplied balance by 3341.92 on that date is equal to the amount of corporate advances. 3341.92 is the amount shown in the settlement agreement for the corporate advances and that's the amount that shows remains not applied.

Q.    Okay.  So, once again, are you kind of stating a fact that that specific amount has not been applied?

A.    That's right.

Q.    Are you providing any opinion that these funds

Page 130

should be applied to that?

A.   No.   I'm just telling you that the amount 3142.92, that was the corporate advances in the settlement agreement had not been applied.

Q.   Can you confirm for me what opinion or opinions you are providing in paragraph 56?

A.   Exactly what I'm saying there.   I'm telling you exactly what the numbers are and how they were applied and what they are.

Q.   But we've walked through some of that and for a number of them, you're saying these are just facts.   I'm not making any opinion of that, so are you making any opinions in that paragraph?

A.   No.   I'm just telling you what the numbers are. That's my job.

Q.   I mean, I believe you said your job was, as an expert witness, to make opinions or findings on the accounting for the loan.   Is that correct?

A.   Right.   And I'm telling you what my accounting workup of the loan and how everything was applied and reversed and how everything balances out now and what remains and that's what I'm stating in paragraph 56.

Q.   And so what is the opinion that you're stating in paragraph 56?

A.   That is my opinion, what I'm stating in

Page 131

paragraph 56 and what the numbers are.  There's $1700 left that's under-applied.

Q.   So is that your only opinion, that there is $1,714.42 that are under-applied?

A.   No.

MR. CHRISTENSEN:  Objection.  Misstates the testimony.

A.   No.  My opinion is what's in paragraph 56.

Q.   Respectfully, this should not be that difficult.  You're walking this line.

A.   Respectfully --

Q.   You're walking this line.  I'm trying to understand what your opinion is, and you're just saying I'm just stating a fact here, so are these your -- are they facts, your opinions?

A.   Look --

Q.   What are your opinions?

A.   Well, if you'll give me a chance to talk, I'll tell you.

My opinions are, I'm going through the numbers and telling you what they are and how they balanced out.  My job is not telling you what's right or wrong or correct or incorrect.  I'm telling you what the numbers assessed out to be, so if you want to call it an opinion or a fact, you call it whatever you want, but paragraph

Page 132

56 is what paragraph 56 is.

Q.  Your job is to tell me your opinions.  You're an expert witness in a federal case hired to provide your opinions.

A.  And I'm --

Q.  Mr. Patterson, I'm entitled to your opinions.  This should not be that difficult for a seasoned expert witness.

A.  Sir --

Q.  I need to understand what you --

A.  I'm a seasoned expert witness.  I've been doing this a long time and I'm not going to get into the legal conclusion and trap of trying to provide something that you're trying to get me to do saying something is right or wrong.  That is not my job.

My job is to get the numbers and tell you how they were applied or how they were over-applied or under-applied, or how they were done.  And that is what I'm doing.  That is my opinion.  I don't have to tell you whether something is right or wrong, okay.

Like I say, respectfully, I've been doing this a long time.

Q.  Right.  So your whole opinion is to tell me what you believe has been correct or incorrect with the accounting on the loan?

Page 133

A.    My opinion is telling you what the numbers are.

Q.    So is your opinion that the amount applied to the loan were under-applied by $1,714.42 as of January 6, 2022?

MR. CHRISTENSEN:  Vague and ambiguous, incomplete.

THE WITNESS:  That's what it says.

BY MR. SCHNEIDER:

Q.    So is it also your opinion that $686.44 of those funds were applied to late charge post-settlement agreement and that they should not have been applied to those amounts?

MR. CHRISTENSEN:  Objection.  Misstates prior testimony.

THE WITNESS:  I did not say they should not have been applied.  I said that they were applied to late charges post-settlement agreement.  I did not say they're not supposed to be applied.

BY MR. SCHNEIDER:

Q.    You should listen to the question more carefully.

MR. CHRISTENSEN:  You're badgering the witness. .we need to calm down, take a break and calm down a little bit.

THE WITNESS:  I understand the game.  I'll play

Page 134

the game.

BY MR. SCHNEIDER:

Q.   This is not a game, Mr. Patterson.  This is litigation.  I'm trying to understand what your opinions are.

A.   And I'm telling you exactly what's in my report.  You want me to add words in my report and I'm not going to do it.

Q.   Okay.  Mr. Patterson, is every single thing contained in your report your opinion?

MR. CHRISTENSEN:  Objection.  Misstates facts.  Form.

BY MR. SCHNEIDER:

Q.   No.  Because you want to come and try to tell me you're telling me what's in your report, but you have already testified that not everything in your report is an opinion, so I am trying to understand what you are stating is your opinion.

A.   Told you exactly what, the whole paragraph 56.  I don't know any other way to say it.

Q.   So moving to paragraph 58, credit to corporate advance in the amount of $172.75 was applied to the loan account on November 15th, 2022.  This credit can be traced to offset corporate advance charges not related to the reinstatement or SA but rather to corporate

Page 135

advance charges assessed post-settlement agreement. Did you count this credit in favor of PHH providing Mr. Mayer credits for the amounts due on the loan?

A.    No.    Because they were provided to corporate advances.  It says post settlement agreement, specific corporate advances.

Q.    So is it your position that Mr. Mayer is entitled to that credit?

A.    Well, they were just credited to the corporate advances that were assessed, and they just applied a credit to those actual corporate advance charges, all seven.

Q.    But there was no dispute that this was a credit provided to Mr. Mayer, correct?

A.    Correct, there's no dispute.

Q.    So what evidence do you have to support your position that you should not count this credit?

MR. CHRISTENSEN:  Objection.  Misstates testimony.

THE WITNESS:  I mean, I could count it.  I'd have to count the charges and then count the credit. Offset one another.  They were all completely different set of charges that were not as part of the settlement agreement.

BY MR. SCHNEIDER:

Veritext Legal Solutions
866-299-5127            calendar-ca@veritext.com            www.veritext.com

Q.    Sir, are you saying that PHH was not entitled to assess those charges?

A.    No, I'm not saying that.  I'm saying they did assess the charges and they gave credit for it.

Q.    So Mr. Mayer received a credit from PHH for that amount, correct?

A.    Yeah.

Q.    Did someone tell you not to count that credit?

A.    I mean, why would I count it.

Q.    Because it was a credit provided to Mr. Mayer.

A.    Okay.  But I didn't count the charges on it, so why would it matter if I didn't count the credit.  They were a whole completely different set of circumstances on those charges.  They were for something that had nothing to do with the settlement agreement.

Q.    So then is it your position that there were specific credits that had to be provided to the settlement agreement?

A.    No.  I'm telling you that those specific credits were priced to specific charges that were outside of the settlement agreement.

Q.    Why does it matter if those charges were outside of the settlement agreement?

A.    Because they were specific charges I could trace them to.  Just like in final corporate advance

Page 137

credit on the 10/23/24, I can trace those exactly to the number in the credit agreement they gave him credit for, so they just go to different charges.

Q.    So you're reading intent into the credits provided by PHH to determine whether they should count towards the credit under the settlement agreement or not?

MR. CHRISTENSEN:  Objection.  Misstates prior testimony.

THE WITNESS:  I'm not looking at intent.  I'm looking at the fact that they actually took a hundred seventy-three dollars, and I can trace those two charges and they gave credit for those specific charges.

BY MR. SCHNEIDER:

Q.    And is there anything in the material that you reviewed that you relied upon to determine that that credit should not count?

MR. CHRISTENSEN:  Misstates his testimony. He's talking about opinions which support them.  Mr. Mr. Vadorn testified about those credits in his deposition.

THE WITNESS:  Not counting it.

BY MR. SCHNEIDER:

Q.    Towards your total calculation of when PHH satisfied the credit pursuant to the settlement

Page 138

agreement.

A.    No.    Because they were for other specific corporate advance charges.

Q.    Did you review a court order that told you not to count that credit in your calculation?

A.    No.

Q.    So you're just basing that off your own assumption because you traced it back to something that was assessed post-settlement?

MR. CHRISTENSEN:    Objection.    Vague and ambiguous and misstates prior testimony.

THE REPORTER:    I'm sorry.    Can we please speak one at a time.

THE WITNESS:    I mean, I can trace those credits to certain charges.    And I mean -- so I'm giving credit for that, credit against those charges, those specific charges.    That's what PHH did.    That's what I'm doing. I don't know any other way to put it.

BY MR. SCHNEIDER:

Q.    It's undisputed that Mr. Mayer received a credit of $172.75 on November 15th, 2022, correct?

A.    Totally undisputed.

Q.    And then just to confirm, without any evidence in discovery, any court order or instruction from counsel, you decided to exclude that credit from your

Page 139

calculations to the total credit provided to Mr. Mayer, correct?

MR. CHRISTENSEN:  Misstates testimony and evidence.  You didn't ask him any of those questions. That's not what he said.

THE WITNESS:  I didn't decide to exclude it.  I did exclude it because they were applied to other charges.

BY MR. SCHNEIDER:

Q.    But there was no court order that told you to exclude it, correct?

A.    Not that I know of.

Q.    Is there anything in the materials that you reviewed that told you to exclude the credit?

A.    No.

Q.    Did anyone tell you orally to exclude the credit?

A.    No.

Q.    So moving to paragraph 59, says $2,230.93 was applied to the loan account on November 15th, 2022. Says this credit can be traced to late charges not related to the reinstatement but rather to late charges assessed post-settlement agreement.  Do you dispute -- strike that.

It is undisputed that Mr. Mayer received a

Page 140

credit in the amount of $2,230.93 on November 15th, 2022, correct?

A.   Correct.

Q.   And you did not include this credit in your total calculation of the credits provided to Mr. Mayer, correct?

A.   That's correct.

MR. CHRISTENSEN:  Objection.  Misstates prior testimony as to what credits and when for what purpose. Objection to form.

THE WITNESS:  Question again, I did not include those credits.

BY MR. SCHNEIDER:

Q.   You did not include those credits in your total calculation of the credits provided to Mr. Mayer pursuant to settlement agreement, correct?

MR. CHRISTENSEN:  Same objections.

BY MR. SCHNEIDER:

Q.   Once again, sir.

A.   I will try to answer the question.  I don't want to get into a long, drawn-out deal, but it's the same reason, because these were tied to specific charges.

Q.   And there is no court order that told you to not count this credit, correct?

Page 141

A.    That's correct.

Q.    And there is nothing in the discovery you reviewed that indicated you should not count this credit; is that correct?

A.    That's correct.

MR. CHRISTENSEN:  Objection.  Misstates testimony.  Object to form.

BY MR. SCHNEIDER:

Q.    You did not receive any oral instruction from anyone to exclude this credit; is that correct?

MR. CHRISTENSEN:  Same objection.

THE WITNESS:  That's correct.

BY MR. SCHNEIDER:

Q.    And paragraph 60, it says, "A credit to late charges in the amount of $343.22 was applied to the loan account on credits to late charges count on March 16th, 2023."  This is the same situation that we discussed with paragraphs 68 and 59?

MR. CHRISTENSEN:  Objection to form.  Vague and ambiguous.  Same objections as to the entire line of --

MR. SCHNEIDER:  Counsel, enough speaking objections.  He understands the question.  Let's move forward.

MR. CHRISTENSEN:  It's a terrible question.  You're trying to trap him and it's not going to work.

Page 142

It's a bad question.  Applying settlement payments --
applying credits pursuant to the settlement
pre-settlement amount is not the same as credits given
to post.

MR. SCHNEIDER:  That's an argument you can make
later, Counsel.  I'm asking what he decided to include
and exclude and the reason and basis for that.

MR. CHRISTENSEN:  You need to be more specific
about your questions about when the credits were given
and for what purpose because your questioning is
misleading and inappropriate.

MR. SCHNEIDER:  Respectfully, Counsel, that's
completely inaccurate.  I'm talking specifically about
paragraphs that he's identified in his own report.
We're identifying them as late, specific amounts and
dates.  There's nothing confusing about this.  He
references the MLA and line number in his own report.
There's absolutely no dispute about what we are talking
about, so that's enough speaking objections.  Let's
finish by having him answer questions that he clearly
understands.

MR. CHRISTENSEN:  Objection stands.
Mr. Patterson, answer whatever you know you can if you
can understand it.

THE WITNESS:  I'm going to answer the same way

Page 143

I did in paragraph 59.

BY MR. SCHNEIDER:

Q.    So if we go back to paragraphs 55 and 56, we've covered this before, but it says that the amounts applied do not equal the SRE and are under-applied by $1,714.42; is that correct?

A.    Yes.

Q.    So if the credits we discussed in paragraph 58 and 59, the two credits provided on November 15th, 2022, MLA line 609 and 610 in the amounts of $172.75 and $2,230.93, if those were counted towards the credit provided to Mr. Mayer pursuant to the settlement agreement, that would satisfy what you have called the under application by $1,714.42, correct?

A.    No, that's not correct.  It would still be $1,714 because I'd have to add the charges back in there what they were credited for.

Q.    So are saying the charges were improper?

A.    No.  I'm not saying they were proper or improper.  Your question was if those credits would have been given back and applied to this 1714.42, would it satisfy that 1714.42 was under-applied.  That was your question if I'm not mistaken.

Q.    Well, is $2,230.93 more than $1,714.42?

A.    It is, but I have to add the charges that they

Page 144

were paying for back into that total so it would still be 1714.42.

Q.   But those charges were assessed post-settlement agreement, correct?

A.   Yeah, but you're going to have one, you're going to have another.  You're going to have the credits you want to get back to there, you know, applied to that, you need to put the charges in what they're for. I mean, if you're going to have one, you've got to have the other.

Q.   I mean, the fact is Mr. Mayer received a credit on those dates and that much is undisputed.

A.   But there were charges that he got those credits for that are going to have to go into that total too.

Q.   Why do those charges have to go into the total? Those charges were assessed post-settlement.  Are you saying that that now increases the amount of credit that PHH has to provide Mr. Mayer?

A.   Well, the credits were given for post-settlement charges so are you saying that they have to go into that settlement agreement credit?

Q.   The credits were provided.  That's what I'm saying.

A.   They were provided, but they weren't for

Page 145

settlement agreement.  They were post-settlement expenses.

Q.    How do you know that they weren't provided for settlement?

A.    Because you can trace them exactly to post-settlement corporate advances late charges.

Q.    So you're saying these credits have to be applied to these specific amounts stated in the settlement agreement?

MR. CHRISTENSEN:  Objection.  That misstates prior testimony.

BY MR. SCHNEIDER:

Q.    Why wouldn't you count these credits?  Simply because these amounts can be traced directly to other amounts that are included in the post-settlement why should these credits that were provided to Mr. Mayer not count towards the total amount of credits that were required under or were purported to be provided under the settlement agreement?

MR. CHRISTENSEN:  Same objection.

THE WITNESS:  PHH credited them to the post-settlement agreement charges.  That's what I'm doing.

BY MR. SCHNEIDER:

Q.    I mean, PHH discredited the account, right?

Page 146

A.    No.   They credited exactly to those charges. They credited them to those charges.   So they credited them exactly to those post-settlement agreement charges, so why am I doing anything different than PHH?

Q.    The fact of the matter is that credit was given on those dates, correct, and you've decided to not count that credit, correct?

A.    I didn't decide.   PHH decided.

Q.    No, that's not true.   You have decided to complete an expert report, and you have yourself decided which credits should count towards the total credit provided under the settlement agreement, and you have decided that based on your tracing back to particular amounts assessed post-settlement or whether they're assessed pre-settlement, but you don't have any information that says the credits should not count towards total credits provided by PHH to Mr. Mayer.   We can move forward.

A.    Let's move forward because I'm not going to argue with you about it anymore.

MR. CHRISTENSEN:   Objection.   Misstates. That's not what's happening.   Post-settlement charges has nothing to do with --

MR. SCHNEIDER:   And that's something you can argue if you would like, but that's not relevant or

Page 147

needed now.

MR. CHRISTENSEN:  Okay.

BY MR. SCHNEIDER:

Q.  So to be clear, when you're calculating the credits provided to Mr. Mayer or what you believe was required under the settlement agreement, you were tracing those credits back to amounts that you believe were included in the reinstatement amount in the settlement agreement?  Correct?

MR. CHRISTENSEN:  Objection to form, misstates testimony.

THE WITNESS:  Your question again.

BY MR. SCHNEIDER:

Q.  Are you not simply going through and seeing that a credit was provided on the loan and saying that credit counts towards the total cumulative amount pursuant to the settlement agreement, correct?

A.  That's not the way PHH does it.  That's the way I did it.

Q.  Instead, you're saying that these specific amounts were included in the reinstatement amount for the settlement agreement, and so those specific amounts need to be credited by PHH; is that correct?

MR. CHRISTENSEN:  Same objections.

THE WITNESS:  I didn't understand your

Page 148

question.

BY MR. SCHNEIDER:

Q.   All right.  Let's go to paragraph 17.  Not paragraph 17.  I'm sorry.  Page 17, paragraph 62.

A.   Okay.

Q.   And it has your final variance analysis.  Once again it includes specific breakdowns of principal and interest, escrow advances, fees for late charges and fees for corporate advances, and then another line item that are now zeroed out.

A.   Okay.

Q.   So you have now traced back these amounts that they have been credited towards the specific amounts as stated in the settlement agreement; is that correct?

A.   Correct.

Q.   Anything that did not fit within the specific amount stated within the settlement agreement, you did not include toward your calculation of credits provided to Mr. Mayer; is that correct?

MR. CHRISTENSEN:  Same objection.

THE WITNESS:  All the credits that were applied to amounts per the settlement agreement are accounted for in that table on page 17.  All the other credits that were given to other charges, late charges are accounted for, and I've noted them in my report.

Page 149

I just don't know -- I'm not -- I don't know any different way to put it, and I really don't want to argue with you about it anymore.

BY MR. SCHNEIDER:

Q.   And for clarity, those amounts were not -- strike that.

For clarity, those amounts were excluded from your total calculation for your credits applied to Mr. Mayer.

A.   That's correct.

Q.   Now, looking at this final variance analysis on page 17, why are the fees for late charges and corporate advances post-settlement agreement now zeroed out?

A.   Because I gave credit for them.

Q.   I'm not sure I understand what you're saying.

A.   Hang on a second.

Q.   We've established that there has been additional credits provided by PHH for what you determined were traced back to late charges or corporate advances post-settlement agreement.

A.   Yeah.

MR. CHRISTENSEN:  Objection.  Misstates facts.

BY MR. SCHNEIDER:

Q.   So why are those amounts excluded from the per actual column?  For the late charges post-settlement,

Page 150

shouldn't there be almost $3,000 of credits in that column?

A.    No.

Q.    Why?

A.    Because there were already credits given and charges.  You're talking about in the 3,341.92.  Is that what you're saying?  In the fees, not late charges?

Q.    No.  So looking at page 17, the variance analysis per actual.

A.    Right.

Q.    For fees, late charges post SA, it says zero dollars?

A.    Right.  Where did the zero come from?

Q.    Right.  Because if we go back to page 15, the variance analysis, after January 6th, 2022, that said 686.44 and then there was additional credits for late charges that you determined were post-settlement agreement on November 15th, 2022 and March 16th, 2023. So shouldn't there be, you know, $3,000 or so on that line?

A.    There should be a credit there and I'm looking to find that.  Can't figure out why.  I'm sure there's an explanation.  Just not sure what it is right now.

Q.    Okay.  And then so for fees, corporate advances post-settlement agreement, there should be some number

Page 151

in there, correct?

A.    It looks like there should be, yes.  I'm going to have to look at it and see.

Q.    Moving to paragraph 64 or 66 of your report, you complete an evaluation on opinion of $24,133.41 in that it was supposed to be for payments between June 2020 through December 2020 for principal and interest only; is that correct?

A.    Correct.

Q.    And you found that that amount would satisfy the principal and interest payment for those months, correct?

A.    Yes.

Q.    And you're not opining on whether that amount would have been sufficient for anything more than principal and interest for that time period, correct?

A.    Correct.

Q.    So moving to paragraph 67 through 70, this discusses purported offer of payments of $181,946.88 plus an additional $28,067.29 on October 9th, 2024.  And paragraph 69, you found that the $181,946.88 would have been enough for the principal and interest portion of the payment for June 1st, 2023 and October 1st, 2024, right?

A.    That's right.

Page 152

Q.   You're not opining that those amounts would have been specific for anything more than principal and interest for that time period, correct?

A.   Correct.

Q.   And in paragraph 70, then states that the offer of $28,067.29 equals the property taxes PHH advanced and then it identifies there's a table that includes property tax advances that you've identified for March 18th, 2021, December 1st, 2021, March 31st, 2022, November 29th, 2022, March 28, 2023 and November 21st, 2023.

A.   Correct.

Q.   So if we go back to your MLA, line 56, let me know when you're there.

A.   56.

Q.   And there is a tax disbursement on March 17th, 2020 for $4,029.29.  Do you see that?

A.   I do.

Q.   Why did you not include this disbursement in your calculation for paragraph 70?

A.   Because this was only for the ones I listed there.  I said this analysis confirms the amount equals the property taxes PHH advanced as follows and listed one, two, three, four, five, six different advances that equal that amount.  So those were the ones that were

Page 153

paid that 28,000 for.  That's all I'm saying.

Q.   So are you opining in paragraph 70 that the offer of $28,067.29 was sufficient to cover all of the advances made by PHH for property taxes?

A.   No.

Q.   Okay.  You're simply saying that it was sufficient to satisfy these specifically-identified property tax advances?

A.   Correct, and the breakdown equals that 28,000 is what I listed there.

Q.   And just for clarity, if we include that additional property tax advancement on March 17th, 2020, the offer of $28,067.29 would not be sufficient to cover all of the ones you identified plus that property tax advancement, correct?

MR. CHRISTENSEN:  Objection to form, misstates prior testimony.

THE WITNESS:  It would not be the same number.

BY MR. SCHNEIDER:

Q.   All right.  So then moving to paragraph 73 and 74, talks about escrow analysis dated February 11th, 2020.  And paragraph 74 states -- I guess for clarity, in your report, you identify this as escrow analysis number one.  And in paragraph 74, escrow analysis number one is calculated correctly based on the status of the

Page 154

loan at that time.  So is it your opinion that the amounts calculated in that escrow analysis number one were correct?

A.    That's what I state, it was calculated correctly.

Q.    Paragraph 76 then states that the omission of an escrow account history is not consistent with the above regulation.  What qualifications do you have that would permit you to opine on what is and what is not compliant with the statutes governing escrow statements?

A.    Worked escrow accounts for a long time.  I'm very familiar with Respa rules and regulations, use them all the time.  Having a history attached to an escrow analysis is important so we can run and determine whether the starting projected balances are correct or not on an escrow analysis, so when a history is omitted from -- when there's not a history from the previous analysis, I'll make a note of it, and that's what I did.

Q.    Have you ever been qualified -- strike that.

Have you ever testified as an expert on mortgage servicing?

A.    Yes.

Q.    To clarify, on mortgage servicing practices?

A.    Yes.

Q.    As opposed to accounting for mortgage

Page 155

servicing?

A.   Yeah, sure have.  Did you read the -- one of the opinions in the ones where they limited my testimony?  It says I was qualified to testify about -- you asked if I've testified as to mortgage accounting?

Q.   Mortgage servicing.

A.   Mortgage servicing.

Q.   Yes.

A.   I have been qualified as an expert for mortgage servicing.

Q.   Do you recall the cases?

A.   No.  But I can certainly give them to you.

Q.   Paragraph 77, 78 talk about the escrow analysis dated February 25th, 2021 and you call this escrow analysis number two.

A.   Right.

Q.   In paragraph 78 you state, "Escrow analysis number two is not calculated correctly."  You say it does not contain the $32,128.95 credit shown in the settlement agreement.  So is it your opinion that the escrow analysis number two overstated the amount owed in escrow by 33,100.92?

A.   Yes.

MR. CHRISTENSEN:  Objection.  Vague as to form.

THE WITNESS:  Yes.

Page 156

BY MR. SCHNEIDER:

Q.   Have you reviewed the additional escrow analysis for February 22nd, 2022?

A.   I don't know.  It's not on my report so must not have.

Q.   So you do not have an opinion on the February 22nd, 2022 annual escrow statement, correct?

A.   Correct.

Q.   Do you have an opinion on the March 8, 2023 annual escrow statement?

A.   No.

Q.   Do you have an opinion on the February 22nd, 2024 annual escrow statement?

A.   No.

Q.   Do you have an opinion on the April 29th, 2024 annual escrow statement?

A.   No.

Q.   Moving to paragraph 82, states, "The monthly statements beginning March 16th, 2021 to February 16th, 2022 showing incorrect escrow payment due of $1,230.33." And is your opinion, the correct escrow payment should be $742.91; is that correct?

A.   Correct.

Q.   And is that reasoning the same reasoning that you used when determining that escrow analysis number

Page 157

two was not calculated correctly being that the $33,120.95 credit was not applied?

A.    Yes.

Q.    And in paragraph 83 states that each monthly statement from July 16th, 2020 January 6th, 2022 shows an incorrect balance due to the $33,120.95 credit per the SA not being entered into the account.  Do you have any opinion on the amount stated for escrow following February 16th, 2022?

MR. CHRISTENSEN:  Objection to form.  Vague.

THE WITNESS:  It's not listed in my report so no.

BY MR. SCHNEIDER:

Q.    Paragraph 84 says, "Each monthly statement from July 16th, 2020 to October 23rd, 2024 shows incorrect assessed expenses amounts due since SA credit fees was not entered into the account until that date."  What did you rely on in reaching this opinion?

A.    I'll need to go back and look at those statements.  In the period of time, it looks like the funds were applied to late charge corporate advances assessed post SA, so the amounts of the expenses were not shown as correct.

Q.    So are you saying that certain credits should have been applied to assessed expenses rather than late

Page 158

charges and corporate advances?

A.    I need to go back and look at those statements and see what the exact amounts were for those assessed expenses, but there was no credit to the fees.  I do not know.  I'd need to go back and look at it.  I just don't -- I can't recall looking at that particular line item.

Q.    Are you providing any opinion in your report as to how a mortgage servicer may apply funds to principal escrow advances and fees when it receives a payment from a borrower?

A.    Payment application hierarchy, no.

Q.    All right.  Paragraph 85 provides an opinion that monthly statements dated March 16th, 2022, April 16th, 2022, May 17th, 2021, and August 13th, 2021 each show incorrect due dates and amounts due for payment.

These statements were dated at a time PHH was completing reversals and reapplications of funds based on the continuing effort of the attorneys for both parties to resolve the dispute related to settlement agreement; is that correct?

A.    Looks like it, yes.

Q.    In other words, these statements were generated in the middle of PHH's efforts to reapply the

Page 159

reinstatement funds for which Mr. Mayer's attorneys had knowledge of, correct?

A.   I don't know what they had knowledge of or didn't, so I don't know.

Q.   Moving to paragraph 87, you discuss a payoff quote dated June 10th, 2021, and paragraph 88 provides your opinion that analysis of this payoff amount is incorrect.  Paragraph 89 and 90 then discuss specific items that you believe are incorrect.  What did you rely on to reach this opinion?

A.   Well, the amounts were shown as unpaid late charges, part of that was -- there was $1200 were assessed post-settlement agreement and that was included in the payoff.  And same way, same goes with paragraph 90, the amounts were assessed post-settlement agreement and were not credited, so saying the amount that is in -- the payoff amount is incorrect because of that.

Q.   Okay.  So other than those specific items you discussed in paragraphs 89 and 90, is it your opinion that the remainder of the payoff quote is correct?

A.   I think everything else checked out okay.

Q.   And so for paragraph 89, is it your opinion that those amounts are incorrect because they include amounts that were stated in the settlement agreement that you believe should have been credited?

Page 160

A.    No.   Weren't credited, yet so that's 1518.32 and then 1201.27 says post-settlement agreement.

Q.    Okay.   But you do not have any opinion as to whether the late charges were appropriate or not; is that --

A.    I don't know whether they were appropriate or not.   Just saying they didn't give credit for them yet and they were assessed post-settlement agreement, so --

Q.    And the same goes for the recoverable balance that the amount stated includes amounts you believe to have been stated in the settlement agreement that have not been credited to Mr. Mayer?

A.    Correct.

Q.    Moving to paragraph 93, paragraphs 93 through 97 discuss a notice of default dated August 24th, 2023, and your opinion is that an amount stated in the notice of default is incorrect; is that right?

A.    Yeah.

Q.    And you base this opinion, at least in part, on your previous determination that the escrow component with the monthly payment was incorrect; is that right?

A.    Yes.

Q.    And I believe your opinion that the monthly payment amount for escrow was incorrect is based on the lack of application of the $33,000 credit identified in

Page 161

the settlement agreement, correct?

A.   Right.

Q.   Now you also state an opinion that the notice of default amount due shows a total escrow amount due of $41,585.40 but that the total escrow advance balance was in fact $27,613.35 is that correct?

A.   Yeah.

Q.   Do you know how servicers calculate the amount for a notice of default?

A.   Yeah.  It's an amount to reinstate basically, amount to cure.

Q.   And what do you mean by that?

A.   Means how to -- amount to bring payments current, bring the loan current.

Q.   And what information are you basing that opinion on?

A.   My experience.

Q.   Are you relying on any materials from this case for that opinion?

A.   No.

Q.   Is it your understanding that a notice of default states the total past due payments or the total amount due?

A.   That's what I just said, the past due payments.

Q.   Do you understand --

Page 162

A.    Amount to cure.

Q.    Do you believe that there's a difference between the total past due payments and the total amount due?

A.    Absolutely.

Q.    Can you explain what that difference is.

A.    Sure.  The amount past due payments is the amount of past due payments to bring the loan current. The amount total due is the principal balance plus accrued interest plus escrow advances and fees.  Like a payoff.

Q.    I'll rephrase.  Would there be a difference between you and the total past due payments and the reinstatement amount?

A.    Well, total past due payment would be included in a reinstatement.

Q.    Do you believe that the amount for the total past due payments would be equal to a reinstatement amount?

A.    No.

MR. CHRISTENSEN:  Objection.  Incomplete hypothetical, vague.  Objection to form.

BY MR. SCHNEIDER:

Q.    You said no.  Why do you say no?

A.    Well, it would be fees or something that would

Page 163

be due, assessed in a reinstatement, sure.  Late charges, fees.  I mean could be, couldn't be.

Q.   If I asked you to calculate the total past due payment, how would you do that?

A.   Well, I would figure out what the date of the last paid installment, figure out how many payments would be due between now and then and add up the payments, principal, interest, there's escrow due and add up escrow.

Q.   How would you calculate the escrow amount due?

A.   Well, I'd have to look and see what it was based on -- what the system says an escrow payment is.

Q.   Okay.  So you would base that on what the escrow monthly payment was for that time period?

A.   Right.

Q.   Okay.  And you wouldn't base it on the advances for escrow for that time period?

A.   No.  That would only be in a payoff.

Q.   Okay.  So the total past due payments would represent the --

A.   Principal, interest and escrow.  For payments.

Q.   And that would be as those are stated on the monthly mortgage statements; is that correct?

MR. CHRISTENSEN:  Objection.  Misstatements testimony, asks for legal conclusion, misstates facts.

Page 164

THE WITNESS:  It could be what's stated on the mortgage statement.  Could be.

BY MR. SCHNEIDER:

Q.  So going back up to paragraph 94, it says you have calculated and reconciled the detailed amount as shown in the table below.  Can you explain to me how you did these calculations?

A.  I'll show you in the table right below it.  I don't know how you want me to explain it.  It's shown in the table.

Q.  Can you explain to me where you got the escrow numbers in the table?

A.  No.  I mean, I'm sure I got them from escrow analysis from the system payment history.  Got them -- you know, I don't know.

Q.  Amount stated in this table would have been the amounts included in the monthly statement requested from the borrower for that time period, correct?

MR. CHRISTENSEN:  Objection.  Misstates facts, incomplete hypothetical.  Objection to form.

THE WITNESS:  You're saying that these payments that I used were in the monthly statements?  I'm sorry. I didn't quite follow you.

BY MR. SCHNEIDER:

Q.  The amounts stated in this table represent what

Page 165

would have been charged per month for principal and interest and escrow; is that correct?

MR. CHRISTENSEN:  Objection as to form.
Misstates facts, incomplete hypothetical.

THE WITNESS:  What would have been charged?

BY MR. SCHNEIDER:

Q.   What was charged for the loan.  These amounts represent what was charged for the loan for the given time period's principal and interest and escrow.  Is that correct?

MR. CHRISTENSEN:  Objection.  I'm sorry.  Go ahead.

THE WITNESS:  No.  Those amounts in this table are what was charged.

BY MR. SCHNEIDER:

Q.   Okay.  So that does represent the total past due payment, correct?

MR. CHRISTENSEN:  Objection.  Asks for conclusion, misstatement testimony.  Objection to form.

THE WITNESS:  Per the system, whatever they had in their system was what was due.  Payment, principal and interest and escrow is what is shown there in that table.

BY MR. SCHNEIDER:

Q.   So in paragraph 98 through 103 discuss the

Page 166

servicing fee for the loan.  And paragraph 98 says counsel has requested an analysis from the service fees paid to PHH for this mortgage loan.  How did you receive that request?

A.    From Mr. Christensen.

Q.    Did you receive that request orally or in writing?

A.    I don't know.  Probably orally over a phone call.  I don't know.  Don't remember.

Q.    In paragraph 102, you said the servicing fees represented in Exhibit 12-A in this document show the following servicing fees.  Then you highlight service fee for loan monthly at six dollars, the default fees, 60 plus days delinquent at $65, foreclosure at $65 and other default fees 40 percent of recovered amount.

Counsel has requested calculations of what the servicing fees would be comparatively between the regular servicing fee of six dollars per month, the default/foreclosure servicing fee of $65.00 per month and the recovery collection default fee of 40% of recovered amount for the period June 1st, 2020 to the date of sale of January 18th, 2024 as shown in the notice of trustee's sale recorded on December 4th, 2023.

Are you providing an opinion in paragraph 103 that these were the amounts that would have been paid to

Page 167

PHH for servicing the loan?

A.    No.

Q.    Does it state any opinion or finding in paragraph 103?

A.    Just what the totals are, based on what Counsel requested me to calculate.

Q.    Are you opining that PHH would receive 40 percent of all amounts recovered on the loan?

A.    No.

Q.    So if we look at the chart table underneath that, it says, "Recovery collection fee at 40 percent of $447,655.82, in parentheses, UPB."  Why did you include that number in that calculation?

A.    Well, Mr. Christensen asked me to because they were all these different fee schedules on this fee schedule here that says recovered amount, and that was the principal balance at that time so that's what I put in there.

Q.    So you were just asked to do some math and you put it in the table?

A.    I was asked to provide these calculations for these particular percentages and that's what I did.

Q.    You were not opining that PHH would receive 40 percent of the unpaid principal balance?

A.    I'm not.

Page 168

MR. CHRISTENSEN:  Objection.  Misstates testimony, facts.  Objection to form.  Vague.  You can answer.

THE WITNESS:  Yeah, I'm not.

BY MR. SCHNEIDER:

Q.   Is there any evidence that you reviewed or relied on that to support these calculations?

MR. CHRISTENSEN:  Objection.  Vague.  Objection to form.

BY MR. SCHNEIDER:

Q.   I guess for clarity, I'll -- strike that.

So did Mr. Christensen tell you to complete a calculation of what the recovery collection fee at 40 percent would be of the unpaid principal balance and you simply did the formula and put it in this chart?

A.   That's correct.

Q.   So what purpose does this calculation serve?

A.   Satisfies Mr. Christensen's request to me to provide these calculations.

Q.   The remainder paragraphs 104 through 107 discuss -- provide calculations for supposed refinancing of Mr. Mayer; is that correct?

A.   Yes.

Q.   And paragraph 105 states that these analyses will use the following assumptions.  Who provided you

Page 169

these assumptions?

A.   Well, let's see.  The 7/1/20 and 11/1/20 were given to me by Mr. Lewis and Mr. Christensen to use for the dates of the refinance.

The refinance amount are the principal balances on those particular dates taken from the loan account. Refinance interest rate is the Freddie Mac rate on those dates, 30-year standard mortgage term.

I did not include any closing top calls or anything like that because that's not -- I mean, I didn't know what they were so I didn't put it in there so -- that's your explanation.

Q.   Did you review any financial record of Mr. Mayer?

A.   No, I did not.

Q.   Did you review anything that indicated Mr. Mayer attempted to refinance in June or July of 2020?

A.   No, I did not.

Q.   Did you review anything that indicated Mr. Mayer attempted to refinance in October or November of 2020?

A.   No.

Q.   Have you reviewed Mr. Mayer's credit?

A.   No.

Page 170

Q.   Have you reviewed Mr. Mayer's history of late payment on is second position mortgage?

A.   I have not.

Q.   Did you know Mr. Mayer had a second position mortgage?

A.   I didn't even know.

Q.   Did you review anything that showed Mr. Mayer was approved for a refinance?

A.   No.

Q.   Do you have any evidence that Mr. Mayer has ever invested any money?

A.   No.

Q.   Did you review anything or have any evidence that Mr. Mayer would have invested any potential savings from that refinance?

A.   I wouldn't know.

Q.   Did you rely on anything to base your finding that Mr. Mayer would have invested every single dollar and cent of difference between the assumed refinances and his current payments toward investments?

A.   No.  That's not in my report so I wouldn't have done that.

Q.   How did you determine his investments would have an annual return of four percent?

A.   I used a conservative amount.  It's noted in

Page 171

the footnotes of my report.  Four percent is a pretty
conservative amount.

Q.   So is anything contained within paragraphs 104
through 107 an opinion?

MR. CHRISTENSEN:  Objection.  Vague as to form,
ambiguous.  I think misstates prior testimony.

THE WITNESS:  Again, these are calculations
that I did for the possibility of a refinance at these
rates, at these terms and the cash flow savings, time
value, money based on those cash flow savings, that's
what they are.

BY MR. SCHNEIDER:

Q.   To be clear, Mr. Christensen asked you to
complete certain calculations for him and these
calculations are explained and completed in paragraphs
104 through 107?

A.   Right.  But I had no idea Mr. Mayer's
qualifications and whether he would qualify or not
because I have no idea.

Q.   So you used all these assumptions to generate
these inflammatory theoretical measure of damages
purported savings -- Counsel, you can let me finish --
investment value that lacks all foundation or reason,
correct?

MR. CHRISTENSEN:  Objection.  It misstates

Page 172

facts, it's misleading and improper question.

MR. SCHNEIDER:  What's misleading is these calculations at all being included withiin the report. These are clearly calculations thathe's submitted that you requested that are completely inflammatory and have no reason, logic, or basis.

MR. CHRISTENSEN:  That's not true.  You know it, and -- and I would clarify this.

MR. SCHNEIDER:  It's misleading because it is not based on the evidence, rather a series of wild assumptions.

MR. CHRISTENSEN:  Well, that's not true, so -- make all the arguments you want on the record.  It's not going to help.  It's not going to change the fact that these facts.

(Simultaneous unreportable colloquy.)

MR. SCHNEIDER:  This is not the time for you to testify.

MR. CHRISTENSEN:  Likewise.  Say the same.

BY MR. SCHNEIDER:

Q.   Now, you are bound by a code of professional standards through the Association of Certified Fraud Examiners, correct?

A.   Yes.

Q.   And one of those standards is that your report

Page 173

should not be misleading in any way, correct?

A.   Yes.

Q.   Now, if we were to have one final hypothetical and I were to tell you that --

A.   Can I interrupt you real quick.  Can I have a bathroom break just for time to go pee.

MR. SCHNEIDER:  I mean, that's fine.  We're at the finish line, but that's fine if you need a quick break.

THE WITNESS:  I called it.  Go ahead.

MR. SCHNEIDER:  Well, depending on if Mr. Christensen has any cross.

THE WITNESS:  Okay.

MR. SCHNEIDER:  Mr. Christensen, do you anticipate having cross?

MR. CHRISTENSEN:  I don't know.  I don't think so.  I got to look.  Ask a couple questions and then take a break.

MR. SCHNEIDER:  Sounds like we're taking a break anyways, Mr. Patterson, so do it now.

THE WITNESS:  Okay.

(Break taken from 3:53 p.m. to 3:58 p.m. CDT.)

BY MR. SCHNEIDER:

Q.   So running through one last hypothetical with you.

Page 174

A.    Okay.

Q.    If the defendants in this case were to release the lien and discharge the loan entirely for Mr. Mayer, there's no dispute that that would provide a huge financial benefit to Mr. Mayer, correct?

MR. CHRISTENSEN:  Objection.  Incomplete hypothetical, vague and ambiguous as to huge financial benefit.  Objection to form.

BY MR. SCHNEIDER:

Q.    You can answer.

A.    Oh, yeah, that might be a big -- you know, be a good deal, you know, if he didn't have a mortgage.

Q.    And if we look at your calculations for present value of cash flow and future value of cash flow, if the loan were to be completely forgiven and discharged and wiped out, would that provide more of a present future value cash flow than either of these analyses?

MR. CHRISTENSEN:  Objection.  Vague and ambiguous, incomplete hypothetical.  Objection to the form.  Misleading.

MR. SCHNEIDER:  Well --

MR. CHRISTENSEN:  I'm trying to make objections.

MR. SCHNEIDER:  Speaking objections that are improper.  He can answer the question.

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

MR. CHRISTENSEN:  He's not giving opinions on that.  I mean --

THE WITNESS:  I mean, that's a different scenario.  I'd be glad to do the calculations if you want to hire me to do it.

(Exhibit No. 1 was introduced.)

BY MR. SCHNEIDER:

Q.    Attaching as Exhibit 1, this is deposition subpoena.  Are you able to see this document?

A.    Not yet.  There it is.

Q.    Have you seen this document before?

A.    Yes.

Q.    Okay.  In this document, there's 18 requests for production.  Do you see that?

A.    I do.

Q.    Do you recall reviewing those requests for production?

A.    I did.

Q.    And do you believe you have provided Mr. Christensen with all responsive documents?

A.    Yes.  He told me that they were to provide documents regarding compensation and that all of the documents that are listed in my report are all the documents that he provided to me or were all the documents that I have, so --

Page 176

(Exhibit No. 4 was introduced.)

BY MR. SCHNEIDER:

Q. And so marking as Exhibit 4, I'll represent to you this is what was produced by Mr. Christensen's office to our office in response to this. It's five total pages, and the first -- an e-mail saying here's the invoice. Do you recall having any other e-mail communications with Mr. Christensen other than this e-mail dated February 27th, 2026?

A. Regarding compensation or any e-mail?

Q. Any e-mail regarding this case.

A. Yeah, we have other e-mails.

Q. Well, I'll go ahead and represent to you that this is the only e-mail that has been provided to us so you've provided Mr. Christensen with other e-mails?

A. I have not. He told me that this was the only e-mail that was required to produce, and that's what I produced.

MR. SCHNEIDER: Counsel, we'll meet and confer about that after.

Q. And on page four of this is an invoice dated April 17th, 2026. Is this a complete invoice for all of the services that you have provided through that date for this matter?

A. Through that date, yes.

Page 177

Q.    And other than your call with Mr. Christensen to prepare for today's deposition, have you incurred any additional fees since April 17th?

A.    Just that call and about an hour and a half this morning reviewing my report.

MR. SCHNEIDER:  Okay.  He's your witness now, Mr. Christensen.

MR. CHRISTENSEN:  No questions.

MR. SCHNEIDER:  We can go off the record.

(The deposition of Bernard Jay Patterson concluded at 4:03 p.m. CDT.)

--o0o--

Page 178

I have read the foregoing transcript, and I declare under penalty of perjury the testimony therein to be true and correct, along with whatever changes I have made thereon.

Executed this        day of                    , 2026 at _____,_____.
                        City                          State


_____

Bernard Jay Patterson

Page 179

Veritext Legal Solutions
866-299-5127        calendar-ca@veritext.com        www.veritext.com

REPORTER'S CERTIFICATE

I, Christine M. Cradit, do hereby certify:

That I am a licensed, Certified Shorthand Reporter, duly qualified and certified as such by the State of California;

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth and nothing but the truth;

That the said deposition was by me recorded stenographically at the time and place first therein mentioned; and the foregoing pages constitute a full, true, complete and correct record of the testimony given by the said witness;

That I am a disinterested person, not being in any way interested in the outcome of said action, nor connected with, nor related to any of the parties in said action, or to their respective counsel, in any manner whatsoever.

Dated this 1st day of May, 2026.

Christine M. Cradit, CSR No. 3805

Page 180

Andrew Joe Christensen, Esq.

Andrew@CaliforniaHomeLawyer.com

May 3, 2026

RE: Cory Mayer v. HSBC Bank

4/21/2026, Bernard Jay Patterson, (#8010526).

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

to schedule a time to review the original transcript at

a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

Transcript - The witness should review the transcript and

make any necessary corrections on the errata pages included

below, notating the page and line number of the corrections.

The witness should then sign and date the errata and penalty

of perjury pages and return the completed pages to all

appearing counsel within the period of time determined at

the deposition or provided by the Code of Civil Procedure.

Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of

Counsel - Original transcript to be released for signature

as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

time of the deposition.

Page 181

_x_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
Transcript - The witness should review the transcript and
make any necessary corrections on the errata pages included
below, notating the page and line number of the corrections.
The witness should then sign and date the errata and penalty
of perjury pages and return the completed pages to all
appearing counsel within the period of time determined at
the deposition or provided by the Federal Rules.
__ Federal R&S Not Requested - Reading & Signature was not
requested before the completion of the deposition.

Page 182