Andrew J. Christensen (SBN: 260748)
Law Offices of Andrew J. Christensen, P.C.
2063 Mountain Blvd. Suite 2
Oakland, CA 94611
Tel: (510) 761-7183
Fax: (510) 680-3430
Andrew@CaliforniaHomeLawyer.com

Nicholas Heath Wooten (SBN: o77n-1870)
3125 Carlton Road
Cumming, GA. 30041
Tel: (833) 937-6389
Nick@nickwooten.com

Attorneys for Plaintiff
Cory Mayer

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| Cory Mayer,<br><br>              Plaintiff,<br><br>        v.<br><br>DEUTSCHE ALT A SECURITIES MORTGAGE LOAN TRUST SERIES 2006-A.;<br>PHH MORTGAGE CORPORATION; WESTERN PROGRESSIVE, LLC; DOES 1-20; and all persons unknown claiming any interest in the property, inclusive and DOES 1 through 50, inclusive,<br><br>              Defendants. | CASE NO.:  5:25-cv-00182-NW<br>Unlimited Jurisdiction<br><br>**Plaintiff's Opposition to Defendants' Motion for Summary Judgment to Plaintiff Cory Mayer's First Amended Complaint, Or, In the Alternative, Summary Adjudication of the Issues**<br><br>Hearing: July 15, 2026<br>Time:    9:00 a.m.<br>Place: San Jose Courthouse, Courtroom 3 – 5th Floor, 280 South 1st Street, San Jose, CA 95113<br><br>Honorable Judge Noël Wise<br>Action Filed: August 9, 2024<br>Trial Date: September 28, 2026 |

Plaintiff hereby opposes Defendants' motion for summary judgment, docket 160.

-1-

# Table of Contents

INTRODUCTION.................................................................................................... 1

1.    DEFENDANTS HAVE NOT PROVEN THE LOAN IS FULLY AND PROPERLY FORGIVEN.................................................................................................... 1

2.    PLAINTIFF'S CLAIMS ARE NOT MOOT ............................................ 4

3.    NONE OF PLAINTIFF'S CLAIMS WERE WAIVED BY SETTLEMENT .......... 6

4.    REFINANCE DAMAGES ARE NOT SPECULATIVE.......................................... 8

5.    THERE ARE STILL GENUINE DISPUTES OF MATERIAL FACT ON ALL CLAIMS FOR RELIEF ................................................................................... 10

A.    Breach of Contract ...................................................................... 10

B.    The Covenant of Good Faith and Fair Dealing.................................... 11

C.    Declaratory Relief ...................................................................... 13

D.    Business and Professions Code §17200 ................................................ 14

E.    Rosenthal Act .............................................................................. 15

F.    Intentional Interference With Contract.............................................. 19

G.    Slander of Title............................................................................ 20

H.    Damages for Impaired Marketability and Diminution in Value Were Disclosed 21

I.    RESPA ...................................................................................... 22

6.    PUNITIVE DAMAGES.......................................................................... 23

7.    OBJECTIONS TO EVIDENCE................................................................. 25

Plaintiffs' Opposition to Summary Judgment  5:25-CV-00182-NW

**Table of Authorities**

**Cases**

*Carolina Beverage Corp. v. FIJI Water Co., LLC,*

102 Cal. App. 5th 977 (2024) ...............................................................................................5

*Conder v. Home Sav. of Am.,*

680 F. Supp. 2d 1168 (C.D. Cal. 2010) ...............................................................................20

*Diaz v. First Am. Home Buyers Prot. Corp.,*

732 F.3d 948 (9th Cir. 2013) .............................................................................................1, 5

*Dist. LEXIS 44158,*

2009 WL 1457738 (N.D. Cal. May 26, 2009) ....................................................................20

*FDIC v. Cashion,*

720 F.3d 169 (4th Cir. 2013) ................................................................................................4

*Golden v. Anderson,*

256 Cal. App. 2d 714 (1967) ..............................................................................................20

*Grand Canyon Tr. v. United States Bureau of Reclamation,*

691 F.3d 1008 (9th Cir. 2012) ..............................................................................................5

*Huckell v. Matranga,*

99 Cal. App. 3d 471 (1979) ..................................................................................................2

*Kachlon v. Markowitz,*

168 Cal. App. 4th 316 (2008) .............................................................................................21

*Lomboy v. SCME Mortg. Bankers, No. C-09-*

1160 SC, 2009 U ................................................................................................................20

*Mazzei v. Money Store,*

308 F.R.D. 92 (S.D.N.Y. May 29, 2015) ........................................................................20

*RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co.*,

56 Cal. App. 5th 413 (2020) ..........................................................................................14

*Rosenthal Act. Komarova v. Nat'l Credit Acceptance, Inc.*,

175 Cal. App. 4th 324 (2009) ........................................................................................16

*Schep v. Capital One, N.A.*,

12 Cal. App. 5th 1331, 220 Cal. Rptr. 3d 408 (2017) ...................................................21

*United States v. Concentrated Phosphate Exp. Ass'n*,

393 U.S. 199 (1968) ....................................................................................................1, 5

*United States v. W. T. Grant Co.*,

345 U.S. 629 (1953) ........................................................................................................5

*Walters v. Fidelity Mortgage of California, Inc. (2010)*

730 F. Supp. 2d 1185 ....................................................................................................20

**Statutes**

Business and Professions Code §17200 .........................................................................14

Cal. Civ. Code § 2343 ...................................................................................................20

Cal. Civil Code §§1504, 1511, 1512, 1485 ..................................................................13

California Civil Code §1788.30 .................................................................................17, 18

California Civil Code §2924 ...........................................................................................21

California Civil Code §2941 .............................................................................................2

California Civil Code §47 ...............................................................................................21

California Evidence Code §622 ................................................................................................3

Section 47 ..........................................................................................................................21

wis Decl. ¶13 ..............................................................................................9, 10, 13

**Other**

FRCP 26 ..............................................................................................................................22

FRCP 37 ..........................................................................................................19, 21, 22, 24

FRCP 37.  A ........................................................................................................................4

FRCP 56 ..................................................................................................4, 5, 13, 25

Rule 26 ................................................................................................................................22

Rule 68 ................................................................................................................................5

wis Decl. ¶13 .............................................................................................. 9, 10, 13

-4-

**INTRODUCTION**

Defendants cannot unilaterally determine the amount of their liability to Plaintiff by purporting to forgive the mortgage loan a few weeks ago and now claim that they have made Plaintiff whole and therefore have the case adjudicated as moot.  The Supreme Court of the United States has addressed this before and stated  "Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave "the defendant . . . free to return to his old ways." *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968) (citing *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953))

The purported loan forgiveness was made without agreement or request and is essentially the equivalent of an unaccepted settlement offer. The Ninth Circuit has ruled that an unaccepted settlement offer "that would fully satisfy a plaintiff's claim is insufficient to render the claim moot." *Diaz v. First Am. Home Buyers Prot. Corp.*, 732 F.3d 948, 950 (9th Cir. 2013).

The jury will decide the amount of damages that will make Plaintiff whole, and this Court will determine the amount of attorney's fees and costs to which Plaintiff is entitled under contract and statute. Defendants do not get to unilaterally decide the limit of their liability.

The purported loan forgiveness is an acknowledgment that Defendants are liable. It does not appear that the loan forgiveness has been done properly or complete at this time.  However, if the loan is in fact properly forgiven at some point before trial, it would set off a part of Plaintiff's damages.  However, it will also increase other damages, including for the income tax liability that would be imposed on Plaintiff by debt forgiveness, and possibly increase damages caused by how they report the matter to the credit agencies.

1. **DEFENDANTS HAVE NOT PROVEN THE LOAN IS FULLY AND PROPERLY FORGIVEN**

There is a genuine dispute of material fact as to whether Defendants have fully and properly forgiven the loan. The only evidence submitted is a purported reconveyance of the deed, but they have not shown that the original note has been marked "paid" or that the reconveyance is valid. Plaintiff did not ask for or consent to Defendants' purported loan forgiveness. It was a surprise 10 days before summary judgment. Plaintiff would welcome a proper and complete loan forgiveness if

Defendants properly complete the process. A proper forgiveness would set off some components of Plaintiff's damages awarded at trial. But it does not moot the case or make Plaintiff whole.

Fully terminating a mortgage loan requires both reconveyance of the deed of trust and return of the original promissory note marked "paid." California Civil Code §2941. The requirement of surrendering the original note marked as "paid" is to protect the maker (Plaintiff) from "risk of the note's reappearance" if Defendants transfer the note to a bona fide purchaser for value that would have the right to collect the debt. *Huckell v. Matranga*, 99 Cal. App. 3d 471, 479 (1979).

Defendants provided no evidence that the original promissory note was marked paid and surrendered to the trustee or agent or to Plaintiff.  Rather, Defendants' exhibit 1 is a copy of the promissory note, which is not marked as "paid." PHH's employee Benjamin Verdooren's declaration was executed May 22, 2026, after the purported forgiveness, and he states that "Attached as Exhibit 1 is a true and accurate copy of the Note." [Verdooren Decl. ¶3].  If this is a true copy of the note as of the date of his declaration, then it proves the loan was not forgiven or terminated or cancelled as Defendants argue. This creates a genuine dispute of material fact as to whether the debt was forgiven.   This is material because Plaintiff is still exposed to Defendants selling or assigning the note to another party and that party attempting to enforce it, or Defendants suing him on the note. This risk undermines any financial benefit as valid basis for setoff of damages.

The purported "Substitution of Trustee and Deed of Reconveyance" was recorded April 29, 2026, unilaterally and without notice to Plaintiff, without agreement with Plaintiff,  and first communicated to Plaintiff by email to Plaintiff's counsel on May 12, 2026.  There are many red flags that create a genuine dispute of material fact as to whether it is proper and valid. Plaintiff will point out several issues here, but more time and discovery would be needed to fully resolve these issues, and Plaintiff did not have that ability because this event occurred 10 days before the MSJ and Defendants have expressly refused further deposition. [Christensen Decl. ¶18].

The Reconveyance is not authenticated HSBC the beneficiary or by DocSolutionsUSA the entity that appears to have created the document.  DocSolutionUSA included a disclaimer at the top that effectively disclaims the legitimacy or validity of the document. It states it "The preparer of this document makes no representation as to the status of the title, loan history, property use or zoning

regulations concerning described assigned, transferred, released, or conveyed nor any matter except the validity of the form of th.is instrument." [**Exhibit 12**]. This disclaimer is a problem because California Evidence Code §622 states that "The facts recited in a written instrument are conclusively presumed to be true as between the parties thereto[.]"  This document cannot be taken at face value where the drafter and signer expressly disclaim its validity in the face of the instrument.

There is a genuine dispute of material fact as to whether HSBC is the beneficiary of the deed of trust and holder of the note authorized to reconvey the deed, or that they are authorized to substitute themselves as trustee because Defendants are in violation of two court orders to produce the exact documents necessary to prove this, which include a pooling and servicing agreement and a servicing agreement which Plaintiff vigorously sought to obtain in discovery for nearly a year. [ECF Dockets 81, 81-1, and 87]. HSBC and PHH have both repeatedly admitted that they cannot confirm that the servicing agreement, or the pooling and servicing agreement they produced in this case are in fact the correct documents or that they apply to Mayer's loan.   On February 13, 2026, the day discovery closed, PHH's witness Verdooren testified that regarding the controlling servicing agreement contracts and the pooling and servicing agreement for HSBC that "still researching. I have not got an answer yet. I've been looking into this on which servicing agreements we were operating off of."   [Verdooren Depo p250]. The pooling and servicing agreement produced is missing required information and documents linking Mayer's loan to the pool or to HSBC and PHH, and Verdooren admitted he was still "trying to confirm" that is the correct document. *Id*. Verdooren then admitted that there are at least two other intervening servicing agents, including Wells Fargo as a master servicer "via Computershare, who subserviced to Newrez […] who then subserviced to PHH." *Id*. He admitted as to this chain of servicers "I just don't know the entire connection between the two" and admitted that "I have not seen any documents for" the subservicing agreements between those entities." [Id at 250-251]. Defendants have not produced these servicing agreements or any other contracts with or between these entites.[Christensen Decl.¶17, 20-22].  This proves Defendants are unable to confirm that HSBC was the beneficiary, or PHH the authorized servicer. This creates a genuine dispute as to whether the reconveyance of the deed signed by Carol Criswell for Onity "f/k/a PHH" as "attorney in fact" for HSBC is valid.

-3-

There is a genuine material issue as to whether PHH merely "charged off" the loan instead of actually forgiving it because PHH states "the loan is now liquidated" [**Exhibit 12**] and Verdooren's declaration claims "the Loan reflects a $0.00 principal balance." [Verdooren Decl. ¶31]. These things are what is commonly known as "charge off" in loan servicing parlance, an internal accounting measure that does not terminate the loan. Loans can be enforced even after charge offs, indluding where the lender issues an IRS Form 1099-C claiming to have cancelled the debt. Courts hold that an IRS Form 1099-C "is not a means of accomplishing an actual discharge of debt[.]" *FDIC v. Cashion*, 720 F.3d 169, 179 (4th Cir. 2013). If the evidence at trial shows a charge off instead of cancelling the note by marking it "paid" then there is no financial value to Plaintiff of the purported forgiveness.

Defendants cannot demonstrate that any evidence related to the purported loan forgiveness can be presented in a form that is admissible at trial under FRCP 56(c)(2). This all happened after the close of discovery, they have refused further discovery on these issues, and they are therefore barred from presenting any of this evidence at trial under the automatic exclusion provisions of FRCP 37. A few days after first being notified of the reconveyance, on May 22, 2026, Plaintiff's counsel asked PHH to appear for deposition on the loan forgiveness. On June 1, 2026, Defense counsel expressly declined further discovery. [Christensen Decl. ¶18]. This Court should deny summary judgment under FRCP 56(d)(1) because Plaintiff does not have all key facts and evidence. Plaintiff cannot reasonably be expected to obtain evidence and fully address all material aspects of this with only 10 days' notice.

## 2. PLAINTIFF'S CLAIMS ARE NOT MOOT

This case is not moot because there is still a controversy and this Court can still grant relief by adjudicating liability on the claims and the amount of damages because the acts are still wrongful, the contract is still enforceable, and there are far more damages and fees that the value of the loan forgiveness. The legal standard is this: ""The doctrine of mootness, which is embedded in Article Ill's case or controversy requirement, requires that an actual, ongoing controversy exist at all stages of federal court proceedings." (citation). "A claim is moot if it has lost its character as a present, live controversy." (citation). "If an event occurs that prevents the court from granting effective relief,

the claim is moot and must be dismissed." Id." *Grand Canyon Tr. v. United States Bureau of Reclamation*, 691 F.3d 1008, 1016-17 (9th Cir. 2012).

"The test for mootness in  cases such as this is a stringent one."  *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)

The purported forgiveness was a unilateral surprise and not by agreement between the parties and PHH believes it makes Plaintiff whole and should result in the termination of the case. Defendants state in their motion that they gave "Plaintiff a free house and more to cure any possible breach" [MPA p1 line 5] and "Defendants decided to voluntarily take action to make Plaintiff whole." [MPA p6 line 7]. This is not an express settlment offer, but Defendants are trying to treat it that way.   The Ninth Circuit ruled that unaccepted settlement offers pursuant to Rule 68 offers of judgment do not moot claims, and identified the "correct approach" as stated by  Justice Kagan of the Supreme Court in a dissent that "An unaccepted settlement offer — like any unaccepted contract offer — is a legal nullity, with no operative effect. As every first-year law student learns, the recipient's rejection of an offer "leaves the matter as if no offer had ever been made." *Diaz v. First Am. Home Buyers Prot. Corp.*, 732 F.3d 948, 954 (9th Cir. 2013) (Citing *Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66(2013)) This logic applies to any settlement offers or unaccepted proposals or offers of payment during a case.

Defendants argue the release "released the Deed of Trust to terminate their relationship with Plaintiff." [MPA p6]. This is not true as a matter of law because it does not terminate the contractual or statutory obligations of the party. Defendants do not allege or show any contractual or statutory right to unilaterally terminate the contract and avoid damages and attorneys' fees, nor any grounds for constructive termination. "if a contract does not itself recognize the concept of constructive termination, the courts may not graft that concept onto that contract." *Carolina Beverage Corp. v. FIJI Water Co., LLC*, 102 Cal. App. 5th 977, 98 (2024).

The purported loan forgiveness is essentially Defendants claiming to voluntarily cease their ongoing illegal conduct in failing all their loan servicing obligations. The Supreme Court has ruled that "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i. e., does not make the case moot." *United States v. W. T. Grant Co.*, 345

U.S. 629, 632 (1953).

The purported forgiveness does not moot Plaintiff's entitlement to attorney's fees and costs under contract in the note, deed of trust, and settlement agreement, or under statues for Rosenthal, RESPA, and as damages for slander of title. Nor does it deprive the court of the ability to adjudicate the entitlement to, and the amount of, emotional distress and punitive damages.

Debt forgiveness also raises new issues  and damages because Plaintiff will have to pay income tax on debt forgiveness, as PHH is well aware as their own counsel admitted in emails to Plaintiff's counsel in 2021: "the acceptance of a discounted payoff will result in debt forgiveness being reported to the IRS." **[Exhibit 62].**

Defendants' argument that the purported forgiveness moots damages is incorrect as explained above. Even if the loan is later properly forgiven, there is a genuine dispute of material fact as to the economic value of that forgiveness, or how it will affect Plaintiff's income tax liability for any actual future cancellation of debt. The jury will determine the amount of Plaintiff's damages, which are far higher than the amount purportedly forgiven, including his economic damages, emotional distress, punitive damages, and attorney's fees.

**3.  NONE OF PLAINTIFF'S CLAIMS WERE WAIVED BY SETTLEMENT**

Plaintiff's claims are not barred by the releases in the April 2020 settlement agreement because he is not seeking liability or damages for actions before that date.   Defendants argue that Plaintiff's claims that the escrow impound was improperly created is waived because it was created before the settlement. However, there is a genuine dispute of material fact over the whether an escrow impound account was ever created, or when. Defendants argue that the impound was created in February 2020, before the settlement was executed in April 2020. Their evidence in support of this fact is merely Verdooren's declaration, which is contradicted by extensive evidence.  First, PHH admits in its MSJ that they accepted as "sufficient" Plaintiff's three post settlement installments for March, April, and May 2020 and credited those months. [Verdooren Decl.¶20].  The settlement was agreed to in February 2020, and the reinstatement of $158,125.89 was to reinstate the loan to February, but it was not executed until April, so when Plaintiff timely paid in May 2020, he included $10,324.89 in additional funds for the three post-settlement installments for March, April, May

2020. He paid $3,447.63 for each month as specified by his counsel in the letter tendering the total payment. [**Exhibit 53**]. This was the amount to pay principal and interest only and did not include escrow. It is undisputed that the correct principal and interest payment on the loan was $3,432.96. PHH did not send billing statements for years, and not for three months after that payment, and the first post settlement statement in July 2020 included an escrow impound of $1,316.52 making the total claimed monthly installment $4,749.48.  **[Exhibit 241].**   This evidence shows it is likely that an escrow impound was created between June and July 2020, not in February because PHH did not require Mayer to pay an impound the first three payments after the reinstatement. In addition, PHH argues in this litigation that they rejected Mayer's next installments from June through December 2020 specifically because they were not enough to cover the escrow impound. This is an excuse made by counsel during the case and the evidence of the hundreds of emails between counsel from 2020 to 2024 shows that is not the reason any payments were rejected.

The settlement release does not release the escrow claims because an escrow impound account was never properly created and the escrow waiver never revoked because there was never proper notice given at any time before or after settlement.  When the loan was originated the parties executed an escrow impound waiver for Plaintiff to pay his taxes directly without an impound. **[Exhibit 3].**  The deed of trust provides that "Lender may revoke the waiver as to any or all Escrow Items at any time ***by a notice given in accordance with Section 15*** and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under Section 3." (emphasis added) **[**Verdooren Exhibit 2**].**   Notice under Section 15 of the deed of trust requires that notices "must be in writing" and by "first class mail" and that "The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender." [Id]. Defendants claim the purported "annual escrow statement" dated February 11, 2020, **Exhibit 43** is the only document that evidences that they gave Plaintiff any notice of creating an impound account.  [MPA p8 lines 13-14]. It is undisputed that the escrow statement was mailed to the office of Plaintiff's attorney Brian Liddicoat and not to Plaintiff's home by first class mail.  It is undisputed that this annual escrow accounting statement does not contain any words revoking the impound waiver contract or notice of creating an impound. Verdooren admitted in deposition that Plaintiff

-7-

never asked Defendants to change his notice address. [**Exhibit 201** p480]. These undisputed facts demonstrate no escrow impound was ever created by revoking the wavier. Defendants cannot defeat liability by making counterfactual assertions that the impound was created pre settlement.

The settlement does not waive any amounts advanced for taxes or insurance or any issues with how the escrow account was handled after the April 2020 settlement, including Plaintiff's claim under RESPA. Plaintiff does not seek damages for pre settlement tax payments.

Plaintiff's allegations that Defendants breached the contract by failing to give Plaintiff notice in writing of change in the loan interest rate is not waived because they never gave notice at any time, neither before or after settlement.

## 4.  UNDERLINE REFINANCE DAMAGES ARE NOT SPECULATIVE

Plaintiff's damages caused by PHH intentionally preventing him from refinancing his loan in 2020 at historic low rates is not speculative, but supported by the testimony of his mortgage loan officer Phillip Lewis in the declaration attached here, and by Plaintiff's testimony in deposition and interrogatory responses, and two expert witnesses. The settlement agreement requried PHH to report "paid as agreed" for the prior seven years within 30 days of settlment payment, and to send these reports to Plaintiff to prove the reporting was done within the next 30 days. This was specifically to allow Plaintiff to meet the refinancing qualifications which require showing the last 12 months of timely payments and so his score would increase over 100 points from where it was because of their negative reporting. Mayer had paid all his installments pre settlement during litigation to his attorney's trust account and had demonstrated the ability to pay and PHH wrongly rejected his payments, but agreed to accept payments in settlement and fix the credit reporting to reflect that reality.  PHH intentionally failed to do this reporting and rejected payments post settlement and continued post settlement negative reporting.

Plaintiff and Mr. Lewis both gave extensive testimony that the only reasons Plaintiff's refinancing did not occur was PHH's credit reporting failures and failure to give a payoff quote. [**Cory Mayer Depo Exhibit 202** p. 13-16, 18, 21-23, 25, 31, 215, 226-228, 231, 233 and 245] [Declaration of Phillip Lewis ¶1-15]. Mayer gave all necessary financial documents to Lewis in his office, they filled out a loan application, and Lewis determined based on a full review of all

information that Plaintiff qualified for the lowest Fannie Mae rate on a 30-year conventional loan except for the fact that PHH had not done the credit reporting pursuant to the settlement, and showed late payments instead of "paid as agreed" for the last 7 years. Lewis and expert Douglas Minor will testify that it is industry standard to not submit loan applications where there are known deal breakers such as the credit reporting here and the lack of a payoff because it is futile and would result in rejection.  Doug Minor's expert report confirms that Mayer met all other qualifications for refinancing at the lowest Fanny Mae rates in 2020. [**Exhibit 653** pages 26-28]. That makes three witnesses that will testify to these facts, demonstrating it is not speculative.

Defendants argue there is no evidence and that the company Lewis works for, Argus Home Loans, did not comply with a subpoena or court order. This is not correct. All responsive documents were produced March 12, 2026, including hundreds of emails. [Sanchez Declaration].  Lewis's declaration confirms he produced all responsive documents which are only emails because he no longer has physical or digital copies of loan application documents from that time because of his standard document retention policy is to destroy sensitive financial records when they becomes unnecessary or stale or when subsequent applications are submitted because it is overly burdensome to maintain it and because of the sensitive nature of the records and the large volume of files. [Lewis Decl. ¶13].  Defendants cannot defeat this case on summary judgment simply because they chose not to depose Phil Lewis.

Expert witness Jay Patterson calculates Plaintiffs damages using proper methodology to compare the stream of payments he would have made under a refinanced loan and his actual loan. [**Exhibit 633** ¶104-107]. Patterson used the unpaid principal balance in PHH's records, the Fannie Mae interest rates applicable pursuant to the declaration of Lewis as the actual rates Plaintiff qualified for at the time. [Lewis Decl. ¶5, 8]  Expert Doug Minor confirms the applicable Fannie Mae rates published by that are published by the Federal Reserve Economic Data (FRED). [**Exhibit 653** pages 27, 28, 37].  Patterson makes the calculations of damages as of July 2020, the earliest date Plaintiff could have refinanced if PHH had timely reported, and in November 2020 when Plaintiff actually first went in and submitted his papers to Lewis. The only reason Plaintiff did not go in earlier in July was because he was waiting for PHH to send the notice of credit reporting

required.  This shows the evidence is not speculative, and there is a genuine dispute of the amount of his damages.

Plaintiff's claim for damages for loss of credit expectancy are supported by the extensive expert witness report of Douglas Minor goes into great detail in all the ways a lower credit score is damaging. [**Exhibit 653**]  Defendants acknowledge in their MSJ that Plaintiff testified that he paid for a truck in cash because knew his credit was bad because of PHH and forewent applying for credit.  Also, the loss of refinancing at a lower rate referred to above is further concrete damages measurable and caused by the failure to properly report pursuant to the settlement agreement.

The damages for credit reporting harm are not preempted by FCRA because Plaintiff is not claiming the reporting was in violation of the Fair Credit Reporting Act, but it was a breach of the settlement contract, the covenant of good faith and fair dealing, and business and professions code, and intentional interference with contract. Their obligation to report in a certain way arises from contract, not statute, and the acts are wrongful on those independent grounds. The grounds for tort liability here arise from their intentional refusal to report for the express purpose of preventing Plaintiff from refinancing the loan. This is distinct from regular credit damage cases where the issue is whether the reporting was accurate.

5. **THERE ARE STILL GENUINE DISPUTES OF MATERIAL FACT ON ALL CLAIMS FOR RELIEF**

A. Breach of Contract

PHH admits they reversed and reapplied the funds five times over about a year and a half after settlement and that "the payments were applied incorrectly" [Verdooren Depo Transcript **Exhibit 200** p112]  because  "the accounting error of not including the credit" [*Id*, p112] and that the "the 33,000 had to be deducted from somewhere" and "a negative balance in escrow which that 33,000 would have covered" "So the credit was never properly applied to the loan. The accounting was never done. Does that make sense?" [Id. p115].  This payment history is demonstrated by PHH"s own loan transaction history **Exhibit 400**, and Patterson's expert report exhibits analyzing it. Plaintiff's expert Jay Patterson's report shows that PHH has never given Plaintiff the full credit of $33,120.95 pursuant to the settlement agreement, but rather a string of miscellaneous credits from

2022 to 2024, and that the credits that were applied to the amounts owed on the loan pre-settlement are $477.26 less than the required $33,120.95. [**Exhibit 633** ¶51-62] This evidence directly contradicts Defendants' argument on MSJ that this just a minor accounting dispute based on Plaintiff deciding to argue for the first time after settlement that the $33,000 "credit" in the settlement is a loan forgiveness and that PHH tried to accommodate that.

Verdooren admitted that PHH did not submit AUD forms to the three credit reporting agencies to say "paid as agreed" for the prior seven years within 30 days of payment as required by the settlement, but claimed that the first time this was done was October 24, 2024, over four years late. [**Exhibit 200** p196-197]. It is undisputed they violated the contract for four years which caused the damages.  Plaintiff's expert Doug Minor will show at trial that the reporting was never properly done, not even in October 2024 because the AUD forms don't cover 2013 to 2020, and that this was far too little too late to cure the harm of four years of failing to report.

The Santa Clara County Tax Assessor website shows each time PHH paid property taxes it was early before the due date, the violation alleged here. **Exhibit 20**.

Defendants rejected Plaintiff's properly tendered payments post settlement three times, including the $24,133.41 paid November 2020 **[Exhibit 59, 79]**, and $210,014.17 tendered October 9, 2024, **[Exhibit 169]** $32,467.13 sent November 2024, [**Exhibit 174**]. Patterson's report confirms these would cover the amounts owed. **Exhibit 633** ¶63-72]. This establishes these were proper and full tenders.  This shows PHH breached the settlement agreement, note, deed of trust and are still in ongoing violation. Patterson's report shows his damages as described above, as does Mr. Minor's.

B.  The Covenant of Good Faith and Fair Dealing

The evidence shows this is not merely restated breach of contract claim because rejecting Plaintiff's payments, their counsel not forwarding payments to the servicer, and claiming for years to be working to correct the loan but never actually doing it and then trying to foreclose for payments they prevented him from making violates the covenant. The evidence shows Defendants' counsel intentionally mislead Plaintiff after the settlement by defeating refinancing and settlement compliance but acting like he was working on it. There are dozens of emails between PHH's counsel Brian Paino and Plaintiff's counsel Pamela Simmons discussing PHH's errors and their claims to be

-11-

working on them in order to complete the refinancing. [Simmons Declaration ¶2-20. **[Exhibits 59, 61, 62, 68, 69, 79, 80, 81, 143, 169, 175].** These email exhibits are only a few of the hundreds available for trial. [Simmons Decl. ¶20].

Defendants' counsel Brian Paino received Plaintiff's payments for June through December 2020 of $24,133.41 because PHH had not fixed its accounting errors over the prior five months since receiving the $158,000 settlement reinstatement and that "At this point, I'm a little hesitant to send in the check you provided as it may compound the account issues" and that "that I'll need to provide you with documents reflecting any such adjustments." **[Exhibit 59].** Plaintiff's counsel informed Paino that Plaintiff was depositing his monthly mortgage payments into her trust account while PHH was working on correcting their problems. **[Exhibit 61].** Paino emailed Simmons that he was working with his client PHH "in an effort to expedite a resolution." [**Exhibit 62**].

Defendants have argued that the settlement agreement does not require any certain application of funds as a contractual obligation or that it is required by a specific time.  If the jury agrees, then the failure to apply them correctly is a breach of the covenant.

PHH's paying property taxes early is a breach of the covenant of good faith and fair dealing. The deed of trust provides that the lender may only pay property taxes and recover them from Plaintiff and create an impound if "Borrower fails to pay the amount due for an Escrow Item." [Verdooren Decl. Exhibit 2 page3] Plaintiff has a contractual right to pay his own taxes under the express impound waiver contract and the deed of trust only allows the lender to revoke the escrow impound waiver for "Failure to pay said taxes or insurance premiums when due[.]" [**Exhibit 3**]. PHH interfered with that contractual right by paying early, before the due dates seven times from 2020 to present. **Exhibit 20** is the Santa Cruz County Tax Assessor's website with the property tax payments made by Plaintiff marked in orange, and the payments made by PHH marked in blue, all with all semi-annual installments paid before the due date.   Plaintiff's expert witness Jay Hibert's report supports that this conduct is wrongful and outside industry standards, supporting a violation of the covenant. [**Exhibit 643** p9-10].

Many of the acts alleged and shown by evidence above as breaches of the contract could be determined by the jury to be wrongful acts that are not contractual obligations, and therefore in the

alternative could find they instead violate the covenant

C. Declaratory Relief

Defendants generically argue declaratory relief is duplicative, superfluous, seeks to remedy past wrongs, and there is no live controversy. However,  Defendants do not specifically address any of the nine specific requests for declaratory relief to which their objections apply, nor the statutory or factual bases for the relief, and therefore Plaintiff has no obligation here under FRCP 56 to present evidence to oppose this.   California law protects a party's contract rights when the other party tries to interfere by rejecting or preventing or frustrating performance including Cal. Civil Code §§1504, 1511, 1512, 1485. Plaintiff's requests for declaratory relief address nine specific and discrete issues in this case and cover three pages of text. [FACC ¶86-97].   For example, §1512 provides "If the performance of an obligation be prevented by the creditor, the debtor is entitled to all the benefits which he would have obtained if it had been performed by both parties."  Similarly, §1511 provides "The want of performance of an obligation, or of an offer of performance, in whole or in part, or any delay therein, is excused by the following causes, to the extent to which they operate:1. When such performance or offer is prevented or delayed by the act of the creditor, or by the operation of law, […] 3. When the debtor is induced not to make it, by any act of the creditor intended or naturally tending to have that effect, done at or before the time at which such performance or offer may be made, and not rescinded before that time."

Plaintiff seeks declaratory relief related to the allegations and evidence showing PHH frustrated and prevented performance.  For example, Defendants argue Plaintiff's payment of $24,000 in November 2020 to cover his seven installments post settlement from June to December 2020 was properly rejected as untimely and because it was insufficient to cover a purported $1,300 per month extra escrow impound.  Plaintiff requests declaratory relief that the §24,000 payment was timely and proper and sufficient in all respects, that he is entitled to all benefits of the contract because the evidence shown above support the allegations in the complaint that Defendants prevented and rejected performance and made it more difficult and Plaintiff was always ready, willing, and able to pay and paid his installments into his attorney's trust account while PHH was preventing performance, and therefore did everything possible to perform, and there was no escrow

-13-

impound or right to collect it or pay his taxes.  In the alternative, declaratory relief that any delay in payment between May and November is excused, or that interest stops accruing on the loan from the time of rejection of the payment to trial, or he is excused from timely making any monthly payments from 2020 to trial and may be paid anytime before loan maturity, that he is declared fully current, that Defendants are not allowed to foreclose before maturity for any payments from 2020 to trial. Plaintiff seeks declaratory relief to resolve the dispute between the parties about whether PHH is entitled to pay property taxes early, or revoke the waiver. Plaintiff seeks relief declaring he is not required to pay back the taxes advanced because the contract provides they may only charge him for it if he failed to pay when due, which he did not.  Each of these is authorized by statute and are proper forms of relief. Even if the loan is eventually forgiven properly before trial and properly admitted as evidence, it could render some of these claims unnecessary. However, Plaintiff is still entitled to the declaratory relief that he is entitled to all benefits of full performance from May 2020 to trial, which would require PHH to report he has paid as agreed from May 2020 to present as that is a benefit of the contract.  PHH is still reporting negatively to his credit as of June 4, 2026, depriving him of the benefits of the contract. **[Exhibit 371].**

Defendants cite the case of *RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co*., 56 Cal. App. 5th 413, 433-434 (2020) to argue a lien release moots a claim for quiet title and declaratory relief. However, that case involved a mechanics lien governed by different laws and procedures from deeds of trust and there did not appear to be any meaningful dispute there as to whether the releases were done properly, and release of the mechanics lien does not affect the validity of the underlying debt, which is distinguishable from this case where the note must also be cancelled.

D.  Business and Professions Code §17200

The evidence herein above of the wrongful acts are sufficient for liability for unfair business practices for preventing and frustrating his payments. Expert Jay Hibert's report addresses extensive evidence and explains how these acts are outside standard servicing practices, which supports a finding of unfair practices. **[Exhibit 643].**    The evidence is sufficient for liability under the "unlawful prong" of the statue that their violations of the Truth in Lending Act (TILA) and corresponding Regulation Z, and the Fair Debt Collection Practices Act (FDCPA) and the Rosenthal

-14-

Fair Debt Collection Practices Act because Patterson's report goes into detail establishing the many material inaccuracies in the billing statements and escrow statements and payoff quotes, Notice of Default and Notice of Trustee Sale. [**Exhibit 633**¶73-97]. These material inaccuracies violate these governing regulations. Plaintiff has shown financial loss by the inability to come current, lost ability to refinance, and seeks injunctive relief mandating that they terminate the escrow impound, enjoin payment of property taxes early, mandate sending statements, and enjoin collecting late fees attorneys' fees, or any other charges because they would not be incurred but for their wrongful conduct.  In other words, to do the job right and comply with industry regulations and standards designed to protect borrowers from exactly these unfair and harmful practices.

A proper and complete loan forgiveness with a proper reconveyance of the deed and returning the original note marked "paid" would render this cause of action unnecessary, but that is not the case at this point in time.

E. <u>Rosenthal Act</u>

Patterson's report establishes the many material inaccuracies in the billing statements and escrow statements and payoff quotes, Notice of Default and Notice of Trustee Sale. [**Exhibit 633**¶73-97]. Verdooren's testimony establishes that these are intentional and they knew the problem since 2020 and 2021 when he admitted that he was personally had identified, as do the servicing notes **[Exhibit 420].** These material inaccuracies violate the Rosenthal Act. Defendants argue that Plaintiff "concedes" that inaccurate or misleading billing statements did not cause emotional distress.   This is not true and their cited evidence does not show this. Plaintiff testified extensively of the many ways Defendants' misconduct in sending inaccurate statements caused his distress. [**Exhibit 202** p. 13-16, 18, 21-23, 25, 31, 215, 226-228, 231, 233 and 245]. This demonstrates causally related emotional distress damages.

The complaint alleges the deceptive means to collect a debt include insisting on an escrow account that does not exist to defeat Plaintiff's ability to get current and to reject his payments. Verdooren's testimony in his two depositions establish that all the monthly billing statements and escrow statements from 2020 to present are materially inaccurate. At first, in 2020, the escrow account showed a large deficiency as if Plaintiff owed over $33,000, but he had paid that in the

reinstatement and they failed to give him the settlement credit and double charged him. Later on, the annual escrow statements for 2022 through 2024 inexplicably show a surplus of over $7,000 which is impossible even if PHH had an authorized escrow account because by 2022 their internal system still showed an escrow advance deficiency greater than $13,000. [**Exhibit 252**, **253**, **254**]. Verdooren admitted these were completely inaccurate but could not explain why. [**Exhibit 200** p162-165]. Verdooren admitted that the Notice of Default filed in August 2023 was recorded three months before PHH had ever sent Plaintiff any payoff quote that was even remotely accurate, and even then, Verdooren admitted the November 2023 payoff quote was overstated by $400. [**Exhibit 200** p444-445]. Patterson's report shows the Notice of Default in 2023 claiming $178,903.80 is overstated by $13,972.05. [**Exhibit 633** ¶97]. This is intentionally deceptive and inaccurate and caused Plaintiff serious emotional distress as he and his family testified because they were trying to foreclose for the incorrect amounts and for more than he owed and for money he had but that they would not take because they always claimed he did not pay enough. These overstated payoffs and Notice of Default and Notice of Trustee Sale were the reasons Defendants rejected Plaintiffs' tender of over $210,000 in October 2024, and $32,000 in November 2024. Defense counsel returned this payment with a letter specifying that was rejected because it was "insufficient to cure the default and bring the loan current." **Exhibit 174**.

The statute of limitations for the Rosenthal Act is one year back to January 10, 2023, based on the motion to enforce the settlement agreement filed January 10, 2024, which resulted in a TRO, which resulted in filing the complaint in a new case August 9, 2024 after it became clear complete relief would require further action. This is the basis for equitable tolling of the statute between January and August 2024. There are plenty of damages shown by the evidence, including statutory and emotional distress and economic damages as shown herein above.

Emotional distress damages are available under the Rosenthal Act. *Komarova v. Nat'l Credit Acceptance, Inc.*, 175 Cal. App. 4th 324 (2009). The evidence supports this causation because these harassing and inaccurate statements and communications demanding payment and claiming he is late and they are going to foreclose for money he has tried to pay, that they were rejecting, and to collect more than he owed. Plaintiff is entitled to statutory penalties between $100 and $1,000 under

California Civil Code §1788.30(b). Defendants do not dispute this.

Defendant's argument that Plaintiff's claim for emotional distress "lacks credibility" will be decided by the jury. Defendants include a table attempting to summarize and characterize certain claims and testimony related to emotional distress. These characterizations are materially misleading and incomplete. There are hundreds of pages of deposition testimony from Plaintiff and his family of the severe emotional distress he suffered caused by the wrongful conduct shown and explained above. A few examples are cited here.

Plaintiff testified at his deposition that he suffered loss of appetite and sleeplessness "continuous" and "going on for ten years" and that the struggles to sleep every single day due to the stress and anxiety caused by PHH. [**Exhibit 202**, p215, 233]. This affected his physical and mental health and it adversely affected his ability to work and focus on his work. [Schneider Decl., Exhibit 11, p 21] Interrogatory response #18.]. Plaintiff testified that Defendants wrongdoing drove him to drinking and split up his marriage and has prevented them from getting back together ever since. He testified his marriage troubles started "related to the foreclosure" in 2016. [Id p21] Plaintiff testified that he did not drink "that much" before but that "the foreclosure caused a lot of stress" and that is when the drinking "started kicking in" because he was "feeling hopelessness from PHH not accepting my—my loan and my money from my loan. And the only thing that I used to deal with the stress would be drinking." [p245]

Plaintiff and his wife Hillary Hamilton separated before 2020 but have always hoped to reconcile and are not divorced.   Plaintiff testified he hoped they were on a path to getting back together "if I can keep my house" and that the threat of losing the house to foreclosure from 2020 to present and the stress from the bank's conduct prevented them getting back together. [Id p14-15]. He testified Ms. Hamilton sometimes did not believe him that the bank was not taking his payments, losing trust in him, which created stress and made him feel helpless. [Id p.13].   They discussed having counseling, but did not do it. [p.16]. "dealing with with my mortgage makes me grumpy and irritable and a hard person to be around." [p18]. Plaintiff is a long time surfer raised in Santa Cruz, but the stress caused him to lose interest in surfing and he worked more to earn money to pay attorneys fees in addition to depositing his mortgage payments in the trust account. The stress caused

him to believe he was having heart attacks several times. [Id. p226].  It caused anxiety and depression. [Id. p.231].  He and his wife had high hopes of getting back together because of the 2020 Settlement he believed it was going to solve the problem. [p.22].  It caused him trouble with his other friends and family because he is no longer a happy go lucky person, but "negative all the time" and is no longer generally "a happy person." [p223]. Plaintiff and his wife were trying actively to start a family for several years but that ended when the stress broke up the marriage.

Hillary Hamilton, Plaintiff's estranged wife, testified that the trouble in their marriage was caused by "The bank not accepting the payments and causing so much turmoil in our relationship because of the stress that Cory experienced[…][**Exhibit 203** p72]. She said  they were "trying to have a family together and that was all taken away because -- because of the bank and the issues with the mortgage. And, I mean, it was emasculating for him. Like I've said, it simply feels like it destroyed our lives, changed him a lot, so, you know, like our -- our lives were derailed because of it, so -- I wish it never happened that way because this is not how I expected my life to be, you know. I don't think Cory did, either. Yeah, it feels like the bank kind of ruined our lives[.]" [Id. p72]. She testified the stress changed his personality: "he can be happy but he's not the same person. It really changed him" [Id. p33-34]. They "had a pretty healthy relationship" before the first foreclosure. [Id p.21].

Helen Mayer, Plaintiff's mother, testified that the bank not taking his payments caused Plaintiff to feel "helpless. Felt horrible. […]he couldn't believe that they would -- his money was -- you know, they wouldn't accept his money" and that Plaintiff told her this constantly for years, and that his stress and problems were "It was always about the bank not accepting his money" and "really stressful for him." [**Exhibit 204** p.37, 38] She said this stress caused by Defendants caused the difficulties in his other relationships. [Id. p.41]. She testified "He always wanted to have children and he still -- like I said, he still does, so... I just feel bad that this all happened and he's not with her anymore[.]" [Id. p.40-41].  His mother sought counseling for a year the stress was so extreme it changed her son's personality: "he was like really hard to talk to during that time when his house was in foreclosure, really took him really hard" and "I had to go seek counseling 'cause it was -- he was hard to talk -- I couldn't talk to him. He would get really mad and angry and… And it helped.

It helped me" [p15]. She testified the stress reduced around the 2020 settlement, but then continued. [p18-20].

Kimberly Mayer, Plaintiff's sister, corroborated the foregoing testimony, and also testified that it changed Plaintiff, that "seemed like there wasn't a ton of hope" and that he felt like no matter what he did it would not fix the problem and "I think just a lot of confusion without having any answers for so long was definitely weighing on him to a point,[…] [Exhibit 206 p.15-16]. She testified "he's worked all the time and so hard, and to see him go through that, potentially losing his house, it's stressful." [Exhibit 206 p.14-15] She said "to like be on the verge of potentially losing it was a huge stressor and -- yeah, it was a very challenging time for him, I would say." [Id at p.15]

Christoper Mayer, Plaintiff's father, likewise testified "But the struggles with this bank has been having a very negative effect on him and it breaks my heart to see him go through this stuff[.]" [**Exhibit 205** p22]. This evidence shows Defendants' actions caused the stress that led to all the other problems including the drinking and breaking up the marriage, not the other way around.

F.  Intentional Interference With Contract

This Court previously denied Defendant's motion to dismiss this claim based on the same arguments that a loan servicer is a party and agent and cannot interfere with the contract, which was fully briefed by the parties. [ECF dockets 37, 41, 61]. The Court should reject it again.  Plaintiff alleges that PHH interfered with the note and deed of trust by preventing payment and paying escrow and the other many wrongful acts shown by the evidence above and below.

PHH argues it cannot interfere with a contract because it is "a contracting party" and it is that PHH is the loan servicer with "power and authority to administer the Loan on behalf of the contracting party, HSBC." [MPA p20 lines11-13].  Defendants have failed to produce servicing agreements proving any relationship between HSBC and PHH despite court orders compelling it. This makes PHH a stranger to the contract. Their evidence in the declaration that they are the servicer for HSBC is inadmissible because they failed to produce it in discovery pursuant to court orders and is prohibited under FRCP 37.  Plaintiff's expert witness Jay Hibert reviewed all 1,300 pages of documents produced in discovery relating to servicing agreements and concluded that "The materials reviewed do not clearly establish, at the loan-specific level, that HSBC was the owner of

-19-

the subject loan or that PHH Mortgage Corporation was acting as the authorized servicer for HSBC" and do not "identify the subject loan" and that "The absence of loan-level documentation is not consistent with standard servicing practices." [**Exhibit 643** p13].

Even if PHH is determined at trial to be a servicing agent, an agent can be liable for interference for acting outside the scope of his authority or without authorization or ratification, or acting for its own financial gain, which makes it a stranger to the contract. Exhibit A is a ruling by the Honorable Judge Jeffrey Brand from the Superior Court of California, Alameda County, overruling a demurrer on this very argument. *Dollaga v. Specialized Loan Servicing, Alameda County Case* RG20073165 (July 20, 2021)  See also *Dollaga v. Specialized Loan Servicing LLC*, 2021 Cal. Super. LEXIS 61438, \*9. Federal Courts in California have ruled against these same Defendants PHH and HSBC on this very issue, denying PHH and HSBC's motion to dismiss because the alleged interference was "by, inter alia, failing to credit payments as contractually required, charging fees that exceeded contractually specified amounts, and by instructing plaintiff to make payments on terms that failed to prevent the foreclosure sale of her home[.]" *Walters v. Fidelity Mortgage of California, Inc*. (2010) 730 F. Supp. 2d 1185. California law specifies an agent is liable to third persons when their "acts are wrongful in their nature." Cal. Civ. Code § 2343. *Golden v. Anderson*, 256 Cal. App. 2d 714, 719-20 (1967)

Mortgage servicers are strangers to the note and deed of trust contracts and courts routinely find that loan servicers are not parties to the underlying loan. "As a loan servicer, Aurora is not a party to the deed of trust itself." *Lomboy v. SCME Mortg. Bankers*, No. C-09-1160 SC, 2009 U.S. Dist. LEXIS 44158, 2009 WL 1457738, at \*5 (N.D. Cal. May 26, 2009) (citing *Ruff v. America's Servicing Co*., No. 07-489, 2008 U.S. Dist. LEXIS 33447, 2008 WL 1830182 (W.D. Pa. Apr. 23, 2008) (holding that servicer "was not a party to the mortgage")). *Conder v. Home Sav. of Am*., 680 F. Supp. 2d 1168, 1174 (C.D. Cal. 2010). "'A significant majority of courts have concluded that loan servicers are not in privity of contract with mortgagors where the servicers did not sign a contract 'With the mortgagors or expressly assume liability." *Mazzei v. Money Store*, 308 F.R.D. 92, 109 (S.D.N.Y. May 29, 2015).

G. Slander of Title

The evidence here shows the Notice of Default and Notice of Trustee Sale were communications with malice and therefore not privileged, because PHH intentionally prevented the payments creating the purported default and tried to foreclose for payments Plaintiff had made and continually tried to make while PHH defeated it. California Civil Code §2924(d)(2) provides that recording the Notice of Default and Notice of Trustee Sale "constitute privileged communications pursuant to Section 47" and the applicable privilege in California Civil Code §47(c), the common interest privilege, only allows "a communication, without malice" to be privileged, "therefore a slander of title claim for recording the Notice of Default and Notice of Trustee Sale depends on whether Defendant "acted with malice." *Kachlon v. Markowitz*, 168 Cal. App. 4th 316, 343 (2008).

"For the purposes of section 47's qualified privilege, "malice" means that the defendant (1) "'was motivated by hatred or ill will towards the plaintiff,'" or (2) "'lacked reasonable grounds for [its] belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights.'" *Schep v. Capital One, N.A.*, 12 Cal. App. 5th 1331, 1337, 220 Cal. Rptr. 3d 408, 413 (2017). The evidence described herein above and below demonstrate malice.

H.  Damages for Impaired Marketability and Diminution in Value Were Disclosed

Damages for impaired marketability were alleged in the complaint, disclosed in response to interrogatories, and proven by a timely disclosed expert and cannot be excluded under FRCP 37.

Plaintiff alleged these damages in the First Amended Complaint filed June 10, 2025, the first time slander of title was alleged stating that the Notice of Default "impaired the marketability of the property and decreased its value." [FAC dkt 33¶142] A few weeks later in July Defendants served their first interrogatories. Plaintiff timely responded on August 1, 2025, disclosing these damages and the manner of calculation including interrogatory 13 attached to Defendants' MSJ, on August 1, 2025, that the NOD "impaired the marketability of the property and decreased its value. This will be the subject of expert witness testimony based on comparable sales and related methodologies." [Schneider Decl. Exhibit 11, page 18]. Plaintiff's timely disclosed expert witness Mark Cianciulli quantifed the damages at "approximately $108,000, with a supported range of approximately $86,000 to $129,000, as of the valuation date." **[Exhibit 662, p5].** Mr. Cianciulli is a real estate broker and based his opinion on comparable sales, market research, publications, and extensive

-21-

personal experience as the broker in dozens or hundreds of sales of real property with impaired titles because of recorded notices of default.  Defendants deposed him.

No harm is alleged or shown by PHH that had nearly a year's notice before MSJ of these damages and manner of calculation, and conducted full discovery.  Amending the initial disclosures was not necessary where discovery was served and responded to immediately after the complaint. The failure to use the specific words "diminution in value" in the initial disclosure was inadvertent, substantially justified, and harmless because the manner of calculation of real estate values is for experts, and Plaintiff did not have evidence of comparable sales or the market research or any of that evidence until the expert broker obtained it, at which point he timely produced it. The law does not require Plaintiff to amend initial disclosures to repeat every interrogatory response or document production. Exclusion of evidence under FRCP 37 is only proper if the evidence was not disclosed "as required by Rule 26(a) or (e)" which includes both initial disclosures under FRCP 26(a) and answering or supplementing written discovery such as interrogatories under FRCP 26(e).   Here, Plaintiff was required to produce this evidence under FRCP 26(e) in response to interrogatories, and did, so FRCP 37 sanctions are inapplicable.

I.   RESPA

If the jury agrees with Defendants that an escrow impound account was properly established, Patterson's report demonstrates PHH was charging nearly double the allowed RESPA amount for impound, and the billing statements and the annual escrow statement are all materially wrong and not consisted with the regulations. [**Exhibit 633** ¶73-80]. The evidence herein shows the damages are causally linked, and even Defendants' own arguments in MSJ prove causation because they claim they rejected Plaintiff's tendered payment of $24,000 by shredding it around April 2021 because it was insufficient to cover the purported $1,300 in additional escrow charges on the monthly billing statements because Plaintiff paid enough to cover the $3,400 per month due for principal and interest, and not to cover the $1,300 extra for the escrow impound. Verdooren admitted the undisputed fact that the $1,300 impound in 2020  and $1,200 in 2021 was too high because it included recovery of over $33,000 in escrow advances that should have been zeroed out by applying the $33,000 credit in settlement, but was not. Plaintiff testified extensively that the rejection of his

payments caused by the escrow impound that was too high caused his distress and is sufficient.

## 6. **PUNITIVE DAMAGES**

The evidence provided here and described in this position are sufficient for punitive damages showing they intentionally prevented payment of the loan and refinancing and attempted to foreclose and that PHH did this to earn higher servicing fees.

Defendants' counsel intentionally prevented Plaintiff's post settlement payments from being sent to PHH which he confirmed by email, **[Exhibit 59],** then expressly agreed with Plaintiff's counsel that Plaintiff "has made all payments through my office but was decided by your office (Paino) that it would be better to allow the servicer to complete their internal process" and monthly payments would be held in Simmon's client trust account pending resolution of PHH of their errors. **[Exhibit 79].** Simmons emailed Paino many times over 4 years about the issues. **[Exhibits 80, 81]**,

PHH's counsel Paino knew refinancing was important and the reason for the credit reporting term in the settlement agreement. Emails between Paino and Simmons show he knew this and asked Simmons "How far along is the refinance process is Mr. Mayer" and "are there any specific deadlines for him to close on a new loan?" November 1, 2020, right after receiving Plaintiff's tendered payment of $24,000.**[Exhibit 59].** Simmons followed up March 8m, 2021, emailing Paino "Cory is ready to refinance his loan" and the statements are still not accurate and the problems not fixed, to which Paino responded he was working "to expedite a resolution." **[Exhibit 62].** There are dozens of similar emails, these are only a few. **[Exhibit 68, 69].**

Hibert's expert report supports punitive damages because it provides detailed opinions based on all the evidence in this case that the wrongful acts occurred and are far outside the scope of industry standards. [**Exhibit 643** p.11-14]. His opinions show Defendants' internal records produced show involved by in-house counsel participating in the conduct alleged to be wrongful, and involved in what is normally loan level standard duties of billing statements, escrow, payment application, and credit reporting. [**Exhibit 643** p13-14]. This is strong evidence supporting Plaintiff's claims that high level managing agents directed PHH's here because there are so many wrongful actions that are so far outside the scope of standard practices, that it cannot be explained as innocent errors, but only intentionally directed by upper management. His opinions are evidence

that outside counsel Brian Paino was acting at the direction of managing agents and outside counsel's acts here would not be made independently. His opinions support punitive damages by demonstrating a financial incentive for PHH to keep the loan in default status to earn more fees: "a loan in default can generate materially greater servicing-related revenue than a performing loan. This creates a financial structure that does not favor rapid payoff or refinance and instead aligns with continued servicing activity." [Id. p.13].

The privilege logs attached here as **Exhibits 33, 34, 35, 36** show over 700 emails between outside counsel, several in-house counsel, including head inhouse counsel Joel Israel, regarding PHH's bad acts alleged here in regard to failing to implement the settlement and other violations from 2020 to present. The internal servicing note logs of actions taken on the loan show nearly 300 employees worked on the loan making countless hundreds of action log entries from 2020 to present. **[Exhibit 420].**   Witnesses Benjamin Verdooren, Tiffany Drexel, and Evelyn Pierre are all PHH employees that testified at deposition confirming their extensive involvement in all the wrongful acts alleged and confirmed that the servicing notes and emails in the privilege logs showed their work on Plaintiff's loan.   Benjamin Verdooren is a managing agent because he worked personally on the case, oversees extensive litigation matters and directs corporate policy, and his deposition transcript establishes this. He directed the application of funds to the loan.   Tiffany Drexel was the senior manager over the specialized home retention department, the highest level over that department in the United States over all loans in litigation in the country. She testified she makes corporate policies and directs the entire department. There is extensive and detailed testimony in her deposition establishing her managing agent status. **Exhibit 207**. Evelyne Pierre is also a managing agent with extensive details in her deposition establishing this. **Exhibit 208**. Outside Counsel Brian Paino counts as a managing agent, and took actions making many of the wrongful acts described above as shown in the emails between him and Simmons, and his hundreds of emails on the privilege logs.   Joel Israel, senior in house counsel is also in the records directing the wrongful conduct.

PHH intentionally chose not to do the credit reporting to intentionally defeat refinance. Verdorren testified that the credit reporting "paid as agreed" for the last seven years pursuant to the settlement required a special request to the credit reporting department, and that the request had to

-24-

come from in-house counsel or outside counsel including Brian Paino, but the request was not made. [**Exhibit 201** p.328-334]. Verdoorn's testimony on this point demonstrates that Brian Paino and inside counsel conspired to not request the reporting. The extensive emails with Paino and Pamela Simmons cited here and in declarations shows he was in constant contact with her about the refinancing and knew the reporting failure was preventing it.

It should have taken only a handful of entry level employees to apply the reinstatement funds to the loan, give the $33,000 credit, do the credit reporting, send billing statements, and properly service the loan. Instead, This demonstrates extreme misconduct on a large scale that cannot possibly be explained as a minor accounting dispute as PHH argues and is malicious and oppressive conduct. The attached servicing notes are a few excerpts only, but there are dozens more.

Punitive damages are merited by the rejection of three full and proper payment tenders described above from 2020 to 2024 because it shows malice and oppression and fraud to reject full payment and try to foreclose.  Patterson's report is evidence that each tender was sufficient to pay what was owed. [**Exhibit 633** ¶67-70]

If admissible at trial, the purported loan reconveyance would support punitive damages because no lender would purport to voluntarily forgive a $628,000 loan two years into litigation over a minor accounting disagreement.

### 7. OBJECTIONS TO EVIDENCE

Plaintiff objects to Verdooren's declaration paragraph 6 because he has no personal knowledge of the facts in that paragraph regarding whether Plaintiff's loan was part of a pool of loans owned by another entity, and he admitted in deposition that he did not know.

Plaintiff objects to admission of the purported reconveyance because Defendant did not produce it in discovery, only purporting to forgive the loan 10 days before MSJ and refusing further discovery. Therefore it should be barred from trial and Defendants cannot demonstrate that any evidence related to the purported loan forgiveness can be presented in a form that is admissible at trial under FRCP 56(c)(2). Plaintiff objects to the admission of the reconveyance because it is not authenticated by DocSolutionsUSA.

DATED:  June 5, 2026

/s/ Andrew J. Christensen

Andrew J. Christensen
Attorney for Plaintiff
Cory Mayer

Plaintiffs' Opposition to Summary Judgment  5:25-CV-00182-NW