# Exhibit A

LAW OFFICES OF ANDREW J. CHRISTENSEN, P.C.
Attn: Christensen, Andrew J.
1970 Broadway
Suite 550
Oakland, CA 94612

The Ryan Firm
Attn: Ryan, Timothy M
2603 Main Street, Suite 1225
Irvine, CA 92606

# Superior Court of California, County of Alameda
# Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Dollaga<br>Plaintiff/Petitioner(s)<br>vs.<br>Specialized Loan Servicing LLC<br>Defendant/Respondent(s)<br>(Abbreviated Title) | No. RG20073165<br>Order<br>Demurrer to the First Amended Complaint Sustained |

The Demurrer to the First Amended Complaint filed for Specialized Loan Servicing LLC was set for hearing on 06/24/2021 at 02:30 PM in Department 22 before the Honorable Jeffrey Brand. The Tentative Ruling was published and was contested.

The matter was argued and submitted, and good cause appearing therefore,

IT IS HEREBY ORDERED THAT:

Defendants Specialized Loan Servicing LLC and Gulf Harbour Investments Corp. demur to the third and sixth causes of action asserted in the First Amended Complaint ("FAC") filed by Plaintiff Judith Dollaga in this action. The third and sixth causes of action sound, respectively, in intentional interference with contract and in negligence. The demurrers assert that these counts fail to state a cause of action. (Code of Civ. Proc. § 430.10(e).)

Defendants demurred to analogous causes of action in Dollaga's original operative complaint. The Court sustained that demurrer with leave to amend on March 30, 2021. Dollaga availed herself of the Court's leave and filed the FAC on April 15, 2021.

The demurrer to the third cause of action is OVERRULED. The demurrer to the sixth cause of action is SUSTAINED WITHOUT LEAVE TO AMEND. Defendants are ordered to serve and file their answer the FAC within 10 court days.

LEGAL STANDARDS

The standard for construing a complaint on demurrer is long-settled: "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed. [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]" (Blank v. Kirwan (1985) 39 Cal.3d 311, 318.)

"Liberality in permitting amendment is the rule, if a fair opportunity to correct any defect has not been given." (Angie M. v. Superior Court (1995) 37 Cal.App.4th 1217, 1227.) For the Court to grant leave to amend after sustaining a demurrer, however, the plaintiff must "show a reasonable possibility of curing the defect in the complaint by amendment." (Heritage Pacific Financial, LLC v. Monroy (2013) 215 Cal.App.4th 972, 994.) The plaintiff bears "the burden of proving that an amendment would cure

the defect." (Ibid.) But when the court has already sustained a demurrer to a similar cause of action with leave to amend, and the plaintiff does not remedy the deficiencies, the Court may "infer that the pleader has no additional allegations with which to make its claim certain and has already pleaded its case to best advantage" and conclude that permitting a further opportunity for amendment would be futile. (Hills Transp. Co. v. Sw. Forest Indus., Inc. (1968) 266 Cal.App.2d 702, 713-714.)

DISCUSSION

1. Timeliness

Plaintiff argues that Defendants' demurrer should be disregarded as untimely. The FAC was served by mail and filed April 15, 2021. Defendants' responsive pleadings were therefore due May 20, 2021. (Code of Civ. Proc. § 430.40(a) [demurrer due 30 days after service]; § 1013(a) [time for response extended five days when service is by U.S. mail within California].) On April 27, 2021, Defendants filed the Declaration of Michael W. Stoltzman, Jr., seeking an automatic 30-day extension under Code of Civil Procedure section 430.41.

Plaintiff argues that the Stoltzman Declaration does not meet the requirements of the Code of Civil Procedure. The Code provides that, before a party may demur to a pleading, the parties must meet and confer by telephone or in person at least five days before a responsive pleading is due and that, "[i]f the parties are not able to meet and confer" the demurring party may receive one automatic 30-day extension "by filing and serving . . . a declaration stating under penalty of perjury that a good faith attempt to meet and confer was made and explaining the reasons why the parties could not meet and confer." (Code of Civ. Proc. § 430.41(a)(2).)

The Stoltzman Declaration states only that counsel "ha[s] not had an opportunity to substantively discuss the merits of Defendants' anticipated demurrers." (Decl. of M.W. Stoltzman Jr. ¶ 5.) It includes no description of any efforts to contact Plaintiff's counsel or other evidence from which the Court could determine that Defendant had made a good-faith effort to contact Plaintiff. It is, therefore, not effective to extend Defendants' deadline and their subsequent demurrer is untimely.

The Court has discretion to consider untimely filings. (See Cal. R. Ct. 3.1300(d) ["If the court, in its discretion, refuses to consider a late filed paper, the minutes or order must so indicate."]) "Cognizant of the strong policy favoring the disposition of cases on their merits [citations], judges usually consider whether to exercise their discretion in applying local court rules and frequently consider documents which have been untimely filed." (Kapitanski v. Von's Grocery Co. (1983) 146 Cal. App. 3d 29, 32.) Plaintiff has not shown that she would be prejudiced by the Court's consideration of Defendants' untimely demurrer, and consideration of Defendants' arguments here will serve to settle the pleadings and bring this case to speedier resolution. In the Court's discretion, therefore, the demurrer shall be heard as though timely filed.

Defendant and its counsel are hereby admonished that the Court expects its procedures and deadlines to be followed strictly and in good faith. The parties are warned that they should not to expect similar lenience in the future.

2. Intentional Interference with Contract

"'[A] stranger to a contract may be liable in tort for intentionally interfering with the performance of the contract.'" (I-CA Enterprises, Inc. v. Palram Americas, Inc. (2015) 235 Cal.App.4th 257, 289, quoting Pacific Gas & Electric Co. v. Bear Stearns & Co. (1990) 50 Cal.3d 1118, 1126.) "The elements of the tort are: '(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'" (Ibid.)

The Court sustained SLS's previous demurrer to an intentional interference cause of action on grounds that the FAC did not allege that it was a stranger to the contract. The FAC alleges that SLS acted as Gulf Harbor's agent in making the trial period plan offer. (FAC ¶ 79.) Plaintiff argues that this distinction makes SLS a stranger to the contract. It does not. Under California law, an agent of a party is not a stranger to a contract. "[O]ne . . . who is not a party to the contract or an agent of a party to the contract is a "stranger" for purpose of the tort of intentional interference with contract." (Redfearn v.

Trader Joe's Co. (2018) 20 Cal.App.5th 989, cited with approval in Caliber Paving Company, Inc. v. Rexford Industrial Realty and Management, Inc. (2020) 54 Cal.App.5th 175, 185.)

The FAC now alleges that SLS acted without authorization when it failed to offer proper loan modification terms to Plaintiff. (FAC ¶ 91.) When an agent acts without authority or ratification, it is not acting as an agent and lacks the power to bind its principal. (See Civ. Code § 2307 ["An agency may be created, and an authority may be conferred, by a precedent authorization or a subsequent ratification"]; § 2315 ["An agent has such authority as the principal, actually or ostensibly, confers upon him."]; § 2316 ["Actual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess."].) When an agent's only connection to a contract is as an agent to its principal and it acts outside the scope of its authority, it is a stranger to the contract. Because Plaintiff alleges that SLS acted against Gulf Harbor's interests and instructions to Gulf Harbor's detriment, and a reasonable finder of fact that SLS acted outside the scope of its authority and was not ratified. (FAC ¶ 91.)

Although SLS's name appears in the TPP documentation it sent to plaintiff, and the TPP is occasionally referred to as an agreement between SLS and Plaintiff, a reasonable factfinder could also find, based on the terms of the agreement, that SLS was acting in its capacity as an agent for the noteholder. SLS did not, after all, own the underlying debt and cannot change the terms of Gulf Harbor's debts unless it is acting as an agent. This is, at the least, an ambiguity that must be construed in Plaintiff's favor when raised by demurrer.

The demurrer to the third cause of action is therefore OVERRULED.

3. Negligence

To state a cause of action for negligence, a plaintiff must plead facts showing that "'defendant had a duty to use due care, that he [or she] breached that duty, and that the breach was the proximate or legal cause of the resulting injury.'" (Vasquez v. Residential Investments, Inc. (2004) 118 Cal.App.4th 269, 278.)

Plaintiff argues that the Biakanja factors support finding a duty here. (See Biakanja v. Irving (1958) 29 Cal.2d 647, 650 ["The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm."].)

As the Court discussed in its Order on Defendants' previous demurrer, the Court finds persuasive the most recent opinion cited by the parties-that of Sheen v. Wells Fargo Bank, N.A. (2019) 38 Cal.App.5th 346, which held that no such duty exists as a matter of law. Although Sheen is currently on review before the California Supreme Court, there remains a split of appellate authority on this point, and the Court finds that the better reasoned line of cases counsels against finding a tort duty to offer a loan modification. (See, e.g., Lueras v. BAC Home Loans Servicing, LP (2013) 221 Cal.App.4th 49, 62-67.)

Because Plaintiff has alleged no new facts showing the breach of a tort duty, the Court infers she has pleaded her case to best advantage and that further leave to amend would be futile. The demurrer to the FAC's sixth cause of action is SUSTAINED WITHOUT LEAVE TO AMEND.

ORDER

The demurrer is SUSTAINED WITHOUT LEAVE TO AMEND as to the FAC's sixth cause of action and otherwise OVERRULED. Defendants shall file their answer or answers within 10 court days of service of notice of this order.

Dated: 07/20/2021 Jeffrey S Brand
facsimile

Judge Jeffrey Brand

Order

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number: RG20073165
Order After Hearing Re: of 07/20/2021

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the foregoing document was mailed first class, postage prepaid, in a sealed envelope, addressed as shown on the foregoing document or on the attached, and that the mailing of the foregoing and execution of this certificate occurred at 1225 Fallon Street, Oakland, California.

Executed on 07/23/2021.

Chad Finke Executive Officer / Clerk of the Superior Court

By ______________________
Deputy Clerk

# **Exhibit B**

Brian A. Paino (SBN 251243)
bpaino@hinshawlaw.com
Helen Mosothoane (SBN 254511)
hmosothoane@hinshawlaw.com
Zeeshan Iqbal (SBN 337990)
ziqbal@hinshawlaw.com
**HINSHAW & CULBERTSON LLP**
350 South Grand Ave., Suite 3600
Los Angeles, CA 90071-3476
Telephone: 213-680-2800
Facsimile: 213-614-7399

Attorneys for *Defendants* **PHH MORTGAGE CORPORATION and HSBC BANK USA, NATIONAL ASSOCIATION, AS TRUSTEE FOR DEUTSCHE ALT-A SECURITIES MORTGAGE LOAN TRUST, SERIES 2006-AR2**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CORY MAYER,<br><br>Plaintiff,<br><br>vs.<br><br>DEUTSCHE ALT A SECURITIES MORTGAGE LOAN TRUST SERIES 2006-A; PHH MORTGAGE CORPORATION; WESTERN PROGRESSIVE, LLC; DOES 1-20; and all persons unknown claiming any interest in the property, inclusive,<br><br>Defendant(s). | Case No.: 5:25-cv-00182-NW<br><br>**DEFENDANT PHH MORTGAGE CORPORATION'S RESPONSES TO PLAINTIFF CORY MAYER'S REQUEST FOR PRODUCTION, SET ONE** |

**PROPOUNDING PARTY:** *Plaintiff* CORY MAYER

**RESPONDING PARTY:** *Defendant* PHH MORTGAGE CORPORATION

**SET NUMBER:** ONE

Pursuant to Federal Rule of Civil Procedure 34, *defendant* PHH Mortgage Corporation ("PHH") provides the following responses to *plaintiff* Cory Mayer's ("Plaintiff") Requests for Production, Set One (the "Requests" and individually, a "Request").

///

///

Subject to and without waiving the foregoing objections, after a diligent search and reasonable inquiry, PHH has not identified any relevant, non-privileged records in its possession that are responsive to this Request.

**REQUEST FOR PRODUCTION NO. 8:**

All servicing agreements or other contracts governing the agency relationship with regard to the SUBJECT LOAN, evidencing YOUR authority to service the LOAN, including all attachments, exhibits, and lists of loans to which the servicing agreements applies.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

PHH objects to this Request on the ground that it is not relevant to any of Plaintiff's claims and is therefore not proportional to the needs of this case, as required under Fed. R. Civ. P. 26(b)(1). The contractual relationship between PHH and HSBC Bank USA, National Association, as Trustee for Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR2 ("HSBC") is not at issue in this case and, in fact, Plaintiff admitted in both his First Amended Complaint and the Settlement Agreement that PHH is the authorized agent for HSBC. PHH further objects to this Request on the ground that it seeks disclosure of proprietary and/or confidential business information of PHH.

**REQUEST FOR PRODUCTION NO. 9:**

All DOCUMENTS establishing that the SUBJECT LOAN is subject to the servicing agreements.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

PHH objects to this Request on the ground that it is not relevant to any of Plaintiff's claims and is therefore not proportional to the needs of this case, as required under Fed. R. Civ. P. 26(b)(1). The contractual relationship between PHH and HSBC is not at issue in this case and, in fact, Plaintiff admitted in both his First Amended Complaint and the Settlement Agreement that PHH is authorized to service the Loan on behalf of HSBC. PHH further objects to this Request on the ground that it seeks disclosure of proprietary and/or confidential business information of PHH.

**REQUEST FOR PRODUCTION NO. 10:**

All powers of attorney for PHH that relate to servicing the SUBJECT LOAN from January 2019 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

PHH objects to this Request on the ground that it is not relevant to any of Plaintiff's claims and is therefore not proportional to the needs of this case, as required under Fed. R. Civ. P. 26(b)(1). The contractual relationship between PHH and HSBC is not at issue in this case and, in fact, Plaintiff admitted in both his First Amended Complaint and the Settlement Agreement that PHH is authorized to service the Loan on behalf of HSBC.

Subject to and without waiving the foregoing objections, PHH will produce the Power of Attorney between HSBC and PHH.

**REQUEST FOR PRODUCTION NO. 11:**

All DOCUMENTS setting forth the compensation for PHH related to the SUBJECT LOAN for all times PHH serviced the LOAN.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

PHH objects to this Request on the ground that it is not relevant to any of Plaintiff's claims and is therefore not proportional to the needs of this case, as required under Fed. R. Civ. P. 26(b)(1). The contractual relationship between PHH and HSBC is not at issue in this case, and the compensation PHH receives to service the Loan has no bearing whatsoever on Plaintiff's claims. PHH further objects to this Request on the ground that it seeks the disclosure of proprietary and/or confidential business information of PHH.

**REQUEST FOR PRODUCTION NO. 12:**

All Universal Data Forms YOU submitted or caused to be submitted to any credit reporting agency from January 2020 to present relating to the SUBJECT LOAN.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

PHH objects to this Request on the ground that it is overly-broad and seeks information not relevant to any of Plaintiff's claims. Specifically, it seeks information that pre-dates the Settlement Agreement and is thus outside of the temporal scope of the operative pleading. Information unrelated to Plaintiff's dispute is not relevant to any of Plaintiff's claims and is therefore not proportional to the needs of the case as required under Fed. R. Civ. P. 26(b)(1).

# Exhibit C

Brian A. Paino (SBN 251243)
bpaino@hinshawlaw.com
Helen Mosothoane (SBN 254511)
hmosothoane@hinshawlaw.com
Zeeshan Iqbal (SBN 337990)
ziqbal@hinshawlaw.com
**HINSHAW & CULBERTSON LLP**
350 South Grand Ave., Suite 3600
Los Angeles, CA 90071-3476
Telephone: 213-680-2800
Facsimile: 213-614-7399

Attorneys for *Defendants* **PHH MORTGAGE CORPORATION and HSBC BANK USA, NATIONAL ASSOCIATION, AS TRUSTEE FOR DEUTSCHE ALT-A SECURITIES MORTGAGE LOAN TRUST, SERIES 2006-AR2**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CORY MAYER,<br><br>Plaintiff,<br><br>vs.<br><br>DEUTSCHE ALT A SECURITIES MORTGAGE LOAN TRUST SERIES 2006-A; PHH MORTGAGE CORPORATION; WESTERN PROGRESSIVE, LLC; DOES 1-20; and all persons unknown claiming any interest in the property, inclusive,<br><br>Defendant(s). | Case No.: 5:25-cv-00182-NW<br><br>**DEFENDANT HSBC BANK USA, NATIONAL ASSOCIATION, AS TRUSTEE FOR DEUTSCHE ALT-A SECURITIES MORTGAGE LOAN TRUST, SERIES 2006-AR2'S RESPONSES TO PLAINTIFF CORY MAYER'S REQUEST FOR PRODUCTION, SET ONE** |

| | |
|---|---|
| **PROPOUNDING PARTY:** | *Plaintiff* CORY MAYER |
| **RESPONDING PARTY:** | *Defendant* HSBC BANK USA, NATIONAL ASSOCIATION, as Trustee for Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR2 |
| **SET NUMBER:** | ONE |

Pursuant to Federal Rule of Civil Procedure 34, *defendant* HSBC Bank USA, National Association, as Trustee for Deutsche ALT-A Securities Mortgage Loan Trust, Series 2006-AR2 ("HSBC") provides the following responses to *plaintiff* Cory Mayer's ("Plaintiff") Requests for Production, Set One (the "Requests" and individually, "Request").

Indeed, records related to the remittance of payments to HSBC has no bearing whatsoever on: (1) Plaintiff's obligations under the Loan; (2) the issue of whether HSBC or PHH complied with the terms of the Settlement Agreement; (3) the issue of whether HSBC or PHH complied with the terms of the Loan; or (4) the issue of whether HSBC or PHH is liable under any of the claims or theories Plaintiff has raised in this action. HSBC further objects to this Request on the ground that it seeks disclosure of proprietary and/or confidential business information of HSBC.

**REQUEST FOR PRODUCTION NO. 3:**

All emails or electronic communications used to transmit the investor remittance reports to YOU from your servicing agents, including PHH and Ocwen from January 2020 to present. For purposes of this request, Investor Remittance Reports shall mean any DOCUMENT, report, spreadsheet, that YOU received from any servicer related to the payments collected on the SUBJECT LOAN.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

HSBC objects to this Request on the ground that it is overly-broad as it seeks information that pre-dates the Settlement Agreement, despite the fact that Plaintiff released all claims related to the Loan through April 2020 pursuant to the terms of the Settlement Agreement. PHH further objects to this Request on the ground that it seeks information that it is not relevant to any of Plaintiff's claims and is therefore not proportional to the needs of this case, as required under Fed. R. Civ. P. 26(b)(1). Indeed, records related to the remittance of payments to HSBC has no bearing whatsoever on: (1) Plaintiff's obligations under the Loan; (2) the issue of whether HSBC or PHH complied with the terms of the Settlement Agreement; (3) the issue of whether HSBC or PHH complied with the terms of the Loan; or (4) the issue of whether HSBC or PHH is liable under any of the claims or theories Plaintiff has raised in this action. HSBC further objects to this Request on the ground that it seeks disclosure of proprietary and/or confidential business information of HSBC.

**REQUEST FOR PRODUCTION NO. 4:**

All DOCUMENTS evidencing compensation received by PHH and/or Ocwen for servicing the SUBJECT LOAN from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

HSBC objects to this Request on the ground that it is overly-broad as it seeks information that pre-dates the Settlement Agreement, despite the fact that Plaintiff released all claims related to the Loan through April 2020 pursuant to the terms of the Settlement Agreement. PHH further objects to this Request on the ground that it seeks information that it is not relevant to any of Plaintiff's claims and is therefore not proportional to the needs of this case, as required under Fed. R. Civ. P. 26(b)(1). Indeed, records related to the compensation PHH and/or Ocwen Loan Servicing, LLC received for servicing the Loan has no bearing whatsoever on: (1) Plaintiff's obligations under the Loan; (2) the issue of whether HSBC or PHH complied with the terms of the Settlement Agreement; (3) the issue of whether HSBC or PHH complied with the terms of the Loan; or (4) the issue of whether HSBC or PHH is liable under any of the claims or theories Plaintiff has raised in this action. HSBC further objects to this Request on the ground that it seeks disclosure of proprietary and/or confidential business information of HSBC.

**REQUEST FOR PRODUCTION NO. 5:**

All electronic written messages regarding the SUBJECT LOAN in any respect, sent or received between any of YOUR employees from January 2019 to present. This shall include emails, letters, notes, memoranda, instant messages and any other manner of written communication.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

HSBC objects to this Request on the ground that it is not relevant to any of Plaintiff's claims and it is overly-broad because it seeks information that is not reasonably limited in scope or subject matter. Indeed, Plaintiff released all claims related to the Loan through the effective date of the Settlement Agreement, yet this Request seeks records predating the Settlement Agreement. Information unrelated to Plaintiff's dispute is not relevant to any of Plaintiff's claims and is therefore not proportional to the needs of the case as required under Fed. R. Civ. P. 26(b)(1). HSBC further objects to this Request to the extent it seeks information protected by the attorney–client privilege and/or work-product doctrine. HSBC further objects to this Request on the ground that it is unduly burdensome as it broadly seeks records related to "electronic written messages" regarding the Loan,

without regard for the subject matter of these message, including whether they have any relevance to Plaintiff's enumerated claims.

Subject to and without waiving the foregoing objections, HSBC will produce all relevant, non-privileged documents in its possession that are responsive to this Request.

**REQUEST FOR PRODUCTION NO. 6:**

All servicing agreements or other contracts governing the agency relationship with regard to servicing the SUBJECT LOAN, evidencing the servicers' authority to service the LOAN, including all attachments, exhibits, and lists of loans to which the servicing agreements applies.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

HSBC objects to this Request on the ground that it is not relevant to any of Plaintiff's claims and is therefore not proportional to the needs of this case, as required under Fed. R. Civ. P. 26(b)(1). The contractual relationship between PHH and HSBC is not at issue in this case and, in fact, Plaintiff admitted in both his First Amended Complaint and the Settlement Agreement that PHH is the authorized agent for HSBC. PHH further objects to this Request on the ground that it seeks disclosure of proprietary and/or confidential business information of PHH.

**REQUEST FOR PRODUCTION NO. 7:**

All DOCUMENTS establishing that the SUBJECT LOAN is subject to the servicing agreements.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

HSBC objects to this Request on the ground that it is not relevant to any of Plaintiff's claims and is therefore not proportional to the needs of this case, as required under Fed. R. Civ. P. 26(b)(1). The contractual relationship between PHH and HSBC is not at issue in this case and, in fact, Plaintiff admitted in both his First Amended Complaint and the Settlement Agreement that PHH is authorized to service the Loan on behalf of HSBC. HSBC further objects to this Request on the ground that it seeks disclosure of proprietary and/or confidential business information of PHH.

**REQUEST FOR PRODUCTION NO. 8:**

All powers of attorney for PHH that relate to servicing the SUBJECT LOAN from January 2019 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

HSBC objects to this Request on the ground that it is not relevant to any of Plaintiff's claims and is therefore not proportional to the needs of this case, as required under Fed. R. Civ. P. 26(b)(1). The contractual relationship between PHH and HSBC is not at issue in this case and, in fact, Plaintiff admitted in both his First Amended Complaint and the Settlement Agreement that PHH is authorized to service the Loan on behalf of HSBC.

Subject to and without waiving the foregoing objections, HSBC will produce the Power of Attorney between HSBC and PHH.

**REQUEST FOR PRODUCTION NO. 9:**

All DOCUMENTS setting forth the compensation for PHH related to the SUBJECT LOAN for all times PHH serviced the LOAN.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

HSBC objects to this Request on the ground that it is not relevant to any of Plaintiff's claims and is therefore not proportional to the needs of this case, as required under Fed. R. Civ. P. 26(b)(1). The contractual relationship between PHH and HSBC is not at issue in this case, and the compensation PHH receives to service the Loan has no bearing whatsoever on Plaintiff's claims. PHH further objects to this Request on the ground that it seeks the disclosure of proprietary and/or confidential business information of PHH.

**REQUEST FOR PRODUCTION NO. 10:**

All Universal Data Forms YOU submitted or caused to be submitted to any credit reporting agency from January 2020 to present relating to the SUBJECT LOAN.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

HSBC objects to this Request on the ground that it is overly-broad and seeks information not relevant to any of Plaintiff's claims. Specifically, it seeks information that pre-dates the Settlement Agreement and is thus outside of the temporal scope of the operative pleading. Information unrelated to Plaintiff's dispute is not relevant to any of Plaintiff's claims and is therefore not proportional to the needs of the case as required under Fed. R. Civ. P. 26(b)(1).

# **Exhibit D**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CORY MAYER,

Plaintiff,

v.

HSBC BANK USA, NATIONAL ASSOCIATION, et al.,

Defendants.

Case No. 25-cv-00182-NW (SVK)

**DISCOVERY ORDER RE DKT. 70**

Re: Dkt. No. 70

Before the Court is the Parties' Joint Submission regarding Defendants' document productions. The Court, guided by the mandates of relevance and proportionality of Rule 26, as well as the litigation history in this action and prior orders of this Court, determines that this matter, except as noted below, may be resolved without oral argument. Civ. L.R. 7-1(b).

Plaintiff's sweeping request for an order overruling objections and "compelling a proper written response" as to all requests (Dkt. 70 at 2) is **DENIED**.

Plaintiff's sweeping request that all documents be produced without redactions (Dkt. 70 at 2) is **DENIED**. Specific redaction issues are raised in Dkt. 68 and 69 and will be addressed at the hearing currently set for December 16, 2025.

Plaintiff's issues as to specific RFPs are addressed in this Order. First, the Court commends the Parties for taking its previous admonishment to heart; this Joint Statement was well organized, identified specific issues succinctly, and tracked the summary chart. The Court's rulings are set forth in Attachment 1 hereto and subject to the instructions below. The exceptions to Attachment 1 are RFP 5 directed to Defendant HSBC and RFPs 6 & 29 directed to Defendant PHH, which appear to relate, at least in part, to the privilege log issue in Dkt. 69 on for hearing on December 16, 2025. Accordingly, the Court will take up those RFPs at the December 16 hearing.

United States District Court
Northern District of California

Additional instructions regarding the Court's rulings in Attachment 1 are as follows:

- The deadline for additional production of documents and, where specifically ordered, service of supplemental responses is **January 7, 2026**.
- Supplemental responses must be **verified**.
- If the Court has ordered further production but no such documents, as kept in the ordinary course of business, exist, Defendants must provide a supplemental response so stating.

**SO ORDERED.**

Dated: December 12, 2025

SUSAN VAN KEULEN
United States Magistrate Judge

United States District Court
Northern District of California

# **Exhibit E**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

United States District Court
Northern District of California

CORY MAYER,

Plaintiff,

v.

HSBC BANK USA, NATIONAL ASSOCIATION, et al.,

Defendants.

Case No. 25-cv-00182-NW (SVK)

**ORDER FOLLOWING DECEMBER 16, 2025 DISCOVERY HEARING**

Re: Dkt. Nos. 68, 69, 70, 73, 76, 84

Before the Court are several pending discovery disputes. Dkt. 68, 69, 70, 73, 76, 84; *see also* Dkt. 71, 80, 83 (additional submissions in connection with discovery disputes). The Court reviewed the Parties' submissions and the relevant law, issued various pre-hearing orders (Dkt. 77, 81, 82), and held a hearing on December 16, 2025. The Court ruled from the bench on the issues not covered by the pre-hearing orders.

The Court set several deadlines over the upcoming weeks. In doing so, the Court has attempted to strike a balance between the February 13, 2026 deadline to complete fact discovery and the upcoming holidays, during which counsel and client representatives may have more limited availability. The Court informed both sides that it expects them to accommodate reasonable requests for extensions of the deadlines set forth below. Any request for an extension of the fact discovery cutoff must be made to the District Judge.

A complete statement of the Court's reasoning is as set forth on the record and is summarized as follows:

**Dkt. 68: Defendants' confidentiality designations**

1. Defendants have not established that the Credit Reporting Resource Guide or code breaker documents are properly designated as confidential. Accordingly, Defendants are to promptly produce copies of these documents to Plaintiff without confidentiality designations.
2. Defendants have established that the Policy and Procedures Manuals are properly designated as confidential but have not established that the additional redactions

in the documents based on relevance are proper. Accordingly, Defendants are to promptly produce copies of these documents to Plaintiff with confidentiality designations but without redactions.

**Dkt. 69: Defendants' privilege log**

1. The form and content of Defendants' privilege log conforms with this Court's standing order.
2. By **December 17, 2025**, Defendants must submit for *in camera* review relevant pages of the servicing notes that reflect the 36[1] servicing notes from the time period April 2020 to present for which privilege is claimed. The documents are to be submitted to SVKCRD@cand.uscourts.gov with a cover email referencing the case name, number and this Order. Any redactions to the servicing notes must be removed with the redacted information identified by highlighting.

**Dkt. 70: Defendants' responses to written discovery.** As to the Requests for Production not addressed in the Court's pre-hearing order at Dkt. 81, the Court ordered as follows:

1. RFPs 5 (to HSBC); 6 and 29 (to PHH): In light of the additional information to be provided by Defendants in connection with Dkt. 73 below, Plaintiff's requests for further responses and production of emails in response to these requests for production as currently drafted are **DENIED.**
2. Following Defendants' production of additional servicing notes with additional employee information in connection with Dkt. 73 below, during **the week of January 5, 2026**, the Parties must meet and confer regarding an expedited production of emails by Defendants concerning specific loan activities identified in the servicing notes. If unable to reach agreement, by **noon PST on January 9, 2026,** each side may submit a cover page along with one page with their proposed scope of and deadline for document production and supplementation of the

[1] To be clear, if privilege is claimed for additional servicing notes due to the relevant time period being expanded at the hearing (from March 2024 to present), then these additional, unredacted servicing notes must also be submitted.



United States District Court
Northern District of California

privilege log. The Court will set a hearing if necessary.

3. RFPs 6, 7 (to HSBC); RFPs 8, 9 (to PHH) in re servicing agreements: By **December 31, 2025,** Defendants must produce documents in their custody and control sufficient to establish that Plaintiff's loan that is at issue in this action is covered by a servicing agreement between HSBC and PHH.

**Dkt. 73: Defendants' identification of employees in servicing notes**

1. By **December 31, 2025,** Defendants must produce a complete set of servicing notes from April 2020 to present, with redactions only for privilege. For any such redactions, the PHH employee identification should not be redacted.
2. By **December 31, 2025,** Defendants must provide to Plaintiffs the following information about all individuals identified in the servicing notes from April 2020 to present: employee name, title, employee ID, Comment User ID, employment status, and last known contact information.

**Dkt. 76: Discovery dispute resolution procedure**

1. Both sides must respond promptly and in good faith when the other side raises a discovery issue to facilitate the joint submission of any unresolved discovery disputes within **7 days** of one side raising a discovery issue. Within this 7 day time frame, the Parties are to meet and confer and, if necessary, exchange drafts of the Joint Submission such that it may be submitted by COB on day 7. The Court will terminate any separate discovery dispute statements filed with the Court.

**Dkt. 84: Depositions of Defendants' employees**

1. The Court **TERMINATES** Plaintiff's separate discovery dispute statement. The Parties are to meet and confer on this dispute under the procedures articulated above.

**SO ORDERED.**

Dated: December 16, 2025

Susan van Keulen

SUSAN VAN KEULEN
United States Magistrate Judge

United States District Court
Northern District of California

# Exhibit F

# EXHIBIT FILED UNDER SEAL

# **Exhibit G**

EXECUTION COPY

DEUTSCHE ALT-A SECURITIES, INC.

Depositor

and

WELLS FARGO BANK, N.A.

Master Servicer and Securities Administrator

and

HSBC BANK USA, NATIONAL ASSOCIATION

Trustee

---

# POOLING AND SERVICING AGREEMENT

Dated as of June 1, 2006

---

Mortgage Pass-Through Certificates

Series 2006-AR2

TABLE OF CONTENTS

ARTICLE I DEFINITIONS

Section 1.1 Definitions. ....8
Section 1.2 Allocation of Certain Interest Shortfalls. ....47

ARTICLE II CONVEYANCE OF TRUST FUND; ORIGINAL ISSUANCE OF CERTIFICATES

Section 2.1 Conveyance of Trust Fund. ....48
Section 2.2 Acceptance by Trustee. ....49
Section 2.3 Repurchase or Substitution of Loans ....49
Section 2.4 Authentication and Delivery of Certificates; Designation of Certificates as REMIC Regular and Residual Interests. ....52
Section 2.5 Representations and Warranties of the Master Servicer. ....53
Section 2.6 Conveyance of Subsequent Loans. ....54
Section 2.7 Establishment of the Trust. ....56
Section 2.8 Purpose and Powers of the Trust. ....56

ARTICLE III ADMINISTRATION AND SERVICING OF THE LOANS; ACCOUNTS

Section 3.1 Master Servicer. ....58
Section 3.2 REMIC-Related Covenants. ....59
Section 3.3 Monitoring of Servicers. ....59
Section 3.4 Fidelity Bond. ....60
Section 3.5 Power to Act; Procedures. ....60
Section 3.6 Due-on-Sale Clauses; Assumption Agreements. ....61
Section 3.7 Release of Mortgage Files. ....62
Section 3.8 Documents, Records and Funds in Possession of Master Servicer To Be Held for Trustee. ....63
Section 3.9 Standard Hazard Insurance and Flood Insurance Policies. ....63
Section 3.10 Presentment of Claims and Collection of Proceeds. ....64
Section 3.11 Maintenance of the Primary Mortgage Insurance Policies. ....64
Section 3.12 Trustee to Retain Possession of Certain Insurance Policies and Documents. ....65
Section 3.13 Realization Upon Defaulted Loans. ....65
Section 3.14 Compensation for the Master Servicer. ....65
Section 3.15 REO Property. ....65
Section 3.16 Annual Statement as to Compliance. ....66

Section 3.17 Assessments of Compliance. ....67

Section 3.18 Master Servicer and Securities Administrator Attestation Reports. ....68

Section 3.19 Annual Certification. ....69

Section 3.20 Intention of the Parties and Interpretation. ....70

Section 3.21 Obligation of the Master Servicer in Respect of Compensating Interest. ....71

Section 3.22 Protected Accounts. ....71

Section 3.23 Distribution Account. ....72

Section 3.24 Permitted Withdrawals and Transfers from the Distribution Account. ....73

Section 3.25 Reserve Fund. ....75

Section 3.26 Pre-Funding Account. ....76

Section 3.27 Capitalized Interest Account. ....77

Section 3.28 Prepayment Penalty Verification. ....78

Section 3.29 Reports Filed with Securities and Exchange Commission. ....79

Section 3.30 Special Servicing. ....84

Section 3.31 Purchase of Delinquent Loans. ....85

ARTICLE IV PAYMENTS TO CERTIFICATEHOLDERS; ADVANCES; STATEMENTS AND REPORTS

Section 4.1 Distributions to Certificateholders. ....86

Section 4.2 Allocation of Realized Losses. ....92

Section 4.3 Statements to Certificateholders. ....93

Section 4.4 Advances. ....96

Section 4.5 Compliance with Withholding Requirements. ....96

Section 4.6 REMIC Distributions. ....96

Section 4.7 Compliance with Withholding Requirements. ....97

Section 4.8 Swap Account. ....97

Section 4.9 Cap Contract. ....98

Section 4.10 Supplemental Interest Trust. ....99

ARTICLE V THE CERTIFICATES

Section 5.1 The Certificates. ....100

Section 5.2 Certificates Issuable in Classes; Distributions of Principal and Interest; Authorized Denominations. ....100

Section 5.3 Registration of Transfer and Exchange of Certificates. ....101

Section 5.4 Mutilated, Destroyed, Lost or Stolen Certificates. ....106

Section 5.5 Persons Deemed Owners. 106

ARTICLE VI THE DEPOSITOR AND MASTER SERVICER

Section 6.1 Liability of the Depositor and the Master Servicer. 107

Section 6.2 Merger or Consolidation of the Depositor or the Master Servicer. 107

Section 6.3 Limitation on Liability of the Depositor, the Master Servicer, the Servicers, the Securities Administrator and Others. 107

Section 6.4 Limitation on Resignation of the Master Servicer 108

Section 6.5 Assignment of Master Servicing. 108

Section 6.6 Rights of the Depositor in Respect of the Master Servicer. 109

Section 6.7 [Reserved] 110

Section 6.8 [Reserved] 110

Section 6.9 [Reserved] 110

Section 6.10 Transfer of Servicing by the Seller of Certain Loans Serviced by GMAC; Special Servicer. 110

ARTICLE VII DEFAULT

Section 7.1 Master Servicer Events of Default. 112

Section 7.2 Trustee to Act; Appointment of Successor. 114

Section 7.3 Notification to Certificateholders. 115

Section 7.4 Waiver of Master Servicer Events of Default. 115

ARTICLE VIII CONCERNING THE TRUSTEE AND THE SECURITIES ADMINISTRATOR

Section 8.1 Duties of Trustee and Securities Administrator. 116

Section 8.2 Certain Matters Affecting Trustee and Securities Administrator. 117

Section 8.3 Trustee and Securities Administrator not Liable for Certificates or Loans. 119

Section 8.4 Trustee, Master Servicer and Securities Administrator May Own Certificates. 119

Section 8.5 Fees and Expenses of Trustee and Securities Administrator. 119

Section 8.6 Eligibility Requirements for Trustee and Securities Administrator. 120

Section 8.7 Resignation and Removal of Trustee and Securities Administrator. 120

Section 8.8 Successor Trustee or Securities Administrator. 122

Section 8.9 Merger or Consolidation of Trustee or Securities Administrator. 122

Section 8.10 Appointment of Co-Trustee or Separate Trustee. 122

Section 8.11 Appointment of Office or Agency. 123

Section 8.12 Representations and Warranties of the Trustee. 124

ARTICLE IX TERMINATION

Section 9.1 Termination Upon Purchase or Liquidation of All Loans. ....................................... 125
Section 9.2 Additional Termination Requirements. ........................................................... 127

ARTICLE X REMIC PROVISIONS

Section 10.1 REMIC Administration. .................................................................................... 128
Section 10.2 Prohibited Transactions and Activities. ......................................................... 131
Section 10.3 Indemnification. ............................................................................................... 131

ARTICLE XI MISCELLANEOUS PROVISIONS

Section 11.1 Amendment. .................................................................................................... 133
Section 11.2 Recordation of Agreement; Counterparts. ..................................................... 134
Section 11.3 Limitation on Rights of Certificateholders. ................................................... 134
Section 11.4 Governing Law. ................................................................................................ 135
Section 11.5 Notices. ............................................................................................................. 135
Section 11.6 Severability of Provisions. .............................................................................. 136
Section 11.7 Notice to Rating Agencies. .............................................................................. 136
Section 11.8 Article and Section References. ...................................................................... 137
Section 11.9 Grant of Security Interest. ............................................................................... 137

provided, however, that such instrument continues to qualify as a "cash flow investment" pursuant to Code Section 860G(a)(6) and that no instrument or security shall be an Eligible Investment if (i) such instrument or security evidences a right to receive only interest payments or (ii) the right to receive principal and interest payments derived from the underlying investment provides a yield to maturity in excess of 120% of the yield to maturity at par of such underlying investment.

*ERISA*: The Employee Retirement Income Security Act of 1974, as amended.

*ERISA-Qualifying Underwriting:* With respect to any ERISA-Restricted Certificate, a best efforts or firm commitment underwriting or private placement that meets the requirements of the Underwriters' Exemption.

*ERISA-Restricted Certificate:* The Class M-9, the Class CE, the Class P and the Class R Certificates and Certificates of any Class that no longer satisfy the applicable rating requirements of the Underwriters' Exemption as specified in the Preliminary Statement.

*ERISA-Restricted Trust Certificate:* Any Certificate other than an ERISA-Restricted Certificate.

*Exchange Act*: The Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

*Fannie Mae*: Fannie Mae, formerly known as the Federal National Mortgage Association, or any successor thereto.

*FDIC*: Federal Deposit Insurance Corporation, or any successor thereto.

*Fitch:* Fitch Ratings or any successor thereto.

*Form 8-K Disclosure Information*: Has the meaning set forth in Section 3.29(b) of this Agreement.

*Franklin Bank*: Franklin Bank SSB or any successor thereto.

*Franklin Bank Servicing Agreement:* The Master Mortgage Loan Purchase and Servicing Agreement, dated as of December 1, 2005, between the Seller and the Franklin Bank.

*Freddie Mac*: The Federal Home Loan Mortgage Corporation, or any successor thereto.

*GMACM*: GMAC Mortgage Corporation, or any successor thereto.

*GMACM Servicing Agreement*: The Servicing Agreement, dated as of April 25, 2005, as amended by Amendment Number One, dated December 29, 2005, between the Seller and GMACM and as modified pursuant to the related Assignment Agreement.

*GreenPoint*: GreenPoint Mortgage Funding, Inc. or any successor thereto.

# Exhibit H

# MORTGAGE LOAN PURCHASE AGREEMENT

This is a Mortgage Loan Purchase Agreement (this "Agreement"), dated June 30, 2006, between DB Structured Products, Inc. (the "Seller") and Deutsche Alt-A Securities, Inc., a Delaware corporation (the "Purchaser").

## Preliminary Statement

The Seller intends to sell the Mortgage Loans (as hereinafter identified) to the Purchaser on the terms and subject to the conditions set forth in this Agreement. The Purchaser intends to deposit the Mortgage Loans into a mortgage pool comprising the Trust Fund. The Trust Fund will be evidenced by a single series of mortgage pass-through certificates designated as Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR2 Mortgage Pass-Through Certificates (the "Certificates"). The Certificates will consist of 15 classes of certificates. The Certificates will be issued pursuant to a Pooling and Servicing Agreement, dated as of June 1, 2006 (the "Pooling and Servicing Agreement"), among the Purchaser as depositor, Wells Fargo Bank, N.A. as master servicer (the "Master Servicer") and as securities administrator and HSBC Bank USA, National Association as trustee (the "Trustee"). The Purchaser will sell the Class A-1-1, Class A-1-2, Class A-2, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 and Class M-8 Certificates to Deutsche Bank Securities Inc. ("DBSI"), pursuant to the Amended and Restated Underwriting Agreement, dated as of August 1, 2003, as amended to and including June 30, 2006, between the Purchaser and DBSI, and the Terms Agreement, dated June 30, 2006, between the Purchaser and DBSI. The Purchaser will sell the Class M-9, Class CE, Class P and Class R Certificates to DBSI pursuant to the Purchase Agreement dated as of June 30, 2006 between Purchaser and DBSI. Capitalized terms used but not defined herein shall have the meanings set forth in the Pooling and Servicing Agreement.

The parties hereto agree as follows:

SECTION 1. Agreement to Purchase. The Seller hereby sells and the Purchaser hereby purchases, on the date hereof (the "Closing Date"), (a) certain one- to four-family, adjustable-rate and hybrid adjustable-rate first lien residential mortgage loans, having an aggregate outstanding principal balance as of the close of business on June 1, 2006 (the "Cut-Off Date"), after deducting payments due on or before that date, of approximately $412,788,022 (the "Initial Mortgage Loans"). After the termination of the Pre-Funding Period, the Trust will include the Initial Mortgage Loans and subsequent mortgage loans, which are expected to have an aggregate principal balance as of the Cut-Off Date of approximately $449,003,247 (the "Mortgage Loans") after application of scheduled payments due on or before the Cut-Off Date whether or not received.

SECTION 2. Mortgage Loan Schedule. The Purchaser and the Seller have agreed upon which of the mortgage loans owned by the Seller are to be purchased by the Purchaser pursuant to this Agreement and the Seller will prepare or cause to be prepared on or prior to the Closing Date a final schedule (the "Closing Schedule") that shall describe such Mortgage Loans and set forth all of the Mortgage Loans to be purchased under this Agreement, including the Prepayment Charges. The Closing Schedule will conform to the requirements set

forth in this Agreement and to the definition of "Loan Schedule" under the Pooling and Servicing Agreement.

SECTION 3. Consideration.

(a) In consideration for the Mortgage Loans to be purchased hereunder, the Purchaser shall, as described in Section 8, pay to or upon the order of the Seller in immediately available funds an amount (the "Purchase Price") equal to $456,010,970.09.

(b) The Purchaser or any assignee, transferee or designee of the Purchaser shall be entitled to all scheduled payments of principal due after the Cut-Off Date, all other payments of principal due and collected after the Cut-Off Date, and all payments of interest on the Mortgage Loans allocable to the period after the Cut-Off Date. All scheduled payments of principal and interest due on or before the Cut-Off Date and collected after the Cut-Off Date shall belong to the Seller.

(c) Pursuant to the Pooling and Servicing Agreement, the Purchaser will assign all of its right, title and interest in and to the Mortgage Loans, together with its rights under this Agreement, to the Trustee for the benefit of the Certificateholders.

SECTION 4. Transfer of the Mortgage Loans.

(a) Possession of Mortgage Files. The Seller does hereby sell to the Purchaser, without recourse but subject to the terms of this Agreement, all of its right, title and interest in, to and under the Mortgage Loans, including the related Prepayment Charges. The contents of each Mortgage File not delivered to the Purchaser or to any assignee, transferee or designee of the Purchaser on or prior to the Closing Date are and shall be held in trust by the Seller for the benefit of the Purchaser or any assignee, transferee or designee of the Purchaser. Upon the sale of the Mortgage Loans, the ownership of each Mortgage Note, the related Mortgage or with respect to a Cooperative Loan (as defined in Exhibit 3 hereto), the related Security Agreement and the other contents of the related Mortgage File is vested in the Purchaser and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or that come into the possession of the Seller on or after the Closing Date shall immediately vest in the Purchaser and shall be delivered immediately to the Purchaser or as otherwise directed by the Purchaser.

(b) Delivery of Mortgage Loan Documents. The Seller will, on or prior to the Closing Date, deliver or cause to be delivered to the Purchaser or any assignee, transferee or designee of the Purchaser each of the following documents for each Mortgage Loan:

(i) with respect to each Mortgage Loan that is not a Cooperative Loan (to the extent not defined herein or in the Pooling and Servicing Agreement, capitalized terms used in this Section 4(b)(i) shall have the meanings set forth on Exhibit 3 to this Agreement):

1. the original Mortgage Note (including all riders thereto), or certified copies thereof, bearing all intervening endorsements necessary to show a complete chain of endorsements from the original payee, endorsed in blank, via original signature, and, if

previously endorsed, signed in the name of the last endorsee by a duly qualified officer of the last endorsee. If the Mortgage Loan was acquired by the last endorsee in a merger, the endorsement must be by "[name of last endorsee], successor by merger to [name of predecessor]". If the Mortgage Loan was acquired or originated by the last endorsee while doing business under another name, the endorsement must be by "[name of last endorsee], formerly known as [previous name]";

2. an original Assignment of Mortgage executed in blank;

3. the original of any guarantee executed in connection with the Mortgage Note, if any;

4. the original Mortgage (including all riders thereto) with evidence of recording thereon and the original recorded power of attorney, if the Mortgage was executed pursuant to a power of attorney, with evidence of recording thereon, and in the case of each MOM Loan, the original Mortgage, noting the presence of the MIN of the Mortgage Loan and either language indicating that the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS®, with evidence of recording indicated thereon; or, if the original Mortgage with evidence of recording thereon has not been returned by the public recording office where such Mortgage has been delivered for recordation or such Mortgage has been lost or such public recording office retains the original recorded Mortgage, a photocopy of such Mortgage, together with (i) in the case of a delay caused by the public recording office, an officer's certificate of the title insurer insuring the Mortgage, the escrow agent, the Seller or the related Servicer stating that such Mortgage has been delivered to the appropriate public recording office for recordation and that the original recorded Mortgage or a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage will be promptly delivered to the Purchaser's designee upon receipt thereof by the party delivering the officer's certificate or by the related Servicer; or (ii) in the case of a Mortgage where a public recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, a copy of such Mortgage with the recording information thereon certified by such public recording office to be a true and complete copy of the original recorded Mortgage;

5. the originals of all assumption, modification, consolidation or extension agreements, with evidence of recording thereon, if any;

6. the originals of any intervening assignments of mortgage with evidence of recording thereon evidencing a complete chain of ownership from the originator of the Mortgage Loan to the last assignee, or if any such intervening assignment of mortgage has not been returned from the applicable public recording office or has been lost or if such public recording office retains the original recorded intervening assignments of mortgage, a photocopy of such intervening assignment of mortgage, together with (i) in the case of a delay caused by the public recording office, an officer's certificate of the title insurer insuring the Mortgage, the escrow agent, the Seller or the related Servicer stating that such intervening assignment of mortgage has been delivered to the appropriate public recording office for recordation and that such original recorded intervening assignment of mortgage or a copy of such intervening assignment of

mortgage certified by the appropriate public recording office to be a true and complete copy of the original recorded intervening assignment of mortgage will be promptly delivered to the Purchaser's designee upon receipt thereof by the party delivering the officer's certificate or by the related Servicer; or (ii) in the case of an intervening assignment of mortgage where a public recording office retains the original recorded intervening assignment of mortgage or in the case where an intervening assignment of mortgage is lost after recordation in a public recording office, a copy of such intervening assignment of mortgage with recording information thereon certified by such public recording office to be a true and complete copy of the original recorded intervening assignment of mortgage;

7. if the Mortgage Note, the Mortgage, any Assignment of Mortgage, or any other related document has been signed by a Person on behalf of the Mortgagor, the original power of attorney or other instrument that authorized and empowered such Person to sign;

8. the original lender's title insurance policy in the form of an ALTA mortgage title insurance policy or, if the original lender's title insurance policy has not been issued, the irrevocable commitment to issue the same; provided, that the Seller shall deliver such original title insurance policy to the Purchaser or any assignee, transferee or designee of the Purchaser promptly upon receipt by the Seller, if any; and

9. the original of any security agreement, chattel mortgage or equivalent document executed in connection with the Mortgage, if any.

(ii) with respect to each Cooperative Loan, as applicable, (to the extent not defined herein or in the Pooling and Servicing Agreement, capitalized terms used in this Section 4(b)(ii) shall have the meanings set forth on Exhibit 3 to this Agreement):

1. the original Mortgage Note (including all riders thereto) bearing all intervening endorsements necessary to show a complete chain of endorsements from the original payee, endorsed in blank, via original signature, and, if previously endorsed, signed in the name of the last endorsee by a duly qualified officer of the last endorsee. If the Mortgage Loan was acquired by the last endorsee in a merger, the endorsement must be by "[name of last endorsee], successor by merger to [name of predecessor]". If the Mortgage Loan was acquired or originated by the last endorsee while doing business under another name, the endorsement must be by "[name of last endorsee], formerly known as [previous name]";

2. the Cooperative Shares, together with the Stock Power in blank;

3. the executed Security Agreement;

4. the executed Proprietary Lease and the Assignment of Proprietary Lease to the originator of the Cooperative Loan;

5. the executed Recognition Agreement;

6. copies of the original UCC Financing Statement, and any continuation statements, filed by the originator of such Cooperative Loan as secured party, each with evidence

of recording thereof, evidencing the interest of the originator under the Security Agreement and the Assignment of Proprietary Lease;

7. copies of the filed UCC assignments or amendments of the security interest referenced in clause (6) above showing an unbroken chain of title from the originator to the Trust, each with evidence of recording thereof, evidencing the interest of the assignee under the Security Agreement and the Assignment of Proprietary Lease;

8. an executed assignment of the interest of the originator in the Security Agreement, the Assignment of Proprietary Lease and the Recognition Agreement, showing an unbroken chain of title from the originator to the Trust; and

9. for any Cooperative Loan that has been modified or amended, the original instrument or instruments effecting such modification or amendment.

Notwithstanding anything to the contrary contained in this Section 4, with respect to a maximum of approximately 1.00% of the Mortgage Loans, by aggregate principal balance of the Mortgage Loans as of the Cut-Off Date, if any original Mortgage Note referred to in Section 4(b)(i) above cannot be located, the obligations of the Seller to deliver such documents shall be deemed to be satisfied upon delivery to the Purchaser or any assignee, transferee or designee of the Purchaser of a photocopy of such Mortgage Note, if available, with a lost note affidavit substantially in the form of Exhibit 1 attached hereto. If any of the original Mortgage Notes for which a lost note affidavit was delivered to the Purchaser or any assignee, transferee or designee of the Purchaser is subsequently located, such original Mortgage Note shall be delivered to the Purchaser or any assignee, transferee or designee of the Purchaser within three (3) Business Days; and if any document referred to in Section 4(b)(ii) or 4(b)(iv) above has been submitted for recording but either (x) has not been returned from the applicable public recording office or (y) has been lost or such public recording office has retained the original of such document, the obligations of the Seller hereunder shall be deemed to have been satisfied upon delivery to the Purchaser or any assignee, transferee or designee of the Purchaser promptly upon receipt thereof by or on behalf of the Seller of either the original or a copy of such document certified by the applicable public recording office to be a true and complete copy of the original.

In the event that the original lender's title insurance policy has not yet been issued, the Seller shall deliver to the Purchaser or any assignee, transferee or designee of the Purchaser a written commitment or interim binder or preliminary report of title issued by the title insurance or escrow company. The Seller shall deliver such original title insurance policy to the Purchaser or any assignee, transferee or designee of the Purchaser promptly upon receipt by the Seller, if any.

Each original document relating to a Mortgage Loan which is not delivered to the Purchaser or its assignee, transferee or designee, if held by the Seller, shall be so held for the benefit of the Purchaser, its assignee, transferee or designee.

(c) Acceptance of Mortgage Loans. The documents delivered pursuant to Section 4(b) hereof shall be reviewed by the Purchaser or any assignee, transferee or designee of the Purchaser at any time before or after the Closing Date (and with respect to each document

permitted to be delivered after the Closing Date, within seven (7) days of its delivery) to ascertain that all required documents have been executed and received and that such documents relate to the Mortgage Loans identified on the Closing Schedule.

(d) Transfer of Interest in Agreements. The Purchaser has the right to assign its interest under this Agreement, in whole or in part, to the Trustee, as may be required to effect the purposes of the Pooling and Servicing Agreement, without the consent of the Seller, and the assignee shall succeed to the rights and obligations hereunder of the Purchaser. Any expense reasonably incurred by or on behalf of the Purchaser or the Trustee in connection with enforcing any obligations of the Seller under this Agreement will be promptly reimbursed by the Seller.

(e) Examination of Mortgage Files. Prior to the Closing Date, the Seller shall either (i) deliver in escrow to the Purchaser or to any assignee, transferee or designee of the Purchaser for examination the Mortgage File pertaining to each Mortgage Loan or (ii) make such Mortgage Files available to the Purchaser or to any assignee, transferee or designee of the Purchaser for examination. Such examination may be made by the Purchaser or the Trustee, and their respective designees, upon reasonable notice to the Seller during normal business hours before the Closing Date and within sixty (60) days after the Closing Date. If any such person makes such examination prior to the Closing Date and identifies any Mortgage Loans that do not conform to the requirements of the Purchaser as described in this Agreement, such Mortgage Loans shall be deleted from the Closing Schedule. The Purchaser may, at its option and without notice to the Seller, purchase all or part of the Mortgage Loans without conducting any partial or complete examination. The fact that the Purchaser or any person has conducted or has failed to conduct any partial or complete examination of the Mortgage Files shall not affect the rights of the Purchaser or any assignee, transferee or designee of the Purchaser to demand repurchase or other relief as provided herein or under the Pooling and Servicing Agreement.

SECTION 5. Representations, Warranties and Covenants of the Seller.

The Seller hereby represents and warrants to the Purchaser, as of the date hereof and as of the Closing Date, and covenants, that:

(i) The Seller is a corporation organized under the laws of the state of Delaware with full corporate power and authority to conduct its business as presently conducted by it to the extent material to the consummation of the transactions contemplated herein. The Agreement has been duly authorized, executed and delivered by the Seller. The Seller had the full corporate power and authority to own the Mortgage Loans and to transfer and convey the Mortgage Loans to the Purchaser and has the full corporate power and authority to execute and deliver and engage in the transactions contemplated by, and perform and observe the terms and conditions of, this Agreement;

(ii) The Seller has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the Purchaser, constitutes a legal, valid and binding obligation of the Seller, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency or reorganization or by general principles of equity;

(iii) The execution, delivery and performance of this Agreement by the Seller (x) does not conflict and will not conflict with, does not breach and will not result in a breach of and does not constitute and will not constitute a default (or an event, which with notice or lapse of time or both, would constitute a default) under (A) any terms or provisions of the articles of incorporation or by-laws of the Seller, (B) any term or provision of any material agreement, contract, instrument or indenture, to which the Seller is a party or by which the Seller or any of its property is bound, or (C) any law, rule, regulation, order, judgment, writ, injunction or decree of any court or governmental authority having jurisdiction over the Seller or any of its property and (y) does not create or impose and will not result in the creation or imposition of any lien, charge or encumbrance which would have a material adverse effect upon the Mortgage Loans or any documents or instruments evidencing or securing the Mortgage Loans;

(iv) No consent, approval, authorization or order of, registration or filing with, or notice on behalf of the Seller to any governmental authority or court is required, under federal laws or the laws of the State of New York, for the execution, delivery and performance by the Seller of, or compliance by the Seller with, this Agreement or the consummation by the Seller of any other transaction contemplated hereby and by the Pooling and Servicing Agreement; provided, however, that the Seller makes no representation or warranty regarding federal or state securities laws in connection with the sale or distribution of the Certificates;

(v) The Seller is not in violation of, and the execution and delivery of this Agreement by the Seller and its performance and compliance with the terms of this Agreement will not constitute a violation with respect to, any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over the Seller or its assets, which violation might have consequences that would materially and adversely affect the condition (financial or otherwise) or the operation of the Seller or its assets or might have consequences that would materially and adversely affect the performance of its obligations and duties hereunder;

(vi) Immediately prior to the sale of the Mortgage Loans to the Purchaser as herein contemplated, the Seller was the owner of the related Mortgage and the indebtedness evidenced by the related Mortgage Note, and, upon the payment to the Seller of the Purchase Price, in the event that the Seller retains or has retained record title, the Seller shall retain such record title to each Mortgage, each related Mortgage Note and the related Mortgage Files with respect thereto in trust for the Purchaser as the owner thereof from and after the date hereof;

(vii) There are no actions or proceedings against, or investigations known to it of, the Seller before any court, administrative or other tribunal (A) that might prohibit its entering into this Agreement, (B) seeking to prevent the sale of the Mortgage Loans by the Seller or the consummation of the transactions contemplated by this Agreement or (C) that might prohibit or materially and adversely affect the performance by the Seller of its obligations under, or validity or enforceability of, this Agreement;

(viii) The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Seller, and the transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by the Seller pursuant to this Agreement are not subject to the bulk transfer or any similar statutory provisions in effect in any relevant jurisdiction, except any as may have been complied with;

(ix) There is no litigation currently pending or, to the best of the Seller's knowledge without independent investigation, threatened against the Seller that would reasonably be expected to adversely affect the transfer of the Mortgage Loans, the issuance of the Certificates or the execution, delivery, performance or enforceability of this Agreement; and

(x) The information set forth in the applicable part of the Closing Schedule relating to the existence of a Prepayment Charge is complete, true and correct in all material respects at the date or dates respecting which such information is furnished and each Prepayment Charge is permissible and enforceable in accordance with its terms upon the mortgagor's full and voluntary principal prepayment under applicable law, except to the extent that: (1) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights; (2) the collectability thereof may be limited due to acceleration in connection with a foreclosure or other involuntary prepayment; or (3) subsequent changes in applicable law may limit or prohibit enforceability thereof under applicable law.

SECTION 6. Representations and Warranties of the Seller Relating to the Mortgage Loans.

The Seller hereby represents and warrants to the Purchaser that as to each Mortgage Loan as of the Closing Date (unless otherwise set forth herein):

(i) The information set forth in the Closing Schedule is true and correct in all material respects as of the Cut-Off Date;

(ii) No Monthly Payment required to be made under any Mortgage Loan has been contractually delinquent by one month or more at any time preceding the date such Mortgage Loan was purchased by the Seller;

(iii) To the best of the Seller's knowledge, there are no delinquent taxes, assessment liens or insurance premiums affecting the related Mortgaged Property;

(iv) The buildings and improvements on the Mortgaged Property are insured against loss by fire and hazards of extended coverage (excluding earthquake insurance) in an amount which is at least equal to the lesser of (i) the amount necessary to compensate for any damage or loss to the improvements which are a part of such property on a replacement cost basis or (ii) the outstanding principal balance of the Mortgage Loan. To the best of the Seller's knowledge, if the Mortgaged Property is in an area identified on a flood hazard map or flood insurance rate map issued by the Federal Emergency Management Agency as having special flood hazards (and such flood

insurance has been made available), a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration is in effect. All such insurance policies contain a standard mortgagee clause naming the originator of the Mortgage Loan, its successors and assigns as mortgagee and the Seller has not engaged in any act or omission which would impair the coverage of any such insurance policies. Except as may be limited by applicable law, the Mortgage obligates the Mortgagor thereunder to maintain all such insurance at the Mortgagor's cost and expense, and on the Mortgagor's failure to do so, authorizes the holder of the Mortgage to maintain such insurance at Mortgagor's cost and expense and to seek reimbursement therefor from the Mortgagor;

(v) Each Mortgage Loan and the related Prepayment Charge complied in all material respects with any and all requirements of any federal, state or local law including, without limitation, usury, truth in lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, predatory and abusive lending, fair housing, or disclosure laws applicable to the origination and servicing of Mortgage Loans of a type similar to the Mortgage Loans and the consummation of the transactions contemplated hereby will not involve the violation of any such laws;

(vi) Except as the Mortgage File may reflect, the Mortgage has not been satisfied, cancelled, subordinated or rescinded in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such satisfaction, cancellation, subordination, rescission or release;

(vii) The Mortgage was recorded or was submitted for recording in accordance with all applicable laws and is a valid, existing and enforceable first lien on the Mortgaged Property including all improvements on the Mortgaged Property;

(viii) The Mortgage Note and the related Mortgage are genuine and each is the legal, valid and binding obligation of the maker thereof, insured under the related title policy, and enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by a bankruptcy, insolvency or reorganization;

(ix) The Seller is the sole legal, beneficial and equitable owner of the Mortgage Note and the Mortgage and has the full right to convey, transfer and sell the Mortgage Loan to the Purchaser free and clear of any encumbrance, equity, lien, pledge, charge, claim or security interest and immediately upon the sale, assignment and endorsement of the Mortgage Loans from the Seller to the Purchaser, the Purchaser shall have good and indefeasible title to and be the sole legal owner of the Mortgage Loans subject only to any encumbrance, equity, lien, pledge, charge, claim or security interest arising out of the Purchaser's actions;

(x) Each Mortgage Loan is covered by either (a) an attorney's opinion of title and abstract of title the form and substance of which is acceptable to mortgage lending institutions making mortgage loans in the area where the Mortgaged Property is located or (b) a valid and binding American Land Title Association lender's

title insurance policy issued by a title insurer qualified to do business in the jurisdiction where the Mortgaged Property is located. No claims have been filed under such lender's title insurance policy, and the Seller has not done, by act or omission, anything that would impair the coverage of the lender's title insurance policy;

(xi) To the best of the Seller's knowledge, there is no material default, breach, violation event or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a material default, breach, violation or event of acceleration, and the Seller has not, nor has its predecessors, waived any material default, breach, violation or event of acceleration;

(xii) To the best of the Seller's knowledge, no Mortgage Loan permits negative amortization or the deferral of accrual interest;

(xiii) As of the date the Mortgage Loan was purchased by the Seller, to the best of the Seller's knowledge, there was no proceeding pending for the total or partial condemnation of the Mortgaged Property;

(xiv) To the best of the Seller's knowledge, the Mortgage Loan is not subject to any valid right of rescission, set-off, counterclaim or defense, including without limitation the defense of usury, nor will the operation of any of the terms of the Mortgage Note or the Mortgage, or the exercise of any right thereunder, render either the Mortgage Note or the Mortgage unenforceable, in whole or in part, or subject to any such right of rescission, set-off, counterclaim or defense, including without limitation the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto;

(xv) To the best of the Seller's knowledge, each Mortgage Loan was originated on forms acceptable to FNMA or FHLMC;

(xvi) The Mortgaged Property is free of material damage and in good repair, excepting therefrom any Mortgage Loan subject to an escrow withhold as shown on the Closing Schedule and only to the extent of that escrow withhold;

(xvii) All parties to the Mortgage Note had the legal capacity to execute the Mortgage Note and the Mortgage, and the Mortgage Note and the Mortgage have been duly executed by such parties;

(xviii) To the best of the Seller's knowledge, at the time of origination of the Mortgage Loan, no appraised improvement located on or being part of the Mortgaged Property was in violation of any applicable zoning law or regulation and to the best of the Seller's knowledge, all inspections, licenses and certificates required in connection with the origination of any Mortgage Loan with respect to the occupancy of the Mortgaged Property, have been made or obtained from the appropriate authorities;

(xix) The Mortgage File contains an appraisal of the related Mortgaged Property which satisfied the standards of FNMA and FHLMC and was made

prior to the origination of the Mortgage Loan by a qualified appraiser, duly appointed by the related originator and was made in accordance with the relevant provisions of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989;

(xx) Each Mortgage Loan is an obligation which is principally secured by an interest in real property within the meaning of Treasury Regulation section 1.860G 2(a);

(xxi) Each Mortgage Loan is directly secured by a first lien on, and consists of a single parcel of, real property with a detached one-to-four family residence erected thereon, a townhouse or an individual condominium unit in a condominium project, or an individual unit in a planned unit development or stock in a cooperative housing corporation;

(xxii) With respect to any Mortgage Loan with an original Loan-to-Value Ratio greater than 80%, the Mortgage Loan will be insured by a primary mortgage guaranty insurance policy, issued by an insurer which meets the requirements of FNMA and FHLMC, which insures that portion of the Mortgage Loan in excess of the portion of the appraised value of the Mortgaged Property required by FNMA. All provisions of such primary mortgage guaranty insurance policy have been and are being complied with, such policy is in full force and effect, and all premiums due thereunder have been paid. Any Mortgage subject to any such primary mortgage guaranty insurance policy obligates the Mortgagor thereunder to maintain such insurance and to pay all premiums and charges in connection therewith. The Mortgage Interest Rate for the Mortgage Loan does not include any such insurance premium;

(xxiii) Each Mortgage Loan was originated by a savings and loan association, savings bank, commercial bank, credit union, insurance company, or similar institution which is supervised and examined by a federal or state authority, or by a mortgagee approved by the Secretary of Housing and Urban Development or any successor thereto;

(xxiv) No Mortgage Loan is (a) subject to, covered by or in violation of the provisions of the Homeownership and Equity Protection Act of 1994, as amended, (b) a "high cost", "covered", "abusive", "predatory", or "high risk" mortgage loan (or a similarly designated loan using different terminology) under any federal, state or local law, including without limitation, the provisions of the Georgia Fair Lending Act, New York Banking Law, Section 6-1, the Arkansas Home Loan Protection Act, effective as of June 14, 2003, Kentucky State Statute KRS 360.100, effective as of June 25, 2003 or any other statute or regulation providing assignee liability to holders of such mortgage loans, (c) subject to or in violation of any such or comparable federal, state or local statutes or regulations;

(xxv) [Reserved];

(xxvi) No Mortgage Loan is a "High-Cost Home Loan" or a refinanced "Covered Home Loan," in each case, as defined in the New Jersey Home Ownership Act effective November 27, 2003 (N.J.S.A. 46;10B-22 et seq.);

(xxvii) No Mortgage Loan is a subsection 10 mortgage under the Oklahoma Home Ownership and Equity protection Act;

(xxviii) No Mortgage Loan is a "High-Cost Home Loan" as defined in the New Mexico Home Loan Protection Act effective January 1, 2004 (N.M. Stat. Ann. §§ 58-21A-1 et seq.);

(xxix) No Mortgage Loan is a "High-Risk Home Loan" as defined in the Illinois High-Risk Home Loan Act effective January 1, 2004 (815 Ill. Comp. Stat. 137/1 et seq.);

(xxx) There is no Mortgage Loan that was originated or modified on or after October 1, 2002 and before March 7, 2003, which is secured by property located in the State of Georgia. There is no such Mortgage Loan underlying the Certificate that was originated on or after March 7, 2003, which is a "high cost home loan" as defined under the Georgia Fair Lending Act;

(xxxi) No Mortgage Loan is a "High-Cost Home Loan" as defined in the Massachusetts Predatory Home Loan Practices Act, effective November 7, 2004 (Mass. Ann. Laws Ch. 183C);

(xxxii) No Mortgage Loan is a "High-Cost Home Loan" as defined in the Indiana Home Loan Practices Act, effective January 1, 2005 (Ind. Code Ann. Sections 24-9-1 through 24-9-9);

(xxxiii) Information provided to the Rating Agencies, including the loan level detail, is true and correct according to the Rating Agency requirements;

(xxxiv) The Mortgage Loans were underwritten in accordance with the related originator's underwriting guidelines in effect at the time the Mortgage Loans were originated (the "Applicable Underwriting Guidelines"), except with respect to certain of those Mortgage Loans which had compensating factors permitting a deviation from the Applicable Underwriting Guidelines;

(xxxv) There are no mechanics' or similar liens or claims which have been filed for work, labor or material provided to the related Mortgaged Property prior to the origination of the Mortgage Loan which are or may be liens prior to, or equal or coordinate with, the lien of the related Mortgage, except as may be disclosed in the related title policy;

(xxxvi) The servicing practices used in connection with the servicing of the Mortgage Loans have been in all respects reasonable and customary in the mortgage servicing industry of like mortgage loan servicers, servicing similar mortgage loans originated in the same jurisdiction as the Mortgaged Property;

(xxxvii) The terms of the Mortgage Note and the Mortgage have not been materially impaired, waived, altered or modified in any respect, except by written instruments, recorded in the applicable public recording office if necessary to maintain the lien priority of the Mortgage. The substance of any such waiver, alteration or modification has been approved by the title insurer, to the extent required by the related policy. No Mortgagor has been released, in whole or in part, except in connection with an assumption agreement (approved by the title insurer to the extent required by the policy) and which assumption agreement has been delivered to the Trustee;

(xxxviii) The Mortgage Interest Rate with respect to the Mortgage Loans is subject to adjustment at the time and in the amounts as are set forth in the related Mortgage Note;

(xxxix) No Mortgage Loan contains a provision whereby the Mortgagor can convert a Mortgage Loan into a fixed rate Mortgage Loan;

(xl) No selection procedures were used by the Seller that identified the Mortgage Loans as being less desirable or valuable than other comparable mortgage loans in the Seller's portfolio;

(xli) No Mortgage Loan is secured in whole or in part by the interest of the Mortgagor as a lessee under a ground lease of the related Mortgaged Property; \

(xlii) No Mortgage Loan is a High Cost Loan or Covered Loan, as applicable (as such terms are defined in the then current Standard & Poor's LEVELS® Glossary which is now Version 5.6(c) Revised, Appendix E (attached hereto as Exhibit 2)) and no Mortgage Loan originated on or after October 1, 2002 through March 6, 2003 is governed by the Georgia Fair Lending Act; and

(xliii) The Mortgage Note, with respect to a Cooperative Loan, is not and has not been secured by any collateral except the lien of the Cooperative Shares and the Proprietary Lease (each as defined in Exhibit 3 hereto).

SECTION 7. <u>Repurchase Obligation for Defective Documentation and for Breach of Representation and Warranty</u>.

(a) The representations and warranties contained in Section 6 shall not be impaired by any review and examination of the Mortgage Files or other documents evidencing or relating to the Mortgage Loans or any failure on the part of the Seller or the Purchaser to review or examine such documents and shall inure to the benefit of any assignee, transferee or designee of the Purchaser, including the Trustee for the benefit of the Certificateholders. With respect to the representations and warranties contained herein as to which the Seller has no knowledge, if it is discovered that the substance of any such representation and warranty was inaccurate as of the date such representation and warranty was made or deemed to be made, and such inaccuracy materially and adversely affects the value of the related Mortgage Loan or the interest therein of the Purchaser or the Purchaser's assignee, transferee or designee, then notwithstanding the lack of knowledge by the Seller with respect to the substance of such representation and warranty

being inaccurate at the time the representation and warranty was made, the Seller shall take such action described in the following paragraph in respect of such Mortgage Loan.

Upon discovery by the Seller, the Purchaser or any assignee, transferee or designee of the Purchaser of any materially defective document in, or that any material document was not transferred by the Seller (as listed on the related Custodian's preliminary exception reports, as described in the related Custodial Agreement, as part of any Mortgage File or of a breach of any of the representations and warranties contained in Section 6 that materially and adversely affects the value of any Mortgage Loan or the interest therein of the Purchaser or the Purchaser's assignee, transferee or designee, the party discovering such breach shall give prompt written notice to the Seller. Within sixty (60) days of its discovery or its receipt of notice of any such missing documentation that was not transferred by the Seller as described above, or of materially defective documentation, or within sixty (60) days of any such breach of a representation and warranty, the Seller promptly shall deliver such missing document or cure such defect or breach in all material respects or, in the event the Seller cannot deliver such missing document or cannot cure such defect or breach, the Seller shall, within ninety (90) days of its discovery or receipt of notice of any such missing or materially defective documentation or within ninety (90) days of any such breach of a representation and warranty, either (i) repurchase the affected Mortgage Loan at the Purchase Price (as such term is defined in the Pooling and Servicing Agreement) or (ii) pursuant to the provisions of the Pooling and Servicing Agreement, cause the removal of such Mortgage Loan from the Trust Fund and substitute one or more Substitute Loans. The Seller shall amend the Closing Schedule to reflect the withdrawal of such Mortgage Loan from the terms of this Agreement and the Pooling and Servicing Agreement. Notwithstanding the foregoing, if the representation made by the Seller in Section 6(xxiv) of this Agreement is breached, the Trustee shall, in accordance with the terms of the Pooling and Servicing Agreement, enforce the obligation of the Seller to repurchase such Mortgage Loan at the Purchase Price, or to provide a Substitute Loan (plus any costs and damages incurred by the Trust Fund in connection with any violation by any such Mortgage Loan of any predatory or abusive lending law) within ninety (90) days after the date on which the Seller was notified of such breach. The Seller shall deliver to the Purchaser such amended Closing Schedule and shall deliver such other documents as are required by this Agreement or the Pooling and Servicing Agreement within five (5) days of any such amendment. Any repurchase pursuant to this Section 7(a) shall be accomplished by transfer to an account designated by the Purchaser of the amount of the Purchase Price in accordance with Section 2.3 of the Pooling and Servicing Agreement. Any repurchase required by this Section shall be made in a manner consistent with Section 2.3 of the Pooling and Servicing Agreement.

(b) If the representation made by the Seller in Section 5(x) is breached, the Seller shall not have the right or obligation to cure, substitute or repurchase the affected Mortgage Loan but shall remit to the Master Servicer for deposit in the Distribution Account, prior to the next succeeding Distribution Date, the amount of the Prepayment Charge indicated on the applicable part of the Closing Schedule to be due from the Mortgagor in the circumstances less any amount collected and remitted to the Master Servicer for deposit into the Distribution Account.

(c) It is understood and agreed that the obligations of the Seller set forth in this Section 7 to cure or repurchase a defective Mortgage Loan (and to make payments pursuant

to Section 7(b)) constitute the sole remedies of the Purchaser against the Seller respecting a missing document or a breach of the representations and warranties contained in Section 6.

SECTION 8. Closing; Payment for the Mortgage Loans. The closing of the purchase and sale of the Mortgage Loans shall be held at the New York City office of McKee Nelson LLP at 10:00 a.m. New York City time on the Closing Date.

The closing shall be subject to each of the following conditions:

(a) All of the representations and warranties of the Seller under this Agreement shall be true and correct in all material respects as of the date as of which they are made and no event shall have occurred which, with notice or the passage of time, would constitute a default under this Agreement;

(b) The Purchaser shall have received, or the attorneys of the Purchaser shall have received in escrow (to be released from escrow at the time of closing), all Closing Documents as specified in Section 9 of this Agreement, in such forms as are agreed upon and acceptable to the Purchaser, duly executed by all signatories other than the Purchaser as required pursuant to the respective terms thereof;

(c) The Seller shall have delivered or caused to be delivered and released to the Purchaser or to its designee, all documents (including without limitation, the Mortgage Loans) required to be so delivered by the Purchaser pursuant to Section 2.1 of the Pooling and Servicing Agreement; and

(d) All other terms and conditions of this Agreement and the Pooling and Servicing Agreement shall have been complied with.

Subject to the foregoing conditions, the Purchaser shall deliver or cause to be delivered to the Seller on the Closing Date, against delivery and release by the Seller to the Trustee of all documents required pursuant to the Pooling and Servicing Agreement, the consideration for the Mortgage Loans as specified in Section 3 of this Agreement.

SECTION 9. Closing Documents. Without limiting the generality of Section 8 hereof, the closing shall be subject to delivery of each of the following documents:

(a) An Officer's Certificate of the Seller, dated the Closing Date, upon which the Purchaser and DBSI may rely with respect to certain facts regarding the sale of the Mortgage Loans by the Seller to the Purchaser;

(b) An Opinion of Counsel of the Seller, dated the Closing Date and addressed to the Purchaser and DBSI;

(c) Such opinions of counsel as the Rating Agencies or the Trustee may request in connection with the sale of the Mortgage Loans by the Seller to

the Purchaser or the Seller's execution and delivery of, or performance under, this Agreement; and

(d) Such further information, certificates, opinions and documents as the Purchaser or DBSI may reasonably request.

SECTION 10. Costs. The Seller shall pay (or shall reimburse the Purchaser or any other Person to the extent that the Purchaser or such other Person shall pay) all costs and expenses incurred in connection with the transfer and delivery of the Mortgage Loans, including without limitation, fees for title policy endorsements and continuations, the fees and expenses of the Seller's accountants and attorneys, the costs and expenses incurred in connection with producing any Servicer's loan loss, foreclosure and delinquency experience, and the costs and expenses incurred in connection with obtaining the documents referred to in Sections 9(a), 9(b) and 9(c), the costs and expenses of printing (or otherwise reproducing) and delivering this Agreement, the Pooling and Servicing Agreement, the Certificates, the prospectus and prospectus supplement, and any private placement memorandum relating to the Certificates and other related documents, the initial fees, costs and expenses of the Trustee, the fees and expenses of the Purchaser's counsel in connection with the preparation of all documents relating to the securitization of the Mortgage Loans, the filing fee charged by the Securities and Exchange Commission for registration of the Certificates and the fees charged by any rating agency to rate the Certificates. All other costs and expenses in connection with the transactions contemplated hereunder shall be borne by the party incurring such expense.

SECTION 11. Servicing. The Mortgage Loans will be master serviced by the Master Servicer under the Pooling and Servicing Agreement and serviced by Countrywide Home Loans Servicing LP ("CHLS"), Franklin Bank SSB ("Franklin Bank"), GMAC Mortgage Corporation ("GMAC"), GreenPoint Mortgage Funding, Inc. ("GreenPoint"), IndyMac Bank, F.S.B. ("IndyMac") and Wells Fargo Bank, N.A. ("Wells Fargo"), as applicable, on behalf of the Trust, pursuant to separate servicing agreements identified in the Pooling and Servicing Agreement and assigned to the Purchaser on the Closing Date and the Seller has represented to the Purchaser that such Mortgage Loans are not subject to any other servicing agreements with third parties (other than the servicing agreements with CHLS, Franklin Bank, GMAC, GreenPoint, IndyMac and Wells Fargo). It is understood and agreed between the Seller and the Purchaser that the Mortgage Loans are to be delivered free and clear of any servicing agreements (other than the servicing agreements with CHLS, Franklin Bank, GMAC, GreenPoint, IndyMac and Wells Fargo). Neither the Purchaser nor any affiliate of the Purchaser is servicing the Mortgage Loans under any such servicing agreement and, accordingly, neither the Purchaser nor any affiliate of the Purchaser is entitled to receive any fee for releasing the Mortgage Loans from any such servicing agreement. For so long as the Master Servicer master services the Mortgage Loans and the applicable Servicer services the Mortgage Loans, the Master Servicer shall be entitled to the Master Servicing Fee and the applicable Servicer shall be entitled to the related Servicing Fee and such other payments as provided for under the terms of the Pooling and Servicing Agreement or the related servicing agreement, as applicable.

SECTION 12. Mandatory Delivery; Grant of Security Interest. The sale and delivery on the Closing Date of the Mortgage Loans described on the Closing Schedule in accordance with the terms and conditions of this Agreement is mandatory. It is specifically

understood and agreed that each Mortgage Loan is unique and identifiable on the date hereof and that an award of money damages would be insufficient to compensate the Purchaser for the losses and damages incurred by the Purchaser in the event of the Seller's failure to deliver the Mortgage Loans on or before the Closing Date. The Seller hereby grants to the Purchaser a lien on and a continuing security interest in the Seller's interest in each Mortgage Loan and each document and instrument evidencing each such Mortgage Loan to secure the performance by the Seller of its obligation hereunder, and the Seller agrees that it holds such Mortgage Loans in custody for the Purchaser, subject to the Purchaser's (i) right, prior to the Closing Date, to reject any Mortgage Loan to the extent permitted by this Agreement and (ii) obligation to deliver or cause to be delivered the consideration for the Mortgage Loans pursuant to Section 8 hereof. Any Mortgage Loans rejected by the Purchaser shall concurrently therewith be released from the security interest created hereby. All rights and remedies of the Purchaser under this Agreement are distinct from, and cumulative with, any other rights or remedies under this Agreement or afforded by law or equity and all such rights and remedies may be exercised concurrently, independently or successively.

Notwithstanding the foregoing, if on the Closing Date, each of the conditions set forth in Section 8 hereof shall have been satisfied and the Purchaser shall not have paid or caused to be paid the Purchase Price, or any such condition shall not have been satisfied and satisfaction of such condition shall not have been waived and the Purchaser determines not to pay or cause to be paid the Purchase Price, the Purchaser shall immediately effect the redelivery of the Mortgage Loans, if delivery to the Purchaser has occurred, and the security interest created by this Section 12 shall be deemed to have been released.

SECTION 13. Notices. All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered to or mailed by registered mail, postage prepaid, or transmitted by fax and, receipt of which is confirmed by telephone, if to the Purchaser, addressed to the Purchaser at 60 Wall Street, New York, New York 10005, fax: (212) 250-2500, Attention: Susan Valenti, or such other address as may hereafter be furnished to the Seller in writing by the Purchaser; and if to the Seller, addressed to the Seller at 60 Wall Street, New York, New York 10005, fax: (212) 250-2500, Attention: Susan Valenti, or to such other address as the Seller may designate in writing to the Purchaser.

SECTION 14. Severability of Provisions. Any part, provision, representation or warranty of this Agreement that is prohibited or that is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement that is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

SECTION 15. Agreement of Parties. The Seller and the Purchaser each agree to execute and deliver such instruments and take such actions as either of the others may, from time

to time, reasonably request in order to effectuate the purpose and to carry out the terms of this Agreement and the Pooling and Servicing Agreement.

SECTION 16. Survival. The Seller agrees that the representations, warranties and agreements made by it herein and in any certificate or other instrument delivered pursuant hereto shall be deemed to be relied upon by the Purchaser, notwithstanding any investigation heretofore or hereafter made by the Purchaser or on its behalf, and that the representations, warranties and agreements made by the Seller herein or in any such certificate or other instrument shall survive the delivery of and payment for the Mortgage Loans and shall continue in full force and effect, notwithstanding any restrictive or qualified endorsement on the Mortgage Notes and notwithstanding subsequent termination of this Agreement, the Pooling and Servicing Agreement or the Trust Fund.

SECTION 17. GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS, DUTIES, OBLIGATIONS AND RESPONSIBILITIES OF THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS (EXCLUDING THE CHOICE OF LAW PROVISIONS) AND DECISIONS OF THE STATE OF NEW YORK. THE PARTIES HERETO INTEND THAT THE PROVISIONS OF SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW SHALL APPLY TO THIS AGREEMENT.

SECTION 18. Miscellaneous. This Agreement may be executed in two or more counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. This Agreement supersedes all prior agreements and understandings relating to the subject matter hereof. Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought. The headings in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

It is the express intent of the parties hereto that the conveyance of the Mortgage Loans by the Seller to the Purchaser as provided in Section 4 hereof be, and be construed as, a sale of the Mortgage Loans by the Seller to the Purchaser and not as a pledge of the Mortgage Loans by the Seller to the Purchaser to secure a debt or other obligation of the Seller. However, in the event that, notwithstanding the aforementioned intent of the parties, the Mortgage Loans are held to be property of the Seller, then (a) it is the express intent of the parties that such conveyance be deemed a pledge of the Mortgage Loans by the Seller to the Purchaser to secure a debt or other obligation of the Seller and (b) (1) this Agreement shall also be deemed to be a security agreement within the meaning of Articles 8 and 9 of the New York Uniform Commercial Code, (2) the conveyance provided for in Section 4 hereof shall be deemed to be a grant by the Seller to the Purchaser of a security interest in all of the Seller's right, title and interest in and to the Mortgage Loans and all amounts payable to the holders of the Mortgage Loans in accordance with the terms thereof and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all amounts, other than investment earnings, from time to time held or

invested in the Protected Accounts established by the Servicers of the related Mortgage Loans for the benefit of the owner thereof, whether in the form of cash, instruments, securities or other property, (3) the possession by the Purchaser or its agent of Mortgage Notes, the related Mortgages and such other items of property that constitute instruments, money, negotiable documents or chattel paper shall be deemed to be "possession by the secured party" for purposes of perfecting the security interest pursuant to Section 9-305 of the New York Uniform Commercial Code, and (4) notifications to persons holding such property and acknowledgments, receipts or confirmations from persons holding such property shall be deemed notifications to, or acknowledgments, receipts or confirmations from, financial intermediaries, bailees or agents (as applicable) of the Purchaser for the purpose of perfecting such security interest under applicable law. Any assignment of the interest of the Purchaser pursuant to Section 4(d) hereof shall also be deemed to be an assignment of any security interest created hereby. The Seller and the Purchaser shall, to the extent consistent with this Agreement, take such actions as may be necessary to ensure that, if this Agreement were deemed to create a security interest in the Mortgage Loans, such security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of this Agreement and the Pooling and Servicing Agreement.

SECTION 19. Third Party Beneficiary. The parties hereto acknowledge and agree that DBSI and each of its respective successors and assigns shall have all the rights of a third-party beneficiary in respect of Section 12 of this Agreement and shall be entitled to rely upon and directly enforce the provisions of Section 12 of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Purchaser and the Seller have caused their names to be signed by their respective officers thereunto duly authorized as of the date first above written.

DB STRUCTURED PRODUCTS, INC.

By:____________________ SUSAN VALENTI
Name:
Title: DIRECTOR

By:____________________ ADAM YARNOID
Name:
Title: DIRECTOR

DEUTSCHE ALT-A SECURITIES, INC.

By:____________________ SUSAN VALENTI
Name:
Title: DIRECTOR

By:____________________ ADAM YARNOID
Name:
Title: DIRECTOR

EXHIBIT 1

Loan #: _____
Borrower: _____

LOST NOTE AFFIDAVIT

I, as ______________________ of _____________________, a _______________ am authorized to make this Affidavit on behalf of __________________ (the "Seller"). In connection with the administration of the Mortgage Loans held by ______________________, a _______________ [corporation] as Seller on behalf of ____________________ (the "Purchaser"), ________________________ (the "Deponent"), being duly sworn, deposes and says that:

1. The Seller's address is:

_____________________________
_____________________________
_____________________________

2. The Seller previously delivered to the Purchaser a signed initial certification with respect to such Mortgage and/or Assignment;

3. Such Mortgage Note and/or Assignment was assigned or sold to the Purchaser by __________________, a _________________ pursuant to the terms and provisions of a Mortgage Loan Purchase Agreement dated as of June 30, 2006;

4. Such Mortgage Note and/or Assignment is not outstanding pursuant to a request for release of Documents;

5. Aforesaid Mortgage Note and/or Assignment (the "Original") has been lost;

6. Deponent has made or caused to be made a diligent search for the Original and has been unable to find or recover same;

7. The Seller was the Seller of the Original at the time of the loss; and

8. Deponent agrees that, if said Original should ever come into Seller's possession, custody or power, Seller will immediately and without consideration surrender the Original to the Purchaser.

9. Attached hereto is a true and correct copy of (i) the Note, endorsed in blank by the Mortgagee and (ii) the Mortgage or deed of trust (strike one) which secures the Note, which Mortgage or deed of trust is recorded in the county where the property is located.

10. Deponent hereby agrees that the Seller (a) shall indemnify and hold harmless the Purchaser, its successors and assigns, against any loss, liability or damage, including reasonable attorney's fees, resulting from the unavailability of any Notes, including but not limited to any loss, liability or damage arising from (i) any false statement contained in this Affidavit, (ii) any claim of any party that purchased a mortgage loan evidenced by the Lost Note or any interest in such mortgage loan, (iii) any claim of any borrower with respect to the existence of terms of a mortgage loan evidenced by the Lost Note on the related property to the fact that the mortgage loan is not evidenced by an original note and (iv) the issuance of a new instrument in lieu thereof (items (i) through (iv) above hereinafter referred to as the "Losses") and (b) if required by any Rating Agency in connection with placing such Lost Note into a Pass-Through Transfer, shall obtain a surety from an insurer acceptable to the applicable Rating Agency to cover any Losses with respect to such Lost Note.

11. This Affidavit is intended to be relied upon by the Purchaser, its successors and assigns. [Seller] represents and warrants that is has the authority to perform its obligations under this Affidavit of Lost Note.

Executed this _ day of _______, 200_.

By: ______________________________
Name:
Title:

On this __ day of ______, 200_, before me appeared ______________________ to me personally known, who being duly sworn did say that he is the ______________________ of ____________________, a ______________________ and that said Affidavit of Lost Note was signed and sealed on behalf of such corporation and said acknowledged this instrument to be the free act and deed of said entity.

Signature:

[Seal]

EXHIBIT 2

Standard & Poor's LEVELS® Glossary Version 5.6(c) Revised, Appendix E

EXHIBIT 3

Definitions with respect to terms used in Sections 2(b)(i) and 2(b)(ii) of this Agreement and not otherwise defined in this Agreement or the Pooling and Servicing Agreement:

Assignment of Proprietary Lease: With respect to a Cooperative Loan, the assignment or mortgage of the related Proprietary Lease from the Mortgagor to the originator of the Cooperative Loan.

Cooperative Corporation: With respect to any Cooperative Loan, the cooperative apartment corporation that holds legal title to the related Cooperative Property and grants occupancy rights to units therein to stockholders through Proprietary Leases or similar arrangements.

Cooperative Lien Search: A search for (a) federal tax liens, mechanics' liens, lis pendens, judgments of record or otherwise against (i) the Cooperative Corporation and (ii) the seller of the Cooperative Unit, (b) filings of Financing Statements and (c) the deed of the Cooperative Property into the Cooperative Corporation.

Cooperative Loan: A Mortgage Loan that is secured by a first lien on and a perfected security interest in Cooperative Shares and the related Proprietary Lease granting exclusive rights to occupy the related Cooperative Unit in the building owned by the related Cooperative Corporation.

Cooperative Property: With respect to any Cooperative Loan, all real property and improvements thereto and rights therein and thereto owned by a Cooperative Corporation including without limitation the land, separate dwelling units and all common elements.

Cooperative Shares: With respect to any Cooperative Loan, the shares of stock issued by a Cooperative Corporation and allocated to a Cooperative Unit and represented by stock certificates.

Cooperative Unit: With respect to any Cooperative Loan, a specific unit in a Cooperative Property.

Financing Statement: A financing statement in the form of a UCC-1 or UCC-3, as applicable, filed pursuant to the Uniform Commercial Code to perfect a security interest in the Cooperative Shares and Pledge Instruments.

MERS: Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

MERS® System: The system of recording transfers of mortgages electronically maintained by MERS.

MIN: The Mortgage Identification Number for Mortgage Loans registered with MERS on the MERS® System.

MOM Loan: With respect to any Mortgage Loan, MERS acting as the mortgagee of such Mortgage Loan, solely as nominee for the originator of such Mortgage Loan and its successors and assigns, at the origination thereof.

Pledge Instruments: With respect to each Cooperative Loan, the Stock Power, the Assignment of Proprietary Lease and the Security Agreement.

Proprietary Lease: The lease on a Cooperative Unit evidencing the possessory interest of the owner of the Cooperative Shares in such Cooperative Unit.

Recognition Agreement: An agreement among a Cooperative Corporation, a lender and a Mortgagor with respect to a Cooperative Loan whereby such parties (i) acknowledge that such lender may make, or intends to make, such Cooperative Loan and (ii) make certain agreements with respect to such Cooperative Loan.

Security Agreement: With respect to a Cooperative Loan, the agreement or mortgage creating a security interest in favor of the originator of the Cooperative Loan in the related Cooperative Shares.

Stock Power: With respect to a Cooperative Loan, an assignment of the stock certificate or an assignment of the Cooperative Shares issued by the Cooperative Corporation.

# **Exhibit I**

# EXHIBIT FILED UNDER SEAL

# **Exhibit J**

Andrew J. Christensen (SBN: 260748)
Law Offices of Andrew J. Christensen, P.C.
2063 Mountain Blvd. Suite 2
Oakland, CA 94611
Tel: (510) 761-7183
Fax: (510) 680-3430
Andrew@CaliforniaHomeLawyer.com

Pamela D. Simmons #160523
Law Office of Simmons & Purdy
2425 Porter Street, Suite 10
Soquel, CA 95073
Tel: (831) 464-6884
Fax: (831) 464-6885
E-mail: pamela@pamelaw.com

Attorneys for Plaintiff
Cory Mayer

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| Cory Mayer,<br>Plaintiff,<br>v.<br>DEUTSCHE ALT A SECURITIES MORTGAGE LOAN TRUST SERIES 2006-A.;<br>PHH MORTGAGE CORPORATION; WESTERN PROGRESSIVE, LLC; DOES 1-20; and all persons unknown claiming any interest in the property, inclusive and DOES 1 through 50, inclusive,<br>Defendants. | CASE NO.: 5:25-cv-00182-NW<br>Unlimited Jurisdiction<br><br>**Plaintiffs' Amended Notice of the Second Deposition of PHH Mortgage Corporation**<br><br>Date: February 6, 2026<br>Time: 9:00 a.m.<br>Place: Veritext Legal Solutions<br><br>Honorable Judge Noël Wise<br>Action Filed: August 9, 2024<br>Trial Date: September 28, 2026 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that pursuant to FRCP 30(b)(6), Plaintiff Cory Mayer ("Plaintiff") will take the oral deposition of PHH MORTGAGE CORPORATION ("PHH").

The deposition will take place at the time and date listed above. The deponent may appear by remote video conference using the remote access link

"REINSTATEMENT FUNDS" means the $158,125.89 identified in the SETTLEMENT AGREEMENT.

"PRINCIPAL" shall mean the person or entity for which YOU are acting as the servicing agent for the SUBJECT LOAN, such as the owner, beneficiary, trustee, or holder of the note.

"IDENTIFY" shall mean to state the name, address, phone number, email, job title, and dates of employment for any individual.

**Topics for Examination**

27. IDENTIFYING all contracts between PHH and HSBC relating to the SUBJECT LOAN and explaining how they apply to PHH, HSBC, and the SUBJECT LOAN. This shall include, but is not limited to, the servicing agreement, pooling and servicing agreement, mortgage loan purchase agreement, assignment assumption and recognition agreement, the asset purchase agreement, the certificates of merger, and all schedules, lists, exhibits, and all other documents related to each of the foregoing documents. This shall include identifying all documents necessary to establish that each document pertains to the SUBJECT LOAN and HSBC and PHH, and where they are located, and why they have not all been produced.

28. Why the date of the servicing agreement between DB Products and GMAC has a date different than the date referred to in the pooling and servicing agreement. This shall include explaining why the servicing agreement is dated 8/5/2005, but the pooling and servicing agreement refers to a GMAC servicing agreement with DB Products dated 4/25/2005 and amended 12/29/2005.

29. The scope of PHH's agency authority in relation to the Loan, and identifying all documents which control the scope of agency, including, but not limited to, how any later documents amended or modified the scope of authority or obligations.

30. Whether Ocwen and/or PHH was or is authorized as the agents of HSBC to stop sending billing statements, to send inaccurate billing statements, to start escrow impounds without notice, to change the address for notices to Plaintiff without his request, to reject payments, to not tell Plaintiff the correct amount of the payment, to pay taxes before they are late in violation of the

deed of trust, to not do the credit reporting under the settlement agreement or to give Plaintiff notice of the reporting.

31. All indemnity agreements between HSBC and PHH, and whether PHH is obligated to indemnify HSBC for any liability incurred by HSBC as a result of the actions alleged in the First Amended Complaint, including whether PHH must indemnify HSBC for any judgment Plaintiff obtains against HSBC in this action, or whether HSBC shall indemnify PHH. This shall include identifying each document and/or contract requiring indemnity, and the scope of the indemnity.

32. Whether HSBC will indemnify PHH, or if PHH will indemnify HSBC, pursuant to the Sections 8.01 and 8.02 of the Servicing Agreement between DB Structured Products and GMAC, bates page 2558-2561.

33. The date, time, and manner of PHH notifying HSBC of this lawsuit, and all communications between HSBC and PHH regarding PHH assuming the defense of this case, pursuant to Section 8.01 of the Servicing Agreement between DB Structured Products and GMAC, bates page 2558-2559.

34. The servicing compensation arrangement between HSBC and PHH, the documents controlling the amount of this compensation, and the documents evidencing the amounts actually received by PHH.

35. The investor remittance reports and related emails produced by Defendants in this case. This shall include, but is not limited to, explaining all entries and all amounts in the reports, what each data point means, the meaning of each column heading, the manner in which the reports are created, sent, stored, and maintained, who receives them, who reviews them. This shall also include confirming the compensation amounts shown in the reports and explaining how those amounts relate to the contracts and servicing agreements governing compensation between HSBC and PHH, and whether the amount of compensation received by PHH is correct according to the compensation structure, and explaining all deviations from the contract compensation amounts.

36. The manner in which the investor remittance reports are sent out, the form of the reports when sent, and how the portal works, and how and where records are kept of the history of

transmissions of the investor remittance reports, and how that data may be exported or shared, such as by screenshot or otherwise.

37. IDENTIFY the entity(ies) to which the investor remittance reports are sent each month. This shall include whether they are sent to Wells Fargo the Master Servicer, or HSBC, or both.

38. IDENTIFY the DOCUMENTS controlling the form and/or content of the investor remittance reports, including where in the contracts, servicing agreements, or related schedules this information is found.

39. The transaction history document produced by Defendants, bates pages 7550 through 7564.

40. All communications between HSBC and PHH in relation to the SUBJECT LOAN that relates to any of the issues raised in the First Amended Complaint from April 2020 to present, including the dates of the communications and their contents, and to IDENTIFY all persons sending or receiving or copied on the emails or other communications.

41. IDENTIFY the main point of contact at HSBC through which PHH communicated relating to the allegations in the First Amended Complaint.

42. The extent to which PHH reports to Wells Fargo as the Master servicer relating to the SUBJECT LOAN.

43. IDENTIFY the person that made the decision to enter into the Settlement Agreement.

44. IDENTIFY the person with the highest level of authority that is responsible for ensuring that PHH complied with the Settlement Agreement from April 2020 to present.

45. IDENTIFY the person(s) with the highest levels of authority that knew of the decision to enter into the Settlement Agreement.

46. IDENTIFY all documents that authorize or authorized PHH to make the decision to enter into the Settlement Agreement in 2020 on behalf of HSBC, including the title of the documents, the date of the documents, the location of the documents, the IDENTITY of the persons executing the documents, and the exact language in those documents authorizing PHH's conduct.

47. Why the credit reporting team did not receive a request to report "paid as agreed" pursuant to the Settlement Agreement as testified by Verdooren on December 19, 2025, on page 204 of the deposition transcript.

48. All actions to discipline any employees that worked on the SUBJECT LOAN from April 2020 to present, and whether anyone was reprimanded, disciplined, or received coaching or supplemental training or had any adverse action taken against them on account of any actions taken regarding the SUBJECT LOAN. This shall include, but is not limited to, whether anyone in the cashiering department or escrow department, or specialized home retention department, or the legal department was disciplined on account of the four reversals and reapplications of PLAINTIFF'S funds to the SUBJECT LOAN from May 2020 through October 2024. This shall include any disciplinary actions against any employee for any of the misconduct alleged in the First Amended Complaint, and against Evelyn Pierre, Tiffany Drexel, Priya Niak, Amelin Desouza, or anyone else.

49. Tiffany Drexel's involvement in the SUBJECT LOAN from April 2020 to present, including what her role was, what she did, IDENTIFY all persons she contacted or communicated with by phone or email or otherwise, all facts she knows related to the SUBJECT LOAN, all facts she knows after reviewing all her emails, how many emails there are and the content of the emails.

50. Evelyn Pierre's involvement in the SUBJECT LOAN from April 2020 to present, including what her role was, what she did, IDENTIFY all persons she contacted or communicated with by phone or email or otherwise, all facts she knows related to the SUBJECT LOAN, all facts she knows after reviewing all her emails, how many emails there are and the content of the emails.

51. Evelyn Pierre's emails regarding the SUBJECT LOAN, including how many there are, all recipients and senders, and all facts in all emails.

52. Whether Evelyn Pierre was responsible for implementing any aspects of the SETTLEMENT AGREEMENT, including, but not limited to, applying the credit to the LOAN, the credit reporting, or removing holds, flags, or stops on the LOAN.

53. Why PHH did not credit the LOAN the $33,000 until January 2022 and October 2024, and who was at fault for not applying the credit earlier, and the first time anyone asked or instructed anyone at PHH to apply the credit.

54. From April 2020 to present, whether Tiffany Drexel or anyone else investigated the delays in PHH applying and reapplying the reinstatement funds to the LOAN, or investigated the failure to report the loan as paid as agreed until 2024, or the failure to run a new escrow analysis in 2020 after the reinstatement funds were paid, or the failure to apply the credit to the Loan until January 2022. This shall include IDENTIFYING who directed or initiated the investigation, who was involved, what they did, the result of the investigation, and what DOCUMENTS exist RELATING TO the investigation.

55. All emails produced by Defendants in this ACTION.

56. Brian Paino's communications with PLAINTIFF'S lawyers.

57. The extent of Sana Shaik's involvement in applying payments to the LOAN, including all dates she took actions on the loan, all facts she knows about the application of funds to the LOAN from April 2020 to present, all facts accessible to her through her emails and records, how many emails she has related to the SUBJECT LOAN, all person's she spoke to about the LOAN, who instructed her to take all actions she took, and all instructions she gave to anyone else about the SUBJECT LOAN.

58. The Notice of Default and Notice of Trustee Sale recorded in 2023 related to the SUBJECT LOAN, including explaining whether the stated defaults are accurate and why.

59. IDENTIFY all persons that authorized and/or directed, and/or caused, and/or created the Notice of Default and Notice of Trustee Sale, including, but not limited to, the decision makers, managing agent, and persons of the highest authority causing these acts, and including the persons deciding on the amount of the default stated in those documents.

60. For each person involved that authorized and/or directed, and/or caused, and/or created the Notice of Default and Notice of Trustee Sale, including calculating the amount of the default, all facts and circumstances known to each of them through the search of their emails and records to refresh their recollections about why and how the Notice of Default and Notice of

Trustee Sale were allowed to be created and recorded to foreclose when PHH knew that the reason the loan was in default was because PHH had failed to apply the REINSTATEMENT AMOUNT to the loan and that this caused Brian Paino to reject his tendered payment, and when Paino and PHH had been informed of Plaintiff's ability and willingness to reinstate the loan as soon as PHH worked out the accounting problems and escrow problems.

61. All searches for emails and electronic messages that PHH has conducted in discovery in this case from August 9, 2024, to present. This shall include, but is not limited to, the date of the searches, the date that PHH first requested or instructed anyone to conduct a search, the manner and content of the request, IDENTIFYING the persons who made and received the requests to search for emails, IDENTIFYING the persons conducting the searches, all search terms used, the systems searched, the manner of the search, IDENTIFY all individuals whose emails were searched, the results of the search, how many emails were found, what was done with the emails.

Dated: January 23, 2026

Andrew J. Christensen

# **Exhibit K**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

Cory Mayer, ) CASE NO.
) 5:25-cv-00182-NW
Plaintiff, )
)
vs. )
)
DEUTSCHE ALT A SECURITIES )
MORTGAGE LOAN TRUST SERIES )
2006-A.; )
PHH MORTGAGE CORPORATION; )
WESTERN PROGRESSIVE, LLC; DOES )
1-20; and all persons unknown )
claiming any interest in the )
property, inclusive and DOES 1 )
through 50, inclusive, )
)
Defendants. )
________________________________ )

VIDEOTAPED DEPOSITION OF PHH MORTGAGE CORPORATION
BY BENJAMIN VERDOOREN AS PERSON MOST KNOWLEDGEABLE
Volume II
Morning Session
Via Videoconference
Friday, February 13, 2026

Reported by:
Gideon Choi
CSR No. 1325

deposited the loans into this trust making Wells Fargo Bank the master servicer and HSBC, as the trustee, into the trust a mortgage passthrough certificate Series 2006-AR2. Wells Fargo was the master of servicer. GMAC remained as a subservicer. 10:08

They serviced the loan until 2012 when Ocwen Financial Corporation purchased or Ocwen Loan Servicing purchased Residential Funding Capital which is the parent company to GMAC which is, I believe, Exhibit 324. Is that correct? No. Yeah, 324. 10:08

BY MR. CHRISTENSEN: 10:09

Q This asset purchase agreement? 10:09

A Yes. Let me back up. The ownership is with the trust, the trust owns the loan, and now we're getting into the servicing transfers of the loan. So GMAC was the subservicer, Ocwen Loan Servicing purchased Residential Funding and GMAC Mortgage, now the servicing's been transferred to Ocwen Loan Servicing, and then in 2019, Ocwen and PHH merged with PHH being the surviving company. I believe that's Exhibit 325 or 326. 326. 10:09

Q Okay. 10:09

A And so now the servicing's been transferred from Ocwen Loan Servicing to PHH via this merger, so we come to today where PHH is the subservicer, and the trust is still the owner of the loan. 10:10

Q Okay. So this servicing agreement, Exhibit 320, between DB Structured Products and GMAC Mortgage, is this the document, the contract between PHH and the trust, right, run by -- I think you said it was deposited in HSBC, is this the contract that controls servicing obligations and rights between HSBC and PHH as related to Cory Mayer's loan? 10:10 10:10 10:10 10:10 10:10 10:10
A This is something I was still researching. I have not got an answer yet. I've been looking into this on which servicing agreements we were operating off of. 10:10 10:10 10:10
Q Okay. Why don't you know? 10:10
A Well, that's what I'm trying to confirm. At this point it should be the pooling and servicing agreement should be the final agreement which is Exhibit 321. I just wanted to get actual confirmation of it. 10:10 10:10 10:10 10:11
Q When did you start asking for that? 10:11
A Today's the 13th. In January, near the end of January. 10:11 10:11
Q Okay. Do you have a subservicing agreement between PHH and Wells Fargo? 10:11 10:11
A Yes, there is a subservicing agreement, actually, between -- it's Wells Fargo via Computershare, who subserviced it to Newrez, N-e-w-r-e-z, who then subserviced it to PHH. 10:11 10:11 10:11 10:12
Q Okay. So there's, I guess, three subservicing agreements that you just mentioned; is that right? 10:12 10:12

Wells Fargo -- when you say Wells Fargo via Computershare, you mean there's an agreement between those two? 10:12 10:12

A I'm still not a hundred percent sure how this -- how it's made up. I know Computershare took over a lot of Wells Fargo's -- it took over, I know, they're custodial side of holding original documents. They also took over some servicing rights. I just don't know the entire connection between the two, if they 100 percent bought the servicing rights or if it's still somehow owned by Wells Fargo. I know when Computershare purchased a lot of things from Wells Fargo, they took a lot of the same employees and offices. So, again, I don't know the whole connection of how that's done together. 10:12 10:12 10:12 10:12 10:12 10:12 10:12 10:12 10:12 10:13 10:13

Q Oh, okay. So Wells Fargo is not Computershare, those are two separate companies; is that what you're saying? 10:13 10:13 10:13

A Yes. 10:13

Q Okay. What documents did you see on these subservicing agreements? You know, when you said Wells Fargo went to Computershare, then Computershare then subserviced to Newrez and then subserviced to PHH, what documents did you see for this? 10:13 10:13 10:13 10:13 10:13

A I have not seen any documents for that. It's just the Computershare knowledge is something I just learned over the years. And with the servicing, the subservicing, I just 10:13 10:13 10:13

know that -- I know that we subserviced the loan from Newrez, who's subservicing it from Computershare, but I've not seen the agreements. 10:13 10:13 10:14

Q Okay. What's the basis for your testimony then? Where is this information coming from? 10:14 10:14

A Part of it is coming from a discussion I had with Kishor Dandel. He deals with investor reporting. My discussion with him showed that we subserviced the loan from Newrez, who subserviced it from Computershare. 10:14 10:14 10:14 10:14

Q Okay. Did he tell you, when you did the investor reporting, who these -- where these investor remittance reports were sent by PHH? 10:14 10:14 10:14

A The investor remittance reports are sent to Computershare. 10:14 10:14

Q Okay. So they're not sent to HSBC? 10:14

A No. 10:14

Q Are the investor remittance reports sent to anywhere else? 10:14 10:14

A No, just Computershare. 10:14

Q Okay. So this servicing agreement here, why does this not -- why have no documents been produced that show Cory Mayer's loan was subject to this servicing agreement? There's no schedules, there's no anything. Do you know? 10:14 10:15 10:15 10:15

MR. NORMAN: Objection. Relevance. Vague. Argumentative. 10:15 10:15

THE WITNESS: I don't know. 10:15
BY MR. CHRISTENSEN: 10:15
Q Okay. Why don't you know? 10:15
A I looked within our system where we store these 10:15
documents. I didn't see the schedule there. I didn't reach 10:15
out and ask anyone about a schedule related to this. 10:15
Q Okay. So how do you know that this ever covered 10:15
Cory Mayer's loan? 10:16
A I know this document is referenced, I believe, in 10:16
the other agreements, in the mortgage loan purchase 10:16
schedule, Exhibit 322. I think that's -- that agreement 10:16
references this agreement so that's where the connection 10:16
lies. 10:16
Q Okay. So this pooling and servicing agreement, 10:16
Exhibit 321, do you see here on Page 23 of this document, 10:16
this is Bates Page 4461, do you see here on the screen where 10:17
it identifies the GMAC M servicing agreement dated 10:17
April 25th, 2005, as amended by Amendment No. 1 dated 10:17
December 29, 2005? 10:17
A I see that. 10:17
Q Okay. Is this the document -- is this referring 10:17
referring to the servicing agreement, Exhibit 320? 10:17
A Well, I know the dates don't match up. I know that 10:17
if you go back to the PSA one, that amendment of 10:17
December 2005, that one references Exhibit 320. I've seen 10:17

that amendment, and it doesn't reference April 25th, 2005, it references August 5th, 2005. 10:17 10:18

Q When did you see that amendment? 10:18

A When I pulled these documents, that was back in January. I don't remember exactly when. Towards the end of January. 10:18 10:18 10:18

Q Okay. So this amendment, No. 1, so amendment is dated December 29, 2005; is that right? 10:18 10:18

A Yes it is. 10:18

Q Okay. But it references that it is amending a GMAC servicing agreement with not the April 25th date, but this August 5th, 2005, date; is that right? 10:18 10:18 10:18

A That is correct. 10:18

Q Okay. So what's the problem? Is there a mistake or is there a different agreement or what? 10:18 10:18

A We ultimately don't know. 10:19

I forgot to mention this other phone call I had, a phone call with the law firm Mayer Brown, who are the attorneys for HSBC, and I don't know if I can get into that discussion. 10:19 10:19 10:19 10:19

MR. NORMAN: Yeah, there's obviously privilege there. I don't know if you can talk more about that, that you had a call with Mayer Brown. 10:19 10:19 10:19

BY MR. CHRISTENSEN: 10:19

Q Does Mayer Brown represent PHH? 10:19

they're not a party to it? Like you said, aren't they three contracts removed, three servicing agreements removed from this? 10:28 10:28 10:28

MR. NORMAN: Objection. Argumentative. Asked and answered. Relevance. 10:28 10:28

THE WITNESS: Again, they're a party to it from the transactions and from the mergers and acquisitions that have taken place over the years from GMAC being acquired by Ocwen loan servicing and then PHH acquiring Ocwen loan servicing. That's how they're a party between that plus the power of attorney that's also been created between the trust and PHH. 10:28 10:28 10:29 10:29 10:29 10:29 10:29

BY MR. CHRISTENSEN: 10:29

Q Okay. Doesn't a subservicing agreement between PHH and, in this case, Newrez, isn't that subservicing agreement the document that would control PHH's -- the scope of their servicing authority and what they're supposed to do? 10:29 10:29 10:29 10:29

MR. NORMAN: Objection. Argumentative. Relevance. May call for a legal opinion. 10:29 10:29

THE WITNESS: The ultimate servicing authority comes from the pooling and servicing agreement. Subservicing agreements, generally speaking, are just hiring another company to do the servicing while still being bound by the original servicing or being bound by the pooling and servicing agreement. Unless there's specific instructions 10:29 10:29 10:29 10:30 10:30 10:30

in between in the subservicing agreement dictating the authority level, the ultimate authority is still the pooling and servicing agreement. 10:30

BY MR. CHRISTENSEN: 10:30

Q Okay. So if I understand what you're saying, you're saying the subservicing agreements, for example, between Wells Fargo and Computershare, Computershare and Newrez, and Newrez and PHH, those documents refer -- incorporate this pooling and servicing agreement as the scope of authority for each of those relationships? 10:30

A So I'm speaking generally because I've not seen these subservicing agreements, but, generally speaking, Newrez is just saying PHH serviced these loans, we're bound by the pooling and servicing agreement, follow that authority and service the loans based off of that. So Newrez was given the authority to subservice the loan from Computershare, from Wells Fargo, from the PSA, but, generally speaking, nothing's changed on the way down to PHH. 10:31

Q Okay. You're speaking generally, not specifically here, I guess, because you have not seen these subservicing agreements; is that right? 10:31

A That is correct. 10:31

Q Okay. Okay. So all these documents that we've looked at here today, Exhibit 320, 321, all the way through 10:31

Argumentative. 10:55
THE WITNESS: Generally, they work together. The PSA and 10:55
the POA are the main governing authorities over PHH or how 10:55
the loan should be -- the PSA dictates how the loan should 10:56
be serviced where the power of attorney gives authority to 10:56
the servicing company to service the loan on behalf of the 10:56
trust. 10:56
BY MR. CHRISTENSEN: 10:56
Q Okay. So are there any other documents besides the 10:56
documents you've produced here to me today that control the 10:56
precise scope of what PHH is authorized to do? 10:56
A No, I think that that's it because that's -- I mean, 10:56
these are the only documents I ever work with or produced in 10:56
the past for other cases is the power of attorney and 10:56
pooling and servicing agreement. 10:56
Q Okay. What contact or interactions does PHH have 10:56
with Newrez or Computershare or Wells Fargo -- 10:56
MR. NORMAN: Objection. Vague. 10:57
BY MR. CHRISTENSEN: 10:57
Q -- related to servicing the loan? 10:57
MR. NORMAN: Objection. Vague. Relevance. 10:57
THE WITNESS: For Computershare, for Computershare, we -- 10:57
our communication with them is once a month when we send 10:57
them remittance reports. As for HSBC, communication with 10:57
them isn't very frequent. It's only when we need something 10:57

within the scope of their servicing authority to act within accepted industry standard servicing practices? 11:01 11:01

A If that's what it says, yes. 11:01

Q Okay. So is PHH, from 2020 to present, have they ever been authorized within the scope of their authority to not send billing statements to Cory Mayer? 11:01 11:01 11:01

MR. NORMAN: Objection. Argumentative. Vague. 11:01

THE WITNESS: That's part of our authority. 11:01

BY MR. CHRISTENSEN: 11:01

Q To decide to stop sending billing statements, that's within the scope of their authority? 11:01 11:01

A Yes. 11:01

Q Okay. Where does it say that? 11:01

MR. NORMAN: Objection. Argumentative. Misleading. 11:02

THE WITNESS: Again, it's not explicitly stated. It's a very general authority that we have to service the loan. 11:02 11:02

BY MR. CHRISTENSEN: 11:02

Q Okay. Where in these documents related to PHH's servicing authority does it authorize PHH to reject tendered payments from a borrower? 11:02 11:02 11:02

MR. NORMAN: Objection. Overbroad. Vague. Misleading. 11:02 11:02

THE WITNESS: Again, it's not explicitly stated in it, but it's part of our general servicing authority. 11:02 11:02

/// 11:02

BY MR. CHRISTENSEN: 11:02

Q So, looking here on Exhibit 320, the servicing agreement, this is Page 17, Bates Page 2534, "Section 2.03: Collection of mortgage loan payments"; do you see this on the screen? 11:02 11:02 11:03 11:03

A I do. 11:03

Q It says, "Following the date of this agreement until the date each mortgage loan ceases to be subject to this agreement, the servicer shall proceed diligently to collect all payments due under each of the related mortgage loans when the same shall become due and payable." Do you see this? 11:03 11:03 11:03 11:03 11:03 11:03

A I do. 11:03

Q Is this part of the scope of PHH's servicing authority? 11:03 11:03

MR. NORMAN: Objection. Vague. 11:03

THE WITNESS: Again, as I stated before, I'm not too sure if this is the agreement we're still operating off of and not the Exhibit 321, but to answer your question, at the time when this was the actual servicing agreement with GMAC, GMAC would have followed this. 11:03 11:03 11:03 11:03 11:03

BY MR. CHRISTENSEN: 11:04

Q Okay. So, you know, considering this says that they shall proceed diligently to collect payments, but in this case, Cory Mayer's case, PHH rejected his payments for a 11:04 11:04 11:04

BY MR. CHRISTENSEN: 11:10
Q Mr. Verdooren, can you please identify whether this Article 3, these sections control the full scope of PHH's servicing agency authority? 11:10
MR. NORMAN: Objection. Argumentative. Vague. Relevance. Overbroad. 11:10
THE WITNESS: Yes, all of Article 3. 11:10
BY MR. CHRISTENSEN: 11:10
Q Okay. Is there any other part of the pooling and servicing agreement that pertains or defines PHH's servicing agency authority for Cory Mayer's loan? 11:10
MR. NORMAN: Objection. Relevance. Vague. 11:10
THE WITNESS: I mean, this pooling and servicing agreement does not mention PHH, but, again, the servicing guidelines -- the overall servicing of this loan or of the loans is in Article 3. 11:10 11:11
BY MR. CHRISTENSEN: 11:11
Q So is that a yes or a no? 11:11
A Again, all the servicing -- whoever, be it GMAC, Ocwen or PHH, the servicing is in -- the servicing guide is in Section 3, Article 3. 11:11
Q Okay. Are there any other documents besides this the pooling and servicing agreement that has modified the scope of servicing agency authority for PHH? 11:11
A No. 11:11

confirmed in writing that PHH is authorized to assume the defense in this case; is that right? 11:26

MR. NORMAN: Objection. We're not waiving privilege. We're not trying to be cute about this, Mr. Christensen. I don't think this is a disputed issue. I mean, you know that the servicer defends the trust pursuant to the applicable agreements. They've notified the trust. There's not much more magic than that. 11:26

MR. CHRISTENSEN: You can answer. 11:26

THE WITNESS: No. I'm sorry. There's no e-mails saying -- from HSBC to PHH dictating that. 11:26

BY MR. CHRISTENSEN: 11:26

Q Okay. Is there any document of any kind confirming that HSBC has authorized PHH to assume the defense of this litigation? 11:26

MR. NORMAN: Objection. Asked and answered. 11:26

THE WITNESS: That's our authority, you know, with the power of attorney, that we handle any legal issues associated with the loan. That's our authority as servicer. So they don't have to e-mail us every time a legal issue comes up on a loan because we already have that authority. 11:27

BY MR. CHRISTENSEN: 11:27

Q Okay. All right. Let's talk about -- this is Topic 34, the servicer compensation arrangement. Okay. 11:27

What is the servicing compensation that PHH receives for servicing Cory Mayer's loan and which documents control that? 11:27 11:27 11:27

MR. NORMAN: Objection. Relevance. Vague. 11:27

THE WITNESS: The pooling and servicing agreement dictates the servicing fee that is paid on these loans for that trust. I've asked where that's located. The people I talked with didn't know. I've not followed up with anyone else to ask about that, but it's dictated by the pooling and servicing agreement. 11:27 11:27 11:28 11:28 11:28 11:28

BY MR. CHRISTENSEN: 11:28

Q Okay. Where in the pooling and servicing agreement, Exhibit 321, does it define the servicing compensation? 11:28 11:28

A Again, the people I was speaking with about it didn't know, and I've not followed up with anyone else about it. 11:28 11:28 11:28

Q Okay. When did you ask them about it? 11:28

A When I had my call with them, this was about a week ago. Or this week. Today's Friday. It was early this week. Just to expand on that, that was my call that I had with Kishor Dandel and his associate. 11:28 11:28 11:28 11:29

Q What's their role? 11:29

A They are in the investor reporting team. I believe Kishor is a team lead, and I believe his associate was also a team lead. 11:29 11:29 11:29

Column AM or even Column AL. For the dollar amounts, I could tell you on the other report that I reviewed, it showed how much PHH had received since servicing this loan since 2019. 11:49 11:49 11:49 11:49

Q Okay. So where does the servicing rate, 0.00375, where does it come from? 11:49 11:50

A I was told it was in the pooling and servicing agreement, but, again, when I asked them about it, they didn't know, and I still need to reach out to somebody to find that rate. 11:50 11:50 11:50 11:50

Q Okay. Why did you not reach out before preparing for the deposition today? 11:50 11:50

MR. NORMAN: Objection. Relevance. 11:50

THE WITNESS: I just didn't think it was that important because I found out how much we had been compensated for servicing this loan since 2019 and, ultimately, I thought that's all that mattered. 11:50 11:50 11:50 11:50

BY MR. CHRISTENSEN: 11:50

Q Okay. Can you explain to me why the servicing compensation rates here are different than what's in the servicing agreements in the PSA and other documents we've looked at today? 11:50 11:50 11:50 11:51

MR. NORMAN: Objection. Relevance. Vague. 11:51

THE WITNESS: We had never -- so far today, we have not pointed out the actual servicing rate in any of the 11:51 11:51

documents so I can't say if that is correct or not correct. 11:51 11:51
BY MR. CHRISTENSEN: 11:51
Q Okay. Why did the investor remittance reports not have the servicing fee amount for each loan when that's what's required by the servicing agreements and related documents that we've looked at today? 11:51 11:51 11:51 11:51
MR. NORMAN: Objection. Argumentative. Misleading. Relevance. 11:51 11:51
THE WITNESS: The service fee rates is in the document. We're looking at it right now, Column AM or AL. That's the servicing fee rate that PHH receives based on the interest from the payments that are received. So without receiving any payments, we don't get any servicing fee. 11:51 11:51 11:51 11:51 11:51
BY MR. CHRISTENSEN: 11:51
Q So you're saying this fee rate is based on the installment payments received or is it based on the principal balance? 11:52 11:52 11:52
A It's based on the interest payments that are received, so if we don't receive any payments, we don't get any money. So since we've been servicing this loan since 2019, PHH has received $2,800 in servicing fees. So if a loan is in default, we don't make any money. 11:52 11:52 11:52 11:52 11:52
Q So, in Exhibit 320, the servicing fees, this is the servicing agreement that your counsel has represented in 11:52 11:52

this case is the applicable servicing agreement. It says monthly service fee per loan, $6; do you see this? 11:52 11:52
A I do. 11:53
Q Why is the servicing -- why does the investor remittance reports have a rate instead of this flat fee? 11:53 11:53
MR. NORMAN: Objection. Relevance. Vague. Overbroad. 11:53
THE WITNESS: As I've stated before, I am -- I've inquired and am still waiting for a response on which servicing agreement that PHH is operating off of. 11:53 11:53 11:53
BY MR. CHRISTENSEN: 11:53
Q Okay. So here it says default fees, $65 for a loan that's 60 days-plus delinquent. How come PHH is not collecting $65? 11:53 11:53 11:53
MR. NORMAN: Objection. Relevance. Assumes facts. 11:53
THE WITNESS: As I stated before, I don't think -- I don't know if we're operating off of this servicing agreement anymore. So our current servicing fee is a rate based off of the interest that's collected. 11:53 11:53 11:53 11:54
BY MR. CHRISTENSEN: 11:54
Q Okay. What's the difference, when it says delinquent status, what's the difference between that and collecting a loan in, like, recovery collection? Like, this refers to recovery collection in here. What does that mean? 11:54 11:54 11:54 11:54
A I don't know. 11:54
Q Why don't you know? 11:54

# **Exhibit L**

Andrew J. Christensen (SBN: 260748)
Law Offices of Andrew J. Christensen, P.C.
2063 Mountain Blvd. Suite 2
Oakland, CA 94611
Tel: (510) 761-7183
Fax: (510) 680-3430
Andrew@CaliforniaHomeLawyer.com

Pamela D. Simmons #160523
Law Office of Simmons & Purdy
2425 Porter Street, Suite 10
Soquel, CA 95073
Tel: (831) 464-6884
Fax: (831) 464-6885
E-mail: pamela@pamelaw.com

Attorneys for Plaintiff
Cory Mayer

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| Cory Mayer,<br>Plaintiff,<br>v.<br>DEUTSCHE ALT A SECURITIES MORTGAGE LOAN TRUST SERIES 2006-A.;<br>PHH MORTGAGE CORPORATION;<br>WESTERN PROGRESSIVE, LLC; DOES 1-20; and all persons unknown claiming any interest in the property, inclusive and DOES 1 through 50, inclusive,<br>Defendants. | CASE NO.: 5:25-cv-00182-NW<br>Unlimited Jurisdiction<br><br>**Plaintiffs' Second Amended Notice of Deposition of HSBC BANK USA, NATIONAL ASSOCIATION, AS TRUSTEE FOR DEUTSCHE ALT-A SECURITIES MORTGAGE LOAN TRUST, SERIES 2006-AR2**<br><br>Date: February 27, 2026<br>Time: 9:00 a.m. PST<br>Place: Veritext Legal Solutions<br><br>Honorable Judge Noël Wise<br>Action Filed: August 9, 2024<br>Trial Date: September 28, 2026 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that pursuant to FRCP 30(b)(6) , Plaintiff Cory Mayer ("Plaintiff") will take the oral deposition of HSBC BANK USA, NATIONAL ASSOCIATION, AS TRUSTEE FOR DEUTSCHE ALT-A SECURITIES MORTGAGE LOAN TRUST, SERIES 2006-AR2.

The deposition will take place at the time and date listed above. The deponent may

appear by remote video conference using the remote access link **https://proceedings.veritext.com/?token=ab084f9475d093e36388387870725948**

Or, Join at https://zoom.us/join via Meeting ID and Password

Meeting ID: 86556916891

Password: vgklPc8B_O

The deposition will be taken before a deposition officer authorized to administer oaths, and if not completed on the date set forth, the deposition will continue from day to day thereafter until completed.

The deposition testimony may be recorded by audio and/or video technology, in addition to recordation by stenographic method as required.

**DEFINITIONS**

"YOU" or “HSBC” includes HSBC BANK USA, NATIONAL ASSOCIATION, AS TRUSTEE FOR DEUTSCHE ALT-A SECURITIES MORTGAGE LOAN TRUST, SERIES 2006-AR2, the company, entity, institution, agency, subsidiary(ies), parent corporation(s) and/or any of its branches, departments, employees, agents, contractual affiliates, or otherwise connected by legal relationship, in the broadest sense. "You" includes any of your sister companies or related entities and their connected companies, whether or not separately incorporated.

"DOCUMENT" shall have the same definition as found for "writings" in the Federal Rules of Evidence 1001.

“SUBJECT PROPERTY” shall mean the residential property located at 8650 Hihn Road, Ben Lomond, CA 95005 (“Property”).

“SUBJECT LOAN” shall mean the mortgage loan secured by PLAINTIFFS real property at 8650 Hihn Rd., Ben Lomond, CA 95005, that is also identified by loan number 8010747676.

The term “NOTE” and “SUBJECT NOTE” shall refer to the mortgage promissory note executed by the Plaintiff in connection with the SUBJECT LOAN that is the subject of this

litigation.

"SETTLEMENT AGREEMENT" means the agreement entered into between PHH, HSBC, and Plaintiff effective April 17, 2020, in settlement the litigation in Superior Court of Santa Cruz County, Case No 17CV00139.

"REINSTATEMENT FUNDS" means the $158,125.89 identified in the SETTLEMENT AGREEMENT.

"PRINCIPAL" shall mean the person or entity for which YOU are acting as the servicing agent for the SUBJECT LOAN, such as the owner, beneficiary, trustee, or holder of the note.

"IDENTIFY" shall mean to state the name, address, phone number, email, job title, and dates of employment for any individual.

**Topics for Examination**

1. The authority of the individual deponent appearing at this deposition to testify on behalf of HSBC at deposition and/or trial in this action, including IDENTIFYING all documents authorizing the individual to testify on behalf of HSBC and to bind HSBC to the testimony. This shall include, but is not limited to, the job title and employer of the witness, identifying the name and title of the authorizing documents, the date of the documents, the persons that executed the documents, the content of the documents, the location, and the exact language in the documents authorizing the deponent to testify as a corporate representative of HSBC.

2. IDENTIFY all documents that authorize or authorized PHH to make the decision to enter into the Settlement Agreement in 2020 on behalf of HSBC, including the title of the documents, the date of the documents, the location of the documents, the IDENTITY of the persons executing the documents, and the exact language in those documents authorizing PHH's conduct.

3. IDENTIFY all persons employed by HSBC with personal knowledge of all facts testified to by the deponent at the deposition.

4. IDENTIFY all persons employed by HSBC from which information was obtained for all testimony given at this deposition.

5. IDENTIFYING all contracts between PHH and HSBC relating to the SUBJECT LOAN and explaining how they apply to PHH, HSBC, and the SUBJECT LOAN. This shall include, but is not limited to, the servicing agreement, pooling and servicing agreement, mortgage loan purchase agreement, assignment assumption and recognition agreement, the asset purchase agreement, the certificates of merger, and all schedules, lists, exhibits, and all other documents related to each of the foregoing documents. This shall include identifying all documents necessary to establish that each document pertains to the SUBJECT LOAN and HSBC and PHH, and where they are located, and why they have not all been produced.

6. Why the date of the servicing agreement between DB Products and GMAC has a date different than the date referred to in the pooling and servicing agreement. This shall include explaining why the servicing agreement is dated 8/5/2005, but the pooling and servicing agreement refers to a GMAC servicing agreement with DB Products dated 4/25/2005 and amended 12/29/2005.

7. The scope of PHH's agency authority in relation to the Loan, and identifying all documents which control the scope of agency, including, but not limited to, how any later documents amended or modified the scope of authority or obligations.

8. Identify all acts of PHH as alleged in the First Amended Complaint are outside the scope of PHH's agency authority.

9. Whether Ocwen and/or PHH was or is authorized as the agents of HSBC to stop sending billing statements, to send inaccurate billing statements, to start escrow impounds without notice, to change the address for notices to Plaintiff without his request, to reject payments, to not tell Plaintiff the correct amount of the payment, to pay taxes before they are late in violation of the deed of trust, to not do the credit reporting under the settlement agreement or to give Plaintiff notice of the reporting.

10. IDENTIFY all documents that authorize or authorized PHH to make the decisions and carry out HSBCs obligations under the Settlement Agreement, including the title of the documents, the date of the documents, the location of the documents, the IDENTITY of the

persons executing the documents, and the exact language in those documents authorizing PHH's conduct.

11. All indemnity agreements between HSBC and PHH, and whether PHH is obligated to indemnify HSBC for any liability incurred by HSBC as a result of the actions alleged in the First Amended Complaint, including whether PHH must indemnify HSBC for any judgment Plaintiff obtains against HSBC in this action, or whether HSBC shall indemnify PHH. This shall include identifying each document and/or contract requiring indemnity, and the scope of the indemnity.

12. Whether HSBC will indemnify PHH, or if PHH will indemnify HSBC, pursuant to the Sections 8.01 and 8.02 of the Servicing Agreement between DB Structured Products and GMAC, bates page 2558-2561, or any other similar servicing agreement term.

13. The date, time, and manner of PHH notifying HSBC of this lawsuit, and all communications between HSBC and PHH regarding PHH assuming the defense of this case, pursuant to Section 8.01 of the Servicing Agreement between DB Structured Products and GMAC, bates page 2558-2559, or any other similar servicing agreement term.

14. The servicing compensation arrangement between HSBC and PHH, including IDENTIFYING all specific language in any and all DOCUMENTS controlling the amount of this compensation.

15. The amounts of PHHs compensation related to the SUBJECT LOAN from April1, 2020 to present, including the exact amount, IDENTIFYING all DOCUMENTS evidencing the compensation paid, and/or received by PHH, and evidencing all compensation owed but unpaid. This shall include explaining and demonstrating whether the compensation received is in the amount and manner specified in the contracts, and if not, why not.

16. The transaction history document produced by Defendants, bates pages 7550 through 7564.

17. The investor remittance reports and related emails produced by Defendants in this case. This shall include, but is not limited to, explaining all entries and all amounts in the

reports, what each data point means, the meaning of each column heading, the manner in which the reports are created, sent, stored, and maintained, who receives them, who reviews them. This shall also include confirming the compensation amounts shown in the reports and explaining how those amounts relate to the contracts and servicing agreements governing compensation between HSBC and PHH, and whether the amount of compensation received by PHH is correct according to the compensation structure, and explaining all deviations from the contract compensation amounts.

18. The manner in which the investor remittance reports are sent out, the form of the reports when sent, and how the portal works, and how and where records are kept of the history of transmissions of the investor remittance reports, and how that data may be exported or shared, such as by screenshot or otherwise.

19. IDENTIFY the entity(ies) to which the investor remittance reports are sent each month. This shall include whether they are sent to Wells Fargo the Master Servicer, or HSBC, or both.

20. IDENTIFY the DOCUMENTS controlling the form and/or content of the investor remittance reports, including where in the contracts, servicing agreements, or related schedules this information is found.

21. RATIFICATION

22. Explain the extent to which HSBC was aware of the actions alleged in the First Amended Complaint from April 2020 to present, and the manner and time in which HSBC became aware of them.

23. The extent to which HSBC directed or controlled PHH's conduct and actions in relation to the SUBJECT LOAN from January 2020 to present.

24. All communications between HSBC and PHH in relation to the SUBJECT LOAN that relates to any of the issues raised in the First Amended Complaint from April 2020 to

present, including the dates of the communications and their contents, and to IDENTIFY all persons sending or receiving or copied on the emails or other communications.

25. All investigations done by HSBC regarding the allegations in the First Amended Complaint from April 2020 to present, including the dates of the investigations, the IDENTITY of all person(s) involved at all levels, the substance of the investigations, all conclusions or results, and the location and identity of all documents and records and information relating to the investigations, including, but not limited to, the computer systems logging or tracking investigations.

26. IDENTIFY the person(s) employed by HSBC that decided from April 2020 to present to not investigate the actions alleged in the First Amended Complaint.

27. IDENTIFY the person(s) employed by HSBC that is the highest level of authority responsible for deciding what actions to take regarding this lawsuit from April 2020 to present to not investigate the actions alleged in the First Amended Complaint.

28. Any and all instances where HSBC, or any of its agents or master servicers, disapproved of any conduct of PHH related to the SUBJECT LOAN, and/or communicated any disapproval to PHH of any conduct related to the allegations in the First Amended Complaint.

29. FACTS

30. The note and deed of trust and loan modification.

31. Identify all parties to the note, deed of trust, and loan modification.

32. The Notice of Default and Notice of Trustee Sale recorded in 2023 related to the SUBJECT LOAN.

33. All emails produced by Defendants in this ACTION.

34. Brian Paino's communications with PLAINTIFF'S lawyers.

35. IDENTIFY all persons employed by HSBC with personal knowledge of any and all facts alleged in the First Amended Complaint.

36. IDENTIFY all persons employed by HSBC likely to have discoverable information—along with the subjects of that information—that the HSBC may use to support its claims or defenses.

37. IDENTIFY the main point of contact at HSBC through which PHH communicated relating to the allegations in the First Amended Complaint.

38. IDENTIFY all HSBC employees and their job titles that oversee, and/or manage, and/or interact with PHH with regard to the SUBJECT LOAN from January 2020 to present, including all persons from the lowest level of authority to the highest level of authority governing all aspects of the relationship between PHH and HSBC and the SUBJECT LOAN. This shall include, but is not limited to, those that communicate with PHH, review PHH's conduct, the performance of the loan, the enforcement of the servicing agreement, managing litigation, complying with document requests, and decision making with regard to enforcing the rights of HSBC against PHH.

39. The extent to which PHH reports to Wells Fargo as the Master servicer relating to the SUBJECT LOAN, and Wells Fargo's role in between PHH and HSBC.

40. The extent to which PHH or HSBC informed Wells Fargo of anything related to the SUBJECT LOAN and the allegations in the First Amended Complaint.

41. IDENTIFY the person that made the decision to enter into the Settlement Agreement.

42. IDENTIFY the person with the highest level of authority that is responsible for ensuring that PHH complied with the Settlement Agreement from April 2020 to present.

43. IDENTIFY the person(s) with the highest levels of authority that knew of the decision to enter into the Settlement Agreement.

44. IDENTIFY the person(s) employed by HSBC from February 2020 to present that were responsible for ensuring that HSBC complied with its obligations under the Settlement Agreement.

45. IDENTIFY all person(s) that are employees of HSBC from February 2020 to present that made the decisions authorizing all actions of attorney Brian Paino from February 2020 to present, including, but not limited to, entering into the Settlement Agreement, rejecting payments, and the attempts to have the Reinstatement Amount applied to the Loan.

46. IDENTIFY the person(s) employed by HSBC from February 2020 to present that took any and all actions to ensure HSBC complied with its obligations under the Settlement Agreement, including, but not limited to, applying the Reinstatement Amount to the Loan, giving a credit of $33,120.95, credit reporting, informing Plaintiff of the credit reporting.

47. IDENTIFY the person(s) that are agents and/or employees of HSBC that authorized PHH to pay Plaintiff's property taxes before they became due in violation of the deed of trust provision that provides: "If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount." This shall include the information for each payment of an escrow item from 2013 to present.

48. IDENTIFY the person(s) that are agents and/or employees of HSBC that authorized PHH to create an escrow impound in February 2020.

49. IDENTIFY the person(s) that are agents and/or employees of HSBC that authorized PHH to reject Plaintiff's payments of $24,133.41, and $32,467.13.

50. Why HSBC caused or allowed rejection of Plaintiff's payments of $24,133.41, and $32,467.13 when HSBC is authorized by the deed of trust to accept such payments under uniform covenant 1 of the deed of trust which provides "Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted."

51. IDENTIFY the person(s) that are agents and/or employees of HSBC that authorized PHH and/or Ocwen to not send Plaintiff notice at anytime from 2015 to present of his change in mortgage payments pursuant to sections 3(c) and 4(F) of the Note.

52. Why HSBC did not cause to be sent Plaintiff notice at anytime from 2015 to present of his change in mortgage payments pursuant to sections 3(c) and 4(F) of the Note, including, but not limited to, notice relating to the interest rate changed to 5.125% in 2015, nor notice about the payment changed from interest only to principal and interest of $3,432.96 which change occurred in 2019, nor any notice that Plaintiff's payment would include an escrow impound account after created in February 2020.

53. IDENTIFY the person(s) that are agents and/or employees of HSBC that authorized PHH to not send Plaintiff notices of mortgage payment changes from 2015 to present.

54. IDENTIFY the point of contact at HSBC for counsel in this litigation.

55. IDENTIFY the person(s) that make the decisions of HSBC related to this litigation, including the decisions on what affirmative defenses to plead, and to respond to discovery, and authorize filing motions, and other such matters.

56. IDENTIFY all persons at HSBC that received the complaint that instituted this action, all persons that reviewed it, and all persons that referred this legal action to PHH to handle.

57. IDENTIFY the person with the highest level of authority that authorized Hinshaw & Culbertson LLP to represent HSBC in this litigation.

Dated: February 9, 2026

/s/ Andrew J. Christensen
Andrew J. Christensen

Cory Mayer v. DEUTSCHE et. al.
CASE NO.: 5:25-cv-00182-NW

**PROOF OF SERVICE**

I, Karen Sanchez, declare that I am a citizen of the United States, over 18 years of age, employed in Alameda County, and not a party to the within action. My business address is 2063 Mountain Blvd. Suite 2, Oakland, CA 94611.

On February 9, 2026 I served the following document on the parties listed below by email.

**Plaintiffs' Second Amended Notice of Deposition of HSBC BANK USA, NATIONAL ASSOCIATION, AS TRUSTEE FOR DEUTSCHE ALT-A SECURITIES MORTGAGE LOAN TRUST, SERIES 2006-AR2.**

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on the following date at Oakland, California.

Dated: February 9, 2026

Karen Sanchez

| **By Email:** | |
|---|---|
| Brian A. Paino (SBN 251243)<br>bpaino@hinshawlaw.com<br>Helen Mosothoane (SBN 254511)<br>hmosothoane@hinshawlaw.com<br>Zeeshan Iqbal (SBN 337990)<br>ziqbal@hinshawlaw.com<br>HINSHAW & CULBERTSON LLP<br>350 South Grand Ave., Suite 3600<br>Los Angeles, CA 90071-3476<br>Telephone: 213-680-2800<br>Facsimile: 213-614-7399<br>Carolina Rico, CRico@hinshawlaw.com | Attorneys for Defendants<br>PHH MORTGAGE CORPORATION and<br>HSBC BANK USA,<br>NATIONAL ASSOCIATION, AS<br>TRUSTEE FOR DEUTSCHE ALT-A<br>SECURITIES MORTGAGE LOAN<br>TRUST, SERIES 2006-AR2 |
| Timothy Alan Schneider<br>Robert Wayne Norman Jr.<br>HOUSER LLP<br>9970 Research Drive,<br>Irvine, CA 92618<br>P: (949) 679-1111<br>tschneider@houser-law.com<br>bnorman@houser-law.com<br>chershey@houser-law.com | Attorneys for Defendants<br>PHH MORTGAGE CORPORATION and<br>HSBC BANK USA,<br>NATIONAL ASSOCIATION, AS<br>TRUSTEE FOR DEUTSCHE ALT-A<br>SECURITIES MORTGAGE LOAN<br>TRUST, SERIES 2006-AR2 |

# **Exhibit M**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

CORY MAYER, Case No. 5:25-cv-00182-NW
Plaintiff,
vs.
DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST SERIES
2006-A; et al.,
Defendants.
__________________________/

REMOTE VIDEOTAPED DEPOSITION OF FERNANDO ACEBEDO
(HSBC Bank USA National Association)

February 27, 2026

Kimberley Richardson, CSR, RPR, CCRR, AA
a Stenographic reporter
CSR. No. 5915
Job No. 7866847

there is any subsequent -- supplements to this agreement that would cover the loan which is possible. Again, that's the purview of the servicer.

BY MR. CHRISTENSEN: 10:51AM

Q. Okay. All right. Topic 6 here on the notice says "Why the date of the Servicing Agreement between DB Products and GMAC has a different date than the date referred to in the Pooling and Servicing Agreement. This shall 10:51AM include explaining why the Servicing Agreement is dated August 5, 2005, but the Pooling and Servicing Agreement refers to a GMAC Servicing Agreement with DB Products dated 4-25-2005 and amended 12-29-2005." 10:51AM

Did you look into this topic to prepare for today?

A. Did I look into it?

Q. Yes. Do you have an answer to this topic?

A. No. That's a question for DB and GMAC. 10:52AM

Q. Isn't that Servicing Agreement controlling the servicing rights and what the servicer has to do for the trust?

MR. NORMAN: Objection. Relevance. Asked and answered. Argumentative. 10:52AM

THE WITNESS: I would have to consult with counsel if that is the controlling agreement for Cory's loan.

BY MR. CHRISTENSEN:

Q. Okay. Topic 7, have you seen this topic here, the scope of PHH's agency authority in relation to the loan? 10:52AM

A. Yes, I've seen it.

Q. Okay. Can you identify for me all the documents which control the scope of PHH's servicing authority for Cory Mayer's loan? 10:52AM

MR. NORMAN: Objection. Asked and answered. Vague.

THE WITNESS: That's a question for PHH.

BY MR. CHRISTENSEN: 10:52AM

Q. Well, didn't PHH service the loan on behalf of the trust? Aren't they the agent of the trust?

MR. NORMAN: Objection. Outside the scope. Calls for a legal conclusion, your term of art "agent." Not in dispute. Asked and answered. 10:53AM

THE WITNESS: I would have to agree with counsel that's -- I would have to consult counsel, agency -- you're using the term "agency," I would have to consult with counsel to determine whether 10:53AM

Overbroad. Misleading.
MR. CHRISTENSEN: You can answer.
THE WITNESS: The trustee doesn't oversee the servicer. So if they acted outside of their scope of agency, that's for the master servicer to 10:57AM determine.
BY MR. CHRISTENSEN:
Q. Okay. But you have -- that's not the answer to my question. It's helpful, but that's not the answer. 10:57AM
You're aware of the allegations in this Complaint, for example, right, that PHH was rejecting Cory Mayer's payments? Do you understand that?
A. I understand from the Complaint I did 10:57AM review there was breach of duty on behalf of PHH and wrongful foreclosure. It's not for the trustee to oversee if that was indeed the case. The master servicer oversees the services, not the trustee. 10:58AM
Q. Is it your understanding that HSBC under the Pooling and Servicing Agreements that these other contracts we talked about that HSBC would be liable for the acts of PHH in servicing the loan?
MR. NORMAN: Objection. Outside the 10:58AM

scope. Calls for a legal opinion or conclusion. Vague. Relevance.

THE WITNESS: I would have to review the specific PSA and consult with counsel.

BY MR. CHRISTENSEN: 10:58AM

Q. Okay. So sitting here today for topic 8, can you identify any acts of PHH alleged in the First Amended Complaint that are outside the scope of PHH's agency authority, yes or no?

MR. NORMAN: Objection. Argumentative. 10:58AM Vague. Misleading. Relevance.

THE WITNESS: Well, as previously stated, we don't oversee the servicer. That is the purview of the master servicer.

BY MR. CHRISTENSEN: 10:59AM

Q. That is not the answer to my question. That's a nonresponsive answer. Yes or no?

MR. NORMAN: Mr. Christensen, you don't need to tell him how to answer the questions. You know better than that. That is argumentative. 10:59AM Vague. Outside the scope. Asked and answered.

MR. CHRISTENSEN: Are instructing your client not to answer?

MR. NORMAN: No. I'm asking you to not tell him how to answer. Ask the questions, and he 10:59AM

THE WITNESS: I'm not aware of any indemnity agreements.
BY MR. CHRISTENSEN:
Q. Because you didn't look?
A. Because generally the trustee doesn't enter into any indemnity agreements with the services. That would be unusual. 11:07AM
Q. You're not aware Benjamin Berdooren said that there are indemnity agreements that exist separate from the indemnity agreements that exist in the servicing agreements that we looked at? 11:08AM
MR. NORMAN: Objection. Misstates testimony. Argumentative.
THE REPORTER: I didn't catch the name.
THE WITNESS: I didn't catch the first half of your question. 11:08AM
MR. CHRISTENSEN: Benjamin Berdooren, B-e-r-d-o-o-r-e-n.
THE WITNESS: I'm sorry. I'll still confused by the question. 11:08AM
BY MR. CHRISTENSEN:
Q. Did you -- let me ask you this, Mr. Acebedo, did you look for any indemnity agreements to prepare for this topic today?
MR. NORMAN: Objection. Vague. 11:09AM

THE WITNESS: No.

BY MR. CHRISTENSEN:

Q. Topic 12, do you see this, whether HSBC will indemnify PHH or if PHH will indemnify HSBC pursuant to these sections of the Servicing Agreement? Did you look into this to prepare for today? 11:09AM

A. We're not a party to that Servicing Agreement. So what you previously showed on the screen, we're not a party to that Servicing Agreement. 11:09AM

Q. When you say "not a party," you mean this Exhibit 320; is that right?

A. Yeah. That's between DB and GMAC.

Q. Okay. Okay, so, again, did you do any investigation, speak with anyone or read any documents to find out whether HSBC will indemnify PHH or the other way around? 11:10AM

MR. NORMAN: Objection. Vague. Argumentative. May call for a legal conclusion. 11:10AM

THE WITNESS: No. I would have to consult with counsel.

BY MR. CHRISTENSEN:

Q. Okay. Topic 13, do you see this?

A. Yes. 11:10AM

there's a lawsuit that the servicer notifies HSBC and says they will take on the defense? Is that the standard procedure?

MR. NORMAN: Objection. Vague.

THE WITNESS: Well, I believe the standard procedure -- I have to recall. If we send them the matter and they may not be aware of it, servicer will appoint counsel and confirm that they will handle the matter. 11:12AM

BY MR. CHRISTENSEN: 11:13AM

Q. Okay. So did HSBC and the trust obtain the counsel in this case?

A. PHH engaged counsel.

Q. Okay, so HSBC did not engage counsel independently. PHH did it on their behalf; is that right? 11:13AM

A. That is the purview of the servicer to engage counsel.

Q. Okay, topic 14 about servicing compensation arrangement between HSBC and PHH. 11:14AM

Mr. Acebedo, can you identify -- can you tell me what the servicing compensation arrangement is between HSBC and PHH pertaining to Cory Mayer's loan?

A. The trustee doesn't get involved in the 11:14AM

servicing compensation. That's between the master servicer and the servicer.

Q. Okay. So you don't know -- HSBC doesn't know how much compensation they're paying to PHH?

MR. NORMAN: Objection. Assumes facts. 11:14AM Misleading. Asked and answered.

THE WITNESS: The master servicer engages the servicer.

BY MR. CHRISTENSEN:

Q. That's not my question. 11:14AM

A. Each party, when the trust is created, each party negotiates their own fees.

Q. Okay. So when a loan payment comes in for Cory Mayer, isn't it true that some of that money gets taken by PHH for servicing fee and some by 11:15AM Newrez and some by Computershare and some by Wells Fargo, and then whatever is left after that goes to the trust; is that right?

A. That's a question for the servicer.

Q. So you don't know the servicing fee 11:15AM arrangements for Cory Mayer's loan; is that right?

A. I do not. It's purview of the servicer.

Q. Who at HSBC would know the answer to that question?

MR. NORMAN: Objection. Argumentative. 11:15AM

# Exhibit N

REAL ESTATE EXPERTS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

CORY MAYER,

**Plaintiff,**

**vs.**

DEUTSCHE ALT A SECURITIES MORTGAGE LOAN
TRUST SERIES 2006-A ET AL.,

**Defendants.**

Case No. 5:25-cv-00182-NW

---

# Expert Witness Report

Prepared by Jay Hibert
JBH Real Estate Experts, Inc.
2600 La Costa Ave.
Carlsbad, CA 92009

*Expert Witness for Cory Mayer*

*Submitted 4/1/2026*

# TABLE OF CONTENTS

| | |
|---|---|
| **Summary of Expert Report** | **3** |
| **Materials Reviewed** | **3** |
| **Qualifications** | **4** |
| **Factual Background** | **6** |
| **Mortgage Servicing Industry Standards** | **7** |
| **Application of Industry Standards to the Facts of This Case** | **7** |
| **Analysis of Servicer Conduct** | **8** |
| **Impact on Borrower’s Ability to Perform and Refinance** | **10** |
| **Opinions** | **11** |
| **Rule 26 Disclosures** | **14** |
| **Exhibit A- Curriculum Vitae** | **16** |
| **Exhibit B - Testimony by trial or deposition the past 4 years** | **25** |
| **Exhibit C - Compensation** | **30** |
| **Exhibit D - Timeline of Loan Events and Servicing Activity** | **31** |

## Summary of Expert Report

This report has been prepared in connection with the United States District Court, Northern District of California, San Jose Division Case No. 5:25-cv-00182-NW; *Cory Mayer, v. Deutsche ALT A Securities Mortgage Loan Trust Series 2006-A, et al., Defendants;* a lawsuit by Cory Mayer, ("Plaintiff"), against Deutsche ALT A Securities Mortgage Loan Trust Series 2006-A, et al., ("Defendants") alleging, among other things, that the Defendants did not properly administer, service and reinstate the Plaintiff's mortgage loan.

I have been retained as an expert to evaluate issues relating to the residential mortgage servicing, industry standards, customs and practices, including the application of borrower payments, the administration of escrow, the accuracy of mortgage statements and payoff demands, the implementation of the settlement and reinstatement of the loan, the role of the loan servicer as compared with the loan owner, and whether the conduct of the servicer was consistent with industry standards, customs, and practices. I am the designated expert witness on behalf of Cory Mayer. I have been retained by the Law Offices of Andrew J. Christensen, on behalf of the Plaintiff.

This report addresses whether the servicer properly administered the loan following reinstatement, whether the loan accounting was accurate and reliable, whether the servicer properly handled escrow, whether the borrower was provided timely and accurate information regarding the loan, and whether the servicer's actions impacted the borrower's ability to perform and refinance the loan.

## Materials Reviewed

In forming the opinions expressed in this report, I reviewed materials including, but not limited to, the Adjustable Rate Note, Deed of Trust, escrow waiver documentation, loan modification agreement, settlement and reinstatement documentation, payment history and transaction records, mortgage statements, escrow analyses, notices of default and trustee sale, correspondence between borrower, counsel, and servicer, privilege logs reflecting internal communications, and deposition transcripts of servicing personnel and corporate representatives. Additionally, I have relied on my more than forty years of experience in banking, mortgage lending, loan servicing, and real estate finance.

It is beyond the scope of my assignment to resolve disputed facts or determine legal conclusions. However, it is well within my expertise to evaluate whether the servicing conduct reflected in the

materials reviewed is consistent with industry standards and practices.

The opinions expressed in this report are based on the materials reviewed to date. I reserve the right to amend or supplement these opinions should additional materials become available. Where appropriate, references to deposition testimony and documents are identified by page and line citations.

***It is beyond the scope of my expertise to resolve factual disputes or reach the ultimate legal conclusion regarding the dispute between the Plaintiff and Defendants. However, it is well within the scope of my expertise to opine on the matters as set forth in this report, and it is my opinion that the servicer failed to properly apply the reinstatement, failed to maintain accurate and consistent loan accounting, improperly administered escrow, failed to provide reliable payoff and statement information, and failed to timely correct known errors, resulting in ongoing account inaccuracies and borrower harm.***

***The opinions expressed in this report are preliminary and based on the materials reviewed to date. I reserve the right to amend or supplement this report should additional documents, deposition testimony, or other materials become available.***

## Qualifications

I have more than forty years of experience in the banking, commercial lending, and real estate finance industries. Over the course of my career, I have participated in or evaluated thousands of real estate-secured loan transactions and commercial real estate investments, many of which required the review and analysis of loan documentation, underwriting materials, and the ongoing administration and performance of those loans, including payment application, loan accounting, and borrower communications.

My professional background includes senior positions in the banking and finance industry with institutions including Bank of America, Union Bank, and Mellon Bank. During my banking career, I worked in commercial lending and real estate finance and was responsible for underwriting, structuring, administering, and monitoring real estate loans, including oversight of loan performance, payment processing, and borrower compliance.

I later served as a senior vice president and shareholder of a commercial business bank, where I continued to originate and manage real estate-secured lending transactions. In that role, I was responsible not only for loan origination, but also for the ongoing administration of loan portfolios,

including review of loan servicing functions, borrower payment performance, and resolution of loan issues and defaults. Throughout my career, I have participated in or evaluated more than 3,000 real estate-secured loan transactions involving commercial properties, development projects, and investment real estate.

I was responsible for developing and managing the bank's real estate department, which included credit underwriting, training, management, and administration of both commercial and residential real estate loans. This included oversight of loan servicing functions such as payment application, escrow administration, loan recordkeeping, and borrower communication. In addition, I opened and managed a new branch office for the bank.

In 2009, I co-founded my own direct lending, brokerage, and consulting business. In 2020, I co-founded JBH Real Estate Experts, Inc. ("JBH"), a firm specializing in consulting for banks and investors, commercial real estate lending, SBA lending, hard money lending, and expert witness services. My work includes evaluation of loan servicing practices, including payment application, escrow administration, loan accounting, and the handling of borrower communications and default situations. I serve as the officer of record for the corporation's California Department of Real Estate broker's license, and I am a member of the California Association of Realtors and the National Association of Realtors.

My professional experience has required extensive review and analysis of loan files, servicing records, payment histories, escrow accounts, and related documents in connection with real estate lending, loan administration, and collateral evaluation. As part of this work, I have regularly evaluated the accuracy of loan accounting, the proper application of borrower payments, and the consistency of loan servicing practices with industry standards.

In addition to my transactional experience, I have served as an expert witness in matters involving commercial and residential lending practices, mortgage servicing, real estate transactions, and industry customs and practices relating to lending and loan administration. I have been retained by both plaintiffs and defendants and have provided opinions regarding loan structures, servicing practices, and the interpretation of real estate transaction and loan servicing documents.

I have been providing expert witness and consulting services since 2010. During that time, I have been designated as an expert more than 325 times in 25 different states in matters involving residential and commercial real estate lending, mortgage servicing, commercial real estate

investment, SBA lending, construction and renovation lending, hard money lending, real estate investment and brokerage, and banking operations-related issues. I have served as an expert witness in arbitration proceedings and in both state and federal court. I have provided deposition testimony more than 100 times, trial testimony 48 times, and expert testimony in arbitration proceedings 18 times.

Through this work, I have developed substantial experience evaluating lending and loan servicing practices, including payment application, escrow administration, loan accounting, borrower communications, default servicing, and the resolution of loan disputes.

In my experience, proper loan servicing is critical to the performance of mortgage loans, and errors in payment application, escrow administration, and loan accounting can directly impact a borrower's ability to perform and resolve a loan.

## Factual Background

The subject loan originated in approximately 2006 as a residential mortgage loan. Based on the loan documents reviewed, escrow for taxes and insurance was initially waived, and the borrower was responsible for direct payment of those obligations.

The loan was subsequently modified in or about 2009, which altered certain payment terms and added complexity to the loan structure.

The loan later went into default, foreclosure proceedings were initiated, a trustee's sale occurred in or about 2016, and that foreclosure was later rescinded in or about 2019.

In or about 2020, the parties entered into a settlement agreement pursuant to which the loan was reinstated. The reinstatement required a substantial payment, which included principal, interest, fees, and escrow-related amounts.

Following reinstatement, the borrower began receiving loan statements and escrow analyses that reflected significant discrepancies, including escrow charges, shortages, and inconsistent balances. The borrower attempted to make payments, resolve the account, and refinance the loan, but the servicer provided inconsistent payoff figures and did not timely reconcile the account.

## Mortgage Servicing Industry Standards

Mortgage loan servicing involves the administration of a loan after origination, including the collection and application of borrower payments, the management of escrow accounts if applicable, issuance of periodic mortgage statements, maintenance of accurate loan records, provision of reinstatement and payoff figures, and communication with borrowers regarding the status of the loan.

Industry standards require that mortgage servicers maintain accurate records, properly apply borrower payments, timely and accurately communicate loan status to borrowers, and promptly investigate and correct known servicing errors.

These standards are particularly important following a settlement and reinstatement, where accurate accounting is necessary to return the loan to a performing status and to permit the borrower to resume normal performance or refinance the loan.

In my experience, servicers are expected to administer loans in a manner that is consistent with the interests reflected in the loan documents and servicing agreements, rather than based on independent or inconsistent considerations.

In my experience, a mortgage loan servicer acts as an agent responsible for administering the loan in accordance with the governing loan documents, servicing agreements, and applicable servicing standards. This includes the obligation to accurately apply payments, maintain reliable loan records, and implement servicing actions in a consistent and transparent manner.

Servicers are expected to carry out these functions in accordance with established servicing guidelines and contractual obligations, rather than based on considerations outside of those standards. Actions that are not consistent with those servicing requirements are not typical of properly administered mortgage loans.

## Application of Industry Standards to the Facts of This Case

The industry standards described above are directly applicable to the circumstances presented in this matter. Following reinstatement, the servicer was required to accurately apply the reinstatement funds, establish the correct loan balance, administer any escrow activity in a clear and supportable manner, and provide the borrower with accurate monthly statements and payoff information.

The materials reviewed reflect that this did not occur. Instead, the loan account reflected inconsistencies in payment application, escrow balances, and payoff figures. The borrower was therefore not provided a reliable statement of the amount necessary to remain current or to pay off the loan through refinance.

Deposition testimony further reflects an inability by the servicer's representatives to clearly identify, explain, or support key servicing decisions, including the basis for default and internal account handling. For example, the Person Most Knowledgeable testified that he was still "researching" who authorized key servicing actions, demonstrating a lack of institutional knowledge regarding the loan, including uncertainty as to who authorized key servicing actions and how account decisions were made. The Person Most Knowledgeable testified that he was "still researching" who authorized the foreclosure and could not identify the responsible individuals. (*Verdooren Dep. 365:4–6, 365:10–13*).

## Analysis of Servicer Conduct

The materials reviewed reflect several categories of servicing deficiencies, including improper application of the reinstatement, inconsistent and unsupported escrow administration, inaccurate and unreliable loan accounting, failure to provide consistent payoff and statement information, failure to timely correct known errors, and lack of sufficient institutional knowledge to explain key servicing decisions.

These deficiencies are further reflected in deposition testimony, including admissions that payments were reversed and reapplied, and that the servicer could not clearly explain the timing or basis for those adjustments. The Person Most Knowledgeable testified that he did not investigate the reasons for the reversal and reapplication of payments and did not speak with the personnel responsible for those actions. (*Verdooren Dep. 22:6–15*). Where the servicer's own records and communications reflect conflicting balances and unresolved adjustments, the borrower is materially impaired in the ability to perform.

In addition, servicing personnel were unable to explain significant delays in applying borrower funds, testifying that they did not remember why the payments were not timely applied. (*Verdooren Dep. 235:1–5*).

In my experience, when a servicer cannot identify who made key servicing decisions, cannot explain its own accounting adjustments, and cannot determine the basis for borrower-facing figures such as reinstatement or payoff amounts, this reflects a breakdown in standard servicing

controls rather than an isolated or acceptable servicing variation.

The materials reviewed in this matter reflect that servicing activity was not being performed independently by front-line personnel, but instead involved escalation and coordination through management-level employees. Testimony confirms that lower-level personnel were required to escalate issues to supervisors, team leads, and management for resolution, rather than acting independently. (Drexel Dep. 26:1-3).

In addition, the record reflects the involvement of management and supervisory personnel, including Jason Bravata (Team Lead – Specialized Home Retention Litigation), Tiffany Drexel (Senior Manager – Specialized Home Retention), and cashiering management personnel, as well as consultation with in-house counsel. These individuals appear repeatedly in communications and testimony relating to key servicing actions, including payment reversals, escrow treatment, reinstatement, and payoff determinations. (See, e.g., Verdooren Dep. 16:21–37; PHH Privilege Logs).

Under standard mortgage servicing practices, actions of this nature would be directed and authorized at the management level, rather than independently determined by lower-level employees. The inability of the servicer to identify specific decision-makers, despite this structure, further supports the conclusion that there was a breakdown in standard servicing controls.

The repeated involvement of management-level personnel across multiple communications and time periods is not consistent with isolated servicing errors, but instead reflects coordinated decision-making at the supervisory and managerial level.

The servicing deficiencies described above—including inconsistent accounting, unclear servicing authority, unexplained escrow administration, and the failure to provide reliable borrower-facing information—are not consistent with standard mortgage servicing practices and reflect a breakdown in normal servicing controls.

The servicing records also reflect that property taxes were paid outside of normal servicing timelines and in advance of typical due dates. The servicing systems used by mortgage servicers are designed to track tax due dates and disburse payments in a consistent and controlled manner. In my experience, payments made significantly in advance of the due date are not typical and generally occur only where there is a specific reason or directive. I did not identify documentation in the materials reviewed explaining the basis for the timing of these tax payments.

I did not identify any escrow analysis, escrow disclosure, or borrower-facing notice in the materials reviewed that would typically accompany the creation of an escrow account.

It is my opinion that the actions reflected in the servicing record—including the failure to properly apply payments, the handling of the escrow account, the issuance of inaccurate billing statements, the failure to implement credit reporting consistent with the settlement agreement, and the failure to provide a reliable payoff demand—are not consistent with standard mortgage servicing practices.

The materials reviewed reflect that Tiffany Drexel, who oversaw the Specialized Home Retention Department, was included in communications relating to these issues and testified regarding escalation and management involvement, which is consistent with supervisory-level review of servicing matters of this nature.

In my experience, actions of this nature, particularly where they involve multiple aspects of loan administration and persist over time, are not the result of routine servicing activity and would require review, involvement, or direction from supervisory or management-level personnel within the servicing organization.

The materials reviewed, including deposition testimony and communications reflected in the privilege logs, indicate that these issues were escalated and involved personnel at higher levels within the organization, which is consistent with the level of involvement typically required for servicing decisions of this nature.

In my experience, servicing actions involving the implementation of settlement terms, credit reporting adjustments, escrow administration, and borrower-facing account information are core operational functions that are controlled by the servicer and are not independently determined by lower-level employees or outside counsel.

The pattern of conduct reflected in the record is not consistent with isolated or clerical servicing errors and instead reflects a systemic breakdown in standard servicing controls and oversight.

## Impact on Borrower’s Ability to Perform and Refinance

The servicing deficiencies described above had a direct impact on the borrower’s ability to perform and resolve the loan.

A borrower seeking to remain current, cure a default, or refinance a mortgage loan must be provided with accurate and reliable information regarding the amount owed. This includes consistent monthly statements, accurate accounting of payments, and a clear payoff demand.

Where, as here, the servicer's own records reflect inconsistent balances, unresolved escrow discrepancies, and ongoing account adjustments, the borrower is unable to determine the correct amount necessary to perform, particularly where the servicer itself cannot identify the basis for key account actions or reconcile its own records. *(Verdooren Dep. 365:4–6).*

In my experience, a lender will not close a refinance transaction without a definitive and reliable payoff figure. The materials reviewed reflect that the borrower attempted to refinance the loan but was unable to do so due to the servicer's failure to provide consistent and accurate payoff information.

As a result, the servicing deficiencies materially impaired the borrower's ability to resolve the loan and contributed to the continuation of default status.

In my experience, where a servicer cannot provide a consistent payoff figure or reconcile its own account records, a borrower is effectively prevented from resolving the loan through normal market mechanisms such as refinance or payoff.

## Opinions

Based upon my review of the materials described above, my experience in mortgage lending and loan servicing, and my understanding of industry standards and practices, I have formed the following opinions.

1. **Mortgage loan servicers are responsible for the administration of loans following origination, including payment application, escrow management, loan accounting, and borrower communications. Industry standards require accurate recordkeeping, proper payment application, and timely and reliable borrower-facing information.**

2. **Mortgage statements and payoff demands must accurately reflect the borrower's loan status. Where a servicer provides inconsistent or inaccurate payoff information, the borrower is impaired in the ability to cure, perform, or refinance the loan.**

3. **The borrower in this case waived the establishment of an escrow impound account. The servicer imposed and administered escrow in a manner that was inconsistent with standard servicing practices, resulting in inaccurate charges and borrower confusion.**

4. **Based upon my review of the servicing records and related materials, I did not identify documentation reflecting that the borrower was provided with notice that the servicer was establishing or re-establishing an escrow account.**

5. **In my experience, standard mortgage servicing practices require that borrowers be provided with clear notice when an escrow account is created or imposed, including the reason for the change and the impact on payment obligations. The absence of such documentation is not consistent with standard servicing practices and would reasonably result in borrower confusion and inaccurate account understanding.**

6. **Property taxes were paid in a manner that was not consistent with typical mortgage servicing practices. Payments made significantly in advance of the due date are not typical and generally occur only where there is a specific reason or directive.**

7. **Based upon my review of the materials, PHH Mortgage Corporation acted as the loan servicer, while ownership of the loan was held by an investor or trustee. There are no materials in my review indicating that PHH owned the loan.**

8. **The servicer failed to properly apply the reinstatement payment following the settlement. The reinstatement was not administered in a manner that restored the loan to an accurate and reliable performing status.**

9. **The servicer failed to maintain accurate and consistent loan accounting, including the application of payments and treatment of escrow-related items. The record reflects reversals, adjustments, and inconsistent balances that were not timely or clearly explained. (Verdooren Dep. 22:6–15).**

10. **The servicer failed to provide accurate and consistent payoff information, materially impairing the borrower's ability to perform or refinance the loan.**

11. **Mortgage servicers receive ongoing servicing compensation while a loan remains**

**active. When a loan is in default, additional fee-based revenue may be generated through default-related activities, including late charges and reinstatement-related fees.**

**The servicing agreements in this matter provide for "ancillary income" to the servicer, including late charges, reinstatement fees, and other fees arising in connection with the loan. (Servicing Agreement dated August 5, 2005, § 1.01 (definition of "Ancillary Income"), PHH_HSBC 002518).**

**As a result, a loan in default can generate materially greater servicing-related revenue than a performing loan. This creates a financial structure that does not favor rapid payoff or refinance and instead aligns with continued servicing activity.**

12. **The compensation structure described above can create a servicing environment in which prolonged default status and unresolved account adjustments are not economically adverse to the servicer in the same manner as loan payoff or refinance.**

13. **The materials reviewed do not clearly establish, at the loan-specific level, that HSBC was the owner of the subject loan or that PHH Mortgage Corporation was acting as the authorized servicer for HSBC.**

**The servicing agreements reviewed are general in nature and do not identify the subject loan. The power of attorney documents reviewed are broad and do not establish a clear servicing relationship for this loan. (PHH–HSBC Power of Attorney, June 4, 2020, PHH_HSBC 000466–470, p. 2).**

**The absence of loan-level documentation is not consistent with standard servicing practices.**

14. **The communications and privilege logs reflect that servicing actions were not made independently by outside counsel. In my experience, outside counsel acts at the direction of the servicer, and decisions regarding servicing operations and settlement implementation are controlled by the servicer.**

15. **The involvement of in-house counsel in the communications reflects participation in servicing-related operational matters. These activities are operational in nature and**

**are typically performed within the servicing organization rather than as independent legal determinations.**

16. **Based upon my review of the communications and privilege logs, certain individuals identified as in-house counsel appear to have been involved in matters relating to loan administration, credit reporting, and implementation of settlement terms.**

    **In my experience, mortgage loan servicers often involve in-house counsel in communications relating to servicing issues. However, the functions reflected in the materials reviewed—such as credit reporting adjustments, payment application, and servicing decisions—are operational in nature and are typically performed by servicing personnel rather than as legal determinations.**

    **The involvement of in-house counsel in these types of operational matters is not uncommon, but does not change the underlying nature of the activity, which remains part of the servicer's loan administration and servicing functions.**

    **Accordingly, the actions reflected in the communications appear to relate to servicing operations and implementation of servicing decisions, rather than independent legal determinations.**

    **In my experience, decisions of this type are made within the servicing organization, even where in-house counsel is included in communications.**

The opinions expressed in this report are based upon my professional experience in mortgage lending and loan servicing, and the materials identified previously in this report.

## Rule 26 Disclosures

**Curriculum Vitae**: My curriculum vitae and professional qualifications are attached as **Exhibit A**.

**Prior Testimony**: A list of matters in which I have testified as an expert witness at trial or deposition during the previous four years is attached as **Exhibit B**.

**Compensation**: My compensation for services in this matter is based upon my standard expert witness fee schedule attached as **Exhibit C**.

The foregoing statements are made under penalty of perjury of the laws of California and the United States and are true and correct to the best of my knowledge and belief.

Dated this 1st day of April, 2026

________________________________________

Jay Hibert, Expert Witness for Cory Mayer

# Exhibit A- Curriculum Vitae

JBH REAL ESTATE EXPERTS

## Curriculum Vitae and Expert Witness Qualifications
## Jay Hibert

**Business Address:** 2600 La Costa, Ave., Carlsbad, CA 92009

**Contact Information:** Mobile Ph: (760) 518-2310 Email: jay@jbhrex.com

**Educational Background:**

**High School:** Point Loma High School, San Diego, CA, 1981

**College:** Pomona College, Claremont, CA, B.A. Areas of concentration; Philosophy, Economics and Accounting

**Licenses:** Licensed California Real Estate Broker (DRE#01523075)

**Relevant Courses:**
Realtor Code of Ethics, 2018
Elder Financial Abuse ABA course, 2018
Continuing Education to maintain licenses above, 2019
Allied Real Estate School, 2010-2011
Annual Banker Compliance Courses from 1985 through 2009
UCLA School of Business Courses 1986-1987

**Trade Associations Past and/or Present:**
RMA
Biocom
USD Family Business Forum
American Electronics Association
Chairman's Roundtable
UCSD Economics Roundtable
Association for Corporate Growth
San Diego Downtown Partnership
Carlsbad Chamber of Commerce
North County Association of Realtors
California Association of Realtors
National Association of Realtors

**Background Summary**

Mr. Hibert has been in the banking, finance, investment and brokerage business for 39 years. His background includes corporate officer roles at large financial institutions such as Bank of America, Union Bank of California and Mellon Bank, as well as Correspondent bank positions. He has extensive experience in commercial loans, hard money loans, bank operations, and consulting

positions in the finance, lending and brokerage industries. In addition, he has served as a Chief Financial Officer during his career. Prior to forming Market Street Consulting Group, Inc., and JBH Real Estate Experts, he was part of the founding team of a San Diego Business Bank. He was responsible for branch operations, credit underwriting, training and administration of real estate and commercial loans. Mr. Hibert's responsibilities included the formation of the bank's real estate department, credit underwriting, recruiting and training operations officers, loan officers and related staff. He now operates his own lending and brokerage company that specializes in providing loans in the bank, hard money, private money and institutional areas. He is licensed with the California Department of Real Estate.

**Relevant Experience:**

**Bank of America Corporate Banking -** Los Angeles, CA 3 years. Responsibilities included managing a portfolio of business clients with annual revenues that exceeded $50,000,000.

**Union Bank of California Corporate Banking -** San Diego and Los Angeles, CA, 5 years. Responsibilities included portfolio management of clients with annual revenues from $20,000,000 to $750,000,000. Additional responsibilities included the opening of a new branch location in San Diego, CA.

**Bank of the West -** San Diego, CA, 3 years. Responsibilities included branch office management, business development and portfolio management of clients with annual revenues from $10,000,000 to $250,000,000. Additional responsibilities included real estate development loans.

**Engineered Equipment Company -** Corona, CA, 3 years. Served as the Chief Financial Officer. Responsible for all decisions related to the company's finance and administration. Negotiated contracts related to disputes including those where litigation was necessary.

**Mellon First Business Bank -** San Diego, CA, 3 years. Responsible for managing a client portfolio of private companies. Duties included real estate loan underwriting and administration. Was responsible for establishing the new San Diego branch location.

**Regents Bank -** San Diego, CA, 8 years. Member of the Founding Team and Shareholder. Opened a new branch location in Carlsbad, CA. as well as the Manager of the Bank's Real Estate Department including Construction lending, SBA 504 and 7a loans, participation loans and loan brokering.

**Market Street Consulting Group, Inc. -** May, 2009 to December, 2019. Founding partner of a licensed and bonded direct lender with the California Department of Business Oversight. Provided corporate and bank consulting services. Additionally, we provided Commercial real estate consulting, brokerage, and loans for all asset classes.

**Market Street Homes -** February 2015 to 2020. Primary focus was residential redevelopment in San Diego, CA and Portland, OR.

**Market Street Realty Group -** February 2015 to 2019. A full service brokerage representing buyers, sellers and real estate investors.

**Endeavor Bank Real Estate Solutions -** October 2019 to March 2021. Assist Endeavor Bank customers in obtaining real estate financing.

**JBH Real Estate Experts -** February 2020 to present. Provide expert witness and consulting services in bank operations, commercial and real estate lending, institutional finance, hard money loans, SBA lending, real estate valuation, brokerage and other related cases.

**Testimony/Designations**

Mr. Hibert has been providing expert witness and consulting services since 2010. He has been designated over 300 times as an expert in 25 different states concerning matters relating to commercial and real estate loans, real estate, house flipping, construction finance, SBA loans, mortgage lending, general banking and operations, brokerage, valuation, hard money loans and investment issues. His experience includes both Federal and State court cases where he has provided deposition testimony, trial testimony and arbitration testimony well over 150 times.

**Other Experience:**

Treasurer - Pacific Southwest Conference of the Evangelical Covenant Church, Walnut Creek, CA 2001-2003
Chairman of the Board - Pacific Southwest Conference of the Evangelical Covenant Church, Walnut Creek, CA 2004-2006

**Seminar presentations And Courses taught:**

Financial Management for Treasurers of non-profit organizations
Expert panel member for CPA continuing education courses
Fundamentals of financial accounting
Expert panel member consulting business owners regarding banking relationships
Guest presenter multiple times for commercial brokerage companies in the area of finance and investment opportunities

**Relevant Expert Designations:** **Case list available upon request**

**Representative Client List:**

- **Fatima Satya**, Law office of Y. Jessie Shaw, Pasadena, CA
- **Alpert Family Trust**, Kirby Noonan Lance & Hoge, LLP., San Diego, CA
- **Won Ki Kim**, Law Office of Charles C. Song, Los Angeles, CA
- **Tomato Bank**, Neufeld Marks, Los Angeles, CA
- **Farmer Boys Produce Market, Inc.**, Law office, John Thomas Dzialo, Orange, CA
- **Eric and Craig Sterling**, Dan Johnson Law Group, San Francisco, CA
- **Old Republic Title Co**., Early Sullivan Wright Gizer & McRae LLP, Los Angeles, CA
- **Southeast Properties, LLC**., Early Sullivan Wright Gizer & McRae, LLP, Los Angeles, CA
- **Fred Sacher**., Bohm Wildish, LLP, Costa Mesa, CA
- **All California Mortgage**, Kaufman Dolowich Voluck & Gonzo, LLP., San Francisco, CA
- **George Fiegl**, Goode Hemme Peterson, San Diego, Baker & McKenzie, San Francisco, CA
- **David Stebbins**, Simone & Associates, San Diego, CA
- **Selby Corporation**, Law Office of Kenneth E. Chyten, Oxnard, CA
- **Stewart Title Company**, Early Sullivan Wright Gizer & McRae, LLP, Los Angeles, CA

- **Ticor Title Company**, Early Sullivan Wright Gizer & McRae, LLP, Los Angeles, CA
- **Victor and Sandra Solano**, Patrick E. Herman, Esq. San Diego, CA
- **Kenmore Villas, LLC**. Western Law Connection, Los Angeles, CA
- **Danny Ho**, Law Offices of Edward C. Tu, Pasadena, CA
- **United Central Bank**, Chuhak & Tecson, Chicago, IL
- **Kamran Banayan**, Scott Kennedy, Attorney at Law, San Diego, CA
- **Fort McDowell Yavapai Nation**, Poindexter & Doutre, Inc., Los Angeles, CA
- **Farmers and Merchants Bank**, Law Offices of Michael Leight, Long Beach, CA
- **William J. Smith, Jr**., Law Office of Thomas K. Eckhardt, Indio, CA
- **CIT Small Business Lending Corporation**, Troy Gould Attorneys, Los Angeles, CA
- **Sheryl Briggs and Atomic Design, LLC**. Coronado Katz, LLC Kansas City, MO
- **Real Estate Acquisition Leaders, Inc**. Vakili & Leus, LLP, Los Angeles. CA
- **Cynthia Espino**, Law Office of Kenneth E. Chyten, Oxnard, CA
- **Barry McCown, Chula Vista Physicians** Mazzarella & Mazzarella, Esq., San Diego, CA
- **Community Valley Bank**, Lewis Brisbois, Palm Desert, CA
- **Richard Meruelo**, Neufeld Marks, Los Angeles, CA
- **Purefitness**, Bradley L. Jacobs Attorney at Law APC, San Diego, CA
- **Deanna Boll**, Denbeaux & Denbeaux, Westwood, NJ
- **Robert D. Voit**, et. al,, Grant, Genovese, & Baratta, LLP, Irvine, CA
- **California Furnishing, Inc**., The Onu Law Firm, Redwood City, CA
- **Lauren Smith-Hams Dressler**, Baker & McKenzie, LLP, San Francisco, CA
- **Healthcare Finance Partners Corporation**, Kaplan Law Firm, San Diego, CA
- **Heeyoung Kim**, LTL Attorneys LLP, Los Angeles, CA
- **EMM Realty of Utah**, Humphrey's Law, Salt Lake City, UT
- **Nationwide Title Insurance**, Jampol Zimet, LLP, Los Angeles, CA
- **Momentum Business Capital,** Global Legal Law Firm, Carlsbad, CA
- **Universal Bank**, Dykema Gosset, LLP, Los Angeles, CA
- **Hugh Douglas Bek**, Avila Law Firm, APC, Torrance, CA
- **John Whang, et. al.,** Willenken Wilson Loh & Delgado, LLP, Los Angeles, CA
- **North Island Financial Credit Union**, Cooley LLP, San Diego, CA
- **Arrowhead Credit Union**, Anderson, McPharlin & Conners LLP, Los Angeles, CA
- **Veridian Credit Union**, Pettit Kohn Ingrassia Lutz & Dolin, San Diego, CA
- **Patrick Kealy**, Hua Gallai, LLP, Beverly Hills, CA
- **Fidelity National Title Group**, Early Sullivan Wright Gizer & McRae, LLP, Los Angeles, CA
- **LJ 6309, LLC.,** Anderson, McPharlin & Conners LLP, Los Angeles, CA
- **Dreien Opportunity Partners LLC**, Jackson Walker LLP, Dallas TX
- **Riverwalk Petroleum, Inc**. William D. Chapman Law Offices, Irvine, CA
- **Thomas W. McNamara**, McNamara Smith LLP, San Diego, CA
- **Bohm Wildish, LLP**, Bohm Wildish & Matson, LLP Costa Mesa, CA
- **Surgeet Sohal,** Law Offices of Heather Gibson, P.C. Santa Clara, CA
- **Debbie Emmer,** Leinoff & Lemos, P.A., South Miami, FL
- **Kevin and Laurie Walton**, Abir Cohen Treyzon Salo, LLP, Los Angeles, CA
- **ANJ Holding LLC,** Law Offices of Stephen R. McLeod, Sherman Oaks, CA
- **Ramon Rahimi,** McFarlin, LLP, Irvine, CA
- **Sylvania, L.P.,** La Jolla Law Group, La Jolla, CA
- **Kashian Enterprises, LP,** Procopio, San Diego, CA
- **Computershare, Inc.** Ogletree, Deakins, Nash, Smoak & Stewart San Francisco, CA
- **Christine Chui,** Bohm Wildish & Matson, LLP Costa Mesa, CA
- **Global Premier Development, Inc.,** Mark Butler & Associates, Newport Beach, CA
- **Daniel Johnson Jr. Attorney in fact.,** Dan Johnson Law Group, San Francisco, CA
- **Richard Brodowski,** David Axelrod, Sierra Law Group, Sonora, CA
- **Cuong Van Tran,** Kaufman Dolowich Voluck & Gonzo, LLP., San Francisco, CA
- **First American Title Company,** Hilbert & Satterly, LLP, San Diego, CA
- **William L. Roy,** Law Offices of Shun C. Chen, Irvine, CA

- **JPMorgan Chase**, Massey & Gail LLP, Chicago, IL
- **KBC Capital, LLC**, Finch, Thornton & Baird, LLP, San Diego, CA
- **California Marketplace**, Fisher & Wolfe, LLP, Beverly Hills, CA
- **Wells Fargo Bank**, Hemar, Rousso & Heald, LLP, Encino, CA
- **New Power, Inc.,** Kunzler Bean & Adamson, Salt Lake City, UT
- **Donald and Lynn Southard,** Ulwelling Law, APC, Costa Mesa, CA
- **Stewart Title.,** Anderson, McPharlin & Conners LLP, Los Angeles, CA
- **Sweet, et al.,** Stone & Sallus, LLP, Manhattan Beach, CA
- **Valbridge Property Advisors, Inc.,** Olson Cannon Gormley & Stoberski, Las Vegas, NV
- **Dave Freeman,** Jamison Law Firm, PC, Pasadena, CA
- **Star Mobilehome Park Management,** Rudderow Law Group, Newport Beach, CA
- **Fidelity National Title Group,** Meylan Davitt Jain Arevian & Kim, Los Angeles, CA
- **WFG National Title Insurance Company,** Ablon, Lewis, Bass & Gale LLP, Los Angeles, CA
- **Muayad Kassab,** Ogletree, Deakins, Nash, Smoak & Stewart, P.C., San Diego, CA
- **Angelica Gardner,** Skane Mills, San Francisco, CA
- **Tamra Perdomo,** Wagner, Zemming Christensen, Riverside, CA
- **Richard Anderson,** Bradley L. Jacobs, Attorney at Law APC, San Diego, CA
- **Deborah Evenchik,** Law Office of Lynn Eric Goar, P.C. Tucson, AZ
- **Cheers Development, LLC,** Kaufman Dolowich Voluck & Gonzo, LLP., San Francisco, CA
- **Crosspointe Church,** Von Esch Law Group, ALC, Fullerton, CA
- **Rhonda Drakeford, et al.,** Law Office of Peter Fredman, PC, Berkeley, CA
- **Pamela Redmond Satran,** Law Offices of Brad Snyder, Woodland Hills, CA
- **David Brewer and Dennise Murdock,** Kelsey Law Group, Henderson, NV
- **Ken Madhvani,** Law Offices of Martin Deutsch, Los Gatos, CA
- **Alia Salem Al-Sabah, The State of Kuwait,** Venable LLP, Baltimore, MD
- **Desert Mountain Luxury Homes, LLC,** Burdman Willis, LLLP, Phoenix, AZ
- **Hilton & Hyland Real Estate, Inc.,** Tuchman & Associates, Los Angeles, CA
- **Waleid Shousha,** Anthony J. Vignier, Esquire, Kearny, NJ
- **American Appraisers Corporation,** Keeney Waite & Stevens, San Diego, CA
- **Russel Myrick,** RDM Legal Group, La Jolla, CA
- **Erick and Michael Diaspro,** Ford, Walker, Haggerty & Behar, LLP, Long Beach, CA
- **Pinnacle Bank,** Hill Wallack, LLP, Princeton, NJ
- **Ramiro Hinojosa,** Ruiz Law Firm PLLC, Pearland, TX
- **Fidelity National Title,** Fidelity Law Group, Irvine, CA
- **Paula Gilbert-Bonnaire,** Leslie W. Westmoreland, Esq., Fresno, CA
- **Presidio Collins, LLC,** Kaufman Dolowich Voluck, San Francisco, CA
- **Christopher Sun,** Robert J. Anderson, Attorney at Law, San Jose, CA
- **Roberto Morelli,** Hanson Law Office, San Francisco, CA
- **Gabriel Michel,** Robert J. Anderson, Attorney at Law, San Jose, CA
- **Verbree Land Holdings, LLC,** Bush Kornfeld LLP, Seattle, WA
- **Residential Bancorp,** Wright, Finlay, & Zak, LLP, Newport Beach, CA
- **F. Anthony Bushman,** Flicker, Kerin, Kruger & Bissada, LLP, Menlo Park, CA
- **Davis,** The Goodell Law Firm, San Francisco, CA
- **Kenneth Dean Patterson,** Buchalter, San Diego, CA
- **Eighteen Capital,** Sbaiti & Company PLLC, Dallas, Texas
- **Silvergate Bank,** Buchalter, San Diego, CA
- **Kimberly M. Jones,** Gibson Lowry, LLP, Las Vegas, NV
- **Karlene Keller,** Sollertis, Rancho Santa Fe, CA
- **Zuniga,** Law Offices of Robert Mills, Glendora, CA
- **Nadine Falbo,** La Jolla Law Group, La Jolla, CA
- **Roger Miles,** Kaufman Dolowich Voluck, San Francisco, CA
- **Sandra Tucceri,** Law offices of Maurizio Mangini, Oceanside, CA
- **Team View Player Associates, LLC,** Vakili & Leus, LLP, Los Angeles, CA
- **Wing Lung Bank,** Kaufman Dolowich Voluck, Los Angeles, CA

- **The Yoga Connection,** Trachtman & Trachtman, LLP, Irvine, CA
- **Brandon Hintz,** Law Office of Eric Andrew Mercer, Sacramento, CA
- **Kirk & Company,** Morrison Mahoney, LLP, Boston, MA
- **David Oas, Co-Trustee of The Ludvigson Trust,** The Yocca Law Firm, LLP, Irvine, CA
- **New Millennium Business,** Engstrom, Lipscomb & Lack, PC, Los Angeles, CA
- **Baruck Bros. Investments,** Boren, Osher & Luftman LLP, El Segundo, CA
- **Brian Burns,** Burns Law Firm, Granada Hills, CA
- **Rendler Val Verde Ranch, LLC,** Lucas & Haverkamp Law Firm, Encinitas, CA
- **Irene Tritz,** Bohm Wildish & Matsen LLP, Costa Mesa, CA
- **TSG Financial Corp.,** The Coleman Firm PC, Newport Beach, CA
- **Jacob Koo,** Vakili & Leus, LLP, Los Angeles, CA
- **Sean Lee, DDS,** Stream Kim Hicks Wrage & Alfaro, PC, Riverside, CA
- **Sunny Acre LLC,** Meylan Davitt Jain Arevian & Kim, Los Angeles, CA
- **Sweeney,** Stone & Sallus, LLP, Manhattan Beach, CA
- **Donald Kunkle,** Law Offices of Michael Bisson, Las Vegas, CA
- **Eshelman Realty, Inc.,** White and Bright, LLP, Escondido, CA
- **Ridec, LLC,** Law Offices of James W. Bates, Pasadena, CA
- **Bush Street Apartment Group, LLC,** Kaufman Dolowich Voluck, San Francisco, CA
- **Johnnie Lee Brown Living Trust,** Majors & Fox, La Mesa, CA
- **Golden Bank,** Law Offices of James W. Bates, Pasadena, CA
- **Ann Petta, Trustee of the Kroon Family Trust,** CA Business Law Group, San Diego, CA
- **TBG Group,** Jones & Associates, New York, NY
- **Laura Blue,** The Goodell Law Firm, San Francisco, CA
- **Sir Winston Enterprises,** Bradley L. Jacobs, Attorney at Law APC, San Diego, CA
- **Martin Foigelman,** The Goldberg Legal Group, Newport Beach, CA
- **JAL, LLC,** Michael J. Harker, Esq., Las Vegas, NV
- **Judith Dollaga,** Law Offices of Andrew J. Christensen, Oakland, CA
- **American Heritage Capital,** Law Offices of Salar Atrizadeh, Beverly Hills, CA
- **iBorrow Finance Loan Fund I, L.P.,** Freedman + Taitelman, LLP, Los Angeles, CA
- **Webcor Construction, LP** Rutan & Tucker, LLP Palo Alto, CA
- **Stewart Title Company,** Fennemore Wendel, Oakland, CA
- **Good Tidings Baptist Church,** Krieger & Krieger, Long Beach, CA
- **Hillcrest Investments, Ltd.,** Law Offices of Michael Bisson, Las Vegas, CA
- **Fee Title, Inc.,** Kaufman Dolowich & Voluck, LLP, San Francisco, CA
- **Mary M. Woodward Trust,** Siddiqui Law, Costa Mesa, CA
- **University Campus Hotel Fund,** Ecoff Campain Tilles & Kay, LLP, Beverly Hills, CA
- **UMRO Realty, Inc.,** Elms Erlich & Mack, Woodland Hills, CA
- **North American Title Insurance,** Early Sullivan Wright Gizer & McRae, LLP, Los Angeles
- **Key Realty, LLC,** Thorndal Armstrong Delk Balkenbush & Eisinger, Las Vegas, NV
- **Bank of the West,** Hall Griffin, Santa Ana, CA
- **Susan L. Sullivan,** Siddiqui Law, Costa Mesa, CA
- **Amram Yahalom,** Davidovich Stein Law Group, LLP, North Hollywood, CA
- **Orange Coast Title Company,** Hall Griffin, Santa Ana, CA
- **D & P Properties,** Finch, Thornton & Baird, LLP, San Diego, CA
- **Mullen, LLC,** Law Offices of J. Cranor Richter, Costa Mesa, CA
- **Republic Valuations NY, LLC,** Morrison Mahoney LLP, New York, NY
- **Steven Trang,** Lagomarsino Law, Henderson, NV
- **Devils Glen Holdings,** Betty, Neuman & McMahon PLC, Davenport, IA
- **Jason Hughes/Hughes Marino,** Cooley LLP, San Diego, CA
- **Stephen & Lynn Valbuena,** Bohm Wildish & Matson, LLP Costa Mesa, CA
- **Lincoln University,** Goldstein, Gellman, Marbostad, Harris & McSparran, San Francisco, CA
- **Greenfield Properties,** Saxe Doernberger & Vita, P.C., Temecula, CA
- **Young Men's Christian Association of LA,** O'Melveny & Myers LLP Los Angeles, CA
- **Mikayel Israyelyan,** Yacoubian & Powell LLP, Los Angeles, CA

- **Lawrence Felix,** Demetriou, Del Guercio, Springer & Francis, Los Angeles, CA
- **Boudreau Pipeline Corporation,** Bohm Wildish & Matson, LLP Costa Mesa, CA
- **Ben Shaoul and Magnum Real Estate Group,** Saxe Doernberger & Vita, Temecula, CA
- **Mary Anne Baysac,** Goldstein, Gellman, Marbostad, Harris & McSparran, San Francisco, CA
- **Hawthorne Hangar Operations,** The Jamison Law Firm, PC, Pasadena, CA
- **Terrence J.E. Ross,** W&D Law, LLP, Irvine, CA
- **The Alley Santa Fe,** Humphreys Wallace Humphreys, P.C., Santa Fe, NM
- **Rediger Investment Corporation,** Cunningham, Treadwell & Bartlestone, Woodland Hills, CA
- **Fidelity National Title,** Fidelity National Law Group, Los Angeles, CA
- **Bruce and Linda Grummer,** Hamilton Law Firm, San Luis Obispo, CA
- **Arlene Christou,** Velasco Law Group, Long Beach, CA
- **Michael Deutsch,** Bohm Wildish & Matson, LLP Costa Mesa, CA
- **Matthew Mengel,** The Goodell Law Firm, San Francisco, CA
- **Josh D. Levine,** Polsinelli PC, Phoenix, AZ
- **Nationwide Property & Appraisal,** Milber Makris Plousadis & Seiden, LLP Woodbury NY
- **An Van De Moortel,** Kaufman Dolowich Voluck, San Francisco, CA
- **Amy Goldman, Chapter 7 Trustee,** Early Sullivan Wright Gizer & McRae LLP, LA, CA
- **Lin Dee Liu Services,** LPS LLP, San Francisco, CA
- **Morgan Brown Real Estate, Inc.** G10 Law, Carlsbad, CA
- **Rehab Financial Group, L.P.,** Toth Law LLC, PA
- **Dwight Patent 10945 Mining, LLC,** Hanks Law Group, Las Vegas, NV
- **West Home Loans, Inc.,** SSL Law Firm LLP, San Francisco, CA
- **Fiddler's Green Medical Marijuana Dispensary, LLC,** Friday Firm, Little Rock, AK
- **Antonia Salazar,** Neufeld Marks, Los Angeles, CA
- **Ken Lamphear,** Murtaugh Treglia Stern & Deily LLP, Irvine CA
- **JKT Enterprises,** White and Bright, LLP, Escondido, CA
- **American Heritage Lending,** Watts Law, APC, Irvine, CA
- **Cal West Home Loans, Inc.,** SSL Law Firm LLP, San Francisco, CA
- **Sarenne Capital, LLC,** Early Sullivan Wright Gizer & McRae LLP, Los Angeles, CA
- **Romas Investment LLC,** FitzGerald Kreditor Bolduc Risbrough LLP, Irvine, CA
- **Premier Bank,** Henderson, Covington, Messenger, Newman & Thomas, Youngstown, OH
- **Estate of Shawn Harrison,** Reich Radcliffe & Hoover, LLP, Irvine, CA
- **Brad Manger,** Velasco Law Group, Long Beach, CA
- **Omni Appraisers,** Plante Lebovic LLP, Irvine, CA
- **Wells Fargo Bank,** Severson & Werson, Irvine, CA
- **Fuel Enterprise, Inc.,** Law Office of John P. Fitzmorris & Associates, Los Angeles, CA
- **U.S. Bank,** Locke Lord LLP, San Francisco, CA
- **Linda Vaccarezza,** Law Office of Judson Henry, Sacramento, CA
- **3371 Reading, LLC,** Chris Wiest, Attorney at Law, Crestview Hills, KY
- **Virginia Bellows,** Miller Injury Attorneys, El Dorado Hills, CA
- **Industrial Developers Realty LLC,** Klinedinst, San Diego, CA
- **Kyle M. Lohse,** Wilke Fleury LLP, Sacramento, CA
- **Kyle Keffer,** Berger Harrison, APC, Laguna Hills, CA
- **Precision Dental, Inc.,** Anderson, McPharlin & Conners LLP, Los Angeles, CA
- **Railey - Class Action,** Manfed, APC, San Diego, CA
- **Big Block Realty, Inc.** Plante Lebovic LLP, Irvine, CA
- **Orange Coast Title Company,** Robertson & Counsel, Newport Beach, CA
- **Matthew Lotze,** N.R. Donath & Associates PLLC, Henderson, NV
- **Citizens Business Bank,** Hall Griffin, Santa Ana, CA
- **Mark K. Johnson,** Buchalter, San Diego, CA
- **Sam Fadaee,** Levinson Arshonsky Kurtz & Komsky, LLP, Sherman Oaks, CA
- **Pamela Secord and Bobbi Slaton,** Pro se, St. Maries, Idaho
- **Michael Separzadeh,** Ecoff Campain Tilles & Kay, LLP, Beverly Hills, CA
- **Grand Pacific Financing Corporation,** Early Sullivan Wright Gizer & McRae LLP, LA, CA

- **Chris Ascher,** Chris Wiest, Attorney at Law, PLLC, Covington, KY
- **Bank Of Hope,** Cozen O'Connor, Santa Monica, CA
- **Charco Design & Build,** Morris, Sullivan and Lemkul, LLP, San Diego, CA
- **Ronald Kiser,** Coss & Momjian, LLP Bala Cynwyd, PA 19004
- **Internal Revenue Service,** Office of Chief Counsel, IRS, Laguna Niguel, CA
- **Farhad Yaghoubi,** Kohrs & Fiske, Malibu, CA
- **Shenandoah Properties,** The Law Office of Eric S. Black, Berkeley Springs, WV
- **Wilmington Savings Fund Society, FSB,** Fidelity National Law Group, Los Angeles, CA
- **Morad Myers,** Cunningham, Treadwell & Bartelstone, Woodland Hills, CA
- **James Ratcliff,** G10 Law, Carlsbad, CA
- **Susan Trujillo,** Hall Griffin, Santa Ana, CA
- **Wolfe Air Aviation, LTD,** The Jamison Law Firm, PC, Pasadena, CA
- **Ventura Hotel & Resort, LLC,** Schneiders & Associates LLP, Oxnard, CA
- **Sierra Pacific Mortgage Company, Inc.,** Wilke Fleury LLP, Sacramento, CA
- **Steven Kozmary,** La Jolla Law Group, La Jolla, CA
- **Eric Chen,** Fitzgerald Kreditor Bolduc Risbrough LLP, Irvine, CA
- **2389 Silver Lake, LLC,** Clinton & Clinton, Long Beach, CA
- **PSIP SN Vermont, LLC,** Callahan & Blaine, Santa Ana, CA
- **Centurion Management Group, Inc.,** Taylor & White, LLP, San Diego, CA
- **Teodulo Castellanos,** Lozoya & Lozoya LLP, Westlake Village, CA
- **Rodeo Capital, Inc.** Woolf & Nachimson, LLP, Los Angeles, CA
- **J.T. McKinney,** Klein & Wilson LLP, Newport Beach, CA
- **Bruno Eschbach,** White and Bright, LLP, Escondido, CA
- **Tsasu, LLC,** Meylan Davitt Jain Arevian & Kim LLP, Los Angeles, CA
- **DBE Loans,** The Schafer Law Firm, P.C., Dana Point, CA
- **Ledcor Construction, Inc.,** Grant & Kessler, APC, San Diego, CA
- **Milana Ostroy,** Putterman Yu LLP, San Francisco, CA
- **Joe C. Betchart,** Fennemore Law, Oakland, CA
- **Amy Giovanna Reiley,** Green Bryant & French, LLp, San Diego, CA
- **Maria Myron,** The Vossler Law Firm, Oakland, CA
- **North Bay Credit Union,** Buchalter, Los Angeles, CA
- **Avance Group USA,** Gordon Rees Scully Mansukhani, Denver, CO
- **Aqua WaterClean,** Law Office of Tatianna Ingman, Valley Village, CA
- **Calmwater Capital,** Reed Smith, LLP, Los Angeles, CA
- **Kasower Properties, LLC,** Early Sullivan Wright Gizer & McRae LLP, Los Angeles, CA
- **Deborah Sapp,** Hickman Robinson Yaege LLP, San Diego, CA
- **Michael Pircher,** La Jolla Law Group, La Jolla, CA
- **Nicholas Dickson,** Grant & Kessler, San Diego, CA
- **Terry Greathouse,** New Mexico Legal Aid, Inc., Albuquerque, NM
- **Internal Revenue Service,** Office of Chief Counsel, IRS, San Francisco, CA
- **Netco Title Company,** Wood Smith Henning & Berman LLP, Las Vegas, NV
- **BDR, Inc.,** Jeffrey & Grosfeld, LLP, Orange, CA
- **Universal Commercial Capital,** Meylan Davitt Jain Arevian & Kim LLP, Los Angeles, CA
- **Christopher Ayeni, M.D.,** The Norvell Firm, Del Mar, CA
- **Carl Karcher Enterprises, LLC,** Smythe Law Group, Inc., Altadena, CA
- **Edward Paul Humenik,** The Jamison Law Firm, PC, Pasadena, CA
- **Chanista Allen,** Humphreys Wallace Humphreys P.C., Tulsa, OK
- **Roman James Design Build,** Jeffery & Grosfeld, LLP, Orange, CA
- **Elie Attar,** Chammas Law Office, APLC, Glendale, CA 91205
- **Richard Clarke,** Tharpe & Howell, LLP, Sherman Oaks, CA
- **Ashod Mooradian,** Marvanlaw, A.P.C., Los Angeles, CA
- **Robert Moradi,** Isaacs Friedberg Zill, Los Angeles, CA
- **Farideh Rad,** The Vossler Law Firm, Oakland, CA
- **1200 Management, LLC,** Levinson Arshonsky Kurtz & Komsky, LLP, Sherman Oaks, CA

- **Lee-Wei Family Trust,** Nixon Peabody LLP, San Francisco, CA
- **Joseph Figone,** Nixon Peabody LLP, San Francisco, CA
- **Katherine Papageorge,** The Goodell Law Firm, San Francisco, CA
- **Wilson-Meade Commercial, Inc.** Gordon Rees Scully Mansukhani, Los Angeles, CA
- **Amy Lui,** Nixon Peabody LLP, San Francisco, CA
- **Antonio Bacerra,** The Goodell Law Firm, San Francisco, CA
- **Cantor Group IV, LLC,** G&B Law LLP, Encino, CA
- **The Socotra Fund, LLC,** Early Sullivan Wright Gizer & McRae, LLP, Los Angeles, CA
- **Orange Coast Title Company of Southern California,** Kahana Feld, Irvine, CA
- **JP Morgan Chase Bank,** Robertson & Counsel, APC, Newport Beach, CA
- **Kendall Farms, L.P.,** Miller & Calhoon, La Jolla, CA
- **Chotto Matte (Beverly Hills),** Nixon Peabody LLP, San Francisco, CA
- **DAUM Commercial Real Estate,** Law Offices of James W. Bates, Pasadena, CA
- **CDC Small Business Finance,** Buchalter, San Diego, CA
- **Mark Cernicky,** Graham Law Firm, Newport Beach, CA
- **Bobby and Mary Ford,** Fidelity National Law Group, Irvine, CA
- **Mechanics Bank,** Robertson & Counsel, Newport Beach, CA
- **Hassan Nafchi,** Beverly Hills Trial Attorneys, Beverly Hills, CA
- **Jonathan and Ariella Silver,** Krishel Law Firm, Calabasas, CA
- **Butterfly Pavillion,** Park LLP, Glendale, CA
- **Alex and Christina Dourbetas,** Fidelity National Law Group, Irvine, CA
- **Venus Happ,** Nixon Peabody, LLP, San Francisco, CA
- **Kreutzkamp Properties, LLC,** Theodora Oringher, Costa Mesa, CA
- **Manuel Del Arroz,** Gregory Betchart, Attorney at Law, Fremont, CA
- **Cory Mayer,** Law Offices of Andrew J. Christensen, P.C. Oakland, CA
- **Ombretta D'Alfonso,** The Law Office of Joseph F. Klatt, La Jolla, CA
- **Jonathan Del Arroz,** Gregory Betchart, Attorney at Law, Fremont, CA
- **Loren Vandergrift,** Kingfisher Law APC, Los Angeles, CA
- **Rancho WG, LLC,** Leland, Parachini, Steinberg, Matzger & Melnick LLP, San Francisco, CA
- **SR Real Estate Holdings, LLC,** The Jamison Law Group, Pasadena, CA
- **The Evergreen Advantage, LLC,** Wright, Finlay & Zak, LLP, Newport Beach, CA
- **David Clark,** Akerman, LLP, Las Vegas, NV
- **Velocity Commercial Capital,** Lerman Whitebook & Ruiz, P.A. Hollywood, FL
- **Estate of Frank Vetter,** The Legacy Lawyers, Irvine, CA
- **Scott Capital,** Wright, Finlay & Zak, LLP, Newport Beach, CA
- **Moradi Saslaw LLP,** Barron & Newburger, P.C., Milwaukee, WI
- **Donovan Clayton,** Buchalter, San Diego, CA
- **Aykem, LLC,** Wright, Finlay & Zak, LLP, Newport Beach, CA
- **SGLC, Inc.,** Donahue Fitzgerald, Oakland, CA

# Exhibit B - Testimony by trial or deposition the past 4 years

1. *Roberto Morelli, et al., vs. Annette Traylor, et al., Superior Court of California County of San Luis Obispo, Case No. 17CVP-0239*
2. *Katalyst Development, LLC vs. Gabriel Michel, Superior Court of the State of California for the County of Santa Clara, Case No. 17-CV-316096*
3. *Alia Salem Al-Sabah, The State of Kuwait Qurtaba Area, vs. World Business Lenders, LLC. et al., United States District Court for the District of Maryland, Case No. 1:18-cv-2958*
4. *Kimberly Moffatt Jones, et al., v. Ronald Soderling, et al., Superior Court of the State of California for the County of Orange, Case No. 30-2018-01037445-CU-FR-CJC*
5. *A/SL DF V, LLC, vs. Minute Man Inc., et al., Superior Court of the State of California for the County of Los Angeles - East District, Case No. KC070437*
6. *Dean Kim v. Jacob Koo, Superior Court of California, County of Orange, Central Justice Center, Case No. 30-2021-01178855-CU-CL-CJC*
7. *Gary Abrams, et al., v. Angelica Gardner, et al., United States District Court for the Central District of California, Case No. 2:19-cv-06947-CAS-AS*
8. *Leigh E. Payne, Successor in Interest to Petitioner, Robert Erle Payne, In Re: The Barbara Bek Payne Trust, Superior Court, County of Los Angeles, Case No. 16STPB01383*
9. *William L. Rendler, et al., v. Brian W. Strange, et al., JAMS Arbitration Case No. 1240024758, San Diego, CA*
10. *AME Zion Church of Palo Alto, Inc., v. AME Zion Western Episcopal District, et al., United States Bankruptcy Court, Eastern District of California, Sacramento Division, Case No. 20-23726*
11. *Webcor Construction, LP, v. Lendlease (US) Construction, Inc., et al., Superior Court of California, County of Los Angeles, Central District, Case No. 19STCV03357*
12. *Laura Blue v. Wells Fargo Bank, et al., Superior Court of the State of California for the County of San Mateo, Case No. 18CIV03763*
13. *University Campus Hotel Fund, L.P., v. TCG SLF I, LLC, et al., Superior Court of the State of California, for the County of Riverside - Historic Courthouse, Case No. RIC2003922*
14. *Ira Boren, et al., v. Angela Fawn Wallace, et al., Superior Court of the State of California for the County of Los Angeles - Central District, Case No. 20STCV00514*
15. *Paula Gilbert-Bonnaire vs. Dana Demerjian, et al., Superior Court of the State of California for the County of Orange, Case No. 30-2019-01089080-CU-FR-CJC*
16. *Amram Yahalom, et al., v. 1st Point Lending, Inc., et al., Superior Court of the State of California, County of Los Angeles, Van Nuys Courthouse, Case No. 20-VE-CV-00913*

17. *TMCO, LTD v. Mikhail Brodsky and Lincoln University, United States District Court Northern District of California, Case No. 20-cv-09300-AGT*

18. *Goldwater Bank, N.A. v. Artur Elizarov, et al., United States District Court, Central District of California, Case No. 5:21-cv-00616-JWH-SPX*

19. *Tina Tran and My Voung v. Mary Anne and Jim Harvey Sy, The Superior Court of California, County of San Francisco, Case No. CGC-20-588778*

20. *Fee Title, Inc., v. Jeffrey Clark Miller, JAMS Arbitration, San Francisco*

21. *Robyn Pearlman v. Shats Investments, et al., Superior Court of California, County of Los Angeles, Stanley Mosk Courthouse, Case No. 19STCV09548*

22. *Greenfield Prop Owner II, LLC, v. Mitsui Sumitomo Insurance Company, et al., Superior Court of California, County of Monterey, Case No. 20-CV-000248*

23. *Cedar Landmarks, Inc., et al., v. Golden Bank, et al., Superior Court of California, County of San Bernardino, Case No. CIV-DS-1715599*

24. *Mullen, LLC v. Interstate Mortgage Alliance Corporation, et al., Superior Court of the State of California, County of San Bernardino, Case No. CVI-DS-1927461*

25. *Hovhannes Babujyan and Heripsime Gina Kinatyan, v. Bruce D. and Linda M. Grummer, Superior Court of California, County of San Luis Obispo, Case No. 21CV-0273*

26. *Karlene Keller, et al., v. Alain Perez and Keller Williams Commercial, ADR Services, Inc., San Diego, CA, Case No. 21-3588-MJR*

27. *Michael Deutsch, v. Galina Samuel, et al., Superior Court of the State of California County of Los Angeles, Central District, Case No. BC721900*

28. *Johhnie, L. Brown, et al., v. Ali d. Abayachi, et al., Superior Court of California for the County of Alameda, Case No. RG20079500*

29. *American Heritage Capital, LP, et al., v. Joseph Richard Kemp, Superior Court of California, County of Orange, Central Justice Center, Case No. 30-2019-01109473-CU-BT-CJC*

30. *Sharestates Investments, LLC v. Republic Valuations NY, LLC, et al., Supreme Court State of New York, County of Kings, Case No. 510889/2021*

31. *Suzanne Yorgason v. Ken Allen Lamphear, Superior Court of the State of California, County of Los Angeles, Case No. 22LBCV00356*

32. *In the Matter of the Accusation of Jason Wade Hughes with the California Department of Real Estate, DRE Case No. H-05759 SD*

33. *BOBS LLC, v. Orange Coast Title Company, et al., Superior Court of California, County of Riverside, Case No. CVPS 2101103*

34. *Jill Hall v. Brad Arthur Manger, et al., Superior Court of California, County of Los Angeles, Central District, Case No. 19STPB04184*

35. *Anabi Oil Corporation v. Fuel Enterprise, Inc., et al., Superior Court of the State of California, County of Los Angeles, Central District, Case No. 21CSTV43687*

36. *Cedric L. Price v. The Precision Dental, Inc., et al., Superior Court of California, County of Los Angeles, Central, Case No. 19STCV24054*

37. *The Alley Santa Fe, LLC, et al., v. New Mexico Bank & Trust, State of New Mexico County of Santa Fe First Judicial District Court, Case No. D-101-CV-2022-01045*

38. *Amy Goldman, Chapter 7 Trustee, et al., v. Shawn Dardashti, United States Bankruptcy Court, Central District of California, San Fernando Division, Case No. 1:20-bk-10069-MT*

39. *Baldo Faieta, et al., v. Chris Johnson, et al., Alternative Dispute Resolution Services, San Francisco, CA*

40. *Matthew Lotze, et al., v. Total Lender Solutions, Inc., et al., Eighth Judicial District Court Clark County, Nevada, Case No. A-22-852827-C*

41. *Irene Tritz v. Vincent and Gayle Tritz, Superior Court of California, County of Orange-Central Justice Center, Case No. 30-2020-01122011-CU-FR-CJC*

42. *Sharestates Investments DACL, LLC, v. Nationwide Property & Appraisal Services LLC, et al., United States District Court Eastern District of New York, Case No. 2:22-CV-01731*

43. *3371 Reading, LLC v. Liberty Mutual Group, Inc.,et al., United States DIstrict Court for the Southern District of Ohio, Case No. 1:22-cv-00062*

44. *Michael and Darla Cavallaro v. Linda Vaccarezza, Superior Court of California in and for the County of Placer, Case No. S-CV-0046709*

45. *Ronald Kiser and Christopher Heilman, v. Truist Investment Services, Inc., Financial Industry Regulatory Authority Dispute Resolution, Richmond Virginia, FINRA No. 22-01965*

46. *Grant Grigoryan, et al., v. Stewart Title of California, et al., Superior Court of California, County of Los Angeles-Central District, Case No. 21STCV31128*

47. *Eric and Lauren Kutcher, et al., v. Roya Javid, et al., Superior Court of California, Santa Clara County, Case No. 20CV369499*

48. *Valbuena v. AA Paint & Custom Finishes, et al., Superior Court of California, County of Orange, Case No. 30-2018-01035004-CU-CD-CXC*

49. *Verpresar LLC, et al., v. Lin Dee Liu, et al., Superior Court of California, County of San Francisco, Case No. CGC-22-600549*

50. *Unit 5, L.P., v. J.T. McKinney Co., Inc., et al., Superior Court of California, San Diego County, Case No. 37-2024-00009722-CU-UD-CTL*

51. *Morgan Brown Real Estate, Inc., v. Brown et al., Superior Court of California, County of San Diego, Case No. 37-2022-00001195-CU-BC-NC*

52. *Milana Ostroy v. FMC T.D. Investments, LLC, et al., Superior Court of California, County of San Mateo, Case No. 20-CIV-02456*

53. ***Steven V. Kozmary, et al., v, 1031 Crowdfunding, LLC, et al., Superior Court of California, County of Orange - North Justice Center, Case No. 30-2020-01176370-CU-NP-CJC***

54. ***DBE Loans LLC v. Enjoy Repeat, Inc., Superior Court of California, County of Los Angeles, Case No. 21TRCV00777f***

55. ***Joe C. Betchart, et al., v. Carson French, et al., Superior Court of California, County of Alameda, Case No. 21CV003964***

56. ***Margareta Molloy, et al., v. Carl Karcher Enterprises, LLC, et al., Superior Court of California, County of Mendocino, Case No. 23CV00391***

57. ***Farideh Rad, et al., v. Lending Star Capital, LLC, et al., Superior Court of California, County of Los Angeles, Case No. 23STCV28326***

58. ***Kimberly and Jonathan Davis, v. Nationstar Mortgage, et al., Superior Court of the State of California, County of Los Angeles, Case No. 23VECV01125***

59. ***MOM CA Investco, LLC., v. 247 Hotels Beverage, LLC., et al., Superior Court of California, County of Orange - West Justice Center, Case No. 30-2023-01325570-CU-BC-WJC***

60. ***Force Rubin, LLC., et al., v. U.S. Real Estate Credit Holdings III-A, L.P., et al., Superior Court of California, County of Riverside, Southwest Justice Center, Case No. RIC 1905743***

61. ***Joseph E. Figone, Successor Trustee, v. Brent Jackson, et al.. ADR Services, Inc. Arbitration, San Francisco, CA, Claim No.: 24-583-LCN***

62. ***Greater Cooper A.M.E. Zion Church, et al., v. AME Zion Western Episcopal District, and The Socotra Fund LLC., et al., United States Bankruptcy Court, Eastern District of California, Sacramento Division, Case No. 20-23726-A***

63. ***Barjinderpal Gill, v. Amy Lui and Michael Gong, Superior Court of California, County of Santa Clara, Case No. 22CV397491***

64. ***Jim DeArkland v. Ventura Hotel & Resort, LLC, Superior Court of California, County of Ventura, Case No. 56-2021-00557046-CU-BC-VTA***

65. ***Na Wu, et al., v. Remington Chase, et al., Superior Court of California, County of Orange, Case No. 30-2022-01243056-CU-FR-CJC***

66. ***Awana Ring, v. Richard Harmon et al., Superior Court of California, County of San Bernardino-Central District, Case No. CIV-DS 1901772***

67. ***Antonio and Guadalupe Becerra, v. Roger Anderson, Trustee, et al., Superior Court of Los Angeles, County of Los Angeles, Case No. 23STCV29374***

68. ***Nat S. Harty and April D. Harty v. Commissioner of Internal Revenue, Department of the Treasury, Docket No. 23354-21***

69. ***Ombretta D'Alfonso, v. Robert Deagazio, Superior Court of California, County of San Diego, North County Division, Case No. 37-2023-00001453-CU-BC-NC***

70. ***Jonathan and Ariella Silver, v. Shelley Singer on behalf of the Estate of Ronald Singer, et al., Superior Court of California, County of Los Angeles, Case No. 24SMCV01688***

71. ***Hassan Nafchi, Trustee, et al., v. Rodeo Realty, Inc., et al., Superior Court of California, for the County of Los Angeles, Case No. 21STCV43807***

72. ***Venus Happ and Sophia Donnelly, vs. David C. Gutekunst, et al., American Arbitration Association, San Francisco, Case No. 01-25-0001-3512***

73. ***Butterfly Pavilion, LLC., et al., v. City of Buena Park, et al., Superior Court of California, County of Orange, Civil Complex Center, Case No. 30-2023-01334465-CU-BT-CXC***

74. ***David P. Goodlaw, v. Edward Paul Humenik, Superior Court of California, County of Los Angeles, Case No. 23STCV00199***

75. ***Rancho WG YNC, LLC, et al., vs. National Integrity Life Insurance Company, Superior Court of California, County of Sacramento, Case No. 24CV005115***

76. ***Daniel Johnson Jr., v. Civic Financial Services, et al., Superior Court of California, County of Sacramento, Case No. 34-2018-00243733-CU-FR-GDS***

77. ***Roberto Bustamante, v. Serve All, Help All, Inc., et al., Superior Court of California, County of Los Angeles, Case No. 21 STCV46724***

# Exhibit C - Compensation

## Schedule of Fees for Services Provided

All fees, unless otherwise stated, are billed in one tenth (1/10) hour increments.

**Retainer:**
$6,500.00.

**Case Preparation, Review, Investigation, Research, Analysis, Reports and Consultation:**
$650 per hour-Principle
$300 per hour-Administration Staff (if applicable)

**Mediation Appearance:***
$750 per hour with a $1,500 minimum charge per appearance

**Deposition:***
$750 per hour with a $1,500 minimum charge per deposition

**Trial and Arbitration Testimony:***
$3,000 minimum half-day flat rate
$6,000 full day flat rate

**Travel Time:**
$300 per hour plus reimbursement for reasonable travel related expenses. Time for out of state travel is not billed per hour. All reimbursable travel expenses (Air, Hotel, etc.) will be billed and are the responsibility of the client.

**Waiting Time:**
$300 per hour

**Cancellation Policy:**
No fees charged except for out of pocket expenses incurred such as travel, etc.

*Estimated fees are due in advance prior to scheduled appearance; and all outstanding invoices must be fully paid, otherwise Expert reserves the right to withhold testimony. ***Client is responsible for payment of deposition testimony should opposing counsel fail to pay the full amount when due.*** All air travel, meals, accommodations, ground transportation and other related expenses to be billed at cost.

# Exhibit D - Timeline of Loan Events and Servicing Activity

| Approx. Date | Event | Significance |
|---|---|---|
| 2006 | Loan origination | Residential mortgage established; escrow initially waived |
| 2009 | Loan modification | Terms altered; increased complexity of servicing |
| 2016 | Trustee's sale | Foreclosure completed |
| 2019 | Foreclosure rescinded | Loan reinstated to active status |
| 2020 | Settlement and reinstatement | Borrower makes substantial reinstatement payment |
| Post-2020 | Loan servicing resumes | Servicer required to establish accurate baseline accounting |
| 2020–2023 | Ongoing statements and escrow activity | Discrepancies appear in balances, escrow, and payment application |
| 2020–2023 | Borrower attempts to resolve loan | Repeated efforts to make payments and obtain accurate information |
| 2020–2023 | Payoff requests | Servicer provides inconsistent payoff figures |
| 2020–2023 | Refinance attempts | Borrower unable to refinance due to lack of reliable payoff |
| Ongoing | Account adjustments and reversals | Servicer unable to clearly explain accounting changes |

This timeline is based on the materials reviewed, including loan records, servicing documents, correspondence, and deposition testimony.